**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

METLIFE, INC.,
200 Park Avenue
New York, NY 10166

          Plaintiff,

  v.

FINANCIAL STABILITY OVERSIGHT
COUNCIL,
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

          Defendant.

Civil Action No. 15-45

**COMPLAINT**

Plaintiff METLIFE, INC. (together with its relevant subsidiaries, "MetLife" or "the Company") for its complaint against Defendant, FINANCIAL STABILITY OVERSIGHT COUNCIL ("FSOC" or "the Council"), alleges, by and through its attorneys, and on information and belief, as follows:

**INTRODUCTION**

1.    This is an action under Section 113(h) of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act" or "DFA"), Pub. L. No. 111-203, 124 Stat. 1376 (codified at 12 U.S.C. § 5323(h)), the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, and the U.S. Constitution, challenging a final decision by the Council to designate MetLife as a nonbank systemically important financial institution ("nonbank SIFI"). *See* Explanation of the Basis of the Financial Stability Oversight Council's Final Determination that Material Financial Distress at MetLife Could Pose a Threat to U.S. Financial Stability and that MetLife

Should be Supervised by the Board of Governors of the Federal Reserve System and Be Subject to Prudential Standards (Dec. 18, 2014) ("Final Designation").

2.      FSOC's decision to designate MetLife as a nonbank SIFI subjects the Company to enhanced supervision by the Board of Governors of the Federal Reserve System ("Board").  The Council's independent member with insurance expertise—the *only* voting member with expertise regarding the insurance industry—dissented in writing from the designation, and the non-voting insurance commissioner representative on the Council also issued a statement opposing MetLife's designation.

3.      The Council's designation of MetLife is premised on its conclusion that "MetLife's material financial distress could lead to an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy."  Final Designation at 3.  That conclusion was arbitrary and capricious, conflicts with the Council's statutory obligations under the Dodd-Frank Act and the rules and guidance that the Council promulgated for designating nonbank financial companies, and was reached through a procedure that denied MetLife its due process rights and violated the constitutional separation of powers.

4.      FSOC made numerous critical errors that fatally undermined the reasoning in its Final Designation of MetLife.  *First*, FSOC failed to understand, or give meaningful weight to, the comprehensive state insurance regulatory regime that supervises every aspect of MetLife's U.S. insurance business, despite statutory and regulatory requirements that direct the Council to consider existing regulatory scrutiny.  Indeed, the Council's "misunderstand[ing] and mischaracteriza[tions]" of state insurance regulation were so fundamental that the non-voting insurance commissioner was struggling "to correct basic factual errors regarding the operation of

2

the state regulatory system just days before" the Council's final vote.  Final Designation at 304

(dissent of Adam Hamm).  *Second*, FSOC fixated on MetLife's size and so-called

interconnections with other financial companies—factors that, considered alone, would

inevitably lead to the designation of virtually any large financial company—and ignored other

statutorily mandated considerations that weighed sharply against designation.  *Third*, FSOC

consistently relied on vague standards and assertions, unsubstantiated speculation, and

unreasonable assumptions that are inconsistent with historical experience (including prevailing

conditions in the 2008 financial crisis), basic economic teachings, and accepted principles of risk

analysis.  In doing so, FSOC wholly ignored the tools used by federal regulators to assess the

potential impact of severely adverse economic conditions in other contexts, including Federal

Reserve Board "stress tests."  *Fourth*, FSOC repeatedly denied MetLife access to data and

materials consulted and relied on by the Council in making its designation determination, thereby

depriving the Company of a meaningful opportunity to rebut FSOC's assumptions or otherwise

respond to its analysis, in violation of MetLife's due process rights.

5.        As a result of these pervasive errors, there are numerous grounds on which

FSOC's Final Designation of MetLife must be set aside, including the following:

6.        ***MetLife Is Not Predominantly Engaged in Financial Activities.***  FSOC's

designation authority is limited in Section 113(a)(2) of the Dodd-Frank Act to "U.S. nonbank

financial compan[ies]."  MetLife is not a "U.S. nonbank financial company" eligible for

designation because it derives more than 15% of its revenues from, and more than 15% of its

assets are related to, insurance activities in foreign markets.  Accordingly, MetLife is not

"predominantly engaged in financial activities" within the meaning of Section 102(a)(6) of the

Dodd-Frank Act and Section 4(k) of the Bank Holding Company Act ("BHCA").

7.       ***Failure to Undertake Activities-Based Review.***   FSOC had an obligation to

consider reasonable alternatives to designating MetLife as systemically important.  Those

alternatives include the "activities-based approach" that FSOC is presently considering for asset

managers, which would impose enhanced Board supervision on certain activities that FSOC

deems to be particularly risky without designating as systemically important the entire company

or companies that conduct them.  Despite the repeated statements of key legislators and federal

financial regulators that traditional insurance activities do not pose systemic risk to the economy,

FSOC provided no reasoned explanation for failing to pursue an activities-based approach for

insurance companies.

8.       ***Failure to Assess Vulnerability.***   FSOC failed to conduct any threshold inquiry

into MetLife's vulnerability to material financial distress, which is mandated by Section 113 of

the Dodd-Frank Act and FSOC's own rules and interpretive guidance.  *See* 77 Fed. Reg. 21,637-

39 ("Final Rule"), 21,639-47 ("Interpretive Guidance") (Apr. 11, 2012) (Appendix A to 12

C.F.R. Part 1310).  Compounding that error, the Council posited impossibly vague conditions of

"material financial distress" at MetLife, "overall stress in the financial services industry," and

"weak[ness]" in the "macroeconomic environment," *id.* at 21,657, and then deployed those

undefined concepts at every turn to support its conclusion that MetLife should be designated.

For its part, MetLife submitted overwhelming evidence that material financial distress at the

Company is extremely unlikely, and that in light of its business model and structure, together

with the authority and practice of state insurance regulators to intervene when insurers

experience material financial distress, there is no reasonable possibility that material financial

distress at MetLife, should it occur, would pose a threat to the financial stability of the United

States.

9.      ***Arbitrary and Capricious Reliance on Unsubstantiated Speculation and Irrational Economic Behavior.***  Numerous other aspects of the Final Designation are likewise premised on unsupported guesswork and unreasonable conjectures, rather than record evidence. For example, MetLife submitted a study from the Oliver Wyman consulting firm demonstrating that, even under the most unrealistic and adverse assumptions of financial distress at MetLife, the Company could still liquidate its assets to cover its liabilities without posing a threat to the broader U.S. economy.  In response, FSOC claimed it had conducted an analysis of its own that showed that asset sales by MetLife could disrupt the financial markets.  But the Final Designation's analysis—which included calculations that were never disclosed to MetLife, and rested on the bizarre assumption that MetLife would sell off its assets in a *randomized* manner rather than in an orderly fashion from most liquid to least liquid—was entirely unreasonable and ahistorical.  FSOC's analysis ignored steps MetLife could and would take to avoid a sudden and massive asset liquidation, including exercising contractual rights to defer policyholder payments for up to six months (rights which must be included in policies under the laws of many States). FSOC likewise assumed that any measures by state regulators would be ineffective.  Indeed, it assumed that regulators' response to distress at MetLife would destabilize other insurers, but did not identify a single example of the failure of *any* insurer of *any* size that led to market-wide "contagion" in the relevant insurance market.  MetLife, for its part, provided an analysis—also performed by Oliver Wyman—that examined prior failures of large life insurance companies and found no evidence of contagion.  MetLife also demonstrated that its insurance and capital markets activities are not of a nature or magnitude that would expose other financial institutions or counterparties to a meaningful threat of economic harm in the event of MetLife's material financial distress.  In straining to find otherwise, the Final Designation unreasonably concluded

that the mere possibility of ordinary levels of economic losses would constitute economy-wide destabilizing harms.

10.      ***Failure to Examine Consequences of its Designation Decision.***  The designation of MetLife will inevitably impose significant costs on the Company—and its shareholders and customers—a concern that MetLife addressed at length in its submissions to FSOC.  The Council nevertheless refused to consider these consequences of designating MetLife.  It did not address MetLife's evidence of substantial market and company-specific costs, and did not even opine on whether designating MetLife was, on balance, for good or for ill.  In ignoring the effects of its action, the Final Designation unreasonably disregarded an important aspect of the problem that Section 113 of the Dodd-Frank Act required it to address.

11.      ***Violation of Due Process and Separation of Powers***.  The FSOC designation process is opaque, sparking criticisms that recently prompted FSOC's Chairman to indicate that the process will be reviewed and reformed.  That will come too late for MetLife, which repeatedly was denied access to the full record on which FSOC's action was based.  Indeed, the Final Designation contains new evidence and analyses to which MetLife never had an opportunity to respond.  In addition, FSOC never identified the thresholds that result in SIFI designation or the manner in which the various statutory and regulatory factors regarding designation are balanced against one another in FSOC's analysis, and, where FSOC guidance did describe thresholds, gave no weight to instances in which MetLife's metrics fell below those thresholds.  These procedural shortcomings severely impaired MetLife's ability to respond to FSOC's grounds for designating the Company and denied MetLife the opportunity to modify its activities in order to avoid designation.  These deficiencies were exacerbated by the extraordinary design in the Dodd-Frank Act of FSOC itself, which identifies individual

6

companies for designation, establishes the standards that govern the designation decision, and then sits in judgment of its own recommendations, relying each step of the way on the same staff that identified the company for designation in the first place.  As a result of these procedural and structural flaws, FSOC's designation of MetLife violated the Company's due process rights and the constitutional separation of powers.

12.     In all of these ways and more, FSOC acted arbitrarily and capriciously, in violation of the Dodd-Frank Act, the APA, and the U.S. Constitution when it designated MetLife as a nonbank SIFI.  This Court should set aside the designation and grant the other relief requested below.

## PARTIES

13.     Plaintiff MetLife is a traditional life insurance group headquartered in New York, with its holding company incorporated in Delaware.  Its life insurance products generate 84% of its premiums.  As is typical for U.S. insurance groups, MetLife conducts substantially all of its business within a relatively simple corporate structure of subsidiary insurance companies that sell and issue the insurance products and directly hold and manage virtually all of the related assets; the subsidiaries are comprehensively regulated by the State or foreign country in which they are domiciled.  As of June 30, 2013 (the reference date for much of FSOC's analysis), 98% of MetLife's consolidated assets, 96% of its liabilities, and 95% of its revenues were in these highly regulated insurance subsidiaries.

14.     MetLife, Inc., the corporate parent, is a true holding company without material independent operations and with only 1% of the Company's consolidated assets, 3% of consolidated liabilities, and less than 1% of consolidated revenues.

15.     MetLife operates in highly competitive markets in approximately 45 countries.  More than 30% of MetLife's consolidated assets and more than 25% of its consolidated revenues

are associated with insurance activities outside the United States.  Product and geographic diversification is a hallmark of MetLife's operations, and has contributed to its strong financial position throughout history.  The Company has historically been a model of financial strength and weathered the 2008 financial crisis well.

16.     The traditional business of life insurance in which MetLife engages differs dramatically from the traditional business of banking.  In general, banks borrow short term and lend long term—for example, by taking liquid, short-term deposits and wholesale funding and investing in illiquid long-term assets, such as commercial loans.  In contrast, life insurers generally write long-term policies and invest premium dollars in long-term assets to make good on those obligations when they come due (typically on the occurrence of adverse events, such as death or disability).  Because life insurers do not depend as banks do on short-term deposits and short-term wholesale funding, they are not subject to the "run" risks (and corresponding liquidity crises) to which banks are subject.

17.     The difference between banks and insurers was emphasized by Governor Daniel Tarullo of the Federal Reserve Board in recent testimony before the Senate Banking Committee. An inquiry into "systemic importance," Tarullo explained, properly focuses on "nontraditional insurance activities where runnability is more of a concern and also . . . [on] things that are not insurance activities of any sort."  CQ Cong. Transcripts, Sen. Banking, Housing and Urban Affairs Comm. Holds Hearing on the Fin. Regulatory Sys., at 38 (Sept. 9, 2014) (statement of Daniel K. Tarullo, Member, Bd. of Governors of the Fed. Reserve Sys.).  There is accordingly a "pretty strong presumption," Tarullo continued, that "traditional insurance activities" are not of systemic importance because those activities do not implicate "runnability."  *Id.*

18.     MetLife's insurance subsidiaries are subject to an extensive regulatory system that

the States have developed and refined over decades to address the unique characteristics of

insurance companies—including an extensive risk-based capital ("RBC") framework responsive

to the risks of the business model of insurers.  States introduced the RBC framework in the early

1990s in response to several insurer failures.  Ever since, MetLife's insurance subsidiaries have

consistently maintained RBC ratios far in excess of required minimums, even during times of

economic stress.  The States' comprehensive oversight of MetLife's insurance subsidiaries also

includes rigorous state licensing requirements and regulatory supervision; periodic examination;

review of insurance products; and review and approval of material transactions involving

MetLife and its affiliates (and certain third parties), including reinsurance arrangements.

Through the McCarran-Ferguson Act, 15 U.S.C. § 1101 *et seq.*, Congress established a federal

policy that recognizes the primacy of the States' regulation of the business of insurance.

19.     Defendant FSOC is an agency of the United States created in 2010 by Section 111

of the Dodd-Frank Act.  It is chaired by the Secretary of the Treasury and comprises fifteen

members, many of whom are heads of other federal agencies engaged in financial regulation.  As

currently composed, only one of the ten voting members, the statutorily-mandated "independent

member with insurance expertise," has meaningful background in insurance or insurance

regulation.

## JURISDICTION AND VENUE

20.     This action arises under the Dodd-Frank Act, 12 U.S.C. § 5323(h), the APA, 5

U.S.C. § 500 *et seq.*, and the U.S. Constitution, U.S. Const., arts. I, II, III & Amend. V.

Jurisdiction therefore lies in this Court under 28 U.S.C. § 1331.

21.     MetLife has standing to bring this action because it has suffered an injury-in-fact

that is traceable to FSOC's Final Designation and is redressable through judicial review and the

setting aside of that determination.  Among other things, the Final Designation subjects MetLife to heightened regulatory oversight and the imposition of enhanced prudential standards by the Board.  Those regulatory requirements are likely to result in substantial costs for MetLife and to adversely affect its competitive position in the market.

22.     Venue is proper in this District under 12 U.S.C. § 5323(h).

## RELEVANT STATUTES AND REGULATIONS

### A.     The Financial Stability Oversight Council

23.     In response to the 2008 financial crisis, Congress established FSOC and, among other things, authorized it to identify nonbank financial companies that should be subject to enhanced supervision by the Board because their material financial distress or particular characteristics could cause systemic effects throughout the U.S. economy.

24.     FSOC is an Executive Branch agency situated within the Department of the Treasury and has 10 voting members and five non-voting members.

a.     The voting members are the Secretary of the Treasury (who serves as Chairperson of FSOC), the Chairperson of the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, the Director of the Consumer Financial Protection Bureau, the Chairperson of the Securities and Exchange Commission, the Chairperson of the Federal Deposit Insurance Corporation, the Chairperson of the Commodity Futures Trading Commission, the Director of the Federal Housing Finance Agency, the Chairperson of the National Credit Union Administration, and an independent member with insurance expertise who is appointed by the President and confirmed by the Senate for a six-year term.  *See* DFA § 111(b)(1), (c).

b.     The nonvoting members, who serve in an advisory capacity, are the Director of the Office of Financial Research, the Director of the Federal Insurance Office,

a state insurance commissioner designated by the state insurance commissioners, a state

banking supervisor designated by the state banking supervisors, and a state securities

commissioner (or officer performing comparable functions) designated by the state

securities commissioners.  *See* DFA § 111(b)(2).  The state insurance commissioner, state

banking supervisor, and state securities commissioner serve two-year terms.

25.     FSOC was established to identify risks to the financial stability of the United

States that could arise from the material financial distress or failure, or from the ongoing

activities, of certain bank holding companies or nonbank financial companies, or that could arise

outside of the financial services marketplace, and to respond to emerging threats to the stability

of the U.S. financial system.  *See* DFA § 112(a)(1).

26.     To that end, FSOC is authorized on a nondelegable basis and by a vote of no

fewer than two-thirds of the voting members—including an affirmative vote by the

Chairperson—to "determine that a U.S. nonbank financial company shall be supervised by the

Board of Governors and shall be subject to prudential standards . . . if the Council determines

that material financial distress at the U.S. nonbank financial company, or the nature, scope, size,

scale, concentration, interconnectedness, or mix of the activities of the U.S. nonbank financial

company, could pose a threat to the financial stability of the United States."  DFA § 113(a)(1).

27.     In enacting Section 113, Congress did not "expect insurance companies engaged

in traditional insurance company activities to be designated by the [FSOC] based on those

activities alone."  156 Cong. Rec. S5902 (statement of Sen. Collins) (July 15, 2010).  Rather,

Congress intended FSOC to "specifically take into account . . . how the nature of insurance

differs from that of other financial products, including how traditional insurance products differ

from various off-balance sheet and derivative contract exposures and how that different nature is

reflected in the structure of traditional insurance companies." *Id.*  Senator Collins (the author of

a key provision regarding designated companies) and Senator Dodd (a principal author of the

Dodd-Frank Act) agreed that the designation of an insurance company engaged in the traditional

insurance business will rarely be appropriate.  *See id*. (statement of Sen. Dodd) ("Where a

company is engaged only in traditional insurance activities, the [FSOC] should also take into

account the matters [Senator Collins] raised.").

28.     Numerous provisions of the Dodd-Frank Act reflect Congress's intent that

FSOC's designation process and Board supervision not usurp existing state regulation that

adequately addresses systemic risk and other prudential concerns, particularly for insurance

companies.  Among other things, these provisions establish that FSOC cannot designate

insurance companies engaged in traditional insurance activities without a thorough assessment of

the regulatory oversight to which they are already subject, *see* DFA § 113(a)(2)(H), and require

FSOC to consult with a company's primary financial regulator when making any systemic

significance determination, *see id.* § 113(g).  *See also, e.g.*, *id.* Title X (excluding the business of

insurance from oversight by the Consumer Financial Protection Bureau); *id.* Title V (limiting

Federal Insurance Office's authority through consultation and coordination requirements); *id.*

§ 203(e) (providing that an insurance company that becomes subject to Title II's orderly

liquidation authority would still be resolved pursuant to state insurance insolvency law).

Moreover, in directing that FSOC's membership include an "independent member with

insurance expertise"—the only one of the ten voting members who holds a federal position for

purposes of service on FSOC alone—Congress recognized both federal financial regulators'

limited understanding of the business and regulation of insurance, and the need to give particular

weight to insurance industry expertise when considering insurers for designation.  Yet, as

illustrated below, FSOC betrayed a fundamental misunderstanding of the business and regulation of insurance in its decision designating MetLife.

**B.      Statutory Standards For Designating Nonbank Financial Companies As Systemically Important**

29.      FSOC's designation authority for companies incorporated in the United States extends only to "U.S. nonbank financial compan[ies]," as that term is defined in the Dodd-Frank Act.  *See* DFA § 113(a); *see also* 12 C.F.R. § 1310.10.

a.      Section 102(a)(4)(B) of the Dodd-Frank Act defines a "U.S. nonbank financial company" as a company that is incorporated or organized under the laws of the United States or any State and is "predominantly engaged in financial activities."  DFA § 102(a)(4)(B); *see also* 12 C.F.R. § 1310.2.

b.      Section 102(a)(6) of the Dodd-Frank Act defines the categories of activities in which a company must be engaged to qualify as being "predominantly engaged in financial activities."  In particular, it requires that 85% of a company's consolidated assets or consolidated annual gross revenues be attributable to "activities that are financial in nature," as that phrase is defined in Section 4(k) of the BHCA, in order to qualify as a "U.S. nonbank financial company" under the Dodd-Frank Act.

c.      Section 4(k) identifies nine categories of activities that are "financial" in nature for purposes of FSOC's designation authority.  *See* 12 U.S.C. § 1843(k).  Only four of those categories have been construed to apply to insurance.  *See id.* § 1843(k)(4)(B), (F), (G), (I).  As relevant here, those activities must be conducted in the United States.

30.     Section 113(a) of the Dodd-Frank Act sets forth the specific factors FSOC is required to consider in determining whether to designate a nonbank financial company as systemically important:

a.     the extent of the leverage of the company;

b.     the extent and nature of the off-balance-sheet exposures of the company;

c.     the extent and nature of the transactions and relationships of the company with other significant nonbank financial companies and significant bank holding companies;

d.     the importance of the company as a source of credit for households, businesses, and State and local governments and as a source of liquidity for the United States financial system;

e.     the importance of the company as a source of credit for low-income, minority, or underserved communities and the impact that the failure of such company would have on the availability of credit in such communities;

f.     the extent to which assets are managed rather than owned by the company, and the extent to which ownership of assets under management is diffuse;

g.     the nature, scope, size, scale, concentration, interconnectedness, and mix of the activities of the company;

h.     the degree to which the company is already regulated by 1 or more primary financial regulatory agencies;

i.     the amount and nature of the financial assets of the company;

j.     the amount and types of the liabilities of the company, including the degree of reliance on short-term funding; and

k.      any other risk-related factors that the Council deems appropriate.

DFA § 113(a)(2).

31.     These standards and criteria establish a high threshold for designation and require

FSOC to consider the financial institution's vulnerability to financial distress and whether its

activities threaten, or reasonably could be expected to threaten, the financial stability of the U.S.

economy.

## C.      The Council's Guidance Interpreting Section 113

32.     On April 11, 2012, FSOC issued its Final Rule and Interpretive Guidance setting

forth "the manner in which the Council intends to apply the statutory standards and

considerations, and the processes and procedures that the Council intends to follow, in making

determinations under section 113 of the Dodd-Frank Act."  77 Fed. Reg. at 21,637.

33.     FSOC identified two "determination standards" under Section 113(a).  The First

Determination Standard is met, FSOC explained, when "material financial distress at the

nonbank financial company could pose a threat to the financial stability of the United States."

*Id.*  According to FSOC, "material financial distress" exists when a company is "in imminent

danger of insolvency or defaulting on its financial obligations."  *Id.* at 21,657.  The Second

Determination Standard is met when "the nature, scope, size, scale, concentration,

interconnectedness, or mix of the activities of the nonbank financial company could pose a threat

to the financial stability of the United States."  *Id.*  FSOC pledged to "take into account all of the

statutory considerations, separately and in conjunction with each other, when determining

whether either of the statutory standards for determination has been met."  *Id.* at 21,640.

34.     FSOC further explained that it had developed a six-category analytic framework

for making designation determinations.  *Id.* at 21,641.  Three of those categories—size,

interconnectedness, and substitutability—are intended to assess "the potential impact of a

nonbank financial company's financial distress on the broader economy." *Id.* The other three

categories—leverage, liquidity risk and maturity mismatch, and existing regulatory scrutiny—

"seek to assess the vulnerability of a nonbank financial company to financial distress." *Id.*

35.     In addition, the Final Rule and Interpretive Guidance defined three so-called

"transmission channels" through which a nonbank financial company could pose a threat to the

broader U.S. economy:  (a) exposure; (b) asset liquidation; and (c) critical function or service.

a.      The exposure transmission channel examines circumstances under which

"[a] nonbank financial company's creditors, counterparties, investors, or other market

participants have exposure to the nonbank financial company that is significant enough to

materially impair those creditors, counterparties, investors, or other market participants

and thereby pose a threat to U.S. financial stability." *Id.* at 21,657.

b.      The asset liquidation transmission channel examines the circumstances

under which "[a] nonbank financial company holds assets that, if liquidated quickly,

would cause a fall in asset prices and thereby significantly disrupt trading or funding in

key markets or cause significant losses or funding problems for other firms with similar

holdings." *Id.* "This channel would likely be most relevant," FSOC explained, "for a

nonbank financial company whose funding and liquid asset profile makes it likely that it

would be forced to liquidate assets quickly when it comes under financial pressure." *Id.*

c.      The critical function or service transmission channel examines the

circumstances under which a "nonbank financial company is no longer able or willing to

provide a critical function or service that is relied upon by market participants and for

which there are no ready substitutes." *Id.*

36.     FSOC also stated that, in some cases, it would designate certain financial activities that it "determines are, or are likely to become, systemically important" (*i.e.*, an "activities-based" approach), rather than making company-based designations.  *Id.* at 21,640; *see also* Press Release, Department of the Treasury, Financial Stability Oversight Council Meeting July 31, 2014, *available at* http://www.treasury.gov/initiatives/fsoc/council-meetings/ Documents/July%2031%202014.pdf.

37.     In conjunction with preparations for designating certain types of nonbank financial companies as systemically important, the Department of the Treasury's Office of Financial Research ("OFR") prepared a study of asset managers.  *See* OFR, Asset Management and Financial Stability (Sept. 2013), *available at* http://www.treasury.gov/initiatives/ofr/ research/Documents/OFR_AMFS_FINAL.pdf.  OFR's report concluded that the asset management industry is highly concentrated, that several large financial institutions with asset management divisions suffered material distress during the 2008 financial crisis, that "a large asset management firm could be a source of risk, depending on its size, complexity, and the interaction among its various investment management strategies and activities," and that "[d]istress at a large asset manager could amplify or transmit risks to other parts of the financial system."  *Id*. at 18.  OFR also opined that "material distress at the firm level, or firm failure, could increase the likelihood and magnitude of redemptions from a firm's managed assets, possibly aggravating market contagion or contributing to a broader loss of confidence in markets."  *Id*. at 19.

38.     Despite these conclusions regarding the systemic risks posed by some asset managers, FSOC is not currently considering the designation of any asset management firm.

Instead, it is developing an activities-based approach to the risks posed by the asset management industry. *Id*. at 3.

**D.    The Designation Process**

39.    FSOC has established a three-stage process for considering whether to designate a company as a nonbank SIFI.  At Stage 1, the Council examines "a broad group of nonbank financial companies" in terms of six "uniform quantitative thresholds" that "are intended to measure both the susceptibility of a nonbank financial company to financial distress and the potential for that . . . financial distress to spread throughout the financial system."  77 Fed. Reg. at 21,660-61.  For each company that meets the first threshold—total consolidated assets—and any of the other five thresholds, the Council proceeds to Stage 2, where it "conduct[s] a robust analysis of the potential threat that" the company "could pose to U.S. financial stability" based on "a wide range of quantitative and qualitative industry-specific and company-specific factors." *Id.* at 21,661.

40.    FSOC undertakes Stages 1 and 2 of its designation process without notifying the company that it is under consideration for designation.  If, after completing its Stage 2 review of the company, FSOC decides to proceed to Stage 3, FSOC notifies the company and provides it the opportunity to submit written materials. *Id.* at 21,662.

41.    Based on the materials submitted by the company, as well as its own evidence and analysis, FSOC preliminarily determines whether designation of the company is warranted.  If it makes such a proposed determination, FSOC provides written notice to the prospective designee that includes "an explanation of the basis of the proposed determination of the Council."  DFA § 113(e)(1).  The proposed designee thereafter has thirty days to request an oral or written hearing to contest the proposed determination. *Id.* § 113(e)(2).  Within sixty days of the hearing,

FSOC is required to provide a final determination of designation that contains "a statement of the basis for the decision of the Council."  *Id.* § 113(e)(3).

42.    The same FSOC principals and staff are responsible for identifying and recommending companies for designation, and judging whether designation is appropriate. Thus, the same individuals build the case for designation, and then judge whether the case they have prepared is more compelling than the case presented by the company.  These principals and staff also formulate, often on an ad hoc basis, the standards that will be applied to render a designation decision.  In these respects, FSOC differs markedly from the Securities and Exchange Commission, Federal Trade Commission, and other agencies that provide some separation of functions that are legislative, prosecutorial, and adjudicative in nature.

43.    Using these procedures, FSOC designated three nonbank financial companies as systemically important prior to designating MetLife:  American International Group, Inc. ("AIG"), Prudential Financial, Inc. ("Prudential"), and General Electric Capital Corporation. Other than MetLife, Prudential is the only traditional life insurance company that has been designated a nonbank SIFI by FSOC, and there is no indication that any other insurance company is under consideration.  Rather, the U.S. operations of the hundreds of other insurance companies with which MetLife competes will continue to be governed exclusively by state law, without the costly overlay of an entirely new federal regulatory regime to which MetLife will be subject.

44.    Three agencies represented on FSOC (the Federal Reserve Board, the Securities and Exchange Commission, and the Department of the Treasury) are members of the Financial Stability Board ("FSB"), an international entity established to coordinate and develop regulatory, supervisory, and other financial sector policies.  In July 2013, the FSB published its initial list of

nine global systemically important insurers, which included MetLife.  The FSB's decision was

not subject to any statutory standards, and MetLife was given no prior notice of its formal

designation or the basis for it, and no opportunity to respond to the designation.  The Board and

Treasury subsequently denied MetLife's requests under the Freedom of Information Act for

documents regarding communications between U.S. regulators and the FSB concerning

companies being considered for inclusion on the FSB's list of global systemically important

insurers.

**E.     The Effects Of Designation: Board Supervision Of Designated Companies**

45.     Dodd-Frank authorizes the Board to impose heightened prudential standards on

nonbank financial companies designated by the Council as systemically important, as well as on

bank holding companies with more than $50 billion in assets.  *See* DFA § 165.  Those

heightened prudential standards, many of which the Board is *required* to implement, include

capital requirements, liquidity requirements, risk management requirements, resolution plan and

credit exposure report requirements, concentration limits, and enhanced public disclosures.  *Id.*

§ 165(b)(1)(A).

46.     In October 2013, the Board promulgated capital requirements for supervised bank

holding companies.  78 Fed. Reg. 62,018 (Oct. 11, 2013).  As to standards to be applied to

insurance companies, the Board stated that it had "decided to consider further the development

of appropriate capital requirements for these companies" and that it would "explore further

whether and how the proposed rule should be modified for these companies in a manner

consistent with section 171 of the Dodd-Frank Act and safety and soundness concerns."  *Id.* at

62,027.  The Board has not yet promulgated capital requirements for designated insurance

companies.

47.     An empirically-based estimate shows that the annual consumer cost of applying additional capital requirements to nonbank SIFI and thrift-owning insurers could be as great as $8 billion, depending on the capital requirements applied.  Oliver Wyman, The Consumer Impact of Higher Capital Requirements on Insurance Products at 2, 9 (Apr. 10, 2013), *available at* http://responsibleregulation.com/wp-content/uploads/2013/05/Pricing-impact-study-Oliver-Wyman-April-10-2013.pdf.  In particular, it has been estimated that imposing bank-centric capital requirements on MetLife would require the Company to raise its capital reserves by tens of billions of dollars, ultimately harming consumers.

48.     In December 2014, Congress passed and President Obama signed the Insurance Capital Standards Clarification Act of 2014 (S. 2270).  The enactment provides that the Board "shall not be required" to impose consolidated minimum capital requirements on any entity regulated by a state insurance regulator "to the extent [the entity] acts in its capacity as a regulated insurance entity."  *Id.* at § 2(c)(1).  The legislation was enacted to address the Board's view that Section 171 of the Dodd-Frank Act as previously worded required the Board to impose bank capital standards on designated nonbank financial companies, including insurance companies.  *See, e.g.*, Letter from Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, to Senator Susan Collins, at 2 (Feb. 6, 2013).

## ADMINISTRATIVE PROCEEDINGS

### A.     The Council's Proposed Designation Of MetLife

49.     On July 16, 2013, FSOC notified MetLife that the Company had reached Stage 3 in the Council's designation process.  Over the ensuing year, MetLife provided FSOC with extensive information about the Company's finances and business model, including a lengthy submission in November 2013 (the "Voluntary Submission").  Beginning in September 2013, MetLife made multiple requests for separate meetings with the FSOC principals, either

individually or collectively, to discuss the basis for a potential designation under the Dodd-Frank Act.  FSOC denied those requests.

50.     On September 4, 2014, FSOC notified MetLife that it had made a preliminary determination to designate the Company as a nonbank SIFI.  FSOC provided MetLife with a Notice of Proposed Determination setting forth its grounds for proposing designation.

51.     On October 3, 2014, MetLife filed a notice invoking its right to a hearing contesting the proposed determination.  FSOC granted a non-public oral hearing, which was held on November 3, 2014.  In advance of the hearing, MetLife submitted evidence and arguments challenging the grounds for designation in the Notice of Proposed Determination; as contemplated by FSOC's rules, MetLife supplemented that submission with additional materials seven days after the hearing.  The materials that MetLife submitted as part of its Voluntary Submission and in response to the Notice of Proposed Determination included the following:

### 1.     The Oliver Wyman Contagion Study

52.     In its 2013 decision designating Prudential, FSOC had relied heavily on unsubstantiated speculation that financial distress at Prudential could spark a loss of confidence and "contagion" throughout the insurance markets.  To better inform FSOC's deliberations, MetLife retained the Oliver Wyman consulting firm to conduct a study of past insurance failures and their effects on competitor insurance companies.  In its study, Oliver Wyman identified all domestic insurance companies with assets over $10 billion that had failed since 1990, as well as large international insurers that had failed in the same period.  (There had been only a handful of such failures.)  Oliver Wyman then searched for evidence that competitor insurers had experienced "policyholder contagion" in the form of an increase in surrenders or lapses of policies, coupled with a decline in new business.  Oliver Wyman's contagion study found no

case where the failure of a large life insurance company had resulted in policyholder contagion at another large life insurer.

53.     Among the companies examined by Oliver Wyman was Confederation Life, a Canadian company that, while significantly smaller than MetLife in absolute terms, held a position in the Canadian economy comparable to MetLife's in the U.S. economy.  Confederation Life held approximately $14 billion in total consolidated assets (2.3% of Canadian GDP) at the time of its failure in 1994, and was the fourth-largest life insurer in Canada.  Yet, following its failure, there was no evidence of contagion to other insurers.  In particular, Oliver Wyman determined that the average individual annuity contract retention rates at the four other largest Canadian insurers remained virtually unchanged (in fact, the average retention rate actually increased slightly, from 85% in 1993 to 86% in 1994).  Further, during the year following Confederation Life's failure, those four insurers generally saw an increase in new business.

54.     Oliver Wyman also examined the experience of U.S. insurers in the years that large insurers had failed, including at the times of the failures of Executive Life in 1991, Mutual Benefit in 1991, and General American Life Insurance Company ("GALIC") in 1999.

55.     Executive Life had approximately $8.8 billion in assets and was the largest life insurer domiciled in California, while Mutual Benefit had approximately $14 billion in assets and was the largest life insurer in New Jersey.  Notwithstanding the failure of those insurers, none of the companies' regional peers or the five largest national insurers by assets experienced adverse movements outside normal historical variations in both policyholder surrender and lapse rates and the acquisition of new business.  Likewise, GALIC had approximately $14 billion in assets at the end of 1998 and was the largest life insurer in Missouri.  There was no evidence of contagion in 1999 at any of GALIC's regional peers or at the top five national insurers.

56.     Oliver Wyman's study also demonstrated that retail policyholders respond at lower levels (and those who do surrender their policies, do so less quickly) than institutional policyholders to the failure of an insurer.  For example, at GALIC, Mutual Benefit, and Confederation Life, institutional policyholders redeemed their policies at a significantly higher rate than retail policyholders.

57.     Oliver Wyman's findings regarding retail policyholders' behavior were confirmed in a study conducted, at MetLife's request, by the National Opinion Research Center at the University of Chicago ("NORC").  That survey demonstrated that policyholders do not treat insurance policies as sources of liquidity and are generally unlikely to surrender a policy in the event of an insurer's financial distress.  Indeed, a large majority of the policyholders polled by NORC indicated that they would retain their policy even if their insurer experienced severe financial distress.

**2.     The Oliver Wyman Liquidity Analysis**

58.     In designating Prudential, FSOC also had speculated that financial distress at that company could force it to engage in a fire sale of assets so large and precipitous that it would depress market prices in those asset classes, prompting a systemic financial crisis.  To test that claim, Oliver Wyman conducted a comprehensive quantitative analysis of MetLife's potential liquidity needs and resulting asset sales, using four scenarios based on assumptions ranging from the adverse to the wholly implausible.

59.     Oliver Wyman's Scenario 1 reflected the experience of MetLife and the insurance industry as a whole with respect to policyholder surrenders and other liability payment demands during the 2008 financial crisis, which was the worst recession since the Great Depression.  The three subsequent scenarios added certain hypothetical sources of stress to assess the impact of the resulting asset sales.  Thus, Scenario 2 started with the 2008 financial crisis assumptions and

added to the severity of the scenario by imposing a four-notch credit rating downgrade of MetLife, leading to presumed payment outflows over a 180-day period that were nearly three times those under the base assumptions reflecting the 2008 financial crisis.

60.     Scenario 3 took these assumptions even further, assuming that policyholder lapse, surrender, and loan rates, and liability payment demands occurred across all types of policyholder liabilities at rates that have never been observed in any prior insurance company failure.  Under this scenario, all institutional counterparties immediately surrendered eligible investment contracts and declined to renew any securities lending transactions.  With respect to retail policies, Scenario 3 used as a baseline, but then substantially increased, the levels of surrenders from the failures of two large insurers, Executive Life in the United States and The Equitable Life Assurance Society in the United Kingdom.  Scenario 3 also included the entirely ahistorical, unrealistic assumptions that all new business ceased, that no insurance regulator intervened, that MetLife experienced significant credit losses, and that MetLife did not invoke its contractual right to defer payments to policyholders for up to six months.  This scenario resulted in payment outflows over 180 days, without any exercise of deferral rights, that were nearly five times the amount under the base assumptions reflecting the 2008 financial crisis.

61.     Oliver Wyman's Scenario 4 added to the conditions in Scenario 3 by adopting the implausible assumption that all general account policyholders who could surrender did so, and further assumed the acceleration and payment of all other liabilities capable of acceleration, the exercise of MetLife's contractual right to defer such surrender payments for a 180-day period, and the writing of no new business and the receipt of no recurring premiums—all without any intervention by state regulators.

62.     Oliver Wyman did not posit Scenarios 3 and 4 to predict the potential severity of financial distress at MetLife or its cash needs, but solely to examine the impact that a wholly farfetched and unprecedented amount of asset sales from an actual portfolio would have on the markets for various asset classes.  Oliver Wyman made clear that there is no evidence of any insurer ever liquidating assets to satisfy policyholder demands to the degree—and as a proportion of its overall balance sheet—hypothesized in Scenarios 3 and 4.  Oliver Wyman also noted that assuming the absence of regulatory intervention in such a situation is completely contrary to experience, implies utter irresponsibility on the part of regulators, and defies credulity.

63.     Even under the numerous wholly implausible adverse conditions in Scenarios 3 and 4, Oliver Wyman's analysis demonstrated that MetLife would still be able to satisfy all liquidity demands arising from the surrender of all surrenderable insurance policies and other surrenderable liabilities and its financial and operating debt without causing price impacts that would significantly disrupt financial markets.  Based on this analysis, Oliver Wyman concluded that there is no reasonable basis for concluding that financial distress at MetLife could trigger policyholder surrenders or other liability liquidity demands that would require asset sales on a scale and at a speed that would produce systemic effects.

### 3.     Existing State Regulatory Oversight

64.     The 2008 financial crisis was attributed in part to financial entities and activities that at the time were subject to limited regulatory oversight.  Accordingly, the Dodd-Frank Act expressly requires FSOC to consider "the degree to which the company is already regulated by 1 or more primary financial regulatory agencies" when making designation decisions.  DFA § 113(a)(2)(H).  Substantially all of MetLife's business activities are overseen by primary financial regulators:  98% of MetLife's assets and 96% of its consolidated liabilities are held in

regulated insurance subsidiaries.  Virtually all of MetLife's U.S. assets are held in subsidiaries that, for decades, have been subject to comprehensive regulation and oversight that has largely been the exclusive province of the States, as reflected in the McCarran-Ferguson Act.

65.     In the proceedings before FSOC, MetLife submitted evidence that it is closely regulated under that extensive framework of state insurance laws.  The record before FSOC also included submissions from state insurance regulators in six States with oversight of entities that account for more than 90% of MetLife's U.S. assets.  Among other things, the submissions made clear that "in the event that MetLife or one or more of its insurance subsidiaries were to fail, [the New York Department of Financial Services] and other state regulators would be able to ensure an orderly resolution of the enterprise; . . . [and] MetLife's life insurance businesses already are closely and carefully regulated."  Letter from Benjamin M. Lawsky, Superintendent, N.Y. Dep't of Fin. Servs., to Jacob Lew, Sec'y, U.S. Dep't of the Treasury, at 1 (July 30, 2014).  MetLife also submitted substantial evidence that none of its entities in any jurisdiction has any material legal obligation to satisfy the liabilities of any entity in any other jurisdiction.

66.     Substantial record evidence confirmed that state regulatory oversight significantly reduces both the possibility of material financial distress at MetLife and the risk that any such distress would have systemic implications for the U.S. economy.  Aspects of state insurance law ensure that MetLife operates with a sufficient amount of capital, and permit—and ultimately compel—regulators to exercise early remediation measures to guarantee that assets are available to meet policyholder obligations in the improbable event of insolvency.  Indeed, the Risk-Based Capital for Insurers Model Act—promulgated by the National Association of Insurance Commissioners ("NAIC") and adopted by MetLife's regulators—authorizes, and, in some cases, requires, an insurer's domestic regulator to take certain actions when the insurer's capital level

27

falls below designated thresholds.  If the capital level of any MetLife subsidiary were to drop

below such thresholds, state regulators could, and almost inevitably would, intervene and

(1) require the Company to submit a comprehensive plan for addressing the deterioration in its

capital position; (2) perform an examination of the plan and the Company's assets, liabilities, and

operations; (3) issue an order specifying corrective actions; and (4) take such actions as are

necessary to place the Company into receivership if these corrective actions cannot be

accomplished or are inadequate.  *See* Statement of Peter G. Gallanis, President, National

Organization of Life & Health Insurance Guaranty Associations, at 4 n.5 (Mar. 27, 2014)

("Gallanis").

67.     Similarly, state regulators mandate that MetLife's subsidiaries establish statutory

reserves with respect to insurance and annuity contracts to ensure that the Company has

sufficient assets to pay policyholders and their beneficiaries.  Every year, state regulators require

each of MetLife's U.S. insurance subsidiaries to analyze the adequacy of all statutory reserves,

and, in each case, a qualified actuary must submit an opinion stating that the statutory reserves

adequately provide for the anticipated cash flows required by the contractual obligations and

related expenses of the U.S. insurance subsidiary.

68.     In addition to the authority to direct MetLife insurance subsidiaries to modify

their practices and divest certain investments if the risks are too high, state regulators can require

periodic financial reports and disclosures, and can approve or reject material transactions and

activities within MetLife's holding company system, including capital actions and extraordinary

dividends, as well as the introduction of new products, policies, and lines of business by

MetLife's insurance subsidiaries.  State insurance laws also require that MetLife's investment

activity be conducted in a safe and sound manner by restricting the level of risk that MetLife can

assume in investing, requiring the use of conservative accounting principles, imposing diversification requirements and exposure limits, restricting MetLife's derivatives trading activity, and limiting the size, concentration, counterparty creditworthiness, and use of certain types of derivatives in MetLife's securities lending program.  MetLife conducts virtually no such activities outside the purview of insurance regulatory authorities.

69.     The state regulatory framework also extends to MetLife, Inc. and MetLife's reinsurance operations.  MetLife, Inc. must file yearly enterprise risk reports with state regulators that describe any activities involving one or more of its affiliates that would be likely to have a material adverse effect upon the financial condition or liquidity of the Company.  MetLife also must submit for regulatory approval all material reinsurance transactions with affiliates (also known as "captives"), which transfer risk to affiliated companies domiciled in different jurisdictions and thereby allow MetLife to utilize a broader array of assets to satisfy capital and reserve requirements.

70.     In addition, States have the power to impose a stay on all of MetLife's withdrawable life insurance liabilities to limit outflows and conduct a more orderly resolution of the Company in the event that it experiences material financial distress.  Such moratorium orders have been used successfully in several insurance company failures.  *See* Gallanis at 10.  In each of those cases, the moratorium relieved potential liquidity pressure on the distressed insurer, without resulting in a run on other insurers.  *Id.* at 11.

71.     Finally, state guaranty associations function in every State to bridge the gap in the event that a failed insurer's estate assets are insufficient to cover policyholder liabilities.  Each state guaranty association is subject to regulatory supervision and examination by the insurance commissioner of its jurisdiction, and is governed by an enabling statute and a plan of operation

approved by the insurance commissioner.  In the event a court determines that an insurer is insolvent and should be liquidated, the guaranty associations pay policyholder claims that are then-payable and ensure the continued provision of insurance protection to consumers, up to a statutorily established maximum level of guaranteed protection.  *See id.* at 2.  Where a failed insurer operates in multiple jurisdictions, the guaranty associations of each jurisdiction coordinate through the National Organization of Life and Health Insurance Guaranty Associations ("NOLHGA").  Extensive historical evidence confirms that state insurance authorities have considerable experience collaborating to successfully resolve multi-state insurers and that guaranty associations have the capacity to protect policyholders from financial losses.

**B.      The Council's Final Designation Of MetLife**

72.      On December 18, 2014, FSOC designated MetLife as a nonbank SIFI, and issued both public and nonpublic versions of its decision.  FSOC determined that "MetLife's material financial distress *could* lead to an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy."  Final Designation at 3 (emphasis added).  In particular, FSOC reached the following conclusions:

a.      <u>Predominantly engaged in financial activities</u>.  The Council concluded that MetLife is a "U.S. nonbank financial company" eligible for designation because its foreign insurance activities are "financial" within the meaning of Section 4(k) of the BHCA and therefore can be included in determining whether MetLife is "predominantly engaged" in financial activities.  In support of that conclusion, FSOC invoked a Board regulation that, without explanation, interpreted Section 4(k) to cover domestic and foreign activities despite clear statutory language that insurance activities must be

conducted in a State or in accordance with State law in order to be considered "financial." *See* Final Designation at 40.  FSOC further posited, without support, that the consolidated assets of MetLife and its subsidiaries need only be "related to"—rather than directly attributable to—financial activities to count toward the 85% threshold.  *See id.* at 39-43.

      b.    <u>Vulnerability to material financial distress</u>.  FSOC determined that it was not required to evaluate the degree to which MetLife was actually vulnerable to "material financial distress."  Final Designation at 27.  In FSOC's view, it was permitted to *assume* "material financial distress" at MetLife and required only to determine whether such distress *could* have systemic effects on the broader U.S. economy, regardless of the improbability of distress occurring.  FSOC further insisted that, despite explicit language recognizing that three of six analytical factors are directed to assessing a company's vulnerability, its Final Rule and Interpretive Guidance did not require it to assess a company's vulnerability to financial distress before designating it as systemically important.  *See id.* at 28.  Moreover, while FSOC's Interpretive Guidance provides that "material financial distress exists when a nonbank financial company is in *imminent danger* of insolvency or defaulting on its financial obligations," 77 Fed. Reg. at 21,657 (emphasis added), the Final Designation, in order to construct a situation of allegedly systemic significance, hypothesized far more dire economic circumstances, not merely assuming "material financial distress," but the total inability of MetLife to satisfy any debts, which is completely implausible.  *See, e.g.*, Final Designation at 89 n.451 ("While the analysis in this document generally assumes material financial distress, certain portions of the analysis, including this subsection, necessarily address the implications of insolvency at MetLife or its significant subsidiaries in order to consider the potential

effects of the company's failure.").  These enhanced levels of financial distress far

exceeded the standard for designation prescribed by statute and FSOC's own guidance,

and were instrumental to the Council's decision to designate MetLife a SIFI.

c.    Activities-based review.  FSOC rejected an activities-based approach

toward MetLife and other insurance companies, even though FSOC is presently

considering such an approach toward asset managers.  According to FSOC, it was not

required to consider an activities-based approach with respect to MetLife because it had

already determined that MetLife satisfied the First Determination Standard, and an

activities-based inquiry is not one of the statutory factors specifically enumerated in

Section 113 for SIFI designation.  *See* Final Designation at 31.  Of course, FSOC's

conclusion that MetLife satisfied the First Determination Standard resulted from its

insistence on reviewing MetLife under that Standard, rather than subjecting it to the

activities-based approach currently being developed for asset managers.  FSOC did not

explain why this regulatory alternative was appropriate for asset managers but not

insurers.

d.    Exposure channel.  FSOC concluded that MetLife's direct exposures to

counterparties, investors, and policyholders, and indirect exposures to market participants

with which it lacks a transactional relationship, are of a magnitude that "could" produce

systemic effects if MetLife experienced "material financial distress."  *See, e.g.*, Final

Designation at 5, 11-12, 33-34, 36, 48, 52, 54-64, 68, 75-89, 97-131.  FSOC repeatedly

asserted that the "exposures" were such that MetLife's financial distress "could cause

losses" to MetLife's counterparties, but it made no attempt to quantify those potential

"losses" or to explain the relative importance of MetLife's various classes of assets and

liabilities to the Council's conclusions. *See, e.g.*, *id.* at 126 (securities lending and derivatives), *id*. at 130-31 (repo markets).  Instead, without accounting for the size or nature of MetLife's portfolios or the mitigants against potential losses, all of MetLife's assets and liabilities were treated in essentially the same, perfunctory manner.  In response to FSOC's initial Notice of Proposed Determination, MetLife had submitted evidence describing each class of "exposures" and demonstrating that FSOC's exposure calculations were overstated by as much as a factor of *25*.  In its Final Designation, FSOC acknowledged that it had overstated or misattributed the amount of MetLife's exposures, and conceded that various factors could limit any actual losses associated with those exposures.  FSOC nonetheless declined to alter its analysis to account for divergences as substantial as, for example, the difference between its own $30 billion "exposure" estimate for one class and MetLife's corrected $1.2 billion calculation, which accounted for collateral.  In this instance and others, FSOC only acknowledged that available collateral "may" mitigate "some" risk.  FSOC declined to retract its overblown $30 billion estimate and insisted that even at the $1.2 billion amount, "exposures" (which are not the same as *losses*) "remain" due to the "potential" for unspecified "price fluctuations." *Id.* at 127 n.614.  This approach, which treats exposure estimates of $1.2 billion and $30 billion as effectively equivalent, was consistent with FSOC's method throughout the Final Designation, which engaged in unbounded speculation about what "could" happen with no consideration of probability, magnitude, or severity.

FSOC attempted to explain away its lack of rigor in assessing "exposure" by claiming that its estimated exposures provided context for the "range" of potential outcomes in the event of material financial distress at MetLife, but were not intended to

be estimates of expected losses to counterparties.  *Id.* at 5 n.7.  The "range" referred to the range of *maximum possible losses*, and consisted of FSOC's incorrect number at the high end, and the corrected figure at the low end.  FSOC made no attempt to correlate any of these figures with actual estimated *losses*, which would in all likelihood be below the low end of the "range" referred to by FSOC.  Because it never projected any estimated losses, FSOC never established a basis for a finding that MetLife's material financial distress would "materially impair" MetLife counterparties within the meaning of the Council's Interpretive Guidance, much less that this could, in turn, threaten the financial stability of the United States.

FSOC also asserted that "MetLife's material financial distress could also indirectly affect other firms due to the market uncertainty about other firms' exposures to MetLife and the potential impact of such exposures on the financial health of those firms and their counterparties," thereby leading market participants "to pull back from a range of firms and markets."  *Id.* at 8.  FSOC thus assumed that the secondary counterparties of MetLife's direct counterparties would have a more significant reaction to MetLife's material financial distress than the direct counterparties themselves.  That is, FSOC essentially posited that an institution's systemic importance could be evidenced by the possibility that unrelated parties may think that it might be systemically important, even though it is not "systemic" based on measurable criteria.

     e.    <u>Asset liquidation channel</u>.  Rejecting Oliver Wyman's asset liquidation analysis, FSOC determined that MetLife could transmit systemic distress through the asset liquidation transmission channel if it were forced to liquidate its assets to meet obligations to counterparties, contract holders, and policyholders.  *See, e.g.*, Final

Designation at 200, 209-26.  In particular, FSOC determined that two sources of potential liquidity strain—institutional and capital markets products that can be terminated or not renewed by the counterparty, and insurance-related liabilities that can be surrendered or withdrawn for cash—could trigger such a liquidation of assets by MetLife.  *Id.* at 5, 15-16.  FSOC's conclusions were expressed as a sequence of nine cascading circumstances that might (and therefore might not) materialize, with no attempt to assess their likelihood or magnitude.  The first five relate to actions external to MetLife:  (i) "[A] forced liquidation of MetLife's assets *could* be amplified by the fact that the investment portfolios of many other large financial intermediaries are also composed of similar assets, [(ii)] which *could* cause significant losses for those firms" and (iii) "*could* result in asset fire sales that [(iv)] *could* disrupt financial market functioning and that [(v)] *could* ultimately damage the broader economy."  Final Designation at 146 (emphases added).

FSOC further assumed that (vi) state regulators would either fail to use the crisis management tools developed for just such circumstances, or (vii) the state regulatory structure—and, in particular, the use of stays or moratoria, which historically have ameliorated financial distress at life insurers and prevented the transmission of systemic effects—"could cause a loss of confidence" and thus exacerbate distress.  *Id.* at 144-45.  Finally, FSOC assumed (viii) that MetLife would not invoke its contractual right to restrict policyholder withdrawals, and (ix) that policyholders would act against their own self-interest and surrender their policies en masse despite associated contractual and tax penalties, and contrary to historical experience.  *Id.* at 90-91.  In no instance did FSOC attempt to explain *why* the postulated sequence of events was plausible, or offer any cogent support for the hypothesized risk.  Instead, it posited a fire sale of assets that

would never occur if state regulators acted as they have throughout history and if MetLife invoked its right to defer policyholder payments, as the Company said it would in such a situation (to honor its fiduciary duties and obligations to policyholders).

FSOC also treated Oliver Wyman's implausible assumptions for Scenarios 3 and 4 as if they were realistic projections of potential financial distress at MetLife, and then justified MetLife's designation by assuming even higher levels of stress and asset liquidation by MetLife, without identifying any evidence or data that suggested that such levels of distress and liquidation were remotely possible.  Instead, FSOC said it had considered "a wide range of plausible alternative assumptions with respect to several of the key variables," *id.* at 147, and then "performed certain analyses based on" Oliver Wyman's Scenario 3, including a "Monte Carlo simulation" under which MetLife would irrationally sell assets in a random order, rather than adopting a reasoned approach and selling the most liquid assets first, *id*. at 209, 221-22.  FSOC declined to specify the "plausible alternative assumptions," "key variables," or other "analyses" that it purportedly performed.  Nor did it put forward a single scenario that it claimed constituted a reasonable profile of potential financial distress at MetLife, or identify a single event or trigger that could cause such material financial distress, let alone the catastrophic collapse that it was hypothesizing.  FSOC also withheld numbers and other data behind its asset liquidation discussion.

FSOC's failure to put forward its own projected scenarios or models—and its insistence instead on opaque and indefinite speculation and conjecture—conflicted with accepted risk assessment practices, including the practices of federal financial regulators in other contexts, as discussed below.  Further, the agency's vague, ambiguous, and

36

indefinite claims deprived MetLife of adequate notice and the opportunity to respond to the proposed bases for designation, and denied it the notice and guidance necessary to identify steps it could take to avoid the "systemic" designation.

       f.     <u>Critical function or service channel</u>.  FSOC assigned unspecified weight to the critical function channel.  FSOC conceded that MetLife operates in competitive markets, but postulated that material financial distress at MetLife nevertheless could transmit stress through this channel in the event of an industry-wide pullback in MetLife's core businesses.  *See* Final Designation at 227.

       g.     <u>Contagion and state regulatory response</u>.  Rather than treating state regulatory frameworks as sources of risk mitigation, FSOC determined that state regulatory mechanisms could result in contagion—spreading "material financial distress" from MetLife to other insurers—including through a State's imposition of a stay or moratorium on withdrawals and surrenders.  Final Designation at 7, 245-46.  FSOC provided no evidence that an insurance company's failure or States' regulatory response had ever caused contagion, either in the period examined by Oliver Wyman or earlier.  But, FSOC said, this historical evidence was not relevant because past insurance failures had not involved an insurer of MetLife's size and purported interconnectedness.  *See id.* at 136.  In shunting state regulatory protections aside, FSOC ignored, among other things, "the degree to which [MetLife] is already regulated by 1 or more primary financial regulatory agencies" (DFA § 113(a)(2)(H)), thus disregarding Congress's recognition that insurance business activities already extensively regulated under state law were not the source of the 2008 financial crisis.  FSOC also drew an analogy between material financial distress at MetLife and the experience of AIG in the 2008 financial crisis, even

though MetLife fared well in the crisis, and—despite AIG's highly public and severe distress—surrender rates across the life insurance industry as a whole in 2008 and 2009 "were actually slightly lower" than in 2007.  Final Designation at 176-77.

By this reasoning, FSOC based its designation of MetLife in substantial part on a "contagion" effect that has never been observed in the insurance industry, and that basic economic understanding indicates would not occur.

h.     Consequences of designation.  FSOC asserted that it had no obligation to assess the effects that designation would have on MetLife, and its shareholders and policyholders, or on insurance consumers in general, because consideration of "costs and benefits" was not mandated by Section 113 of the Dodd-Frank Act.  Final Designation at 26-27.  Rejecting MetLife's position that consideration of consequences is a "risk-related factor" that FSOC must examine under Section 113(a)(2)(K), FSOC insisted that Section 113(a)(2)(K) merely recognizes FSOC's *discretion* to identify additional criteria but does not impose any mandatory requirements on the agency.  *Id.* at 29.  FSOC gave no reason for declining to exercise this discretion, nor did it explain why it was appropriate to take a regulatory action without considering the effects that action would have.  FSOC also ignored MetLife's evidence describing the increased annual consumer cost and increased costs to the Company that would result from imposition of higher capital requirements.

73.     The only FSOC voting member with insurance expertise, S. Roy Woodall, Jr., dissented.  Woodall understood the "central foundation for this designation" to be FSOC's reliance on a "sudden and unforeseen insolvency of unprecedented scale, of unexplained causation, and without effective regulatory responses or safeguards"—a starting point he found untenable.  Final Designation at 301 (dissent of S. Roy Woodall, Jr.).  Woodall also criticized

FSOC for engaging in a distorted application of the First Determination Standard rather than an evenhanded evaluation of MetLife under the Second Determination Standard. "Importantly," Woodall wrote, "rather than confronting the greater burden tied to the Second Determination Standard, it is easier [for FSOC] to simply presume a massive and total insolvency first, then speculate about the resulting effects on activities, than it is to initially analyze and consider those activities." *Id.* at 300. In addition, Woodall expressed concern that the deck may have been stacked in favor of designation from the outset, writing that "the consent and agreement by some of the Council's members at the FSB to identify MetLife" as a global systemically important insurer "sent a strong signal early-on of a predisposition as to the status of MetLife in the U.S. – ahead of the Council's own decision by all of its members." *Id.* at 302.

74. FSOC's non-voting state insurance commissioner representative, Adam Hamm, also wrote separately in opposition to the designation. At the "core" of the Final Designation, Hamm stated, was FSOC's imposition of "an impossible burden of proof" on MetLife, requiring the Company to "prove that there are no circumstances under which the material financial distress of the company could pose a threat to the financial stability of the United States." Final Designation at 309 (dissent of Adam Hamm). Hamm also faulted FSOC for its "[d]isregard[ ]" of "the full scope of state insurance regulatory" powers that officials would deploy were MetLife's insurance subsidiaries to experience "material financial distress." *Id.* at 305. He explained that state insurance capital requirements and numerous other regulatory powers "[n]ot only . . . help prevent solvency concerns" for an insurance company, "but, as a result of [state] authorities allowing for early regulatory intervention and ongoing supervision, they also minimize the impact of any material financial distress on policyholders, other counterparties and the system." *Id.*

## STATEMENT OF THE CLAIMS

### COUNT ONE:

### FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE METLIFE IS NOT A "U.S. NONBANK FINANCIAL COMPANY"

75.     MetLife incorporates by reference the allegations of the preceding paragraphs.

76.     Relying on Sections 4(k)(4)(B) and 4(k)(4)(I) of the BHCA, and related regulations, FSOC determined that MetLife is a "U.S. nonbank financial company" eligible for designation under Section 113 of the Dodd-Frank Act because more than 85% of its revenues and assets relate to "financial activities," and the Company is therefore "predominantly engaged in financial activities."  FSOC reached this conclusion by including MetLife's foreign insurance activities within its calculation.  That determination is based on a misreading of these subsections of the BHCA, which do not extend to foreign insurance activities.

77.     Specifically, FSOC ignored language in Sections 4(k)(4)(B) and 4(k)(4)(I) that limits the definition of "financial activities" to those that occur "in any State" or that are subject to "State law."  Section 4(k)(4)(B) defines as "financial activities" "[i]nsuring, guaranteeing, or indemnifying against loss, harm, damage, illness, disability, or death, or providing or issuing annuities, and acting as principal, agent, or broker for purposes of the foregoing, *in any State*." 12 U.S.C. § 1843(k)(4)(B) (emphasis added); *see also* 12 C.F.R. § 225.86(c); 12 C.F.R. Part 242, app. A, (b) (repeating statutory definition).  Section 4(k)(4)(I) similarly requires that the authorized activities be undertaken "in accordance with relevant *State law* governing such investments." 12 U.S.C. § 1843(k)(4)(I)(iii) (emphasis added); *see also* 12 C.F.R. §§ 225.86(c), 242.3; 12 C.F.R. Part 242, app. A, (i) (repeating statutory requirement that the shares represent an investment made "in accordance with relevant state law").  Accordingly, Sections 4(k)(4)(B)

and 4(k)(4)(I) extend only to the activities of an insurer that occur in the United States or are otherwise subject to state law.

78.     More than 30% of MetLife's consolidated assets and more than 25% of its consolidated revenues are attributable to insurance activities that occur *outside the United States* and that are *not* subject to the law of any U.S. State. MetLife's U.S. insurance activities, which are the only activities encompassed by Sections 4(k)(4)(B) and 4(k)(4)(I) of the BHCA, are therefore insufficient to satisfy the 85% statutory threshold. *See* 12 C.F.R. Part 242, app. A, (b), (i). Because less than 85% of MetLife's consolidated revenues and assets are attributable to activities that are "financial in nature" within the meaning of the BHCA and the Dodd-Frank Act, MetLife is not "predominantly engaged in financial activities" and does not qualify as a "U.S. nonbank financial company" eligible for designation as a nonbank SIFI.

79.     FSOC's designation of MetLife was therefore arbitrary and capricious under the Dodd-Frank Act and the APA. Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT TWO:

### FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE IT IS FATALLY PREMATURE

80.     MetLife incorporates by reference the allegations of the preceding paragraphs.

81.     It was arbitrary and capricious for FSOC to designate MetLife at this juncture because its Final Designation is fatally premature in three respects.

82.     *First*, the Board has not yet promulgated enhanced prudential standards for designated insurers, which left FSOC unable to address several statutory criteria that it is required to consider before designating a company a nonbank SIFI. For example, Section 113(a)(2)(H) of the Dodd-Frank Act directs FSOC to consider "the degree to which the company

is already regulated by 1 or more primary financial regulatory agencies." DFA § 113(a)(2)(H). FSOC has interpreted this provision, in turn, to require that it consider the adequacy of "existing regulatory scrutiny." 77 Fed. Reg. at 21,641. In order to conduct that analysis, FSOC must have some understanding of the alternative regulatory requirements that would result from designation—*i.e.*, the regulatory requirements the Board will apply to nonbank SIFIs that States do not. Those requirements are unknown.

83.     FSOC is also required, under both Section 113(a)(2)(K) of the Dodd-Frank Act and the requirements of reasoned decisionmaking under the APA, to consider the consequences of designation, including whether and how designating MetLife would further the Dodd-Frank Act's purpose of mitigating a potential threat to the financial stability of the United States, as well as the effects of designation upon MetLife, its shareholders, and its customers. By designating MetLife before the Board has promulgated the prudential standards for designated insurance companies, FSOC was unable to weigh these regulatory considerations: It neither determined how and to what extent federal oversight would be superior to state regulation nor assessed the effects of designation on MetLife and its customers and shareholders.

84.     *Second*, the Board has not yet promulgated standards for exempting systemically important entities from Board oversight, as it is required to do by Section 170(a) of the Dodd-Frank Act. *See* DFA § 170(a). FSOC frustrated Congress's unambiguously expressed purpose by designating MetLife as systemically important *before* the Board establishes rules to shield designated nonbank financial companies from the costs of unnecessary Board supervision. The absence of those standards deprived MetLife of the opportunity to conform its conduct to requirements of such an exemption and thereby avoid the costs and burdens of designation and resultant regulation.

85.     *Third*, FSOC has not yet established a standardized process for making designation determinations and thus cannot ensure that similar companies receive similar treatment.  The Government Accountability Office, for instance, has criticized FSOC for lacking a "systematic and comprehensive approach" for identifying financial institutions that could pose a threat to the U.S. economy.  U.S. Gov't Accountability Office, GAO-14-873T, Financial Stability Oversight Council: Status of Efforts to Improve Transparency, Accountability, and Collaboration, at 6 (2014).  In response to these and other criticisms, FSOC Chairman (and Treasury Secretary) Jacob Lew recently announced that FSOC will begin to "consider possible changes" to its designation procedures.  Meeting of the Financial Stability Oversight Council (Oct. 6, 2014), at 6.  FSOC's Final Designation of MetLife denied the Company the benefit of the modified procedures that will evidently be used by FSOC when considering companies for potential designation in the future.

86.     FSOC's designation of MetLife in the absence of these yet-to-be-promulgated rules and procedures was arbitrary and capricious, and violated the Dodd-Frank Act, and the APA.  MetLife is therefore entitled to relief under Section 113(h) of the Dodd-Frank Act and the APA, 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT THREE:

### FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE FSOC FAILED TO CONSIDER ALTERNATIVES TO DESIGNATION AND TO PROVIDE A REASONED EXPLANATION FOR REJECTING ALTERNATIVES

87.     MetLife incorporates by reference the allegations of the preceding paragraphs.

88.     A touchstone of reasoned agency decisionmaking is the consideration of alternatives to the regulatory action proposed by the agency and providing a reasoned explanation if those alternatives are rejected.  *See, e.g., Motor Vehicle Mfrs. Ass'n of the United*

*States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983); *Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498-99 (D.C. Cir. 1989).  FSOC failed to satisfy this requirement because the Final Designation reflects no consideration of alternatives to designation and rejects, without reasoned explanation, the use of an activities-based approach for evaluating insurance companies.

89.     MetLife repeatedly requested that FSOC consider an activities-based approach to regulating insurers in lieu of company-specific designations.  *See, e.g.*, Letter from Ricardo A. Anzaldua, Exec. Vice President & Gen. Counsel, MetLife, to Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC, at 1-2 (Aug. 6, 2014).  FSOC rejected those requests without reasoned explanation.  Instead, FSOC insisted that considering an activities-based approach is not a prerequisite to MetLife's designation because it is not one of the statutory considerations in Section 113, and would not be necessary or appropriate in any event because FSOC had already determined that MetLife poses systemic risks under the First Determination Standard.  FSOC never explained why an activities-based approach is suitable for asset managers but not insurers, or why asset managers that might also satisfy the First Determination Standard should not be evaluated under that Standard on a company-specific basis, as MetLife was.

90.     Furthermore, in designating MetLife, FSOC relied in part on the assets held in MetLife's variable annuity separate accounts, without ever acknowledging that MetLife's variable products are a vehicle for accessing the kinds of mutual fund investment products offered by asset management firms, or that these mutual fund assets vastly exceed the assets associated with MetLife's variable products.

91.     Consistent with its perfunctory rejection of an activities-based approach for insurance, FSOC has repeatedly declined to conduct the kind of diligence for the insurance

industry that it has undertaken for asset managers.  The Office of Financial Research assembled

and published its comprehensive 2013 report on the risks associated with asset management

firms and activities, but it published no comparable report concerning insurance companies prior

to FSOC's commencing its designations of insurers.  *See, e.g.*, Letter from Rep. Scott Garrett et

al. to Jacob J. Lew, Sec'y, U.S. Dep't of the Treasury, at 1 (Sept. 2, 2014) ("Garrett").  Similarly,

FSOC convened a public conference on asset management activities in order to solicit the advice

of asset management firms and other stakeholders, but held no similar conference for insurance

companies.  Garrett at 2.  And FSOC met in July 2014 to discuss the extent to which the asset

management industry poses systemic risk and "directed [its] staff to undertake a more focused

analysis of industry-wide products and activities to assess potential risks associated with the

asset management industry," but conducted no similar inquiry for insurers.  *Id*.  Finally, on the

same day that FSOC announced its Final Designation of MetLife, it requested public comment

regarding its potential regulation of certain activities of asset managers.  *See* FSOC Press Center,

Financial Stability Oversight Council Releases Request for Comment on Asset Management

Products and Activities (Dec. 18, 2014).

     92.    FSOC's refusal to conduct similar analyses of insurance activities has prompted

members of Congress to criticize the agency for "devot[ing] far less effort to empirical analysis,

stakeholder outreach, and transparency in its consideration of insurance companies for

designation than it [did] for asset management firms."  Garrett at 2.  Former Representative

Barney Frank, a principal co-sponsor of Dodd-Frank, stated that "asset managers or insurance

compan[ies] that just sell insurance as it's [traditionally] defined" do not have "systemic . . .

effect" and thus should *all* be regulated based on the "activities they engage in."  CQ Cong.

Transcripts, House Fin. Servs. Comm. Holds Hearing on the 2010 Fin. Regulatory Overhaul

Law, at 120 (July 23, 2014) (statement of former Rep. Frank); *see also* Daniel K. Tarullo,

Member, Bd. of Governors of the Fed. Reserve Sys., at 2011 Credit Market Symposium:

Regulating Systemic Risk, at 6, 11 (Mar. 31, 2011) ("The potential for systemic risk from

contagion effects really reflects the potential failure of an asset class or business model more

than a firm . . . . [T]o a considerable extent, potential contagion effects are best contained by

directly addressing them, rather than by trying to indirectly address them through designating

large numbers of nonbank-affiliated institutions under section 113 of the Dodd-Frank Act."),

*available at* http://www.federalreserve.gov/newsevents/speech/tarullo20110331a.pdf. FSOC

entirely ignored these considerations and alternatives in designating MetLife.

93.     FSOC also failed to consider other alternatives to designation.  For example,

FSOC never considered using its authority to make recommendations to MetLife's primary

regulator, which is expressly contemplated by Section 112(k) of the Dodd-Frank Act and was

identified by MetLife as an alternative to designation.  *See* DFA § 112(a)(2)(K).  By considering

this alternative to designation, FSOC could, at a minimum, have made clear the ways in which

existing state regulatory scrutiny of insurers is purportedly insufficient to address threats of

systemic risk, thereby affording state regulators the opportunity to address those purported

shortcomings.  FSOC should have given particular weight to Congress's express grant of

authority to FSOC in Section 112(k) to work with state regulators as an alternative to designation

so as to minimize conflict with the principles underlying the McCarran-Ferguson Act, under

which the regulation of the "business of insurance" is reserved to the States absent federal law

specifically relating to the business of insurance.  *See* 15 U.S.C. § 1012.  In failing to use its

Section 112(k) authority, FSOC effectively displaced state regulation to a significantly greater

extent than Congress intended.

94.     FSOC's failure to consider and address an activities-based approach toward insurance companies, and to consider other reasonable alternatives to designation, was arbitrary and capricious under the Dodd-Frank Act and the APA.  Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT FOUR:

**FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT, FSOC'S OWN REGULATIONS, AND THE APA BECAUSE FSOC FAILED TO ASSESS METLIFE'S VULNERABILITY TO MATERIAL FINANCIAL DISTRESS**

95.     MetLife incorporates by reference the allegations of the preceding paragraphs.

96.     The APA and basic dictates of reasoned decisionmaking prohibit an agency from imposing onerous burdens on regulated entities in order to prevent purely illusory risks.  *See, e.g.*, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).  The requirement to undertake a vulnerability analysis is also an essential component of FSOC's obligation under Section 113(a)(1) of the Dodd-Frank Act to determine whether material financial distress at a company "*could* pose a threat to the financial stability of the United States."  DFA § 113(a)(1) (emphasis added).  In order to avoid the conclusion, on the assumptions employed in the Final Designation, that every large financial institution must be designated as systemic, "could" in Section 113(a)(1) must mean more than a purely theoretical possibility.  Moreover, if distress at a company is highly unlikely, it is likewise unlikely that any such distress "could" emerge as a threat to the U.S. financial system.  Accordingly, several of the statutory considerations in Section 113 concern a company's vulnerability to financial distress, including the requirement to consider a company's leverage and the degree to which it is already regulated.  *See* DFA § 113(a)(2).

97.     FSOC's own Interpretive Guidance confirms this statutory obligation to consider a company's vulnerability to material financial distress, stating that FSOC is required to consider "the vulnerability of a nonbank financial company to financial distress" and that "leverage, . . . liquidity risk and maturity mismatch, and . . . existing regulatory scrutiny" are barometers of such vulnerability.  77 Fed. Reg. at 21,641; *see also id.* at 21,658 ("Nonbank financial companies that are highly leveraged, have a high degree of liquidity risk or maturity mismatch, and are under little or no regulatory scrutiny are more likely to be more vulnerable to financial distress.").  In contrast, FSOC stated, the remaining criteria identified in its Interpretive Guidance—size, substitutability, and interconnectedness—"seek to assess the potential impact of the nonbank financial company's financial distress on the broader economy." *Id.*  Accordingly, by its own account, a substantial portion of FSOC's analysis is supposed to be directed at determining a company's vulnerability to material financial distress.

98.     In its Final Designation, FSOC declined to consider MetLife's vulnerability to material financial distress, instead assuming that MetLife was experiencing financial distress. FSOC then compounded this error by assuming a total run on MetLife by all general account policyholders who could surrender their policies and using stress levels far in excess of material financial distress—defined in FSOC's own guidance as "imminent danger of insolvency"—to generate economic effects that it deemed "systemic."  77 Fed. Reg. at 21,657.

99.     FSOC's failure to evaluate MetLife's vulnerability to material financial distress, and its reliance on conditions more severe than its own definition of material financial distress, was arbitrary and capricious under the Dodd-Frank Act and the APA.  Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT FIVE:

**FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE IT WAS INCONSISTENT WITH THE STATUTORY CRITERIA SET FORTH IN SECTION 113(a)(2)**

100.    MetLife incorporates by reference the allegations of the preceding paragraphs.

101.    The Final Designation failed to conduct a rigorous examination of MetLife under the standards established in Section 113(a)(2) of the Dodd-Frank Act.  Instead, the Final Designation ignored the statutory factors that militated against MetLife's designation, such as leverage and the scope of existing regulatory scrutiny, and focused overwhelmingly on MetLife's size and purported "interconnectedness" with other financial institutions, and on the transmission channels described in the Council's Final Rule and Interpretive Guidance.  In giving undue weight to MetLife's size and purported "interconnectedness," and viewing those characteristics largely through the lens of its own invented "transmission channels," FSOC neglected the statutory factors expressly enumerated in Section 113.  Its failure to undertake a meaningful examination of all of the statutory criteria was arbitrary and capricious, and contrary to the plain text of Dodd-Frank.

102.    By its terms, Section 113(a)(2) prohibits FSOC from undertaking a vague and generalized designation inquiry and requires instead that it focus on the "nature" of various aspects of the operations of the specific company at issue, including the "nature" of the company's off-balance sheet "exposures," the "nature" of the company's "transactions and relationships" with banks and nonbanks that are "significant," the "nature . . . and mix of the activities of the company," and the "nature of the financial assets of the company."  DFA § 113(a)(2).  The repeated instruction to consider the company's qualitative "nature" underscores the Council's obligation to address company-specific characteristics and to analyze the features

and purposes of the company's transactions.  Accounting for the "nature" of MetLife's "transactions," "relationships," and "activities" required FSOC to meaningfully account for, among other things, the sharp distinction between the life insurance and banking businesses, which the Final Designation failed to do.

103.     The Final Rule and Interpretive Guidance that FSOC purported to apply in designating MetLife also squarely contradict Section 113.  Instead of focusing on the "nature" of a company's business, the designation standard set forth in FSOC's guidance concentrates on "size" and "interconnectedness," and purports to derive those concepts from seven of the eleven Section 113(a)(2) criteria, even where the statutory criteria appear to have no relation to the entity's size or interconnectedness.  For example, FSOC asserted that its obligations to consider Section 113(a)(2) factors such as the "importance of the company as a source of credit for households, businesses, and state and local governments" and the "extent to which assets are managed rather than owned" are captured by the size and interconnectedness criteria—despite the absence of any apparent link between "size" and "interconnectedness," on the one hand, and those specific statutory factors, on the other.  77 Fed. Reg. at 21,640.

104.     By superimposing its own regulatory criteria on the Section 113(a)(2) factors, FSOC reduced Congress's eleven-factor, company-specific inquiry into a generalized, high-level analysis focused overwhelmingly on an entity's size and purported interconnectedness with other market participants—factors that, considered alone, would lead to the designation of virtually *any* large financial company.

105.     The Final Designation amplified the foregoing errors in the Final Rule and Interpretive Guidance by merely reciting the statutory factors and acknowledging general data from the evidentiary record pertaining to those factors without meaningfully addressing those

data or their bearing on systemic risk or the appropriateness of MetLife's designation.  FSOC devoted fewer than 10 pages of discussion to the statutory factors—a small fraction of the more than 160 pages directed to the "transmission channels" formulated by FSOC.  *Compare* Final Designation at 31-39, *with id.* at 74-236.

106.    FSOC's improper emphasis on MetLife's size is exemplified by, among other things, its claim that even though there was no observed case in history of an insurer's failure causing "contagion" to other insurers, this "contagion" could happen in the event of material financial distress at MetLife because it is larger than any insurer that has failed in the past.  By postulating that MetLife's prominence would provoke a panic that justifies designation, FSOC improperly made size the basis for designation and swept aside the considerations required by Congress, as well as those required by FSOC's own regulatory framework, under which designation is to be based on an assessment whether "exposures" threaten to "materially impair . . . counterparties" and whether a "liquidation" of assets "would cause a fall in asset prices."  77 Fed. Reg. at 21,657.  FSOC's reliance on a "contagion" theory therefore violated the Dodd-Frank Act, FSOC's Interpretive Guidance, and was arbitrary and capricious in violation of Dodd-Frank and the APA.

107.    FSOC's failure to apply the statutory factors mandated by Congress was arbitrary and capricious, and violated the Dodd-Frank Act and the APA.  Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

<u>**COUNT SIX:**</u>

**FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE IT DEPENDED UPON UNSUBSTANTIATED, INDEFINITE ASSUMPTIONS AND SPECULATION THAT FAILED TO SATISFY THE STATUTORY STANDARDS FOR DESIGNATION AND FSOC'S OWN INTERPRETIVE GUIDANCE**

108.    MetLife incorporates by reference the allegations of the preceding paragraphs.

109.    The Final Designation is based on assumptions that are unsubstantiated, far-fetched, and unmoored from the evidentiary record.  Rather than utilizing empirical evidence and accepted methodologies to assess whether financial distress and systemic effects are likely, the Final Designation *assumed* extraordinarily severe financial distress at MetLife and then speculated whether there was any chance that distress "could" have systemic effects on the broader economy.  The Final Designation reflects an arbitrary and capricious exercise in "sheer" speculation, not the inquiry into enumerated statutory factors and concrete evidence that Congress intended.  *See Sorenson*, 755 F.3d at 708 (agency judgments "must be based on some logic and evidence, not sheer speculation") (internal quotation marks and punctuation omitted); *see also City of Centralia v. FERC*, 213 F.3d 742, 749 (D.C. Cir. 2000) (when an agency's "conclusion is based on sheer speculation . . . it cannot be said that there is substantial evidence" supporting the challenged action).

> **1.    FSOC's Assumptions Regarding Material Financial Distress At MetLife Ignored Settled Risk Analysis Principles, Resulting In Indefinite And Unbounded Speculation To Which MetLife Had No Meaningful Opportunity To Respond.**

110.    The Final Designation unreasonably departed from accepted risk assessment principles and practices.  In concluding that material financial distress at MetLife could threaten the broader U.S. economy, the Final Designation relied on a fact-defying sequence of implausible events and irrational actions by market participants and state regulators.  As a result, the Final Designation disregarded well-established principles of risk analysis, including the methods employed by federal regulatory agencies and international banking regulators in other contexts.  Under these methods, risk assessments are predicated on scenarios that are (1) carefully described and objectively defined, and (2) reasonably consistent with real-world experience.  The Final Designation satisfies neither element.

111.   *First*, the Final Designation purported to describe events stemming from hypothetical material financial distress at MetLife "in the context of a period of overall stress in the financial services industry and in a weak macroeconomic environment."  77 Fed. Reg. at 21,657.  But FSOC offered no objective definition of the conditions of "overall stress" or a "weak macroeconomic environment."  Although FSOC asserted that it had "address[ed] a range of outcomes that are possible but vary in likelihood," Final Designation at 9, it did not describe any of those "outcomes" or their likelihood in any manner that would allow for reasoned analysis.  In particular, FSOC did not identify in any way the values or ranges of values that were assumed for key macroeconomic variables, even though objectively specifying "stress" conditions is standard federal regulatory practice in analogous settings.

112.   For example, a prominent feature of the Board's oversight of the largest U.S. bank holding companies is the Comprehensive Capital Analysis and Review ("CCAR"), which is designed to assist the Board in assessing banks' ability to withstand substantial economic pressures.  The CCAR tests the resilience of a bank holding company by subjecting it to a series of hypothetical "stress scenarios," ranging from a "baseline" scenario to "adverse" and "severely adverse" economic conditions.  These scenarios are constructed by analyzing 28 different variables, including unemployment, exchange rates, prices, incomes, and interest rates, thereby pairing qualitative concepts—such as "severe recession" and a "sharp slowdown in economic activity"—with specific quantitative variables that may be deployed against a bank's balance sheet to assess the effects.  *See, e.g.*, 2014 Supervisory Scenarios for Annual Stress Tests Required under the Dodd-Frank Act Stress Testing Rules and the Capital Plan Rule (Nov. 1, 2013), *available at* http://www.federalreserve.gov/bankinforeg/bcreg20131101a1.pdf.  By contrast, in designating MetLife, FSOC declined to identify or delineate the scenarios it

claimed to have considered and thus turned "material financial distress" into a "black box" standard under which it could construct new, and increasingly dire, economic conditions with no evident empirical basis, and then purport that these completely hypothetical, cataclysmic scenarios served to refute all of the empirical, historical, and analytical evidence supplied by MetLife in the proceedings.

113.   *Second*, the Final Designation failed to account for "the *likely* behavioral response of other market participants to events of market stress," in violation of accepted risk analysis principles.  BCBS, Principles for Sound Liquidity Risk Management and Supervision ¶ 104 (Sept. 2008) (emphasis added); *see also* Policy Statement on the Principles for Development and Distribution of Annual Stress Test Scenarios, 77 Fed. Reg. 68,047, 68,049 (Nov. 15, 2012) (interim guidance).

a.   <u>Speculation regarding policyholder response</u>.  The Final Designation posited that, in the event of financial distress at MetLife, policyholders would seek to terminate their insurance coverage early, even though penalty provisions and tax requirements would in most cases make it economically imprudent to do so.  Final Designation at 143-44.  Evidence ignored by FSOC makes clear that policyholders do not engage in mass policy surrenders that are contrary to their economic interests (especially since certain insurance products contain provisions that make them more, rather than less, valuable when other investments fall in value).  Indeed, the evidence presented by MetLife shows that, taking into account the estimated losses resulting from early surrenders of insurance policies (which include tax penalties and potential difficulty in finding similarly priced replacement coverage), the average policyholder stands to incur significantly *greater* losses by surrendering rather than retaining the policy.  In most

insolvencies, moreover, coverage for the majority of policyholders continues uninterrupted without the need for the policyholder to do anything, as state resolution authorities often arrange for the assumption of the insolvent insurer's obligations by solvent insurers that buy up blocks of in-force business.

Furthermore, FSOC's uncritical invocation of what policyholders "could" do in response to MetLife's material financial distress led it to make contradictory assertions about the effects of policyholders withdrawing from MetLife and buying insurance from competitors, and to construe those assertions as resulting in invariably harmful effects to MetLife and the broader U.S. economy.  For example, FSOC observed that individual policyholders might surrender their MetLife policies in response to reports of the Company's material financial distress and substitute the "financial products offered by *another insurance company*," thus exacerbating MetLife's financial distress.  Final Designation at 164 (emphasis added).  But on the same page of its designation decision, FSOC posited that efforts by MetLife and state regulators to stop policyholder withdrawals at the Company "could cause policyholders *at other insurers* to lose confidence in the life insurance industry," *id.* (emphasis added), thereby implying that nervous policyholders would renounce life insurance coverage altogether (a notion wholly unsupported by historical evidence).  In effect, on a single page of its decision, FSOC simultaneously relied on a migration *toward* rival insurance companies, and a migration *away* from those companies, to justify designation of MetLife, without ever pausing to address the internal contradiction of this "heads-FSOC wins, tails-MetLife loses" methodology.

b.      Speculation assuming inadequate and ineffective state regulatory response.

FSOC hypothesized that, were state insurance regulators to impose a stay on withdrawals

in an effort to promote stability, the regulators' action would paradoxically reduce

"confidence" in other insurers and lead to a potential "run" across multiple insurance

firms.  Final Designation at 138, 144-45.  FSOC offered no evidence to support this

proposition and nowhere explained why state regulation would trigger contagion, but

federal regulation would supposedly mitigate it.  Further, in positing a scenario in which

MetLife's retail and institutional policyholders withdraw from MetLife en masse and at

equal rates, the Final Designation contradicted evidence and economic predictions that

were critically important to a regulation adopted by the SEC just months before.  *See*

Money Market Reform, 79 Fed. Reg. 47,736, 47,795 (Aug. 14, 2014).  In establishing

different regulatory requirements for the money market funds used by retail and

institutional investors, the SEC explained that institutional investors had reacted more

quickly and decisively to market stress in the 2008 financial crisis because their

investment stakes were larger, and concluded that they could be expected to do so in the

future because they are more likely to have the "sophistication and resources to monitor"

a fund's deteriorating holdings.  *Id.*  The Comptroller of the Currency, the Federal

Reserve, and the Federal Deposit Insurance Corporation relied on similar assumptions in

their rule imposing a liquidity coverage ratio ("LCR") on certain banking organizations.

*See* U.S. Liquidity Coverage Ratio: Liquidity Risk Measurement Standards, 79 Fed. Reg.

61,440 (Sept. 3, 2014).  In explaining the rule—which assumes significantly higher

outflow rates for wholesale deposits than for retail deposits during a 30-day stress

scenario—the agencies concluded that wholesale deposits are likely to be withdrawn

substantially more quickly than retail deposits because of the greater "sophistication" of entities that maintain wholesale deposits.

FSOC's Final Designation simply ignored this overwhelming consensus on the behavior of institutional and retail investors—which had been supplied for the record by MetLife, together with other confirming evidence—in positing a virtually instantaneous withdrawal by retail consumers from their insurance policies.

   c. <u>Arbitrary failure to examine the likelihood and magnitude of events</u>. FSOC arbitrarily declined to assign any values or probabilities to any part of its analysis, thereby further freeing the agency to engage in unbounded and indefinite speculation to which MetLife had no meaningful ability to respond.  Throughout its Proposed and Final Designations, the agency rested conclusions on assertions that certain events "could" occur, and that certain consequences "could" follow.  By refusing to distinguish the probable from the improbable or even large from small, the agency effectively eliminated any role for the countervailing evidence and arguments provided by MetLife.  Rather, all of MetLife's evidence and arguments were dispelled by assertions that things "could" happen, even if the probability and magnitude were wholly unexamined and almost certainly negligible.  For example, in response to MetLife's explanation for why it could not reasonably be compared to two insurance companies that failed in the early 1990s (prior to the major regulatory innovation of RBC requirements)—namely, because the companies had failed as a result of a heavy concentration in junk bond investments, which had prompted state regulators to impose new limits on insurer investments in risky assets—FSOC nevertheless responded that "a similar type of concern *could* arise, on a much larger scale, in the context of MetLife's material financial distress."  Final

Designation at 139 (emphasis added).  That response completely ignored MetLife's evidence and argument that subsequent state regulatory requirements, including the state-based RBC regime, substantially mitigated the likelihood of such events.

FSOC also failed to acknowledge that certain events it construed as transmitters of systemic effects through the "exposure transmission channel" would actually be offset by the occurrence of events assumed in the "asset liquidation channel."  For example, FSOC included in its exposure analysis certain letters of credit that may be drawn to meet claims only if the assets set aside to meet the claims have been exhausted.  The assets set aside for claims would never be exhausted, however, if policyholders surrendered their policies en masse, as FSOC supposed in its asset liquidation analysis.  FSOC nonetheless ignored this evidence submitted by MetLife and included the letters of credit in its exposure assessment.

###### 2. The Council Had No Reasoned Justification For Positing Material Financial Distress At MetLife More Severe Than Even The Most Improbable Scenarios Examined By Oliver Wyman.

114. Oliver Wyman's asset liquidation study examined four increasingly dire scenarios of financial distress at MetLife, ranging from the adverse to the wholly implausible.  The analysis demonstrates that, even under the third and fourth scenarios (which were so aggressively adverse as to be implausible), MetLife would not be forced to engage in asset sales on the scale or at the speed necessary to threaten U.S. financial stability.

115. The Final Designation unreasonably disregarded the premises and findings of Oliver Wyman's asset liquidation study.  Without specifying the assumptions or values that FSOC viewed as appropriate, and failing to disclose to MetLife the calculations that agency staff purportedly performed, FSOC asserted that it had conducted its own analyses based on the model provided by MetLife and that those analyses, which were a variation on Oliver Wyman's

Scenario 3, showed that MetLife's asset sales could disrupt financial markets.  *See* Final

Designation at 209, 225.

116.     Even the limited detail that FSOC provided regarding the nature of its asset

liquidation analyses demonstrates that FSOC's assessment was fundamentally flawed and

predicated on unreasonable assumptions and sheer speculation.  For example:

> a.     <u>Unavailability of State Regulatory Tools</u>.  In assessing MetLife's potential
>
> for systemic effects through the asset liquidation channel, FSOC ignored the efficacy of
>
> existing state regulatory scrutiny and its ability to prevent and mitigate financial distress
>
> experienced by insurers.  FSOC dismissed the ability of state regulators to impose a
>
> moratorium on surrenders by suggesting that it could produce adverse, rather than
>
> ameliorative, effects by depressing policyholder confidence.  FSOC's asset liquidation
>
> discussion nowhere acknowledged States' investment oversight, RBC requirements that
>
> compel States to rehabilitate or liquidate a failing insurer, and coordination efforts
>
> between regulators in different jurisdictions (through NAIC) and state guaranty
>
> associations (through NOLHGA).  FSOC likewise ignored statements by the President of
>
> NOLHGA, Peter Gallanis, that state regulators "*routinely* have imposed . . . moratoriums
>
> in life company receiverships in which there were concerns that 'spikes' in voluntary
>
> surrenders and withdrawals might have unduly threatened the company's liquidity or
>
> precipitated financially disadvantageous 'fire sales' of assets" and that these moratoria
>
> "invariably have secured the [regulators'] ability, with the support of the guaranty system
>
> when required, to satisfy all or the vast preponderance of essential insurance promises to
>
> consumers," Supplemental Statement of NOLHGA President Peter G. Gallanis, at 4
>
> (Oct. 14, 2014), and that he was aware of "no such evidence" that the imposition of

moratoria in significant receivership cases resulted in increased surrender and withdrawal activity at other insurers, *see id.* at 12.

Indeed, even if there were *no* existing state regulation or resolution of insurance companies, FSOC could have prepared virtually the *same* asset liquidation narrative; the only recognition FSOC gave existing regulatory scrutiny was to say that state regulatory attempts to assist a financially distressed insurer would only deepen the crisis.  This approach violated FSOC's statutory responsibility to consider existing regulatory scrutiny, and—by itself—rendered FSOC's asset liquidation analysis arbitrary, capricious, and an improper basis for designating MetLife.  While FSOC may wish to speculate (without evidence) that state stays would cause an unidentified amount of contagion, FSOC had no rational basis to assume that state regulators would not impose a stay.  And with a stay, FSOC's asset liquidation scenario indisputably would never occur. *See id.* at 4, 12.

      b.      <u>Unavailability of Deferral</u>.  FSOC's asset liquidation analysis fails, likewise, because the rapid liquidation FSOC hypothesized would not occur if MetLife invoked its contractual right to defer payments to policyholders.  MetLife submitted record evidence stating that if Scenario 3 materialized, it would likely invoke deferral provisions in total or in selected areas of its business.  Thus, while FSOC may wish to speculate (without evidence) that deferral by MetLife would cause contagion, FSOC had no rational basis to assume not only that state regulators would not issue a stay but also that MetLife would decline to defer.  For this reason too, FSOC's asset liquidation scenario indisputably would never occur and is a pure fiction that may not be used as a basis for designating MetLife.

   c. <u>Flawed Scenario Evaluation</u>.  FSOC's attempt to ground its asset

liquidation analysis in "certain analyses based on" Oliver Wyman's Scenario 3 while

disclaiming reliance on Scenario 4 fails on its own terms as well.  By abandoning its

Notice of Proposed Determination's treatment of Oliver Wyman's Scenario 4 as an

acceptable "baseline," FSOC tacitly acknowledged that Scenario 4 was too far-fetched

and implausible to support designation.  But FSOC then improperly escalated the

assumptions in Scenario 3—which itself was implausible—without explaining how those

adjustments did not cross the line and make the scenario as implausible as Scenario 4.

FSOC also erred in failing to establish that Scenario 3 was plausible, and by asserting that

its adjusted Scenario 3 generated market effects that threatened U.S. financial stability.

In fact, Oliver Wyman's Scenario 4—the only purpose of which was to test the effect on

the market of a maximum theoretical amount of asset sales (and which in no way was

designed to validate the plausibility of its underlying assumptions)—showed that MetLife

would be able to meet all potential liquidity demands without causing price impacts that

would pose a threat to U.S. financial stability even when facing a wholly implausible,

adverse set of assumed conditions.  Those conditions included—in addition to the

historically unsupportable assumption of state regulatory paralysis—simultaneous and

totally unprecedented mass surrenders by millions of policyholders acting directly

contrary to their own economic interests, and a hypothetical macroeconomic environment

that was significantly worse than the 2008 financial crisis and comparable to the most

stressed environment used in the current CCAR regime, without the concomitant benefit

to the value of the assets held by MetLife that would normally result from declining

interest rates.  FSOC failed to provide adequate explanation or support for reaching a contrary conclusion through its vaguely-described "analyses" performed on Scenario 3.

d.      <u>Random Order of Asset Sales</u>.  FSOC stated that, in performing its own (unspecified) analyses under the conditions of Scenario 3, it had used a "Monte Carlo" simulation to test variations in the order in which MetLife would sell its assets in hypothetical asset liquidation conditions.  *See* Final Designation at 221-22.  The Monte Carlo technique randomizes the order of asset sales—and therefore assumes, for example, that to raise cash MetLife would be as likely to sell illiquid, unique real estate (on which it would suffer financial loss) as it would highly liquid securities (on which it would incur little or no loss).  The Monte Carlo assumption effectively assumes that management would completely abdicate responsibility and is thus wholly inappropriate for assessing the effects of MetLife's liquidation of assets, which invariably would be conducted, not randomly, but in a rational manner that seeks to raise the maximum amount of funds with the least loss in the shortest period of time by selling the most liquid assets first and the least liquid assets last.  The very fact that FSOC posited a random asset liquidation schedule, as opposed to a planned schedule, underscores the speculative and implausible analysis and assumptions that FSOC employed in designating MetLife.

**3.      FSOC Grossly Exaggerated The Economic Impact Of Material Financial Distress At MetLife, Including By Sharply Exaggerating Market Participants' Purported "Exposures" To MetLife.**

117.    FSOC also dramatically overstated the risk to MetLife's counterparties and other market participants of material financial distress at MetLife.  In particular, the Final Designation sharply exaggerated the amount and significance of counterparties' "exposure" to MetLife by unreasonably disregarding the economic effects of established risk-reduction measures and the effects of existing state and federal regulation, and by repeating boilerplate, unsubstantiated

62

assertions that the "exposures" were such that MetLife's material distress "could cause losses" to the exposed entities—while disregarding the economic effects of MetLife's evidence that, among other things, the extent of the losses would be reduced by important mitigating factors and would arise from meaningfully distinct classes of "exposures."

      a.    <u>Failure to identify a "range," estimate, or "scenario" relied on, and reliance on conditions more severe than "material financial distress</u>."  FSOC's exposure analysis suggested an unbounded range of potential losses by MetLife counterparties— ranging from zero (for fully collateralized counterparties) to the full amount of their exposure to MetLife—with the Council studiously abstaining from any "estimate of expected losses to counterparties."  Final Designation at 78 n.381.  FSOC repeatedly stated that it was "consider[ing] [a] range of potential outcomes" of MetLife's material financial distress, *id.* at 9, 116, but declined to specify any particular range, estimate, or scenario, and failed to estimate losses (versus "exposure") at all, beyond saying that the exposures "could cause losses," *id.* at 81, 100, 126, 155.  FSOC also nowhere explained how these potential "losses" would "materially impair" MetLife's counterparties, as called for by its own Interpretive Guidance.  The result, in effect, was indifference to whether the actual losses to an entity exposed to MetLife would be significant or minuscule.  FSOC's conclusion did not change, for example, even when MetLife demonstrated that FSOC's estimated exposure was as many as *four times* greater than any reasonably possible loss to a counterparty.  *Id.* at 82-84, 132-35.  FSOC therefore failed to identify the *basis* for its decision, which was arbitrary, capricious, and irreconcilable with the most basic requirements for reasoned government decisionmaking.  And by performing a truncated analysis that halted at speculating that "exposures" "could cause

losses"—including "unrealized losses" or merely "interrupted . . . payments " (*id.* at 88,

102)—FSOC failed to make the necessary statutory determination of a threat to U.S.

financial stability, or even to determine that counterparties would be "materially

impaired," as required by its Interpretive Guidance.

FSOC also violated the plain terms of Section 113 of the Dodd-Frank Act, as well

as its Interpretive Guidance, by basing its designation decision on a MetLife insolvency

far more severe than "material financial distress," which it defined as "imminent danger

of insolvency or defaulting on . . . financial obligations."  77 Fed. Reg. at 21,657.

b.    Risk reduction practices omitted.  FSOC ignored the accepted effects of

widely-used risk reduction practices.  For example, FSOC's exposure calculations

ignored the availability of collateral, notwithstanding that a lender holding collateral is

protected from loss to the extent of the value of that collateral.  That fundamental

principle of collateralized lending is reflected in numerous statutory schemes, including

the Dodd-Frank Act's swaps reform provisions and the National Bank Act lending limit.

*See* 12 U.S.C. § 84.

c.    Regulatory requirements presumed inadequate and ineffective.  FSOC

either wholly ignored applicable risk-reducing provisions in state and federal regulations

or assumed that they would not function as intended.  For example, FSOC substantially

disregarded and arbitrarily failed to account for the new risk-reducing measures the SEC

had imposed on money market mutual funds just two months before issuance of the Final

Designation.  In its new rules, the SEC authorized money market mutual funds to impose

liquidity fees and redemption gates to moderate or restrict panic-driven investor

redemptions during times of market stress, concluding that this would sharply reduce the

likelihood of a "run" that forced the fund to "break the buck."  *See* Money Market

Reform, 79 Fed. Reg. at 47,747-49.  The SEC also withdrew permission for institutional

funds to maintain a stable price of $1.00 per share, thus eliminating the possibility of

those funds' breaking the buck.  *See id*. at 47,775.  By relying in its Final Designation on

the assertion that as many as 65 money market mutual funds that hold MetLife securities

could nevertheless break the buck, FSOC failed to take account of these measures.  (Even

prior to the SEC rules, only two U.S. money market funds had ever broken the buck.)

For example, the Final Designation maintained that "breaking the buck" at money market

mutual funds holding MetLife securities remained a serious concern because "a *majority*

of the 69 [money market mutual funds] holding MetLife's [securities] are estimated to be

retail [funds]," which under the SEC rule continue to be allowed to offer a stable net asset

value of $1.00 per share.  Final Designation at 12 n.39 (emphasis added); *see generally*

Money Market Fund Reform (Notice of Proposed Rulemaking), 78 Fed. Reg. 36,834,

36,835-37 (June 5, 2013) (describing pricing and valuation conventions that allow money

market mutual funds to "sell and redeem shares at a stable share price [typically $1.00 per

share] without regard to small variations in the value of the securities that comprise its

portfolio").  But FSOC's rudimentary counting did not address the new availability of

liquidity fees and redemption gates at all funds (both retail and institutional) as tools for

stopping panic and thus eliminating the risk of the funds "breaking the buck" in the event

of material financial distress at MetLife.  In light of the mitigating effect of fees and gates

and the elimination of any possibility that institutional funds could break the buck—not

to mention the fact that only *two* funds have ever "broken the buck"—it was utterly

implausible, arbitrary, and capricious for FSOC to predict that financial distress at

MetLife could lead to an epidemic of "buck breaking" at as many as *sixty-five* funds.

118.    After MetLife methodically rebutted the Notice of Proposed Determination's

calculation of the "aggregate capital markets exposures" of counterparties to MetLife,

demonstrating that the correct estimate was $90 billion rather than $183 billion, FSOC asserted

in the Final Designation that its overestimate did not change its conclusion regarding systemic

effects because even exposures at the lower ends of the estimated ranges "could" result in

MetLife's material financial distress posing a threat to the broader economy.  Final Designation

at 82.  Here again, FSOC relied on the vagueness of its method and conclusions to dismiss

MetLife's empirical refutation.

119.    FSOC also ignored without explanation MetLife's demonstration that its

counterparties' exposures were not systemically important, as reflected by the CCAR regime

used by the Board to assess banks' vulnerability to external economic impacts.  MetLife showed

that if the eight U.S. G-SIBs—that is, banks designated by international banking regulators as

"global systemically important banks"—were to lose the full value of their "exposure" to

MetLife (adjusted for expected recovery in policyholder liabilities)—an utterly implausible

assumption in the first instance—the resulting reduction in the U.S. G-SIBs' capital would be

many times *smaller* than the reduction provided for in the U.S. G-SIBs' CCAR analyses under

the "severely adverse" economic scenario.  Specifically, the CCAR's "severely adverse"

economic scenario is expected to cause the U.S. G-SIBs' capital to fall by amounts ranging from

37 times to 173 times *greater* than the reduction in capital attributable to the total failure of

MetLife.  *See* Oct. 16, 2014 Submission, II-13-14 (Table II-3).  These eight U.S. G-SIBs passed

the CCAR stress tests, meaning that the economic conditions underlying the CCAR "severely

adverse" scenario are not expected to cause the capital of any U.S. G-SIB to fall below the

Board-required minimums designed to prevent the banks from faltering.  It follows that the total

failure of MetLife and the total wipeout of claims—which would have a far smaller effect on

U.S. G-SIBs' capital—would not impose substantial financial stress on the U.S. G-SIBs.

FSOC's Final Designation neither deployed an analysis similar to CCAR nor responded in any

manner to MetLife's contention that the CCAR comparison showed that counterparties'

exposures to MetLife are not systemically important.

120.    FSOC likewise ignored without comment MetLife's illustration that the damages

and fines paid to the U.S. Government by several banks illustrated that counterparties' adjusted

"exposure" to MetLife could not be a source of systemic impacts.  The largest exposure by dollar

amount that an individual G-SIB has to MetLife is $3.2 billion (based on the exposure amount

corrected for overstatements and adjusted for expected recoveries on policyholder liabilities).

That amount is well below the amount of fines or settlements reportedly paid by G-SIBs in

recent years in connection, for example, with mortgage settlements (JPMorgan Chase & Co. at

$13 billion and Bank of America Corporation at $16.65 billion) and alleged violations of U.S.

foreign asset control restrictions (BNP Paribas at $8.9 billion).  Although these fines were large,

none resulted in material financial distress at the G-SIB.

121.    As with the CCAR analysis, MetLife advised FSOC of the inconsistency between

its "exposure" analysis in the Proposed Designation decision and these settlement payments by

G-SIBs.  Yet, in its Final Designation, FSOC neither responded to this objection nor provided

any yardstick or barometer for determining when "exposure" to MetLife was so great as to pose

a threat.

4.     **The Council's Systemic Risk Analysis Unreasonably Failed To Account For Existing Regulatory Scrutiny And Erroneously Equated MetLife With AIG As A Source Of "Contagion."**

122.     FSOC premised its designation of MetLife in substantial part on a "contagion" theory under which material financial distress at MetLife would spark an industry-wide panic, with customers of *other* insurers surrendering their policies and demanding immediate payment. Such a contagion effect has never been found to have occurred in the insurance industry—it exists only in the perception of the non-insurance experts on FSOC.  FSOC's contagion theory further posited that state insurance regulators would take only inadequate steps in response to MetLife's material financial distress, a conclusion that ignores record evidence that state regulators regularly deploy regulatory tools to address "stress situations" before systemic effects develop.

123.     Oliver Wyman's contagion study thoroughly analyzed past insurance failures and demonstrated that the chain of events postulated in FSOC's "contagion" theory was implausible. In fact, the study confirmed that the failure of one insurance company generally represents an opportunity for that firm's competitors to acquire new customers.  For example, at the time of its failure in 1994, Confederation Life was the fourth largest life insurer in Canada, but its failure did not result in an increase in policyholder surrenders at any other large Canadian insurer. Rather, in the year following the failure, Confederation Life's competitors generally saw an increase in new business.

124.     FSOC also ignored record evidence in asserting that state regulatory stays and other tools would backfire and actually be harmful in the event of MetLife's financial distress. In response to FSOC's erroneous assumptions concerning the ineffectiveness of state regulatory responses to insurance "contagion," Commissioner Hamm explained:

Consistent with the objectives of insurance regulation, these actions [by state insurance regulators] can be taken to preserve assets for policyholders, who do not or cannot surrender their policies, in order to ensure their insurance claims can be paid in the future.  Fears of surrenders leading to mass asset liquidation are thus unfounded, as insurance regulators have the ability and, moreover, the responsibility to take action in such an event.  *To the extent that the Council speculates about such stays leading to further contagion across the insurance industry, insurance regulators have extensive authorities to intervene to protect policyholders at these other firms as well.*  It is worth noting that our authorities are flexible and provide us substantial means to quell panic.  Even when a stay is implemented, insurance regulators can allow the release of funds in certain circumstances such as, for example, when a policyholder faces a financial hardship or similar emergency.

Final Designation at 306 (dissent of Adam Hamm) (emphasis added).  FSOC simply ignored this statement by the state insurance commissioner who, by statute, serves on FSOC for the purpose of informing its understanding of insurance in SIFI designation decisions.

125.    Moreover, although FSOC mechanically summarized the submissions from insurance regulators in New York, Connecticut, Delaware, North Carolina, Louisiana, and California, *see* Final Designation 246-49, FSOC failed to address the substance of those submissions or their uniform representation that state insurance regulators closely monitor MetLife's business activities and are willing and able to use numerous regulatory tools to address risks posed by those activities, including any possible contagion effects.  For example, in hypothesizing that MetLife's size would pose an insurmountable challenge for state regulators if the Company experienced "material financial distress," FSOC contradicted clear evidence that state insurance regulators calibrate their supervisory efforts to the scale of the supervised company's activities.  As the Louisiana Commissioner of Insurance (and past president of the NAIC) explained, "FSOC's emphasis on MetLife's size ignores the fact that state regulators pay particular attention to their largest companies and would be most attentive to the earliest signs of trouble at a company like MetLife, precisely because of its size."  Letter from James Donelon, Louisiana Insurance Comm'r to Jacob Lew, Sec'y, U.S. Dep't of the Treasury, at 2 (Nov. 7,

2014).  FSOC nowhere acknowledged or responded to this statement; rather, it treated MetLife's size exclusively as a factor that militated in favor of designation.

126.    FSOC compounded its error by relying on supposed contagion sparked by MetLife without providing any evidence or basis to believe that this insurance industry contagion—which has never occurred at all—not only would occur but would be so grave in MetLife's case as to threaten the financial stability of the United States.

127.    The Final Designation also fundamentally misunderstood the important differences between MetLife and AIG as potential sources of contagion risk, including the unique, non-insurance related problems that caused the federal government to intervene at AIG in 2008.  As a representative of the New York State Insurance Department (now the New York Department of Financial Services) explained to Congress, "The main reason why the federal government decided to rescue AIG was not because of its insurance companies."  TARP and Other Government Assistance for AIG:  *Hearing Before the Congressional Oversight Panel*, 111th Cong. 134 (May 26, 2010) (testimony of Deputy Superintendent Michael Moriarty, N.Y. State Ins. Dep't).  Rather, it was because of the risk created by AIG's capital market financial products—in particular, its credit default swaps—which are unrelated to the business of insurance and were not subject to the insurance regulatory regimes that oversee 98% of MetLife's assets and 96% of its liabilities.  *Id.* at 140.

128.    Unlike AIG, MetLife is predominantly engaged in extensively regulated traditional insurance activities, and its credit default swaps activities are substantially different in both type and amount from those of AIG.  MetLife engages in such activities only through regulated insurance companies overseen by state insurance regulators and only for hedging and asset-replication purposes.  Moreover, MetLife's credit default swaps portfolio is minuscule

compared to AIG's credit default swaps activities in the immediate run-up to the financial crisis. *See* Federal Reserve, Report Pursuant to Section 129 of the Emergency Economic Stabilization Act of 2008:  Secured Credit Facility Authorized for American International Group, Inc. on September 16, 2008, at 2, *available at* www.federalreserve.gov/monetarypolicy/files/ 129aigseccreditfacility.pdf.

129.    In all of these respects and many others, FSOC's Final Designation reflected arbitrary and capricious reasoning based on unsubstantiated speculation and conjecture that violated both the Dodd-Frank Act and the APA.  Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT SEVEN:

### FSOC'S DESIGNATION OF METLIFE WAS ARBITRARY AND CAPRICIOUS AND VIOLATED THE DODD-FRANK ACT AND THE APA BECAUSE FSOC FAILED TO CONSIDER THE ECONOMIC EFFECTS OF DESIGNATION ON METLIFE

130.    MetLife incorporates by reference the allegations of the preceding paragraphs.

131.    The SIFI designation process is meant to reduce risk and promote stability.  It would therefore be arbitrary and capricious for FSOC to take an action intended to reduce the systemic risk purportedly posed by a company without considering substantial evidence that the action would weaken the very entity that it was intended to strengthen.  Yet, that is precisely what FSOC did in its Final Designation.

132.    Insurance is a highly competitive industry in which MetLife vies with numerous domestic and foreign companies of varying sizes to attract customers and capital.  If an insurer is subject to additional and different regulatory requirements that impose materially higher costs than those borne by competitors, the designated company is placed at a significant and potentially insurmountable competitive disadvantage.  Depending on the prudential standards that the Board ultimately promulgates for designated insurers, MetLife could have substantially

71

higher capital requirements than most of its principal competitors, forcing the Company to increase costs to consumers and potentially withdraw from certain markets, thereby reducing consumer choice and competition.  Alternatively, if MetLife did not raise prices in response to the imposition of bank-based capital standards and accepted the resulting reduction in its return on investment, MetLife could lose billions of dollars in value.  Other regulatory obligations that will apply to MetLife—but not most of its principal competitors—include the requirement that MetLife submit a detailed resolution plan setting forth how the Company could be resolved under the Bankruptcy Code.  The resolution plan will have to be resubmitted annually, and a failure to submit a "credible" resolution plan could result in the imposition of a variety of measures, including additional capital, leverage, or liquidity requirements, and forced divestiture of assets or operations.

133.    Because the economic consequences of designation, including the effects on competition and MetLife's shareholders and policyholders, are "important aspect[s] of the problem" at hand, *State Farm*, 463 U.S. at 43, FSOC was obligated to consider those consequences as an additional "risk-related factor[ ]" under Section 113(a)(2).  At the very least, FSOC was required to do more than decline to consider these effects simply because Section 113(a)(2) does not expressly mandate a cost-benefit analysis.  *See* Final Designation at 29.

134.    FSOC's failure to consider the consequences of designation for MetLife, its shareholders, and its policyholders was arbitrary and capricious, and a violation of its statutory mandate under Section 113(a) of the Dodd-Frank Act.  Accordingly, MetLife is entitled to relief under Section 113(h) of the Dodd-Frank Act and the APA, 5 U.S.C. §§ 702, 706(2)(A), (B), (C).

## COUNT EIGHT:

### FSOC'S DESIGNATION OF METLIFE VIOLATED THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT AND THE SEPARATION OF POWERS

135.    MetLife incorporates by reference the allegations of the preceding paragraphs.

136.    FSOC's structure violates fundamental separation of powers principles because it blends—in a single body of ten voting and five non-voting members—all three powers of government.  FSOC members perform a legislative function by adopting rules that purport to set the standards used to determine whether to designate companies; an executive and prosecutorial function by proposing companies to be subject to the standards they have promulgated, investigating those companies, and building the case for designation; and an adjudicative function by issuing final decisions adopting their own proposed rationales.  Not only is each of these functions performed by the same body, but they are also performed by the same individuals, without even a separation of functions into offices or divisions.  In exercising these combined legislative, executive, and judicial powers to make determinations that have immediate effects on private parties before they have secured judicial review, the Council violates the constitutional separation of powers.  *See Elliott v. SEC*, 36 F.3d 86, 87 (11th Cir. 1994) ("An agency may combine investigative, adversarial, and adjudicative functions, as long as no employees serve in dual roles."); *see also* 5 U.S.C. § 554(d).

137.    The combination of legislative, executive, and adjudicative functions in FSOC's members also resulted in a violation of MetLife's due process rights.  FSOC's Final Designation subjects MetLife to onerous new regulatory obligations following an adversarial process in which the same people who designated the Company made the decision to identify it as a candidate for designation in the first instance, collected the evidence, and also built the case for designation.

138.     In addition, due process requires the government to provide adequate notice of what is required and what is prohibited, so the public may conform their conduct.  Likewise, the government must provide explicit standards for those who will apply the law.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them," and must give a "person of ordinary intelligence a reasonable opportunity to know" what the law is).  FSOC's designation regime fails on both counts.  Among other things, FSOC has never identified the thresholds that result in SIFI designation and how the various statutory and regulatory factors are being balanced against one another.  Those shortcomings severely impaired MetLife's ability to respond to FSOC's grounds for designating the Company and denied it the opportunity to modify its activities in order to avoid designation.

139.     FSOC also repeatedly and improperly denied MetLife access to the full record on which its Notice of Proposed Determination and Final Designation were based.  During the pendency of FSOC's consideration of MetLife, the Company made repeated requests to FSOC for access to the record, but those requests were met in every instance with an absolute or near-absolute denial of access to any additional information.  MetLife also sent a total of ten requests under the Freedom of Information Act ("FOIA") to FSOC, the Federal Insurance Office ("FIO"), the Board, and the Federal Housing Finance Agency ("FHFA") seeking information about FSOC's designation process and standards and the regulatory consequences that would result from designation.  5 U.S.C. § 552.  FSOC and FIO did not produce a single document; FHFA produced a single, heavily redacted document; and the Board produced 241 pages of documents that were already publicly available.  Among other things, FSOC refused to provide MetLife with complete copies of the final decisions designating Prudential and AIG (with confidential

financial information redacted), thereby denying access to key precedents that were essential for fully understanding the standards applied by FSOC.  Because it was denied access to FSOC's analyses and evidence and other information directly relevant to the designation process, MetLife was denied its constitutional right to be heard and to respond fully and meaningfully to the flaws in FSOC's designation determination.

140.    This violation of MetLife's due process rights was exacerbated by FSOC's reliance on new evidence and analysis in the Final Designation that was not included in its Notice of Proposed Determination.  *See, e.g.*, Final Designation at 24-25, 253, 255 (intercompany accounting eliminations in MetLife's consolidated balance sheets); *id.* at 95 (new calculation purportedly resulting in a lower liability coverage ratio for the Executive Life insolvency); *id.* at 221-22 (Monte Carlo analysis).  Because FSOC revealed these aspects of its determination only in the Final Designation, MetLife had no opportunity to respond to them.  It was likewise unable to respond to FSOC's assessment of the effects of material financial distress at MetLife because FSOC never identified with any measure of specificity the cause of that distress, the dimensions of the distress, or the broader macroeconomic environment in which the distress occurred.  By assuming a cataclysmic event that caused both financial distress at MetLife and serious damage to the broader U.S. economy but failing to identify that event or its origins, the Final Designation deprived MetLife of the ability to present evidence establishing that the event would not occur, or that it would not pose any risk to U.S. financial stability.

141.    The designation of MetLife therefore violated the Due Process Clause of the Fifth Amendment and the constitutional separation of powers.  Accordingly, MetLife is entitled to relief under the U.S. Constitution, U.S. Const., arts. I, II, III & Amend. V, Section 113(h) of the Dodd-Frank Act, and the APA, 5 U.S.C. §§ 702, 706(2)(B).

## COUNT NINE:

## THE DODD-FRANK ACT'S PROVISIONS CONCERNING FSOC'S AUTHORITIES VIOLATE THE SEPARATION OF POWERS BY ASSIGNING LEGISLATIVE, PROSECUTORIAL, AND ADJUDICATIVE FUNCTIONS TO THE SAME INDIVIDUALS

142.    MetLife incorporates by reference the allegations of the preceding paragraphs.

143.    Sections 112 and 113 of the Dodd-Frank Act authorize FSOC to perform the legislative, investigative and prosecutorial, and adjudicative functions described above.  The Act confers these authorities within a framework that empowers FSOC's members to identify companies eligible for designation, assemble information and mount a case against them, issue a "proposed determination" that is "proposed" in name only, and then ratify its own rationales. *See* DFA § 113(e)(1).  These functions are performed not merely by the same body, but by the same individuals.

144.    By lodging these functions within the same agency, and failing to provide for any division of these competences between and among FSOC's ten voting and five non-voting members or discrete divisions or staffs within the agency, the Dodd-Frank Act violates the constitutional separation of powers.  *See Elliott*, 36 F.3d at 87; *see also* 5 U.S.C. § 554(d).

145.    Accordingly, MetLife is entitled to relief under the U.S. Constitution, U.S. Const., arts. I, II, III & Amend. V, Section 113(h) of the Dodd-Frank Act, and the APA, 5 U.S.C. §§ 702, 706(2)(B).

## COUNT TEN:

### CLAIM FOR INJUNCTIVE RELIEF

146.     MetLife incorporates by reference the allegations of the preceding paragraphs.

147.     MetLife will be irreparably harmed if FSOC's Final Designation is permitted to stand in the absence of the Board's issuance—and FSOC's consideration—of a rule establishing enhanced prudential standards for designated insurers.  The absence of that rule precluded FSOC from considering the statutory criteria required for designation, including the sufficiency of existing regulatory scrutiny.  *See* DFA § 113(a)(2)(H).  MetLife will also be irreparably harmed if FSOC's Final Designation is permitted to stand in the absence of the Board's issuance of a rule specifying the grounds for exempting designated entities from Board supervision.

148.     MetLife will also be irreparably harmed if FSOC's Final Designation is permitted to stand in the absence of clear standards for designating nonbank financial companies as systemically important because the absence of clear standards violated MetLife's due process rights, and MetLife's designation will subject it to competitive harms that similarly situated insurers may avoid.

149.     An injunction restraining FSOC from engaging in conduct inconsistent with the Dodd-Frank Act necessarily serves the public interest.

150.     The harm to MetLife caused by the Final Designation, which likely includes hundreds of millions of dollars in costs per year as a result of new regulatory burdens, such as the requirement to submit a detailed resolution plan on an annual basis, and potentially billions in associated, unspecified capital requirements to be imposed by the Board, outweighs any benefits or interests claimed by FSOC in designating MetLife before it finalizes its designation standards or before the Board issues a final rule concerning the prudential standards to be applied to designated nonbank financial companies or a rule implementing its exemption authority.

151.    MetLife is therefore entitled to injunctive relief under Section 113(h) of the Dodd-Frank Act and 5 U.S.C. § 702.

## PRAYER FOR RELIEF

152.    WHEREFORE, MetLife prays for an order and judgment:

a.      Declaring that FSOC's designation of MetLife was not in accordance with the Due Process Clause of the Fifth Amendment, the constitutional separation of powers, the Dodd-Frank Act, and the APA, and that it was arbitrary and capricious within the meaning of Section 113(h) of the Dodd-Frank Act and 5 U.S.C. § 706(2)(A);

b.      Vacating and setting aside the designation;

c.      Declaring that the Dodd-Frank Act's conferral of legislative, prosecutorial, and adjudicative functions on the same individuals within an agency, without any separation of functions into offices or divisions, violates the separation of powers, and thus is null and void;

d.      Enjoining FSOC and its officers, employees, and agents from implementing, applying, or taking any action whatsoever to designate MetLife until the Board promulgates prudential standards for insurance companies and criteria for exempting nonbank financial companies from Board supervision, and until FSOC finalizes its designation standards;

e.      Awarding Plaintiff its reasonable costs, including attorneys' fees, incurred

in bringing this action; and

f.      Granting such other and further relief as this Court deems just and proper.


Respectfully submitted,


Dated: January 13, 2015

/s/ Eugene Scalia
Eugene Scalia (D.C. Bar No. 447524)
    *Counsel of Record*
EScalia@gibsondunn.com
Amir C. Tayrani (D.C. Bar No. 490994)
Ashley S. Boizelle (D.C. Bar No. 1010322)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539

*Counsel for Plaintiff MetLife, Inc.*