# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **METLIFE, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )    **Civil Action No. 15-cv-00045 (RMC)** |
| **FINANCIAL STABILITY** | ) |
| **OVERSIGHT COUNCIL,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>BRIEF OF PROFESSORS OF LAW AND FINANCE AS *AMICI CURIAE* SUPPORTING DEFENDANT</u>

ROBERT J. JACKSON, JR.,
GILLIAN E. METZGER
Center for Constitutional Governance
Columbia Law School
435 West 116th Street
New York, NY 10025

KATE ANDRIAS (D.C. Bar No. 983674)
Telephone: (734) 763-9697
Email: kandrias@umich.edu
MICHAEL S. BARR
University of Michigan Law School
625 South State Street
Ann Arbor, MI 48109

*Counsel for* Amici Curiae

Dated: May 22, 2015

# TABLE OF CONTENTS

Statement of Interest ........................................................................................................... 1

Summary of Argument ....................................................................................................... 1

Argument ............................................................................................................................ 3

I.   In Response to the Devastating Effects of Nonbanks' Distress During the 2008 Financial Crisis, Congress Created a Carefully Balanced System for Identifying Systemically Significant Nonbank Financial Firms. ................................................................................. 3

   A.  In Dodd–Frank, Congress Recognized that Regulatory Gaps Leading to the Absence of Effective Federal Supervision of Nonbank Financial Firms Contributed to the Crisis. ..................................................................................................................... 3

   B.  Congress Designed the FSOC's Structure and Procedures to Ensure that Its SIFI Designations Derive from Expert, Informed, and Predictive Judgments About the Financial System. ................................................................................................... 4

      1.  Congress Designed the FSOC's Structure and Procedures to Ensure Expert, Informed, and Constrained Exercise of the Designation Power. ............................ 5

      2.  Both Congress and the FSOC Recognized that SIFI Designations Would Necessarily Involve Predictive Analysis. ............................................................. 7

   C.  The FSOC's Designation Authority Is Particularly Important in Light of Restrictions Congress Has Imposed on Strategies that Federal Regulators Used During the 2008 Financial Crisis. ..................................................................................................... 9

II.  Congress Limited Judicial Review of FSOC SIFI DESIGNATIONS to a Highly Deferential Arbitrary and Capricious Standard, Which Is Easily Met Here. .................... 10

   A.  Congress Limited Judicial Review of FSOC SIFI Designations to a Highly Deferential Arbitrary and Capricious Standard. ........................................................ 10

   B.  The FSOC's Designation of MetLife Easily Meets the Deferential Standard of Review Applicable Here. ........................................................................................... 13

      1.  The FSOC Properly Concluded that MetLife's Financial Distress Could Threaten U.S. Financial Stability Through Market Participants' Significant Exposure to MetLife. ..................................................................................................... 13

      2.  The FSOC Properly Found that MetLife's Material Financial Distress Could Lead to Asset Sales that Could Threaten U.S. Financial Stability................................. 18

C.  This Court Should Decline MetLife's Invitation to Impose Procedural or Evidentiary Requirements Beyond Those Contemplated by Congress. ........................................ 20

Conclusion ................................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Power Co. v. EPA*, 251 F.3d 1026 (D.C. Cir. 2001) ............................................... 11

*BellSouth Corp. v. FCC*, 162 F.3d 1215 (D.C. Cir. 1999) ............................................................ 11

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011) .......................................................... 12

*Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010) ................................................. 11

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .......................................... 11

*Domestic Sec., Inc. v. SEC*, 333 F.3d 239 (D.C. Cir. 2003) ....................................................... 11

*Melcher v. FCC*, 134 F.3d 1143 (D.C. Cir. 1998) ...................................................................... 11

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................................................................... 10

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) ............................................................ 22

*Rural Cellular Ass'n v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009) ............................................. 10, 11

*Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519 (1978) ............................................... 22

**Statutes**

12 U.S.C. § 343 (2012) .................................................................................................................. 9

12 U.S.C. § 5321 (2012) ................................................................................................................ 5

12 U.S.C. § 5322 (2012) ........................................................................................................... 5, 7

12 U.S.C. § 5323 (2012) .......................................................................................................... passim

15 U.S.C. § 78c (2012) ................................................................................................................ 12

15 U.S.C. § 78w (2012) ............................................................................................................... 12

15 U.S.C. § 80a-2 (2012) ............................................................................................................ 12

50 U.S.C. § 3021 (Supp. I 2013) ................................................................................................... 5

Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010) ........................................................................ 1, 7

**Legislative Documents**

155 Cong. Rec. (2009) ................................................................................................ 7

156 Cong. Rec. (2010) ............................................................................................ 4, 7

*Establishing a Framework for Systemic Risk Regulation:  Hearing Before the S. Comm on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-297, 111th Cong. (2009) (statement of Sen. Dodd) ................................................................................................ 6

H.R. 4173, 111th Cong. (as introduced in House, Dec. 2, 2009) ................................. 6

*Modernizing Bank Supervision and Regulation—Part 1:  Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-109, 111th Cong. (2009) ........... 5

S. Rep. No. 111-176 (2010) .................................................................................. 3, 4

*The Administration's Proposal to Modernize the Financial Regulatory System:  Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-228, 111th Cong. (2009) 6

**Administrative Documents**

77 Fed. Reg. 21,637 (Apr. 11, 2012) ..................................................................... 8, 22

Determination of Foreign Exchange Swaps and Foreign Exchange Forwards under the Commodity Exchange Act, 76 Fed. Reg. 25,774 (May 5, 2011) ............................. 8

Fin. Stability Oversight Council, *Notice of Final Determination and Statement of the Basis for Financial Stability Oversight Council's Final Determination Regarding MetLife, Inc.* (Dec. 18, 2014) ..................................................................................................... passim

Fin. Stability Oversight Council, *Supplemental Procedures Relating to Nonbank Financial Company Determinations* (2015) ............................................................................ 9

**Other Authorities**

Complaint, *MetLife, Inc. v. Financial Stability Oversight Council*, No. 15-45 (D.D.C. Jan. 13, 2015) .......................................................................................................... passim

Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* (2011) .............................. 3, 9

J.M. Hammersley & D.C. Handscomb, *Monte Carlo Methods* (1964) ....................................... 23

Jacob E. Gersen, *Administrative Law Goes to Wall Street:  The New Administrative Process*, 65
Admin. L. Rev. 689 (2013) .................................................................................................. 5

Jeffrey N. Gordon & Christopher M. Gandia, *Money Market Funds Run Risk: Will Floating Net
Asset Value Fix the Problem?*, 2014 Colum. Bus. L. Rev. 313 ............................................. 16

Jeffrey N. Gordon, *The Empty Call for Cost-Benefit Analysis in Financial Regulation*, 43 J.
Legal Stud. (Special Issue) 351, 366–67 (2014). ..................................................................... 8

John C. Coates IV, *Cost-Benefit Analysis of Financial Regulation: Case Studies and
Implications*, 124 Yale L.J. 882, 1011 (2015) ......................................................................... 8

Marcin Kacperczyk & Philipp Schnabl, *How Safe Are Money Market Funds?*, 128 Q.J. Econ.
1073 (2013) ............................................................................................................................. 15

Phelim P. Boyle, *Options: A Monte Carlo Approach*, 4 J. Fin. Econ. 323 (1977) ...................... 23

Richard Carnell, Jonathan Macey & Geoffrey Miller, *The Law of Banking and Financial
Institutions* (4th ed. 2009) ....................................................................................................... 15

Robin Greenwood et al., *Vulnerable Banks*, 115 J. Fin. Econ. 471 (2015) ................................. 23

Viral Acharya et al., *Rollover Risk and Market Freezes*, 66 J. Fin. 1177 (2011) ......................... 19

## STATEMENT OF INTEREST

*Amici* are fifteen law and finance professors from leading universities whose research focuses on financial regulation and administrative law, including the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd–Frank"), Pub. L. No. 111-203, 124 Stat. 1376 (2010).[1]  *Amici* have an interest in the presentation to the Court of analysis and academic research relevant to the issues in both fields raised by this case.

## SUMMARY OF ARGUMENT

The financial crisis of 2008, and the deep and long recession that it spawned, were the most serious economic calamities to befall the nation since the Great Depression.  Congress's response, Dodd-Frank, recognized that the failure to effectively regulate nonbank financial companies was a central contributor to the crisis.  The nation's financial regulators had failed to foresee and address systemic risks, in part due to regulatory gaps that had prevented consolidated supervision by the Federal Reserve of major nonbank financial firms, such as Lehman Brothers and American International Group ("AIG").  To protect the country against future crises, Congress created the Financial Stability Oversight Council ("FSOC" or "Council") and granted it the power to designate nonbank financial companies as systemically important financial institutions ("SIFIs") subject to supervision by the Federal Reserve.[2]  Without this power, nonbank financial firms could once again expose the nation to economic disaster.  This grant of power is particularly important given that Congress simultaneously curtailed previously existing

---

[1] A list of *amici*—and their institutional affiliations, provided for identification purposes only—is included in the Appendix. Although several of the *amici* previously served in the current Administration, the views reflected here are solely their own.

[2] Although Dodd-Frank uses different language to describe firms that are designated by the FSOC, throughout this brief we adopt the common convention of referring to such firms as "SIFIs."

emergency authorities that federal regulators used to stabilize nonbank financial firms during the crisis.

Congress carefully designed the FSOC's structure and procedures to ensure that SIFI designations would derive from expert, informed, and deliberate judgments.  In order to produce system-wide perspective and deep expertise, Congress placed the heads of the nation's leading financial regulators on the FSOC.  And to ensure deliberate and balanced decision-making in connection with SIFI designations, Congress imposed a supermajority voting requirement, included perspectives from independent and nonvoting members, and added numerous other internal procedural checks.  At the same time, Congress understood—indeed, Congress mandated—that the FSOC's SIFI designations would be predictive in nature.  The FSOC's role, Congress directed, would be to determine whether material financial distress at a nonbank firm *could* pose a threat to the financial stability of the United States, not whether it *would* constitute a threat.  12 U.S.C. § 5323(a) (2012).  That is because the very purpose of designation is to subject the firm to consolidated supervision by the Federal Reserve so that regulators can prevent the firm from undermining the nation's economic stability in the future.

Anticipating that the Council's work would demand deep expertise and probabilistic judgments and be subject to procedural protections that ensure informed and deliberate decision-making, Congress expressly limited judicial review of FSOC designations.  *See* 12 U.S.C. § 5323(h) (2012).  This Court's review in this case is statutorily restricted to the highly deferential arbitrary and capricious standard, and FSOC's designation of MetLife easily meets that standard.  MetLife's designation was based on two projected threats to financial stability that could arise from the company's material financial distress: losses caused by financial-market participants' exposure to MetLife and market disruptions arising from the asset sales that could accompany

MetLife's distress.  Far from being arbitrary or capricious, both projections were carefully

reasoned and are amply supported by the record.

In the end, MetLife's challenge amounts to an effort to have this Court impose procedural

and evidentiary prerequisites on FSOC designations that are not found in the governing statute.

But those policy choices are for Congress, not the courts. This Court should decline MetLife's

invitation to interfere with Congress's policy choices about how best to secure the stability of the

U.S. economy.

## ARGUMENT

## I.  IN RESPONSE TO THE DEVASTATING EFFECTS OF NONBANKS' DISTRESS DURING THE 2008 FINANCIAL CRISIS, CONGRESS CREATED A CAREFULLY BALANCED SYSTEM FOR IDENTIFYING SYSTEMICALLY SIGNIFICANT NONBANK FINANCIAL FIRMS.

### A.  In Dodd–Frank, Congress Recognized that Regulatory Gaps Leading to the Absence of Effective Federal Supervision of Nonbank Financial Firms Contributed to the Crisis.

The financial crisis of 2008 crushed the American economy, plunging the United States

into a years-long Great Recession.  The crisis shuttered American businesses, cost millions of

Americans their jobs, and wiped out billions in home values and retirement savings.  S. Rep. No.

111-176, at 39 (2010); *see also* Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report*

xv–xvi (2011).  This wreckage arose, in part, from the activities of firms outside the formal

banking system that were nevertheless engaged in extensive financial activities.  S. Rep. No.

111-176, at 40, 43.  These firms effectively engaged in the essential business of banks—

including "maturity transformation," or borrowing in the short term and lending over the long

term—but escaped meaningful prudential regulation.  When the short-term funding markets that

these firms relied upon dried up, their distress fanned a panic that nearly destroyed the global

financial system.

The regulatory gaps that allowed these firms to evade federal oversight contributed significantly to the crisis and the harm that it caused.  According to Congress, "gaps in the regulatory structure allowed . . . risks and products to flourish outside the view of those responsible for overseeing the financial system," with "[m]any major market participants . . . not subject to meaningful oversight by federal regulators."  S. Rep. No. 111-176, at 43.  These participants included major nonbank financial companies like AIG and Lehman Brothers.  *Id.*

To address the regulatory gaps revealed by the nation's experience with AIG and Lehman, Congress created the FSOC and gave it authority to designate nonbank financial firms for Federal Reserve supervision.  Unlike other federal financial regulators, whose reach is limited to specified activities or markets, Congress gave the FSOC the unique ability to "get above [other regulators'] silo-like focus, so they can look ahead of the crisis."  156 Cong. Rec. 6615 (2010) (statement of Sen. Warner).  Designation, in turn, ensured that major market participants with the potential to wreak havoc on the U.S. economy would no longer be able to evade effective federal oversight.

**B. Congress Designed the FSOC's Structure and Procedures to Ensure that Its SIFI Designations Derive from Expert, Informed, and Predictive Judgments About the Financial System.**

Congress carefully designed the FSOC's structure and procedures to ensure that its SIFI designations would be the product of an expert, informed, and deliberative process.  At the same time, Congress anticipated that the FSOC's judgments would be predictive in nature.  Congress understood that the FSOC—by the very nature of its responsibility for identifying nonbank firms that could contribute to the next crisis if not properly supervised—would be required to make predictions about how such firms' distress could pose a threat to financial stability.

1.  *Congress Designed the FSOC's Structure and Procedures to Ensure Expert, Informed, and Constrained Exercise of the Designation Power.*

While debating and enacting Dodd–Frank, Members of Congress repeatedly recognized the vast and changing nature of the financial system—and the complexity of analyzing systemic risk.  *See, e.g.*, *Modernizing Bank Supervision and Regulation—Part 1:  Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-109, 111th Cong. 2 (2009) (statement of Sen. Dodd).  Precisely because of this complexity, Congress created the FSOC:  A uniquely expert body with significant discretion to "identify risks to the financial stability of the United States" and to "respond to emerging threats to the stability of the United States financial system." 12 U.S.C. § 5322(a)(1) (2012).

The FSOC's voting members include all of the nation's top financial regulators, each the head of an agency charged with overseeing a class of financial institutions or activities, and an independent member with insurance expertise, as well as the Secretary of the Treasury as Chair.  *See* 12 U.S.C. § 5321(b)(1).  The Council also has nonvoting members who serve in an advisory capacity.  *Id*. § 5321(b)(2).  This structure builds into the FSOC deep knowledge of financial institutions across the economy, as well as competing perspectives and viewpoints.[3]  The FSOC's composition resembles other administrative entities that have similarly weighty responsibilities—such as the National Security Council, charged with responsibility for advising the President on crucial matters of national security.  50 U.S.C. § 3021(a)–(b) (Supp. I 2013).

The FSOC's structure reflects Congress's deliberate effort to create a systemic financial regulator that would combine the expertise and diverse perspectives of distinct prudential regulators into a single, coordinated body.  The Obama Administration initially proposed

---

[3] *See* Jacob E. Gersen, *Administrative Law Goes to Wall Street:  The New Administrative Process*, 65 Admin. L. Rev. 689, 693–702 (2013).

creating an oversight council with only monitoring, coordinating, and advisory functions, while

providing the Federal Reserve the authority to designate nonbank financial firms.[4]  The proposal

of a council with relatively limited powers triggered criticism at congressional hearings:

Members of Congress and many witnesses urged that, to predict and protect against the next

financial crisis, the council needed to have greater regulatory bite.[5]

In the end, Congress determined that the designation power should lie with a body

capable of looking across the sweep of the entire financial system.  Following the advice of

leading financial regulators that the designation authority reflected "tremendous power" and was

thus "better exercised by a council where there would be a diversity of views and some checks

and balances," Congress included the heads of all major financial regulatory agencies on the

Council.[6]  Congress also guarded against arbitrary decision-making by imposing a supermajority

voting requirement for SIFI designations.  Such designations can only be made "on a

nondelegable basis and by a vote of not fewer than 2/3 of the voting members then serving,"

including an affirmative vote by the Treasury Secretary.  12 U.S.C. § 5323(a)(1).[7]  In sum,

Congress made near consensus among a group of financial regulators and experts with an

unprecedented diversity of perspectives a prerequisite to exercise of the FSOC's designation

authority.  Congress also imposed notice and hearing requirements on SIFI designations, 12

---

[4] *See Establishing a Framework for Systemic Risk Regulation:  Hearing Before the S. Comm on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-297, 111th Cong. 2–3 (2009) (statement of Sen. Dodd); *The Administration's Proposal to Modernize the Financial Regulatory System: Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs*, S. Hrg. No. 111-228, 111th Cong. 7 (2009) (statement of Timothy Geithner, Secretary, Dep't of the Treasury).

[5] *See Establishing a Framework for Systemic Risk Regulation*, *supra*, at 8–9 (statement of Mary L. Schapiro, Chairman, SEC); *id.* at 13–14 (statement of Sheila C. Bair, Chairman, FDIC); *id.* at 40 (statement of Sen. Warner).

[6] *See id.* at 17 (statement of Sheila C. Bair, Chairman, FDIC).

[7] The legislative history reveals that Congress chose this procedure deliberately:  The initial House version of the bill provided for SIFI designations by a simple majority vote.  *See* H.R. 4173, 111th Cong. § 1103(a) (Dec. 2, 2009).

U.S.C. § 5323(e), and required the FSOC to consult with any nonbank company's prudential

regulator before determining whether the company should be subject to Federal Reserve

supervision and to annually reevaluate its designation.  *Id*. §§ 5323(d), (g).

> 2. *Both Congress and the FSOC Recognized that SIFI Designations Would Necessarily Involve Predictive Analysis.*

Having designed an expert institution with a unique range of regulatory perspectives and

extensive internal checks and balances, Congress made clear that the FSOC would often need to

make predictive judgments in designating SIFIs.  *See, e.g.*, 156 Cong. Rec. 6919 (2010)

(statement of Sen. Dodd); 155 Cong. Rec. 30,828 (2009) (statement of Rep. Kanjorski) (Dodd-

Frank allows designation for nonbanks "that are so large, interconnected, or risky that their

collapse would put at risk the entire American economic system, even if those firms currently

appear to be well-capitalized and healthy.").

The text of Dodd-Frank is clear that the designation process will involve a predictive

judgment, authorizing the FSOC to designate nonbank financial companies whose distress

"*could* pose a threat to the financial stability of the United States."  12 U.S.C. § 5323(a)(1)

(emphasis added).  More generally, Congress described the duties of the Council to include

"requir[ing] supervision . . . for nonbank financial companies that *may* pose risks to the financial

stability of the United States." *Id.* § 5322(a)(2)(H) (emphasis added).  Notably, Congress did not

require the FSOC to show that a designated firm's distress *would* pose a threat to financial

stability, although Congress did impose that evidentiary burden as a condition for other

regulatory actions authorized by Dodd–Frank.[8]

---

[8] *See, e.g.*, Dodd–Frank § 722(h) (amending the Commodity Exchange Act, 7 U.S.C. § 1b, to permit the Secretary of the Treasury to exempt foreign exchange contracts from Dodd–Frank's swaps-clearing mandate only after the Secretary considers, *inter alia*, "whether the required trading and clearing of [those contracts] *would* create systemic risk . . . or threaten the financial

It is unsurprising that Congress chose conditional, predictive language when describing the standard for SIFI designations.  Assessing the systemic effects of distress at large financial firms requires regulators to forecast how millions of market participants might respond to the news that a major market participant may not be able to meet its obligations.  The agency must then in turn predict how market participants might respond to *other participants'* reactions to this information.[9]  Moreover, the regulator must conduct this assessment for a broad range of potential states of the world:  Those where the institution's failure leads to cascading failures of other institutions, for example, as contrasted with those where the institution's failure stands alone.  That is why Congress required that FSOC show only that a nonbank firm's distress "*could* pose a threat to the financial stability of the United States" in order to designate that firm for Federal Reserve supervision.  Consistent with Congress's direction, the Council's designation process anticipates that the analysis underlying a designation will be predictive and enables the FSOC to consider a wide range of data and analyses before reaching its decision.[10]

---

stability of the United States" (emphasis added)).  The Treasury Department has already issued an exemption for foreign exchange contracts under this provision, and it was careful to describe its evidentiary basis in the terms Congress required. Determination of Foreign Exchange Swaps and Foreign Exchange Forwards under the Commodity Exchange Act, 76 Fed. Reg. 25,774, at 25,775, 25,777  (May 5, 2011) (finding that these contracts "*would* mitigate the relevant risks" and that "requiring clearing [of the contracts] *would* disrupt the existing settlement process" (emphases added)).

[9] Congress's recognition of the predictive nature of the designation process is consistent with recent academic literature emphasizing the dynamic nature of financial regulation as a limit on what agencies can and should be required to know before making regulatory choices.  *See, e.g.*, John C. Coates IV, *Cost-Benefit Analysis of Financial Regulation: Case Studies and Implications*, 124 Yale L.J. 882, 1011 (2015); Jeffrey N. Gordon, *The Empty Call for Cost-Benefit Analysis in Financial Regulation*, 43 J. Legal Stud. (Special Issue) 351, 366–67 (2014).

[10] *See* Authority To Require Supervision and Regulation of Certain Nonbank Financial Companies, 77 Fed. Reg. 21,637, 21,645 (Apr. 11, 2012) (codified at 12 C.F.R. pt. 1310) (requiring the Council to conduct "robust analysis of the *potential* threat that . . . nonbank financial companies *could* pose to U.S. financial stability" and allowing it to consider "information obtained directly from the nonbank financial company"); Fin. Stability Oversight Council, *Supplemental Procedures Relating to Nonbank Financial Company Determinations* 2-3

**C. The FSOC's Designation Authority Is Particularly Important in Light of Restrictions Congress Has Imposed on Strategies that Federal Regulators Used During the 2008 Financial Crisis.**

At the same time that Congress gave the FSOC significant power to anticipate and prevent future financial instability through the SIFI designation process, Congress also limited the tools that federal financial regulators had used in 2008 to address the financial crisis. As a result, impairment of the FSOC's designation authority would not only create a gap in the federal government's ability to anticipate future financial crises—it would do so at a time when financial regulators have fewer tools at their disposal to remediate failure.

For example, in the days following Lehman's bankruptcy in 2008, the Federal Reserve lent billions of dollars that provided critical liquidity to AIG to prevent a nonbank failure that would have devastated the U.S. economy. Fin. Crisis Inquiry Comm'n, *supra*, at 347–52. Dodd–Frank, however, curtails the Federal Reserve's authority to lend to individual firms in this way. 12 U.S.C. § 343(3)(A). Similarly, the failure of another systemically significant nonbank company, Bear Stearns, in early 2008 presaged the financial crisis that followed. That firm's orderly acquisition by J.P. Morgan was made possible by emergency Federal Reserve lending to an entity that acquired toxic assets then held by Bear Stearns. Fin. Crisis Inquiry Comm'n, *supra*, at 289–90. But the Federal Reserve's authority to take similar actions in the future was significantly constrained by Dodd-Frank. *See* 12 U.S.C. §§ 343(3)(A), 343(3)(B)(iv), (C) (requiring any such lending to be "broad-based," rather than transactional, and requiring approval from the Secretary of the Treasury and disclosure to Congress in the event that the Federal Reserve engages in such lending).

---

(2015) (permitting companies potentially subject to designation to submit written materials to the FSOC).

In sum, Congress chose to replace many of the authorities that federal regulators used in 2008, which targeted the *ex post* implications of nonbank firm failures, with the FSOC and its power to identify nonbank firms for regulatory scrutiny *ex ante*.  Congress thereby made the FSOC's SIFI designation authority critical to ensuring the nation's economic stability.

## II.  CONGRESS LIMITED JUDICIAL REVIEW OF FSOC SIFI DESIGNATIONS TO A HIGHLY DEFERENTIAL ARBITRARY AND CAPRICIOUS STANDARD, WHICH IS EASILY MET HERE.

The statutory system that Congress created to protect the nation's economic stability thus depends on expert and predictive judgments collectively reached by the nation's top financial regulators.  Although Congress provided for judicial review of SIFI designations, it made clear that the courts should play a limited role.  The highly deferential arbitrary and capricious standard Congress established for SIFI designations is easily met here.  The FSOC's designation of MetLife was carefully considered and well-reasoned, and its explanation for MetLife's systemic financial importance is amply supported by the record and by academic research.

### A.  Congress Limited Judicial Review of FSOC SIFI Designations to a Highly Deferential Arbitrary and Capricious Standard.

In providing the FSOC with its critical authority to designate nonbank financial companies as SIFIs, Congress specified that judicial review of the FSOC's SIFI designations would be "limited to whether the final determination . . . was arbitrary and capricious."  12 U.S.C. § 5323(h) (2012).  Such review, it has long been established, is "narrow" and very deferential to the agency's conclusions.  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009).  As the Supreme Court has explained, "[a] court is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  Rather, agency action is

normally "entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

While arbitrary and capricious review is always deferential, it is even more so here for four reasons. *First*, "the decision under review requires expert policy judgment of a technical, complex, and dynamic subject." *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1311 (D.C. Cir. 2010). As the D.C. Circuit has long held, "[a]gency determinations based upon highly complex and technical matters" are entitled to great deference. *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003) (quoting *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1035 (D.C. Cir. 2001)) (internal quotation marks omitted). Few agency decisions are more technical, or involve more complex economic judgments, than the FSOC's task of determining whether "material financial distress at the U.S. nonbank financial company, or the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the U.S. nonbank financial company, could pose a threat to the financial stability of the United States." 12 U.S.C. § 5323(a)(1).

*Second*, particularly deferential review is warranted here because the judgment under review is fundamentally predictive in nature. *See Rural Cellular Ass'n*, 588 F.3d at 1105. "In circumstances involving agency predictions of uncertain future events, complete factual support in the record for the [agency's] judgment or prediction is not possible or required." *Id.* (quoting *Melcher v. FCC*, 134 F.3d 1143, 1151 (D.C. Cir. 1998)) (internal quotation marks omitted)). This is because "a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency." *Id.* (quoting *Melcher*, 134 F.3d at 1151) (internal quotation marks omitted); *see also BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999) (quoting *Melcher*, 134 F.3d at 1152) ("When . . . an agency is

obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, our role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive.").

*Third*, judicial review is only one of the many mechanisms that Congress used to guard against arbitrary SIFI designations.  Congress carefully designed the FSOC to be a broadly expert body, one that would harness the major financial regulatory agencies' deep area-specific expertise into a single Council that would be free of parochial bias and able to identify threats to the financial system as a whole.  The FSOC's unusual structure and design, as well as its voting procedures, ensure that SIFI determinations are informed by extensive financial expertise, incorporate diverse regulatory perspectives, and reflect supermajority support among the nation's leading financial regulators.

*Fourth* and finally, Congress's choice to limit judicial review of SIFI designations contrasts strikingly with its approach in other financial regulatory contexts, such as that of the Securities and Exchange Commission ("SEC").  There the D.C. Circuit has held that statutory language obliging the SEC to consider "the effect of a new rule upon efficiency, competition, and capital formation," 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c), imposes a "*unique* obligation" on the agency's evidentiary burden before the courts.  *Business Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (emphasis added).  Here, Congress imposed no such obligation, instead charging the FSOC with using its expert judgment to examine the potential for a particular company to threaten the financial stability of the United States based on a range of factors, with its ultimate determination subject only to "arbitrary and capricious" review.  12 U.S.C. § 5323(h).

### B. The FSOC's Designation of MetLife Easily Meets the Deferential Standard of Review Applicable Here.

The FSOC's determination that material financial distress at MetLife could pose a threat to the financial stability of the United States easily survives the deferential arbitrary and capricious standard of review applicable here. The FSOC provided two bases for its determination. First, it concluded that both institutional and retail financial-market participants' exposures to MetLife could cause material financial distress at MetLife to threaten U.S. financial stability. Second, it found that asset liquidations resulting from MetLife's financial distress could also pose such a threat. Both of these bases are amply supported by the record in this case. They are also supported by broader academic research. Moreover, they reflect exactly the sort of expert judgment that Congress charged the FSOC with making. Indeed, the objections that MetLife is attempting to litigate here demonstrate the importance of great deference to the nation's sole regulatory body with a view of the full sweep of financial markets.

> *1. The FSOC Properly Concluded that MetLife's Financial Distress Could Threaten U.S. Financial Stability Through Market Participants' Significant Exposure to MetLife.*

*Institutional investors.* The Council found that large financial institutions—the pension funds, money market funds, large banks, and large insurers that are critical to so many financial markets—have significant exposures to MetLife both because of MetLife's role as a guarantor of investments throughout the economy and because of MetLife's own capital-market activities.

As to MetLife's role as a guarantor, the Council's analysis shows that the company directly or indirectly guarantees the value of more than $100 billion of investments for large institutions. *See* Fin. Stability Oversight Council, *Notice of Final Determination and Statement of the Basis for Financial Stability Oversight Council's Final Determination Regarding MetLife,*

*Inc.* 11–12, 75–76 (Dec. 18, 2014)  [hereinafter Final Basis[11]] (describing and quantifying

MetLife guarantees).  MetLife thus provides institutional investors with critical protection in the

event of a significant drop in their investments' value.  If MetLife were to experience material

financial distress, this important backstop would be compromised, leading to broader financial

instability.  *See id.* at 86 (stating that although "a large portion of MetLife's institutional products

are in separate accounts," "the guarantees for these products are obligations of the general

account and therefore reliant on MetLife's financial strength").  The consequences of such

instability could be significant because material financial distress at MetLife is unlikely to occur

in a vacuum.  Rather, distress at MetLife is likely to occur in the context of broader market

stress—at the very moment when institutional investors and their fiduciaries would most be in

need of MetLife's guarantees.

The record equally supports the FSOC's conclusions regarding institutional exposures to

MetLife's capital markets activities.  As the FSOC found, institutional investors will suffer

greatly if MetLife is unable to repay what it has borrowed.  Institutional investors, large financial

institutions and others own more than $130 billion of MetLife's debt.[12]  It is clear that MetLife's

failure would impose losses on these investors that could pose a threat to the financial stability of

the United States.

Even more striking than the aggregate size of MetLife's debt is that MetLife finances so

much of its activities through short-term borrowing that must be repaid or refinanced in the near

---

[11] This brief cites the previously non-public Final Basis, which was provided to undersigned *Amici* by the FSOC on May 13, 2015, with redactions that had been made by MetLife.

[12] *See id.* at 98 & tbl. 8 (summarizing MetLife's financing structure).  This figure was calculated by taking the total amount of capital-market exposure to MetLife described in Table 8 of the Final Basis and deducting MetLife's market capitalization as of June 30, 2013, the date of the data provided in that Table.  Thus, the figure includes certain contingent liabilities included in the values described in Table 8.

term.  *See id.* at 101 & tbl. 9 (classifying only $18.6 billion of MetLife's $56.1 billion in debt as

"long-term" debt).  Such short-term borrowing is commonly financed by money-market funds

("MMFs"), and the FSOC's analysis shows that MMFs hold more than $4 billion in MetLife's

short-term borrowings.  *See id.*, at 110 & tbl. 13.  MMF investors view MMFs as a low-risk

investment and rely heavily on their ability to redeem their MMF shares for no less than one

dollar per share at any time.[13]  But the FSOC found that, should MetLife experience material

financial distress, anywhere from eleven to as many as *sixty-five* MMFs could "break the buck"

and go below that critical one dollar per share level.  *See id.* at 111 & fig. 6 (showing that, as of

2013, sixty-five MMFs could break the buck if MetLife's debt securities lost 100% of their

value, and that eleven funds could do so if MetLife's debt securities lost just 15% of their value).

This finding is notable for two reasons.  *First*, it is eerily familiar:  In 2008, the failure of

a nonbank financial firm to which MMFs had provided short-term lending—in that case, Lehman

Brothers—led to fear that MMFs might "break the buck," contributing to a broad panic among

investors, who withdrew $300 billion from MMFs in the days following Lehman's bankruptcy.[14]

That panic, or "run," on MMFs resulted in significant instability throughout the financial system,

and helped to freeze credit markets for financial and real-economy firms alike.  The run was

stopped only by an unprecedented, multi-trillion-dollar government guarantee on MMFs, which

dwarfed better-known efforts like the Troubled Asset Relief Program in size and scope.  *Second,*

as recent scholarship in this area has noted, tepid post-crisis attempts to reform MMFs provide

---

[13] *See, e.g.*, Richard Scott Carnell, Jonathan R. Macey & Geoffrey P. Miller, *The Law of Banking and Financial Institutions* 604–10 (4th ed. 2009) (describing MMFs as a functional "substitute" for federally insured checking accounts); *see also* Marcin Kacperczyk & Philipp Schnabl, *How Safe Are Money Market Funds?*, 128 Q.J. Econ. 1073, 1074 (2013) (noting that, before the 2008 financial crisis, "investors regarded money funds as a low-risk investment that was almost as safe as cash").

[14] *See, e.g.*, Kacperczyk & Schnabl, *supra*, at 1.

little assurance that such a run could not occur again.[15]   The record thus supports FSOC's

conclusion that material financial distress at MetLife could threaten the stability of the U.S.

financial system through institutional investor exposures.

Retail customers.   The record also supports the FSOC's conclusion regarding retail

customers.   MetLife has more than fifty million U.S. insurance customers and over $275 billion

in general account insurance liabilities.   Should MetLife face material distress, these customers

would face the unprecedented possibility that their insurer, one of the nation's largest, would be

unable to meet policyholder demands for cash.

Legal and economic barriers that deter policyholders from surrendering their policies for

cash, or borrowing against their policies, could mitigate the strain on *MetLife's* resources in the

event of its distress, as MetLife contends.   Compl. 28–30.   But it does not follow that these

barriers would limit or avoid the *systemic* consequences of MetLife's inability to meet

policyholders' demands for cash.[16]   To the contrary, policyholders who face the possibility that

MetLife might fail, and who cannot easily exchange claims on MetLife for cash, can be expected

to seek other sources of liquidity at precisely the moment when the financial system is under

stress.   Nor should we expect policyholders simply to be able to substitute into insurance

products provided by MetLife's competitors under the extraordinary circumstances that would

accompany MetLife's distress.   As the FSOC concluded, distress at a firm of MetLife's size and

---

[15] *See* Jeffrey N. Gordon & Christopher M. Gandia, *Money Market Funds Run Risk:  Will Floating Net Asset Value Fix the Problem?*, 2014 Colum. Bus. L. Rev. 313, 326–29 (providing empirical evidence suggesting that the SEC's principal reforms in this area are unlikely to address some causes of the 2008 MMF panic).

[16] Nor, as the Council concluded, does it follow that these economic barriers will prevent many policyholders from surrendering their policies in sufficiently uncertain circumstances. Final Basis, *supra*, at 169 ("Depending on the circumstances, the unknown costs of retaining a policy could be larger than the known costs of surrendering a policy.").

scope could lead consumers to doubt the "financial strength . . . of the broader industry." Final

Basis, *supra*, at 91.

MetLife maintains that any systemic consequences of its inability to meet policyholder

cash demands could be mitigated by state guaranty associations ("GAs")—*i.e.*, entities funded by

assessments on insurance policies that cover benefit payments in the case of an insurer's failure.

But a failure of an insurer of MetLife's vast size would test the limits of the GAs' financial and

operational resources, exposing policyholders to losses beyond those limits.

As to the GAs' capacity to cover the full financial scope of policyholders' exposure, as

the FSOC correctly pointed out the amount of coverage GAs provide to policyholders varies a

great deal by policy type, ranging from as little as $100,000 to as much as $500,000. *See* Final

Basis, *supra*, at 89 n.452. In some cases, therefore, GAs would not cover all losses. And even if

the GAs could and did cover all policyholder losses arising from distress at MetLife, their

resources could be so depleted as to leave them unable to respond to losses were another insurer

to fail—again, at the precise moment when such a failure might be most likely. *See id.* at 94

("MetLife's liquidation could leave the GAs with little capacity to respond to the failure of other

large or mid-size insurers.").

More importantly, it is doubtful that the various state GAs have the operational capacity

to handle distress at a firm of MetLife's scale and scope. The GAs would have to manage a

situation of dazzling complexity involving the resolution of dozens of insurance subsidiaries.

True, the National Organization of Life and Health Insurance Guaranty Associations

("NOLHGA"), a voluntary association of state GAs, historically has coordinated resolution

efforts among the GAs. *See* Compl. 30. But each state GA participates in such a resolution on a

voluntary basis, and the NOLHGA has never attempted to coordinate a resolution in the context of distress at a firm of MetLife's size and scope. *See* Final Basis, *supra*, at 90.

In any event, the relevant question here is not whether the NOLHGA could actually manage such a spectacular and unprecedented resolution, but whether policyholders, in the midst of the crisis-like atmosphere that would likely accompany a MetLife failure, might fear that state GAs' resolution efforts would be inadequate to prevent losses. That fear could lead policyholders to demand safety and liquidity at a time when the financial system is bereft of both, threatening the stability of the U.S. financial system. The Council's conclusion that retail policyholders might respond to MetLife's failure—and the cascading uncertainty that would follow—in this way was neither arbitrary nor capricious.

> 2.   *The FSOC Properly Found that MetLife's Material Financial Distress Could Lead to Asset Sales that Could Threaten U.S. Financial Stability.*

The record also provides ample support for the FSOC's finding that financial distress at MetLife could lead to "fire sales" of its assets—*i.e.*, rapid sales at increasingly lower prices to generate cash—that would threaten systemic stability. The FSOC correctly found that asset sales related to both MetLife's funding structure and its policyholder obligations could pose such a threat.

*Funding structure*. As noted above, *see supra* Part II.B.1., MetLife engages extensively in maturity transformation, borrowing in the short term and lending over the long term. As a result, MetLife lacks the flexibility to respond to sudden repayment demands without engaging in extensive asset sales. MetLife would face such repayment demands if the institutions that provide its short-term financing refuse to "roll over" or extend the repayment of MetLife's

borrowing.[17]  This refusal could drain more than $5 billion in cash each month from the

company.  Final Basis, *supra*, at 152 & tbl.23.[18]  In addition, MetLife extensively lends highly

liquid securities (*i.e.*, those that can quickly be sold for cash) to other institutions, receiving cash

that it invests in illiquid securities (*i.e.*, those that are more difficult to sell).  In ordinary

circumstances, this is a common, and highly profitable type of trade conducted by many large

financial institutions.  In the event of MetLife's distress, however, the borrowers of its securities

could demand that their cash be returned.  To make things worse, once financial distress at

MetLife is detected, its short-term lenders will become increasingly unwilling to roll over its

debt and borrowers of its securities will increasingly demand that their cash be returned.  These

events could lead to additional asset sales that would depress securities prices, further threatening

the stability of the financial system.[19]

 *Policyholder obligations.*  As explained above, *see supra* Part II.B.1, MetLife's financial

distress could lead policyholders to doubt whether the company will be able to meet its

obligations, and hence cause them to surrender their policies for cash.  Notwithstanding legal and

economic impediments to such surrenders, some $50 billion in MetLife policyholder obligations

can be withdrawn with little or no penalty over a relatively short period of time.  Final Basis,

*supra*, at 143.  MetLife may need to sell additional assets to meet policyholder demands for cash.

---

[17] *See, e.g.*, Viral Acharya et al., *Rollover Risk and Market Freezes*, 66 J. Fin. 1177 (2011) (providing a framework for analysis of the risk that short-term borrowing will not be rolled over).

[18] Indeed, as the FSOC found, MetLife was unable to roll over the most favorable form of its short-term borrowings during the financial crisis.  *See* Final Basis, *supra*, at 153 & fig.7 (showing that MetLife addressed this problem in 2008 by borrowing over an increasingly shorter term and by borrowing on financial terms that were increasingly favorable to its lenders).

[19] Because of MetLife's size and the illiquid nature of many of its assets, such sales would significantly affect the prices of these securities.  *See* Final Basis, *supra*, at 151 & n. 736 (citing Brian Begalle et al., *The Risk of Fire Sales in the Tri-Party Repo Market*, FRBNY Staff Report No. 616 (2013), for the proposition that sales of more than $250 million would impact prices in these markets).

To be sure, as MetLife has pointed out, state insurance regulators can impose stays on policyholder redemptions that would give MetLife precious time to meet these demands. Compl. 29, 59–60. But the imposition of such a stay would send a powerful signal about the magnitude of MetLife's distress that could cause still more policyholders to seek to surrender their policies for cash.[20] *See* Final Basis, *supra*, at 144–45 (pointing out that "the imposition of a stay on discretionary withdrawals could cause a loss of confidence").

Moreover, the critical point again is that the demands on MetLife's cash in a crisis can all be expected to occur *at the same time*. In the event of its distress, MetLife's short-term lenders will likely extend less credit, its securities-lending counterparties will likely require that cash be returned, and its policyholders will likely demand more cash than under any other circumstances. They will do so not only because of their awareness of MetLife's weakness but because of concerns about how other institutions will respond to MetLife's weakness. Under these circumstances, MetLife could well be forced to liquidate assets at a magnitude and speed that could threaten financial stability. The Council's finding to that effect was neither arbitrary nor capricious.

### C. This Court Should Decline MetLife's Invitation to Impose Procedural or Evidentiary Requirements Beyond Those Contemplated by Congress.

MetLife's challenge to its designation essentially recognizes that the FSOC acted neither arbitrarily nor capriciously in making its predictive judgment. Instead, it attacks the very statutory scheme for addressing systemic risk that Congress created. Indeed, MetLife not only

---

[20] Imposing a stay on policyholder demands for cash is akin to the old policy of declaring a "bank holiday," barring depositors from withdrawing their savings from a bank that is in danger of suffering a run. It is true that such holidays gave individual banks badly needed breathing room to address potential runs. But the practice also fanned widespread banking panics and contributed to the Great Depression. No one seriously argues today that bank holidays are a useful or wise policy tool for preventing bank runs.

evades the fact that Congress instructed FSOC to make the predictive judgments it did, but also seeks to impose procedural and evidentiary prerequisites on the FSOC that are not found in the governing statute. But it is well established that these types of policy choices are left to Congress, not the courts.

We focus here on just two of MetLife's many contentions that improperly invite the Court to engage in policy choices better left to Congress and the FSOC. *First*, MetLife suggests that the Court require that FSOC determinations meet procedural requirements not specified by Congress in Dodd-Frank. *Second*, MetLife urges the Court to second-guess the predictive analysis upon which its designation is based. The Court should decline both invitations to make financial regulatory policy. Doing otherwise would seriously impede the Council's ability to discharge its critical task of safeguarding the nation's financial stability.

*Procedural requirements.* As noted above, in Dodd-Frank Congress carefully established both the FSOC and the procedural safeguards associated with the designation process, including supermajority voting requirements, the right to a hearing, and a requirement that the FSOC engage in regulatory consultation. *See supra* Part I.A. In addition, the Council has separately established and expanded upon the procedural protections that nonbank financial firms enjoy in connection with the designation process, including the right to make voluntary submissions for the Council's consideration before a proposed designation. *See id.*

MetLife, however, argues that a better approach is reflected in the Federal Reserve Board's bank "stress tests," or comprehensive capital analysis and review process ("CCAR"). *See* Compl. 53–54. According to the Complaint, the CCAR process employs "specific quantitative variables"; by contrast, MetLife contends, the FSOC's designation process is a "'black box.'" *Id.* at 54.

Nothing in law or logic requires the FSOC to adopt rigid quantitative measures in connection with the designation process.[21]  Congress specified not only the procedural prerequisites to designation but also the factors that should guide the Council, including the extent of the company's leverage, its interconnections with other SIFIs, and "any other risk-related factors that the Council deems appropriate."  12 U.S.C. § 5323(a)(2)(K).  Congress chose not to require that the Council establish particular quantitative measures in connection with the designation process.  Moreover, Congress's choice reflects sound policy.  As noted above, the complex and dynamic nature of systemic-risk analysis often renders quantitative measures unduly narrow or even misleading in this context.

Thus, both the statutory text and policy rationale of Dodd-Frank make clear that consideration of any factors beyond those expressly listed in the statute is left to the FSOC, not the courts.  As a result, this Court lacks authority to impose such tests as a prerequisite to SIFI designation.  Just this Term the Supreme Court reiterated the cardinal principle of administrative law that courts must not impose additional procedures on agencies beyond those that are otherwise required by law.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015) ("Beyond the APA's minimum requirements, courts lack authority to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good. . . .  To do otherwise would violate the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 544, 549 (1978)) (internal quotation marks omitted))).

---

[21] For present purposes, we put to one side the fact that the Council actually *has* chosen, in its discretion, to employ clearly articulated quantitative measures at Stage 1 of the designation process.  *See* 77 Fed. Reg. 21,637 (Apr. 11, 2012).

*Predictive judgments.* MetLife also encourages the Court to second-guess the Council's predictive judgments, a task beyond both the Court's purview and its expertise. In particular, MetLife argues that the FSOC, in connection with its review of MetLife's consultant Oliver Wyman, Inc.'s analysis of asset sales, improperly "assume[ed] even higher levels of stress and asset liquidation by MetLife" than Oliver Wyman did, and "fail[ed] to put forward its own projected scenarios or models," contrary to "accepted risk assessment practices." Compl. 36.

To the contrary, the FSOC did precisely what Congress envisioned an expert agency would do with an analysis of this type: The Council subjected the Oliver Wyman report to close testing based on a wide range of predictions about potential scenarios. For example, the FSOC carefully considered how asset sales caused by MetLife's financial distress could affect other large financial institutions. The Council's tests used methods established in both longstanding[22] and post-crisis[23] academic research to evaluate Oliver Wyman's analysis of that question. The data and assumptions used in those tests, rather than "opaque," as the Complaint asserts, were described in detail in the FSOC's basis for its determination. *See* Final Basis, *supra*, at 331–34. And the tests demonstrated that the magnitude of the harm arising from a fire sale at MetLife

---

[22] MetLife's quoted reference to the well-known technique of Monte Carlo simulation, *see* Compl. 36, and its suggestion that such analysis reflects "opaque and indefinite speculation," *id.*, is puzzling. Monte Carlo simulation involves testing complex problems by generating and evaluating potential outcomes; the outcomes are not produced completely at random but instead within given probabilities. This method has been established in the finance literature for at least forty years and has been applied to a wide variety of well-known problems in the field. *See* J.M. Hammersley & D.C. Handscomb, *Monte Carlo Methods* (1964); *see also, e.g.*, Phelim P. Boyle, *Options: A Monte Carlo Approach*, 4 J. Fin. Econ. 323 (1977) (applying this method to option-pricing problems).

[23] The Council's analysis, which considered the effects of asset sales related to significant and rapid decreases in the value of the firm's equity, is based in part upon a framework provided by a paper recently published in one of the premier peer-reviewed journals in finance research. *See* Final Basis, *supra*, at 329–40 (citing Robin Greenwood et al., *Vulnerable Banks*, 115 J. Fin. Econ. 471 (2015) (providing a model for asset sales caused by negative shocks to bank equity)).

could be greater than the harm caused by fire sales at all but nine other firms in the nation.  *See id.* at 335, 337 tbl. 54.

To second-guess predictive judgments of this type would do more than improperly interfere with agency prerogatives.  It would impose an evidentiary burden upon the FSOC's work that Congress did not intend the agency to bear.  And it would significantly impede the Council's future efforts to safeguard the nation's financial system.  This Court should decline MetLife's invitation to interfere with policy judgments designed to protect the American economy from the kind of devastation wrought by the last crisis—and the threat of the next one.

## CONCLUSION

For all of the foregoing reasons, this Court should grant Defendant's motion to dismiss Plaintiff's complaint or, in the alternative, for summary judgment.

Dated:  May 22, 2015

Respectfully submitted,

By: /s/  Kate Andrias

KATE ANDRIAS (D.C. Bar No. 983674)
(734) 763-9697
kandrias@umich.edu
MICHAEL S. BARR
University of Michigan Law School
625 South State Street
Ann Arbor, MI 48109

ROBERT J. JACKSON, JR.,
GILLIAN E. METZGER
Center for Constitutional Governance
Columbia Law School
435 West 116th Street
New York, NY 10025
*Counsel for* Amici Curiae

# APPENDIX

Kate Andrias
Assistant Professor of Law
Michigan Law School

Michael S. Barr
Roy F. and Jean Humphrey Proffitt Professor
of Law
Michigan Law School

John C. Coffee, Jr.,
Adolf A. Berle Professor of Law
Columbia Law School

Darrell Duffie
Dean Witter Distinguished Professor of
Finance and Shanahan Faculty Fellow
Graduate School of Business
Stanford University

Ronald J. Gilson, Charles J. Meyers Professor
of Law and Business, Emeritus, Stanford Law
School, Marc and Eva Stern Professor of Law
and Business
Columbia Law School

Jeffrey N. Gordon
Richard Paul Richman Professor of Law and
Co-Director, Richman Center for Business,
Law & Public Policy
Columbia Law School

Robert J. Jackson, Jr.
Professor of Law and Co-Director
Ira M. Millstein Center
Columbia Law School

Kathryn Judge
Associate Professor of Law and
Milton Handler Fellow
Columbia Law School

Andrew Metrick
Deputy Dean & Michael H. Jordan Professor
of Finance and Management
Yale School of Management

Gillian Metzger
Stanley H. Fuld Professor of Law Columbia
Law School

Saule T. Omarova
Professor of Law
Cornell University

Amiyatosh Purnanandam
Associate Professor of Finance and Michael R.
and Mary Kay Hallman Fellow
University of Michigan Ross School of
Business

Jennifer Taub
Professor of Law
Vermont Law School

Adrian Vermeule
John H. Watson, Jr. Professor of Law Harvard
Law School

David Zaring
Associate Professor
The Wharton School
University of Pennsylvania

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of May, 2015, I electronically filed the foregoing

Brief of Professors of Law and Finance as *Amici Curiae* Supporting Defendant with the Clerk of

the Court via the CM/ECF system, causing it to be served electronically on all counsel of record.

Dated:  May 22, 2015

By: /s/ Kate Andrias

Kate Andrias (D.C. Bar No. 983674)
University of Michigan Law School
625 South State Street
Ann Arbor, MI 48109
Telephone:  (734) 763-9697
Email:  kandrias@umich.edu
*Counsel for* Amici Curiae