**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| METLIFE, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>FINANCIAL STABILITY OVERSIGHT COUNCIL,<br><br>    Defendant. |

Civil Action No. 15-cv-45 (RMC)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
TO INTERVENE AND CONTINGENT APPLICATION FOR AN ORDER TO SHOW
CAUSE WHY THE RECORD SHOULD NOT BE UNSEALED, SUBMITTED BY
BETTER MARKETS, INC.**

Better Markets, Inc.
Dennis M. Kelleher
D.C. Bar No. 1009682
Stephen W. Hall
D.C. Bar No. 366892
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Email: dkelleher@bettermarkets.com
Email: shall@bettermarkets.com

Dated: November 19, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

INTRODUCTION ................................................................................................... 1

IDENTITY OF BETTER MARKETS ....................................................................... 3

BACKGROUND ..................................................................................................... 5

THE GAPS IN THE RECORD ............................................................................... 7

    I.   The Joint Appendix ...................................................................................... 8

    II.  The Parties' Motions and Memoranda ...................................................... 11

ARGUMENT ........................................................................................................ 14

    I.   Better Markets should be permitted to intervene under Rule 24(b), which is a well-recognized mechanism for allowing members of the public to challenge the sealing of records in a judicial proceeding ................................................................. 14

          A.  Better Markets' motion is timely ..................................................... 16

          B.  Better Markets' limited intervention will not result in undue delay or prejudice to the parties ............................................................................. 18

          C.  Better Markets' claim for full access to the record shares a common question of law or fact with the underlying litigation ....................................... 19

    II.  Members of the public have a well-established right of access to records in judicial proceedings, which has been infringed in this case without an adequate justification or an independent balancing of interests ....................................................... 20

          A.  Better Markets has a presumptive common law right of access to the judicial records in this case ....................................................................... 21

          B.  Where sealed information is important to the public interest, as in this case, the public right of access is especially compelling ................................... 22

          C.  All of the documents under seal are "judicial records" ..................... 23

          D.  The presumption in favor of public access to judicial records can be overcome only by a strong showing under a multi-factor test, which the Court has never had occasion to apply in this case ..................................................... 24

          E.  The appropriate remedy is for the Court to issue an Order to Show Cause why

the record should not be unsealed, which requires the parties to explain the basis for every redaction, and then for the Court to independently assess whether the need for each redaction outweighs the public's interest ................................26

1.   A three-step process will ensure that the record is as transparent as possible while protecting any valid confidentiality interests the parties have .........26

2.   Neither attorney-client privilege nor 12 U.S.C. § 5322(d)(5) is a valid justification for sealing the records at issue ...............................................31

CONCLUSION .................................................................................................34

CERTIFICATE OF SERVICE .........................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1 (D.D.C. 2010) .......... 16, 17, 18, 19

*Avirgan v. Hull*, 118 F.R.D. 252 (D.D.C. 1987) ........................................................ 28

*Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304 (11th Cir. 2001)...................... 22

*Cipollone v. Liggett Group., Inc.*, 106 F.R.D. 573 (D.N.J. 1985) ................................. 28

*Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 304 F.R.D. 19 (D.D.C. 2014) ..................... 16

*Ctr. for Biological Diversity v. U.S. EPA*, 274 F.R.D. 305 (D.D.C. 2011) ................................. 20

*Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918 (D.C. Cir. 2003) ............................................. 21

*EEOC v. Nat'l Children's Ctr., Inc.* ("*Children's Ctr. I*"), 98 F.3d 1406 (D.C. Cir. 1996).............

........................................................................................................................... 21, 22, 25

*EEOC v. Nat'l Children's Ctr., Inc.* ("*Children's Ctr. II*"), 146 F.3d 1042 (D.C. Cir. 1998)

............................................................................................................................ *passim*

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003) ..................................... 27

*Friedman v. Sebelius*, 672 F. Supp. 2d 54 (D.D.C. 2009) ........................................................... 22

*FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404 (1st Cir. 1987)....................................... 24, 25

*Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) ............................................................... 9

*Huntsman-Christensen Corp. v. Entrada Indus., Inc.*, 639 F. Supp. 733 (D. Utah 1986)............ 32

*In re Application of Nat'l Broad. Co.*, 653 F.2d 609 (D.C. Cir. 1981)....................................... 25

*In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2 (D.D.C. 2013)......................................... 15

*In re Guantanamo Bay Detainee Continued Access to Counsel,* 968 F. Supp. 2d 222 (D.D.C. 2013)

.......................................................................................................................................... 14

*In re John Doe Corp.*, 675 F.2d 482 (2d Cir. 1982) ................................................................... 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 300 F.R.D. 19 (D.D.C. 2013)........... 14, 15, 16

*Authorities upon which we chiefly rely are marked with asterisks.

*In re Sealing & Non-Disclosure*, 562 F. Supp. 2d 876 (S.D. Tex. 2008) ..................................... 30

*In re Shepard*, 800 F. Supp. 2d 37 (D.D.C. 2011) ........................................................ 24

*In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 25068 (D.D.C. Mar. 19, 2001)................................................................................................... 15

*Jessup v. Luther*, 227 F.3d 993 (7th Cir. 2000) ........................................................... 19

*Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268 (D.C. Cir. 1991) ....................... 21, 22

*\*Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978) ..................................................... 9, 21

*Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) .......................................... 19

*Primas v. District of Columbia*, 719 F.3d 693 (D.D.C. 2013)........................................... 25

*Roane v. Leonhart*, 741 F.3d 147 (D.C. Cir. 2014) ..................................................... 16

*Roth v. U.S. DOJ*, 656 F. Supp. 2d 153 (D.D.C. 2009) ................................................. 30

*San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096 (9th Cir. 1999) ..................... 17

*SEC v. Am. Int'l Group,* 712 F.3d 1 (D.C. Cir. 2013) ............................................... 21, 24

*Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 242 F.R.D. 1 (D.D.C. 2007) ...................... 28

*United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424 (10th Cir. 1990) ........................... 17

*United States ex rel. Schweizer v. Oce, N.V.*, 577 F. Supp. 2d 169 (D.D.C. 2008) .................... 22

*United States v. El-Sayegh,* 131 F.3d 158 (D.C. Cir. 1997) .......................................... 21, 24

*United States v. Ellis*, 90 F.3d 447 (11th Cir. 1996)................................................... 30

*\*United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980) .................................... 21, 25, 29

*Union Oil v. Leavell*, 220 F. 3d 562 (7th Cir. 2000)................................................... 33

*\*Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d 897 (D.C. Cir. 1996).......... 23, 25, 29

*Weil v. Markowitz*, Civ. No. 83-3685, 1985 U.S. Dist. LEXIS 24095 (D.D.C. Oct. 30, 1985) ... 30

*Willingham v. Ashcroft*, 355 F. Supp. 2d 390 (D.D.C. 2005) ....................................................... 30

**Statutes**

12 U.S.C. § 5322(d)(5) ................................................................................................... 31, 32

12 U.S.C. § 5323(a)(1)......................................................................................................... 11

12 U.S.C. § 5323(b)(5) ........................................................................................................ 12

5 U.S.C. § 552(a) ................................................................................................................. 32

**Other Authorities**

*Basis for the Financial Stability Oversight Council's Final Determination Regarding MetLife, Inc.*

(Dec. 18, 2014) ................................................................................................................. 6

**Rules**

D.C. Cir. R. 47.1(c)............................................................................................................. 15

LCvR 7(n)(1) ..................................................................................................................... 8, 24

Fed. R. Civ. P. 24(b) ..................................................................................................... *passim*

Fed. R. Civ. P. 26........................................................................................................ 27, 28, 29

## <u>INTRODUCTION</u>

This is a historic case that will define for years to come the ability of our government to prevent future financial crises like the one that engulfed our nation in 2008. That crisis destroyed the jobs, savings, and homes of millions of Americans; caused untold human suffering; and annihilated $20 trillion of gross domestic product. Its effects are still being felt today.

Congress and the President responded by enacting the sweeping financial reforms set forth in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank"). At the very core of those reforms is the authority of the Financial Stability Oversight Counsel ("FSOC") to identify nonbank financial institutions that could pose risks to our financial system and to designate them for prudential supervision by the Board of Governors of the Federal Reserve System ("Federal Reserve"). The purpose of this authority is to help protect the public, the financial markets, and the entire U.S. economy from another devastating crisis.

In this landmark case, MetLife seeks to nullify the FSOC's judgment that, as one of the world's largest and most interconnected insurance conglomerates, MetLife should be designated for enhanced supervision to help avoid a recurrence of the 2008 financial crisis. A decision in favor of MetLife will not only rescind that important new layer of oversight but also cripple the FSOC's ability in future cases to identify and address systemic risks **before** they materialize. It is difficult to conceive of a matter in which the public has a greater interest in understanding both the full reasoning of this Court and the factual basis on which the Court relies.

Yet more than half of the record has been sealed as a result of the parties' privately negotiated agreements. The parties have thus deprived the public of its presumptive right of access to judicial proceedings, a right that is especially compelling in a case that will have such an enormous impact on the public interest.

1

Accordingly, Better Markets now moves to intervene under Rule 24(b) of the Federal Rules of Civil Procedure for the specific and limited purpose of challenging the extensive redactions and sealed filings that have cordoned off the majority of the record from public view.[1] Acting not only as a member of the public but also as a public interest organization, Better Markets seeks to vindicate, to the fullest possible extent, its presumptive right of access to all of the filings in this action, including the factual record and the motions and memoranda setting forth the parties' arguments on the extraordinarily important issues presented.

While the FSOC and MetLife may each have valid confidentiality concerns under applicable law, it is this Court, not the parties, that must strike the proper balance between those concerns and the public's compelling and well-established right of access to judicial records. Accordingly, if granted leave to intervene, Better Markets will apply, through the contingent application attached hereto as Exhibit A, for an Order to Show Cause why the record should not be unsealed. The proposed Order to Show Cause will create a process whereby the Court acquires the necessary information from the parties so that it may properly balance the parties' interests with the public's.[2] In the end, the result must be to substantially pare back the parties' sweeping, overbroad redactions while striking a balance between valid confidentiality concerns and the

---

[1] As an organization dedicated to promoting transparency, accountability, and oversight in the financial system, Better Markets separately submitted an amicus brief that defends the FSOC's designation process and argues for the dismissal of MetLife's claims, so that the FSOC's designation authority remains fully intact and available for use when necessary as Congress intended. *See* Br. of Better Markets as Amicus Curiae, ECF No. 78 (D.D.C. filed Sept. 28, 2015).

[2] The parties have shielded information in this case generally by filing unredacted documents under seal and then filing redacted versions of those documents in the public docket, with the Court's approval pursuant to consent motions. References in this memorandum to the "sealed" materials encompass any and all of the information that has been withheld from the public record, including documents that were never filed in the public record at all, and documents that were filed but with portions redacted.

public's right of access.

## <u>IDENTITY OF BETTER MARKETS</u>

Better Markets, Inc. ("Better Markets") is a nonprofit organization that promotes the public interest in the financial markets. It is a member of the public, and as such, it enjoys the same presumptive right of access to judicial records that every member of the public may invoke.

In addition, Better Markets engages in extensive advocacy and public education. In regulatory commentary and significant court cases involving financial regulation and enforcement, Better Markets advocates for greater transparency, accountability, and oversight in our financial system. The ultimate goal of this advocacy is to ensure that our financial system serves the real economy more effectively for the benefit of all Americans, without precipitating another devastating financial crisis. Better Markets also employs mainstream and social media channels to promote public awareness about financial reform and Better Markets' advocacy efforts.

For example, focusing extensively on the rulemaking process following the financial crisis of 2008 and passage of Dodd-Frank, Better Markets has submitted more than 175 comment letters to U.S. and international financial regulators and policymakers—including the FSOC—advocating for strong and swift implementation of comprehensive financial reforms in the securities, commodities, and credit markets. And, in more than 15 amicus briefs and other court filings, Better Markets has defended financial reform rules against legal challenges from the financial industry, promoted transparency in court proceedings, and called for stronger enforcement of the laws against financial fraud and abuse.

Better Markets has fought specifically to protect the type of stability and transparency interests that are at stake in this case. For example, it has submitted extensive comment to the FSOC arguing for improvements in its rules and guidelines on designation. *See* Comment Letter from Better Markets to FSOC on Authority to Designate Financial Markets Utilities as

Systemically Important (Jan. 20, 2011); Comment Letter from Better Markets to FSOC on Authority to Designate Financial Market Utilities as Systemically Important (May 27, 2011); Comment Letter from Better Markets to FSOC on Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies (Dec. 19, 2011).[3] Better Markets has also advocated for greater transparency in the FSOC's operations, *see* Comment Letter from Better Markets to FSOC on Implementation of the Freedom of Information Act (May 25, 2015),[4] and for more rigorous analysis of the potential systemic risks associated with specific financial industry sectors within its broad purview, *see* Comment Letter from Better Markets to FSOC on Asset Management Products and Activities (Mar. 25, 2015);[5] Letter from Better Markets to Jacob Lew on Response to Errors and Inaccuracies in the Letter from Former Chairmen, Commissioners, and Senior Staff of the U.S. Securities and Exchange Commission to the Financial Stability Oversight Council (Mar. 5, 2013).[6]

    In addition, Dennis Kelleher, the President and CEO of Better Markets, has testified before the Senate Banking Committee to address, among other issues, the key role of the FSOC's designation authority in preventing financial crises. *See* Dennis Kelleher's Testimony before Senate Banking Committee (Mar. 25, 2015), *available at* http://www.bettermarkets.com/reform-

---

[3] Collected comment letters *available at*
 http://www.bettermarkets.com/sites/default/files/FSOC_Comment_Letters.pdf.

[4] Comment letter *available at* https://www.bettermarkets.com/sites/default/files/FSOC-
 %20Comment%20Letter-%20FOIA%205-25-11.pdf.

[5] Comment letter *available at* https://www.bettermarkets.com/sites/default/files/FSOC%20-
 %20CL%20-%20Asset%20Management%20Products%20and%20Activities%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.pdf

[6] Comment letter *available at* https://www.bettermarkets.com/sites/default/files/Letter-%20Lew-
 %20FSOC%20MMF-%203-5-13.pdf

resources/dennis-kellehers-testimony-senate-banking-committee.

Better Markets has also fought aggressively for independent representation of the public interest in litigation where the parties' agreements on important matters have resulted in a collapse of the adversary system. For example, in *SEC v. Citigroup*, Better Markets fought to ensure that the Second Circuit would appoint independent counsel to represent the district court's rejection of a settlement in a high-profile enforcement action. *See* Mot. of Better Markets as Amicus Curiae, ECF No. 108, No. 11-cv-5227 (2d Cir. filed Feb. 15, 2012). On appeal, the parties were aligned in an effort to obtain approval of their negotiated consent decree, and no party to the case would defend the district court's ruling rejecting the settlement. Following submission of Better Markets' amicus brief on the issue, the Second Circuit ordered the appointment of pro bono counsel to advocate for affirmance of the district court's order. *See* Order, ECF No. 123, No. 11-cv-5227 (2d Cir. Mar. 16, 2012).

## **BACKGROUND**

In 2008, Wall Street precipitated the worst financial crisis since the stock market crash of 1929 and the worst economic calamity since the Great Depression. *See* Better Markets, *The Cost of the Crisis: $20 Trillion and Counting* (July 2015), *available at* https://www.bettermarkets.com /sites/default/files/Better%20Markets%20-%20Cost%20of%20the%20Crisis.pdf. In the wake of these historic events, America's elected officials responded by enacting a comprehensive set of regulatory reforms in Dodd-Frank. One of the most important regulatory innovations in that sweeping legislation was the creation of the FSOC, an agency that is unique in the history of financial regulation in both its design and importance. Comprised of representatives from virtually every federal and state regulatory authority, the FSOC's core mission is to monitor all sectors of the financial markets, identify risks to the financial stability of the United States wherever they

may arise, and respond with a variety of measures to mitigate those threats.

Congress equipped the FSOC with broad powers to carry out this challenging task, including the authority to collect large amounts of information, analyze that data, and, when appropriate, exercise its discretion to designate systemically significant nonbank financial institutions for prudential supervision by the Federal Reserve. This designation authority plays a uniquely important role in preventing another financial crash and economic crisis. Unknown and unforeseen systemic risks arising from nonbank financial institutions were at the core of the 2008 crisis, as illustrated by the collapse of American International Group, Bear Stearns, Lehman Brothers, the Reserve Primary money market fund, and others. Ensuring that such nonbank financial institutions are subject to appropriate oversight is one of the FSOC's most important missions and preserving that authority is essential to protecting the American people.

Notwithstanding its vital function and broad authority, the FSOC has proceeded cautiously and deliberatively since its creation in 2010, exercising its designation authority only four times in five years. With respect to MetLife, the FSOC issued its designation decision on December 18, 2014 after finding that "financial distress at MetLife could pose a threat to U.S. financial stability." Based on this determination, and in accordance with the applicable statutory provisions, MetLife announced that "MetLife will be supervised by the Board of Governors and be subject to enhanced prudential standards." *Basis for the Financial Stability Oversight Council's Final Determination Regarding MetLife, Inc.* (Dec. 18, 2014) ("Public Basis") at 2, *available at* http://www.treasury.gov/initiatives/fsoc/designations/Documents/MetLife%20Public%20Basis.p df.

Although the publicly released explanation of the designation, the Public Basis, is only 31 pages long, it is clear from that document alone that a vast amount of information was exchanged,

in writing and orally, between MetLife and the FSOC during the designation process, which spanned 17 months. As explained in the Public Basis, staff of the FSOC and senior FSOC officials conducted 17 meetings with MetLife representatives and MetLife's state insurance regulators regarding a possible designation. *See id.* at 2–3. During that period of evaluation, MetLife submitted more than 21,000 pages of information to the FSOC, after which the FSOC granted MetLife an oral hearing and accepted multiple additional submissions from MetLife. *See id.* at 3. The FSOC's designation of MetLife thus generated an extensive administrative record.

## <u>THE GAPS IN THE RECORD</u>

MetLife initiated this lawsuit on January 13, 2015 by filing a ten-count complaint challenging the FSOC's final decision "to designate MetLife as a nonbank systemically important financial institution." Compl. ¶ 1, ECF No. 1 (D.D.C. filed Jan. 13, 2015). MetLife's Complaint advances a wide range of arguments and legal theories predicated on the Constitution, the statutory provisions governing designation, and the Administrative Procedure Act. It attacks virtually every possible aspect of the FSOC's designation process, including allegations claiming that MetLife is not subject to designation; faulting the FSOC for both the process and substance of its designation of MetLife; asserting that the FSOC failed to conduct a cost-benefit analysis; and even contending that the FSOC violates the doctrine of separation of powers by virtue of its structure and operations.

Since the filing of the Complaint, the parties have created a litigation record largely shrouded in secrecy. The process has been marked by three characteristics:

     1.     First, the parties have sealed an extensive amount of material, including two-thirds of the Joint Appendix, which will serve as the core evidentiary foundation for the Court's resolution of the issues presented. They have also sealed portions of their memoranda that set forth their arguments.

2.      Second, they have invoked an assortment of general grounds for the sealing of documents and information, including claims that the materials contain confidential business information of MetLife; confidential business information of entities other than MetLife; and information that is internal, pre-decisional, and deliberative in nature.

3.      And third, they have accomplished all of this through negotiated agreements embodied in consent motions, without substantive judicial review and analysis of the sealed materials and without an independent determination about whether the proper balance has been struck between the confidentiality concerns the parties assert and the public's interest in having access to the record.

As detailed below, the parties have followed this approach with respect to the two core collections of documents relevant to this case: the Joint Appendix and the various memoranda that the parties have filed in the case.

I.      The Joint Appendix

The Joint Appendix is comprised of excerpts from the full Administrative Record,[7] and it

_____

[7] The FSOC produced the Administrative Record to MetLife on May 8, 2015, totaling 86,111 pages, but, in accordance with Local Rule 7(n), it has not been filed in the public docket. *See* LCvR 7(n). The Certification of the Administrative Record filed in the docket indicates that the FSOC withheld material from the Administrative Record, including some privileged documents and other material containing "confidential business information of entities other than MetLife or are internal, pre-decisional, and deliberative in nature." Certification of Administrative Record ¶ 4, ECF No. 17, Attachment No. 1 (D.D.C. filed May 8, 2015).

MetLife has challenged the FSOC's decision to withhold documents and information from the Administrative Record. The dispute has focused on materials that "third-party foreign and domestic regulators provided to the Counsel pursuant to information sharing agreements." Joint Mot. for Entry of Protective Order ¶ 1, ECF No. 35 (D.D.C. filed June 11, 2015). As to some documents, the matter was resolved by virtue of a Protective Order that the parties negotiated and jointly requested from the Court. *See id.*; Protective Order, ECF No. 38 (D.D.C. June 12, 2015). The Protective Order allowed the FSOC to produce previously withheld material to MetLife with the assurance that the material would be provided only to MetLife's outside counsel and

represents the portions of the record on which the parties are relying in their memoranda setting forth their arguments on the merits. It plays a critical role in this case, yet it has been filed under seal, and the version entered in the public docket has been heavily redacted.

The process of filing the Joint Appendix began on September 3, 2015, when MetLife filed an unopposed motion for leave to file the Joint Appendix under seal, indicating that the record contains "business information that might harm a litigant's competitive standing." Pl.'s Mot. to File J.A. Under Seal at 1 (quoting *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978)). MetLife argued that disclosure of such "information to MetLife's competitors could result in substantial competitive harm to MetLife." *Id.* The motion also indicated that the parties were "conferring with respect to the preparation of a redacted version of the Joint Appendix that will be filed on the Court's public docket." *Id.* at 2. Further, the motion noted: "In particular, the parties are actively negotiating with respect to those documents within the Joint Appendix . . . that will need to be redacted in full or in part and are attempting to develop an approach to redactions that will afford the public access to non-confidential portions of the Joint Appendix without undue delay or an unwarranted burden on the parties." *Id.* The Court granted that motion on September 3, and the unredacted version of the Joint Appendix was filed under seal on September 4, 2015.

---

consultants and only for use in this litigation. However, the FSOC has apparently still refused to produce some information obtained from third-party regulators, notwithstanding the Protective Order, and those documents are the subject of a pending Motion to Compel filed by MetLife. *See* ECF No. 50 (D.D.C. filed June 29, 2015). On November 6, 2015, the Court ordered the FSOC to deliver the documents at issue to chambers for ex parte review *in camera*. *See* Minute Order (D.D.C. Nov. 6, 2015). However, while the Court's ruling on the Motion to Compel will resolve MetLife's claim for full access to the Administrative Record, it will not address the separate question of the public's right of access to the record in this case. *See Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011) (subjecting records to a protective order does not overcome presumption for unsealing judicial records).

On September 25, 2015, MetLife filed a notice explaining: (1) that the parties remained "actively engaged in discussions" regarding appropriate redactions to the public version of the Joint Appendix; (2) that MetLife was not in a position to file the public version on September 25; (3) that they anticipated doing so on September 30; and (4) that the parties would continue their discussions regarding redactions in an effort to reach agreement in advance of September 30. *See* ECF No. 75. On September 30, 2015, MetLife filed the "public, redacted version of the Joint Appendix." ECF No. 85 (attaching seven of sixteen volumes).

A review of the Table of Contents to the Joint Appendix, attached hereto as Exhibit B, reveals that **more than two-thirds** of the documents it contains have been redacted. It comprises 16 volumes. Nine of those 16 volumes have been "Redacted in Full" (representing at least 1645 pages withheld), and four volumes have been redacted in part (representing an additional 288 pages withheld). *See* Ex. B ("Table of Contents"), at ii–vi. And there are additional redactions of whole pages or lines of text throughout the remainder of the Joint Appendix.

In fact, only 935 pages in the Joint Appendix have been at least partially publicly filed, while at least 1933 pages have been withheld entirely, resulting in a redaction "rate" of 67%. And the scale of sealing is actually larger still, because this calculation does not account for Volume 16, which was withheld in its entirety. Because the Table of Contents fails to indicate the number of pages in Volume 16—the final volume—it is impossible to know how much additional material has been withheld. It is beyond dispute, however, that the parties have sealed the vast majority of the Joint Appendix, the core collection of the evidence on which this case will be decided.

Although it is impossible to fully assess the qualitative nature of the specific material that has been sealed or redacted, all of it has presumptive, inherent significance. Everything in the Joint Appendix is derived from the Administrative Record, and the Administrative Record is, by

definition, material "considered, directly or indirectly, in the Council's determination to designate MetLife for supervision by the Board of Governors of the Federal Reserve System." Certification of Administrative Record ¶ 3, ECF No. 17, Attachment No. 1 (D.D.C. filed May 8, 2015). Moreover, the materials in the Joint Appendix were culled from the Administrative Record based on the parties' judgment that those items constitute the most important evidentiary support for their respective positions on the merits. There can be no question that the Joint Appendix contains information that is highly relevant to the issues presented in this case. It is therefore of enormous public interest.

Moreover, some of the specific sealed documents are plainly central to the issues presented. For example, the entirety of MetLife's "voluntary submission," comprising 6 volumes, has been "Redacted in Full." Table of Contents at iii. This material presumably contains the bulk of the arguments and supporting materials that MetLife relied on in its effort to persuade the FSOC that designation was unwarranted. It is difficult to believe that this entire collection of documents, directly relevant to the case, warrants blanket confidential treatment. Yet it has been completely removed from the Joint Appendix.

Also fully redacted is an item from Volume 15 of the Joint Appendix labeled "Oliver Wyman: Analysis of Market Consequences of Severe Financial Distress (Feb. 14, 2014)." This document would seem to bear directly on the ultimate issue in this case—the impact on the financial system if MetLife were to experience "material financial distress." 12 U.S.C. § 5323(a)(1). And yet it too has been fully, not selectively, redacted.

II.    The Parties' Motions and Memoranda

Likewise, the parties' substantive memoranda on the merits have generally been filed under seal and then filed in the public docket in redacted form, all pursuant to private negotiations and

11

consent motions. For example, on May 8, 2015, the FSOC filed two documents under seal: a consent motion to seal and an accompanying memorandum in support of its motion to dismiss, or in the alternative, for summary judgment. In a separate, publicly filed "Notice of Filing Motion to File Under Seal," the FSOC simply averred that the filing of its memorandum under seal was necessary to protect "confidential business information" of MetLife in accordance with section 112(b)(5) of Dodd-Frank, 12 U.S.C. § 5323(b)(5). *See* ECF No. 20. In the Notice of Motion, the FSOC also indicated that it would "consult with Plaintiff" regarding "the necessary redactions" to be made in the version of the memo that would be filed in the public docket. Thereafter, on May 11, 2015, the FSOC filed a public version of its memorandum, with multiple redactions. *See* Redacted Mem. in Supp. of Def.'s Mot. to Dismiss at 46, 47, 48, 51 n.35, ECF No. 22.

On June 12, 2015, MetLife filed an unopposed motion to file, under seal, its unredacted memorandum in support of its cross-motion for summary judgment and in opposition to the FSOC's motion to dismiss. *See* ECF No. 37. The motion simply indicated that filing under seal was appropriate because MetLife's memorandum would contain the company's "proprietary commercial or financial information," the public disclosure of which "could result in substantial competitive harm to MetLife." *Id.* at 2. Thereafter, on June 16, 2015, MetLife filed a public version of its memorandum, with multiple redactions. *See* Pl.'s Mot. at 61, 64, 65, ECF No. 39.

On July 29, 2015, the FSOC filed a consent motion for leave to file, under seal, its unredacted reply memorandum in support of its motion to dismiss, or in the alternative, for summary judgment, and in opposition to MetLife's cross-motion for summary judgment. *See* ECF No. 55. Once again, the motion summarily indicated that sealing of the memorandum was necessary to protect "confidential business information" that MetLife had provided to the FSOC. *Id.* at 2. The motion further indicated that before filing a redacted version of the memorandum in

the public docket, the FSOC would "confer with MetLife on its proposed redactions, in order to help ensure that all appropriate redactions are made." *Id.* The Court granted that motion on July 30, 2015. On August 4, 2015, the FSOC filed its redacted, public version of its reply memorandum, with multiple redactions. *See* FSOC Reply Mem. at xi, 3, 12, 19, 20, 28, 29, 32, 47, 48, 53, 54, 62, 65, ECF No. 60.

On August 19, 2015, MetLife filed an unopposed motion for leave to file, under seal, its unredacted reply memorandum in support of its cross-motion for summary judgment, and to file a "publicly available redacted version" thereafter. ECF No. 63. The Motion recited the same general reason for confidentiality, noting that the reply memorandum would contain "the company's proprietary commercial or financial information," the disclosure of which "could result in substantial competitive harm to MetLife." *Id.* at 2. The Court granted that motion on August 19. On August 21, 2015, MetLife filed its redacted, public version of its reply memorandum, with multiple redactions, and filed its sealed unredacted version as well. *See* Pl.'s Reply Mem. at 4, 5, 24, 31, ECF No. 65.

On September 30, 2015, MetLife filed a Notice indicating that it had filed "updated public versions of its briefs." ECF No. 86. The Notice explained that "in the course of discussing appropriate redactions to the Joint Appendix, the parties determined that some information that had been redacted from the public versions of the briefs could be made public without compromising the proprietary commercial or financial information of MetLife." *Id.* at 1. Accordingly, the Notice indicated that "some of the redactions in the previously filed public versions of the briefs have been lifted." *Id.* The FSOC did the same. *See* ECF No. 84 ("The parties have since discussed those redactions and have determined that additional information can be publicly released.").

13

In summary, a large amount of information relating to the resolution of extraordinarily important issues is being withheld from the public in derogation of its well-established, presumptive right of access to judicial proceedings. The parties have invoked a number of general justifications for this sealing of information, without identifying the specific grounds that apply to specific documents and without specifying the likelihood and gravity of the harm they foresee from release of the information. And while the parties have sought and obtained judicial approval for these consensual redactions, the Court has never had occasion to undertake any independent assessment of the parties' contention that confidential treatment is warranted for the reasons they claim, or that the parties' interest in confidentiality outweighs the public's interest in having full access to the record in this extraordinarily important case. Better Markets' motion to intervene and contingent application for an Order to Show Cause why the record should not be unsealed seek to remedy this secretive state of affairs.

## **ARGUMENT**

**I.      Better Markets should be permitted to intervene under Rule 24(b), which is a well-established mechanism for allowing members of the public to challenge the sealing of records in a judicial proceeding.**

The United States Court of Appeals for the District of Columbia has established that "third parties may be allowed to permissively intervene under Rule 24(b) for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order." *EEOC v. Nat'l Children's Ctr., Inc.* ("*Children's Ctr. II*"), 146 F.3d 1042, 1046 (D.C. Cir. 1998); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 300 F.R.D. 19, 21 (D.D.C. 2013) (the standard for motions under Rule 24(b)(1) is relaxed where intervention is sought for the limited purpose of unsealing the record); *In re Guantanamo Bay Detainee Continued Access to Counsel,* 968 F. Supp. 2d 222, 224 (D.D.C. 2013) (same). In fact, the Circuit has

14

observed that "every circuit court that has considered the question has come to the conclusion that nonparties may permissibly intervene for the purpose of challenging confidentiality orders." *Children's Ctr. II*, 146 F.3d at 1045–46.[8]

Although the grant of intervention under Rule 24(b) remains within every court's discretion, that discretion is exercised liberally, "to favor permissive intervention when third parties seek it only for the purpose of unsealing records." *Children's Ctr. II,* 146 F.3d at 1046; *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 300 F.R.D. 19, 21 (D.D.C. 2013); *In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2001 U.S. Dist. LEXIS 25068, *29 (D.D.C. Mar. 19, 2001) ("The requirements for permissive intervention are to be construed liberally, with all doubts resolved in favor of permitting intervention." (internal quotation marks omitted)). Indeed, motions to intervene for the limited purpose of unsealing the record are often granted as a matter of course. *See, e.g.*, *In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2, 5 n. 3 (D.D.C. 2013) ("The parties do not seriously dispute that the Post, as a nonparty newspaper, may 'permissively intervene under Rule 24(b) for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order.' " (quoting *Children's Ctr. II*, 146 F.3d at 1046)).

To the extent that the traditional elements of Rule 24(b) apply when intervention is sought for the limited purpose of unsealing records, they are all satisfied in this case. Normally, to litigate under Rule 24(b)(1)(B), a would-be intervenor must present: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of

---

[8] The strong policy favoring public access to judicial records is even reflected in the D.C. Circuit Rules, which provide that: "A party **or any other interested person** may move **at any time** to unseal **any** portion of the record in this court, including confidential briefs or appendices filed under this rule." D.C. Cir. R. 47.1(c) (emphases added).

15

law or fact in common with the main action." *Children's Ctr. II*, 146 F.3d at 1046. In determining whether to allow intervention, courts must also consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights. *See* Fed. R. Civ. P. 24(b)(3); *Consumer Fin. Prot. Bureau v. Ocwen Fin. Corp.*, 304 F.R.D. 19, 23 (D.D.C. 2014), *aff'd*, 2015 U.S. App. LEXIS 5664 (D.C. Cir. Apr. 7, 2015).

As a threshold matter, "[a]n independent jurisdictional basis is unnecessary when the movant seeks to intervene only for the limited purpose of obtaining access to documents covered by seal." *Children's Ctr. II,* 146 F.3d at 1047. The rationale for this exception is clear: "[S]uch intervenors do not ask the district court to exercise jurisdiction over an additional claim on the merits, but rather to exercise a power that it already has, namely the power to modify a previously entered confidentiality order." *Id.* Accordingly, Better Markets need not establish an independent ground for jurisdiction. The other elements typically applicable under Rule 24(b) are present, as shown below.

A.    Better Markets' motion is timely.

In assessing the timeliness of an intervention motion, courts weigh "all the circumstances, especially the time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already in the case." *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 19 (D.D.C. 2010) (quoting *United States v. AT&T,* 642 F.2d 1285, 1295 (D.C. Cir. 1980)). The timeliness requirement is "aimed primarily at preventing potential intervenors from unduly disrupting litigation, to the unfair detriment of the existing parties." *Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014).

This element "has been viewed flexibly in the context of interventions to amend protective

orders." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 300 F.R.D. 19, 22 (D.D.C. 2013). Courts frequently allow intervention for the limited purpose of unsealing the record even after significant delays. *See Aristotle,* 714 F. Supp. 2d at 19 (holding that intervention was timely "more than one year after the routine briefing was completed on the motion for summary judgment, and some six months after the last hearing" in the case). Indeed, "[i]ntervention is the proper vehicle by which third parties should seek to alter protective orders and obtain access to sealed documents **even after a case is over**." *Children's Ctr. II*, 146 F.3d at 1048 (emphasis added); *see also San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1100 (9th Cir. 1999) ("[D]elays measured in years have been tolerated where an intervenor is pressing the public's right of access to judicial records."); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (allowing intervention for purposes of unsealing records three years after case settled).

Under these guidelines, Better Markets' motion is clearly timely. This case is far from over: Briefing on dispositive motions was only recently completed (as of September 30, 2015, when MetLife filed its revised reply brief), and oral argument will not take place for nearly three months. Moreover, the single most important collection of sealed documents—the Joint Appendix—was not publicly available in its redacted form until September 30, just over a month ago. Better Markets could not possibly have assessed the scope of the material placed under seal and redacted from those documents until that date.

The other factors that determine "timeliness" also weigh in favor of intervention. Better Markets is seeking to intervene for an important purpose, one that is firmly established in American jurisprudence: to vindicate its fundamental right of access to judicial proceedings. Intervention is the proper means for preserving this right. *See Aristotle,* 714 F. Supp. 2d at 18. Indeed, it is the only mechanism capable of fully protecting Better Markets' right of access.

17

B.    <u>Better Markets' limited intervention will not result in undue delay or prejudice to the parties.</u>

Rule 24(b)(3) provides: "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." At this point, the sole issue before the court is whether Better Markets should be permitted to intervene to contest the sealing of large portions of the record. The question of whether to grant the contingent application aimed at unsealing records is a separate inquiry from the threshold decision to grant intervention. *See Aristotle*, 714 F. Supp. 2d at 20 ("Whether and to what extent documents should be unsealed is a separate inquiry. The question before the Court is merely whether the applicant should be permitted to join the proceeding and bring that inquiry before the Court."). Accordingly, the issue at hand is not whether unsealing portions of the record would prejudice the parties but whether granting Better Markets' motion to intervene would prejudice the parties. Yet that limited request by itself could not possibly impose unfair prejudice or delay on the parties.

Moreover, if the Court grants the instant motion to intervene and allows Better Markets to challenge the sealing of records, resolution of the underlying request for an independent evaluation of the sealed documents will not lead to unfair burden or prejudice to the parties. Better Markets will not be contesting the merits of the litigation or asserting any claim of its own related to the merits, so its intervention will not impede the parties' ability to litigate the underlying controversy. Better Markets' limited intervention will not interfere with discovery or settlement negotiations—assuming either of those activities were ongoing in this case—or even delay the entry of final judgment. Neither the instant motion to intervene nor the contingent application for an Order to Show Cause why the record should not be unsealed threatens undue delay, prejudice, or interference with this litigation.

C.    Better Markets' claim for full access to the record shares a common question of law or fact with the underlying litigation.

Rule 24's requirement of a common question is also liberally construed "when the movant seeks to intervene for the collateral purpose of challenging a confidentiality order." *Children's Ctr. II*, 146 F.3d at 1047. Courts routinely find that the issue of whether the record should be unsealed is itself a question of law in common with the main action. *See, e.g.*, *Jessup v. Luther*, 227 F.3d 993, 999 (7th Cir. 2000) ("[C]onfidentiality is—in the language of Rule 24(b)(2)—a 'question of law . . . in common' between the Parties and the [intervenor]." (ellipsis in original)); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 (3d Cir. 1994) ("By virtue of the fact that the [intervenors] challenge the validity of the Order of Confidentiality entered in the main action, they meet the requirement of Fed. R. Civ. P. 24(b)(2) that their claim must have 'a question of law or fact in common' with the main action.").

Although the D.C. Circuit has not expressly adopted this principle,[9] it has repeatedly upheld the intervention of nonparties for the limited purpose of challenging a protective order in cases where there was no common question except the propriety of that order. The Circuit has characterized its own case law as holding that "[n]o particularly strong nexus of fact or law need exist between the two suits when a nonparty seeks to intervene for the sole purpose of gaining access to documents subject to a confidentiality order." *Children's Ctr. II*, 146 F.3d at 1048. The "Circuit has adopted a flexible reading of Rule 24(b)'s 'claim or defense' language, 'allowing intervention even in situations where the existence of any nominate claim or defense is difficult to

---

[9] In *Children's Center II*, the Circuit approvingly cited *Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 778 (3d Cir. 1994), for the proposition that a third-party challenge to a protective order inherently shares a common question of law with the underlying litigation. *See* 146 F.3d at 1047. This Court did the same in *Aristotle*, 714 F. Supp. 2d at 19.

find.' " *Ctr. for Biological Diversity v. U.S. EPA*, 274 F.R.D. 305, 312 (D.D.C. 2011) (quoting *Children's Ctr. II*, 146 F.3d at 1046).

The reason for this elastic standard is clear: If courts insisted that intervenors seeking access to court records raise a common question with the main action beyond the issue of whether the records should be sealed, there would be no mechanism for members of the public to gain access to records unless they had some personal interest in the case. This would vitiate the general public's right of access to court records, effectively limiting that right to those relatively few people with a special connection to the underlying controversy being litigated. Accordingly, Better Markets' contention that the records in this case should be unsealed has a sufficient legal or factual nexus with the main action to warrant intervention under Rule 24(b).

For all of the foregoing reasons, the Court should allow Better Markets to intervene in this case for the limited purpose of seeking to unseal the judicial record.

## II.    Members of the public have a well-established right of access to records in judicial proceedings, which has been infringed in this case without an adequate justification or the requisite independent balancing of interests.

As demonstrated above, Better Markets is entitled to intervene for the limited purpose of challenging the extensive sealing of the record in this case. If the Court grants the motion to intervene, Better Markets will seek to enforce its right of access by filing an application for an Order to Show Cause why the record should not be unsealed, in the proposed form attached hereto as Exhibit A. Through that application, Better Markets will ask the Court to issue an Order to Show Cause that requires each party parties to re-evaluate all of their redactions to date, to pare back any existing redactions that were unwarranted, and to then justify any remaining redactions with particularity so that the Court may balance the interests of the party that seeks a particular redaction with the public's right of access to judicial records.

A.    <u>Better Markets has a presumptive common law right of access to the judicial records in this case.</u>

The federal courts have long recognized that all members of the public have a presumptive, common law right of access to judicial records. *See Warner Commc'ns*, 435 U.S. at 597–98; *EEOC v. Nat'l Children's Ctr., Inc.* ("*Children's Ctr. I*"), 98 F.3d 1406, 1409 (D.C. Cir. 1996) (recognizing the "strong presumption in favor of public access to judicial proceedings") (citing *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991)).[10]

This right of access is rooted in the need for public oversight of our governmental institutions. The Supreme Court has framed this entitlement in terms of "the citizen's desire to keep a watchful eye on the workings of public agencies." *Warner Commc'ns*, 435 U.S. at 597–98. The D.C. Circuit has characterized public access to judicial records as "fundamental to a democratic state," in that such access "serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally." *United States v. Hubbard*, 650 F.2d 293, 315 & n.79 (D.C. Cir. 1980). Such judicial transparency is an indispensable element of our democratic system of government. *See SEC v. Am. Int'l Group,* 712 F.3d 1, 3 (D.C. Cir. 2013); *United States v. El-Sayegh,* 131 F.3d 158, 161 (D.C. Cir. 1997).

Accordingly, Better Markets enjoys a right of access to the judicial records in this case simply by virtue of being a member of the public. As argued below, its claim is especially strong

---

[10] The public's right of access to judicial records has often been predicated on the First Amendment as well as the common law. Recognizing that the D.C. Circuit has expressed doubts about whether the First Amendment right of access applies outside of the criminal context, *see SEC v. Am. Int'l Group,* 712 F.3d 1, 5 (D.C. Cir. 2013); *Ctr. for Nat'l Sec. Studies v. DOJ,* 331 F.3d 918, 935 (D.C. Cir. 2003), Better Markets bases its motion on the common law right of access and the Court's inherent authority to order disclosure of its own records. That authority is well-established: A district court has inherent authority to seal and unseal documents as part of its "supervisory power over its own records and files." *Warner Commc'ns*, 435 U.S. at 598.

because the records at issue here relate to matters of enormous public importance.

      B.    <u>Where sealed information is important to the public interest, the public right of access is compelling.</u>

While always powerful, the general public's right of access to court records is particularly compelling where information filed in court relates to an important public interest. *See Children's Ctr. I*, 98 F.3d 1406, 1410 (public interest in disclosure found "compelling" where it would shed light on how public funds were being spent by a charity and on the quality of care being provided to the city's children); *Greater Se. Cmty. Hosp. Corp.*, 951 F.2d at 1277–78 (case remanded for a reconsideration of the need for any sealing of the record, in light of the "obvious public interest" in being informed about the quality of available healthcare); *see also Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1308 (11th Cir. 2001) ("[W]here there is a particularly strong public interest in court records, the common-law right of access is measured by the compelling interest standard.").

This Court has also recognized that the need for public access to judicial records may be regarded as particularly vital where members of "the taxpaying public are, in effect, real parties in interest." *United States ex rel. Schweizer v. Oce, N.V.*, 577 F. Supp. 2d 169, 172 (D.D.C. 2008). "[I]n cases where the government is a party[,] the appropriateness of making court files accessible is enhanced." *Friedman v. Sebelius*, 672 F. Supp. 2d 54, 58 (D.D.C. 2009) (internal quotation marks omitted).

These principles apply with the utmost force here. This case involves a matter of undoubted consequence for the entire country: the ability of our financial regulators to identify and contain systemic risks to our financial system that could ignite or intensify another financial crisis. And in a very literal sense, the taxpayers are the real parties in interest in this case because the inability to prevent another financial crisis raises the dreadful prospect of more billion-dollar taxpayer bailouts

of banks and nonbank institutions deemed "too big to fail."

The unique importance of this case is also reflected in the media coverage. The press has written about every aspect of it, including the FSOC's proposed designation of MetLife in September 2014; the actual designation on December 18, 2014; MetLife's filing of this lawsuit; and MetLife's claim that the FSOC has improperly withheld documents from the Administrative Record.[11]

Better Markets is an especially fitting proponent of an open and accessible record in this case because its very mission is to advocate for greater transparency, accountability, and oversight in our financial markets. It is seeking access to the record to advance those goals, and ultimately to ensure that the operations of government—both the FSOC and the Court in this instance—are fully transparent as they address MetLife's challenge to one of the most important financial reforms ever adopted.

C.    All of the documents placed under seal and redacted in this case are "judicial records."

Whether documents under seal are judicial records is an important threshold inquiry in any case where a member of the public seeks to unseal court records, *cf. Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d 897, 902 (D.C. Cir. 1996), since "not all documents filed with courts

---

[11] *See* Gina Chon, *Regulators propose systemic risk label for MetLife*, Financial Times (Sept. 4, 2014, 10:09 PM), *available at* http://www.ft.com/intl/cms/s/0/850b91f8-3466-11e4-8039-00144feabdc0.html#axzz3rJmiTUKx; Leslie Scism & Victoria McGrane, *MetLife Considers Challenging 'Systemically Important' Label*, Wall St. J. (Dec. 18, 2014), *available at* http://www.wsj.com/articles/metlife-designated-as-systemically-important-by-u-s-panel-1418937044?alg=y; Mary Williams Walsh, *MetLife Sues Over Being Named Too Big to Fail*, N.Y. Times Dealbook Blog (Jan. 13, 2015, 7:31 AM), *available at* http://dealbook.nytimes.com/2015/01/13/metlife-to-fight-too-big-to-fail-status-in-court/; John Heltman, *MetLife Accuses FSOC of Withholding Documents*, American Banker (June 29, 2015), *available at* http://www.americanbanker.com/news/law-regulation/metlife-accuses-fsoc-of-withholding-documents-1075150-1.html.

are judicial records." *Am. Int'l Group,* 712 F.3d at 3. "[W]hat makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process." *El-Sayegh,* 131 F.3d at 163; s*ee also FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 409 (1st Cir. 1987) ("[W]e rule that relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies.").

Under these tests, the sealed records in this case are clearly "judicial records." The Joint Appendix and the parties' memoranda have of course all been "submitted to, and accepted by" the Court. *Standard Fin. Mgmt. Corp.,* 830 F. 2d at 409. In addition, they all play a central role in this case. Under the Local Rules of this Court, the Joint Appendix is by definition the portions of the Administrative Record that the parties are relying on to substantiate their respective positions. *See* LCvR 7(n)(1). The Local Rules also provide that the materials in the Joint Appendix must "relate" to the issues presented in the pending dispositive motions. *Id.* In addition, the Joint Appendix is the evidentiary foundation on which the Court will rely when rendering its decision. Given the role of the Joint Appendix and its importance to the parties as well as the Court, all of the documents it contains are judicial records.

The parties' motions and memoranda play an equally important role in this case. They set forth all of the arguments that the parties want the Court to consider in rendering its decision. They too are judicial records, subject to the common law right of access.

D.    <u>The presumption in favor of public access to judicial records can be overcome only by a strong showing under a multi-part test that the Court has never had occasion to apply in this case.</u>

Although the public's right to inspect and copy judicial records is not absolute, *In re Shepard*, 800 F. Supp. 2d 37, 41 (D.D.C. 2011), "[t]he citizens' right to know is not lightly to be

deflected," and "only the most compelling reasons can justify non-disclosure of judicial records." *Standard Fin. Mgmt. Corp.*, 830 F.2d at 410; *accord Children's Ctr. I*, 98 F.3d at 1409. The Court must balance the public's right of access against the interests invoked to support nondisclosure. *See Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d at 902.

In determining whether this presumption of public access has been overcome, the court must weigh a number of factors: (1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings. *See Hubbard*, 650 F.2d at 317–22; *see also Primas v. District of Columbia*, 719 F.3d 693, 698–99 (D.D.C. 2013). It is only "if the district court, after considering the relevant facts and circumstances of the particular case, and after weighing the interests advanced by the parties in light of the public interest and the duty of the courts, concludes that justice so requires" may the court then permit records to be sealed or redacted. *In re Application of Nat'l Broad. Co.*, 653 F.2d 609, 613 (D.C. Cir. 1981) (internal quotation marks omitted).

In this case, it is already apparent that several factors support disclosure of the contents of the sealed documents. For example, as demonstrated above, the public has a compelling interest in having access to the entire record in a case of this extraordinary importance. In addition, the parties filed the documents with the Court for the purpose of substantiating their respective positions on the merits, and those documents represent the core evidentiary record on which the Court will rely in rendering its decision. The sealed documents were also relied on directly or indirectly by the FSOC when it made the decision to designate MetLife for supervision by the

Federal Reserve.

Until now, however, the Court has never been called on to apply these factors to the information placed under seal so that it could make an independent determination of the parties' claimed need to seal large portions of the record. The parties have made those decisions by agreements that received the Court's approval only summarily in proposed orders. As a consequence, the parties have never demonstrated to the Court the underlying basis for the "property and privacy interests" they have invoked, apart from conclusory representations in various joint motions. Nor have the parties explained why their interest in confidentiality outweighs the public's presumptive—and in this case compelling—right of access to the record.

E.  <u>The appropriate remedy is for the Court to issue an Order to Show Cause why the record should not be unsealed, which requires the parties to explain the basis for every redaction, and then for the Court to independently assess whether the need for each redaction outweighs the public's interest.</u>

To fully protect the public's right of access to the records in this case, the Court should eventually unseal every document unless first, a legitimate basis for redaction exists, and second, the party's interest in confidentiality outweighs the public's fundamental interest in judicial transparency. The proposed Order to Show Cause creates an effective process to facilitate the Court's decision.

1. *A three-step process will ensure that the record is as transparent as possible while protecting any valid confidentiality interests the parties have.*

To make this determination, the Court should first require the parties to re-evaluate the redactions they have made in the Joint Appendix. Notwithstanding their recent effort to file less-redacted briefs, the parties have not yet revisited and scaled back the blanket redactions to the Joint Appendix. In light of the size of the Joint Appendix, each party should be required to demarcate the precise redactions that it believes are necessary to protect a legitimate confidentiality concern.

Such redactions should be narrowly tailored to address the asserted concern, and they should not cover one word—let alone one page—more than necessary. This process may well cause the parties to conclude that they have unnecessarily redacted at least some portions of the Joint Appendix. In that event, they can promptly file an updated Joint Appendix containing only those particular redactions that one party or the other will defend as justified, so that the public may see the freshly unsealed information while the Court considers the validity of the remaining redactions.

The second step requires the parties to provide more specific justifications for the remaining redactions. In this context, a "party asserting good cause bears the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130–31 (9th Cir. 2003). To aid the Court in performing this analysis, each party should first meet a burden of production by submitting a "redaction log," akin to a privilege log, that specifies, for each proposed redaction, the justification(s) for the redaction. In addition, each justification should provide sufficient information to explain why all, and not just a portion, of the proposed redacted material should be kept from the public, including specifying the prejudice or harm that public access would cause to the party. If both parties agree that a redaction is warranted, then each party should list and justify it.

Case law on Rule 26 of the Federal Rules of Civil Procedure, which sets forth the type of showing that parties must make to justify a protective order, provides illustrative guidance for the showing the parties should make here. *See Foltz*, 331 F.3d at 113 ("Now that the Private Intervenors have challenged the contention that the unfiled discovery documents belong under seal, the district court must require [the seal's proponent] to make an actual showing of good cause for their continuing protection under Federal Rule of Civil Procedure 26(c).").

Rule 26(c) provides that "[t]he court may, for **good cause**, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." (emphasis added). In this context, "good cause" requires a movant for a protective order to "articulate specific facts showing 'clearly defined and serious injury' resulting from the discovery sought." *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987) (quoting *Cipollone v. Liggett Group., Inc.*, 106 F.R.D. 573, 583 (D.N.J. 1985) (the movant's burden "normally entails showing both that the information sought requires protection under the Rule, and that disclosure will result in clearly defined and serious injury.")). A proponent of a redaction "cannot rely on merely conclusory statements" but must articulate with particularity the facts underpinning the alleged injury. *Avirgan*, 118 F.R.D. at 254.

This Court has noted that "[i]n deciding whether or not to grant a protective order, courts typically weigh the burdensomeness [of the documents' being made available] . . . against the need for, and the relevance of, the information being sought." *Tequila Centinela, S.A. de C.V. v. Bacardi & Co.*, 242 F.R.D. 1, 4 (D.D.C. 2007). But where the party seeking a protective order has failed, as a threshold matter, to articulate "what could amount to a claim of harm," a court does not reach the balancing factors—the motion for a protective order must be denied. *Id.* After all, absent a specific claim of harm, "the Court would need to speculate to determine what general harm may occur if the alleged 'confidential material' became public." *Id.*

Here, the parties have done almost nothing to satisfy their burden. They have generally asserted that certain privileges or other grounds for confidentiality apply, but only as to broad categories of documents, not specific documents let alone specific pages or phrases within them. Similarly, they have identified only the most generic types of harm that might result from disclosure of some of the information but not particular facts that plausibly establish the threat of

harm. Instead, the parties should be held to the analogous standard put forth in Rule 26: "When a party withholds information . . . the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A).

The third and final step of the process is for the Court to review each party's proposed redactions *in camera* to determine (a) whether the justification(s) offered can meet that party's burden for demonstrating good cause and (b) whether, even for an otherwise justified redaction, the party's valid interest in nondisclosure—which is a function of the nature, likelihood, and magnitude of harm—outweighs the public's presumptive and compelling right of access to that information. *See Wash. Legal Found. v. U.S. Sentencing Comm'n,* 89 F.3d at 902. As shown above, the Joint Appendix and the parties' briefs are judicial records that play a crucial role in this case, and the public's right of access therefore attaches to them. Once the parties have provided the Court with adequate and accurate redaction logs, the Court will be able to balance the party's asserted interest against the public's interest using the *Hubbard* factors.[12]

Recent developments in this case drive home the need for independent judicial review of the sealed documents. Both parties have implicitly acknowledged that their own judgments about what should remain confidential were previously in error. On September 30, 2015, MetLife filed a notice indicating that it had filed "updated public versions of its briefs." ECF No. 86. MetLife explained that "in the course of discussing appropriate redactions to the Joint Appendix, the parties

---

[12] If an adversarial process would be of assistance to the Court, Better Markets is available to argue for the public interest, but does not here apply to do so, as the Court is eminently capable of balancing interests on the basis of the parties' submissions and its understanding of the issues in the case.

determined that some information that had been redacted from the public versions of the briefs could be made public without compromising the proprietary commercial or financial information of MetLife," such that "some of the redactions in the previously filed public versions of the briefs have been lifted." *Id.* The FSOC did the same. *See* ECF No. 84. Although the parties' briefs contain fewer redactions as a result of this exercise, much of them still remains under seal, and the Joint Appendix remains two-thirds redacted. This exercise illustrates that the parties' own judgments about the redactions necessary to protect their confidentiality interests are subject to change, and were, even in their view, originally overbroad. This further confirms that the Court should conduct an independent review of the parties' claims for secrecy.

*In camera* review of documents is a well-recognized mechanism for preserving confidentiality while enabling a court to conduct a thorough and independent judicial assessment of litigants' confidentiality claims. *See In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir. 1982) ("*In camera* submissions provide a method of judicial resolution which preserves confidentiality when justified."); *Roth v. U.S. DOJ*, 656 F. Supp. 2d 153, 164 (D.D.C. 2009) (ordering modifications in the FBI's redactions in documents subject to FOIA request following *in camera* review), *aff'd,* 642 F.3d 1161, 1185 (D.C. Cir. 2011). [13] In fact, this Court just issued an order

_____

[13] The Court also may enlist the assistance of a magistrate judge to evaluate additional information from the parties regarding their confidentiality claims, to review the documents *in camera*, and to determine which documents, if any, should remain under seal and which should be open to public view. *See, e.g.*, *United States v. Ellis*, 90 F.3d 447, 451 (11th Cir. 1996) (affirming magistrate judge's order unsealing court documents following *in camera* hearing); *In re Sealing & Non-Disclosure*, 562 F. Supp. 2d 876, 895 (S.D. Tex. 2008) (magistrate judge unsealed large swath of court filings in criminal case); *Willingham v. Ashcroft*, 355 F. Supp. 2d 390, 391 (D.D.C. 2005) (magistrate judge ordered that documents be redacted in accordance with specific instructions); *see also Weil v. Markowitz*, Civ. No. 83-3685, 1985 U.S. Dist. LEXIS 24095 at *4 (D.D.C. Oct. 30, 1985) ("[T]he magistrate has the jurisdiction to vacate the protective orders.").

providing for *in camera* review of the documents that are the subject of MetLife's Motion to Compel. *See* Minute Order (D.D.C. Nov. 6, 2015). Here, *in camera* review of the redacted information is an appropriate mechanism to ensure that the correct balance is struck between justified confidentiality concerns and the public's presumptive and compelling right of access to judicial records. The proposed Order to Show Cause submitted herewith creates a fair process that will limit the burden on the Court by giving it the information necessary both to test the parties' assertions and to balance the parties' interests against the public's.

> ### 2. Neither attorney-client privilege nor 12 U.S.C. § 5322(d)(5) is a valid justification for sealing the records at issue.

Careful scrutiny of the parties' justifications for their proposed redactions is especially critical in light of the sweeping redactions they have made to date. Better Markets anticipates the parties' raising and citing authority for a variety of justifications, but at least two would be meritless. First, the attorney-client privilege and the work-product doctrine are inapposite here and should not be invoked by either party as a justification for the redaction of any part of the Joint Appendix or briefs. Because the unredacted versions of the Joint Appendix and the briefs were filed under seal and voluntarily exchanged by the parties, the privilege has been destroyed for all the documents that are the subject of the proposed Order to Show Cause.[14]

Second, the statutory provision of Dodd-Frank that requires the FSOC to maintain the confidentiality of information it receives is inapplicable in this context. *See* 12 U.S.C. § 5322(d)(5). This statute, which provides the FSOC's authority to obtain information, provides:

> (5) Confidentiality
>  (A) **In general**
>  The Council, the Office of Financial Research, and the other member

---

[14] Better Markets recognizes the possibility that some of the sealed documents exchanged by the parties are themselves redacted, in which case that redacted information may still be privileged.

> agencies shall maintain the confidentiality of any data, information, and reports submitted under this subchapter.
>
> (B) **Retention of privilege**
>
> The submission of any nonpublicly available data or information under this subsection and part B shall not constitute a waiver of, or otherwise affect, any privilege arising under Federal or State law (including the rules of any Federal or State court) to which the data or information is otherwise subject.
>
> (C) **Freedom of Information Act**
>
> Section 552 of title 5, including the exceptions thereunder, shall apply to any data or information submitted under this subsection and part B.

*Id.* Subsection (5)(A) applies to the FSOC and its member agencies, not to a federal court. And Better Markets does not contend that MetLife's sharing of once-privileged information with the FSOC destroyed any privilege, which would run afoul of subsection (5)(B). Instead, it was the sharing of the sealed Joint Appendix and briefs with opposing counsel that destroyed work-product and attorney-client privilege. Finally, subsection (5)(C), concerning the Freedom of Information Act, is not binding on a federal court, as it applies only to an "agency." 5 U.S.C. § 552(a). Accordingly, although this provision of Dodd-Frank may bear on one *Hubbard* factor—whether the information was previously public—it cannot on its own justify the sealing of judicial documents or overcome the strong presumption of public access to them.

Moreover, even potentially legitimate bases for confidentiality must be closely scrutinized. For example, MetLife has generally asserted that huge swaths of information must be sealed because they would otherwise disclose confidential business information. But such blanket assertions do not automatically entitle a party to withhold information from the public record. Businesses have no generalized right to keep business information secret, even when its release could lead to adverse consequences. *See Huntsman-Christensen Corp. v. Entrada Indus., Inc.*, 639 F. Supp. 733, 738 (D. Utah 1986). In short, even if these sealed documents were required by Dodd-Frank to be maintained as confidential by the FSOC, and even if a FOIA request directed at the FSOC would not have prevailed, the context fundamentally changed when MetLife decided to sue.

Indeed, when litigants such as MetLife call on the courts, "they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials." *Union Oil v. Leavell*, 220 F. 3d 562, 567–68 (7th Cir. 2000).

The FSOC has conceded that at least some of the legal protections that may apply to the documents in the record are not absolute. In defending against MetLife's Motion to Compel, the FSOC observes: "To be sure, the Council acknowledges that in some cases the protections described above must yield to a party's need for information—or, in a record review case such as this one, to the Court's need for an administrative record sufficient for the Court to adjudicate a challenge to a federal agency decision." Def.'s Opp'n to Pl.'s Mot. to Compel Disclosure of Withheld and Redacted Record Materials at 2, ECF No. 52 (referring to the protections in 12 U.S.C. § 5322(d)(5)). This acknowledgement that such protections must sometimes yield to greater interests further highlights the need for the Court to independently balance the parties' claimed interests in confidentiality with the public right of access to judicial records—once the parties have provided specific, concrete grounds for their confidentiality claims and the harm they fear from public disclosure.

The extensive sealing of the record in this case cannot be justified unless and until the parties substantiate their confidentiality claims to the Court in much greater detail and the Court reviews the sealed documents *in camera* to balance the parties' confidentiality concerns against the public's presumptive and well-established right of access to all judicial records.

## CONCLUSION

For all of the foregoing reasons, Better Markets respectfully requests that the Court grant its motion to intervene so that it may apply for an Order to Show Cause why the record should not be unsealed.

Dated: November 19, 2015                    Respectfully Submitted,

                                            /s/ Dennis M. Kelleher
                                            Dennis M. Kelleher
                                            D.C. Bar No. 1009682
                                            Stephen W. Hall
                                            D.C. Bar No. 366892
                                            Better Markets, Inc.
                                            1825 K Street, N.W., Suite 1080
                                            Washington, D.C. 20006
                                            Tel: 202-618-6464
                                            Email: dkelleher@bettermarkets.com
                                            Email: shall@bettermarkets.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2015, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the CM/ECF system. In accordance with Local Rule 5.4(d), electronically filing a document operates to effect service of the document on all counsel.

/s/ Stephen W. Hall
Stephen W. Hall
D.C. Bar 366892
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Email: shall@betttermarkets.com

**Exhibit A**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

METLIFE, INC.,

               Plaintiff,

      v.

FINANCIAL STABILITY OVERSIGHT
COUNCIL,

              Defendant.

Civil Action No. 15-cv-45 (RMC)

## CONTINGENT APPLICATION OF BETTER MARKETS, INC. FOR AN ORDER TO SHOW CAUSE WHY THE RECORD SHOULD NOT BE UNSEALED

Here comes now Better Markets, Inc. ("Better Markets"), having moved under Rule 24(b) of the Federal Rules of Civil Procedure to intervene in this action for the limited purpose of unsealing the record. If that motion is granted, Better Markets hereby applies to the Court for an Order to Show Cause why the record in this action should not be unsealed. A proposed Order to Show Cause and a memorandum of points and authorities in support of the application (the same memorandum supporting the motion to intervene) are submitted herewith.

Better Markets has conferred with opposing counsel about this application and has learned that the plaintiff, MetLife, Inc., opposes the application for an Order to Show Cause, and that the defendant, the Financial Stability Oversight Council, takes no position at this time, but reserves the right to oppose after reviewing the motions. Should either party submit an opposition memorandum under LCvR 7(b), Better Markets will submit a reply memorandum under LCvR

7(d). Better Markets does not request oral argument on the application for an Order to Show Cause, but is available should the Court decide to hold argument.

Dated: November 19, 2015      Respectfully submitted,

            /s/ Dennis M. Kelleher     
            Dennis M. Kelleher
            Better Markets, Inc.
            D.C. Bar No. 1009682
            Stephen W. Hall
            D.C. Bar No. 366892
            1825 K Street, N.W., Suite 1080
            Washington, D.C. 20006
            Tel: 202-618-6464
            Email: dkelleher@bettermarkets.com
            Email: shall@bettermarkets.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| METLIFE, INC., | |
| Plaintiff, | |
| v. | |
| FINANCIAL STABILITY OVERSIGHT COUNCIL, | Civil Action No. 15-cv-45 (RMC) |
| Defendant. | |

## PROPOSED ORDER TO SHOW CAUSE

Having considered the application of Intervenor Better Markets, Inc. ("Better Markets") for an Order to Show Cause, the memorandum of points and authorities in support thereof, and the entire record herein, it is hereby

ORDERED that Better Markets' application is GRANTED; it is further

ORDERED that counsel for the Plaintiff and the Defendant each shall, within ___ days from the date of this Order to Show Cause, complete a review of every document within the Joint Appendix and briefing that has been redacted in whole or in part and determine whether any portions thereof may be unredacted, and shall file new versions on the public docket; and it is further

ORDERED that each party's counsel shall by the same date show cause why any document redacted in full or in part should remain so, by filing with chambers:

(A) a redaction log specifically identifying, with respect to each document that has been placed under seal in whole or in part—

1

(1) the particular justification(s) for the party's claim that the document or part thereof is properly redacted; and

(2) the basis for the party's claim that the party's interest in redacting each such document in whole or in part outweighs the public's interest in having access to the record in this case; and

(B) a copy of each original document, with the desired redaction highlighted, to facilitate review *in camera*.

SO ORDERED.

Dated: _____                    _____
                                                  Rosemary M. Collyer
                                                  United States District Judge

2

**Exhibit B**

# TABLE OF CONTENTS

| Item | AR Page(s) | JA Page |
|------|-----------|---------|

**VOLUME 1**

Authority to Require Supervision and Regulation of Certain Nonbank Financial Companies, 77 Fed. Reg. 21,637 (Apr. 11, 2012) ..................................................................................AR-1–26....................JA-1

Financial Stability Oversight Council, Hearing Procedures for Proceedings Under Title I or Title VIII of the Dodd-Frank Wall Street Reform and Consumer Protection Act...............................AR-27–33.................JA-27

Minutes of the Financial Stability Oversight Council (July 16, 2013) ..................................................................................AR-34–39.................JA-34

Minutes of the Financial Stability Oversight Council (Sept. 4, 2014) ..................................................................................AR-44–51.................JA-40

Minutes of the Financial Stability Oversight Council (Dec. 18, 2014) ..................................................................................AR-63–76.................JA-48

Letter from Amias M. Gerety, Deputy Assistant Sec'y, FSOC, to Steven Kandarian, MetLife, Inc. (July 16, 2013) ......................AR-77–79.................JA-62

Letter from Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC, to Ricardo A. Anzaldua, MetLife, Inc. (Aug. 20, 2014).................AR-80–82.................JA-65

**VOLUME 2**

Explanation of the Basis of the Financial Stability Oversight Council's Proposed Determination Regarding MetLife ("Proposed Designation") **REDACTED IN FULL**...................AR-83–308................JA-68

**VOLUME 3**

Proposed Designation (cont'd) **REDACTED IN FULL**.................AR-309–55.................JA-294

**VOLUME 4**

Explanation of the Basis of the Financial Stability Oversight Council's Final Determination that Material Financial Distress at MetLife Could Pose a Threat to U.S. Financial Stability and that MetLife Should Be Supervised by the Board of Governors of the Federal Reserve System and Be Subject to Prudential Standards (Dec. 18, 2014) ("Final Designation") ......................AR-356–571...............JA-341

ii

# TABLE OF CONTENTS
## *(continued)*

| Item | AR Page(s) | JA Page |
|------|------------|---------|

**VOLUME 5**

Final Designation (cont'd) ...............................................AR-572–742...............JA-557

Basis for the Financial Stability Oversight Council's Final
    Determination Regarding MetLife, Inc. (Dec. 18, 2014) ............AR-743–73.................JA-728

**VOLUME 6**

Letter from Ricardo A. Anzaldua, MetLife, Inc. to Patrick
    Pinschmidt, Deputy Assistant Sec'y, FSOC (Nov. 10, 2014)
    **REDACTED IN FULL**...............................................AR-1056–83...............JA-759

**VOLUME 7**

MetLife's November 13, 2013 Voluntary Submission
    (all sections) **REDACTED IN FULL** .......................................AR-1433–706.............JA-787

**VOLUME 8**

MetLife's November 13, 2013 Voluntary Submission (all sections)
    (cont'd) **REDACTED IN FULL**...............................................AR-1707–2006..........JA-1061

**VOLUME 9**

MetLife's November 13, 2013 Voluntary Submission (all sections)
    (cont'd) **REDACTED IN FULL** ...............................................AR-2007–251.............JA-1361

**VOLUME 10**

MetLife's October 16, 2014 Voluntary Submission (all sections)
    **REDACTED IN FULL**...............................................AR-2252–539.............JA-1606

**VOLUME 11**

MetLife's October 16, 2014 Voluntary Submission (all sections)
    (cont'd) **REDACTED IN FULL**...............................................AR-2540–776.............JA-1894

**VOLUME 12**

MetLife's October 16, 2014 Voluntary Submission (all sections)
    (cont'd) **REDACTED IN FULL**...............................................AR-2777–973.............JA-2131

# TABLE OF CONTENTS
## *(continued)*

| **Item** | **AR Page(s)** | **JA Page** |
|---|---|---|

Excerpts from MetLife, Inc., Annual Report (Form 10-K) (Feb. 27, 2014) ...................................................................AR-3497–821.............JA-2328

**VOLUME 13**

Transcript of FSOC Nonbank Financial Company Hearing (Nov. 3, 2014) ...................................................................AR-3955–4095...........JA-2372

Letter from Ricardo A. Anzaldua, MetLife, Inc. to Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC (Aug. 6, 2014) .......AR-4096–99...............JA-2513

Letter from Ricardo A. Anzaldua, MetLife, Inc. to Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC (Oct. 30, 2014).......AR-4230–34...............JA-2517

Memorandum Attached to Letter from Brian W. Smith, Mayer, Brown & Platt, to Jay B. Bernstein & Betsy Cross (Sept. 29, 2000) **REDACTED IN FULL**................................................AR-4312–55...............JA-2522

Letter from Robert deV. Frierson, Bd. of Governors of the Fed. Reserve Sys., to Steven Goulart, MetLife, Inc. (Oct. 29, 2010)..AR-4366–70...............JA-2566

Excerpts from MetLife, Inc., Annual Report (Form 10-K) (Feb. 21, 2012) ...................................................................AR-4371–99...............JA-2571

**VOLUME 14**

Bd. of Governors of the Fed. Reserve Sys., Commercial Paper Funding Facility .........................................................AR-11388–467..........JA-2600

**VOLUME 15**

Letter from James Donelon, La. Ins. Comm'r, to Jacob Lew, Sec'y, U.S. Dep't of the Treasury (March 27, 2014)..............AR-27985–90.............JA-2680

Letter from James Donelon, La. Ins. Comm'r, to Jacob Lew, Sec'y, U.S. Dep't of the Treasury (Nov. 7, 2014) .................AR-27991–96.............JA-2686

Oliver Wyman: Analysis of Market Consequences of Severe Financial Distress (Feb. 14, 2014) **REDACTED IN FULL**.......AR-48134–75.............JA-2692

Letter from Ricardo A. Anzaldua, MetLife, Inc., to Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC (Sept. 18, 2014) .....AR-61158–60.............JA-2734

iv

# TABLE OF CONTENTS
## *(continued)*

| Item | AR Page(s) | JA Page |
|---|---|---|

Letter from Ricardo A. Anzaldua, MetLife, Inc., to Patrick
Pinschmidt, Deputy Assistant Sec'y, FSOC (Oct. 6, 2014).........AR-61161–62.............JA-2737

Letter from Ricardo A. Anzualda, MetLife, Inc. to Patrick
Pinschmidt, Deputy Assistant Sec'y, FSOC (May 21, 2014)......AR-62369–72.............JA-2739

Letter from Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC, to
Ricardo A. Anzaldua, MetLife, Inc. (Oct. 3, 2014)....................AR-62393–96.............JA-2743

Letter from Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC, to
Ricardo A. Anzaldua, MetLife, Inc. (Oct. 7, 2014)....................AR-62401–08.............JA-2747

Letter from Ricardo A. Anzaldua, MetLife, Inc., to Patrick
Pinschmidt, Deputy Assistant Sec'y, FSOC (Oct. 22, 2014).......AR-62439–45.............JA-2755

Letter from Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC, to
Ricardo A. Anzaldua, MetLife, Inc. (Oct. 30, 2014)..................AR-62457–58.............JA-2762

Letter from Dave Jones, Cal. Ins. Comm'r, to Jacob Lew, Sec'y,
U.S. Dep't of the Treasury (Oct. 27, 2014) ................................AR-62470–78.............JA-2764

Letter from Karen Weldin Stewart, Del. Ins. Comm'r, to Jacob
Lew, Sec'y, U.S. Dep't of the Treasury (Oct. 13, 2014) .............AR-62479–86.............JA-2773

Statement of NOLHGA President Peter G. Gallanis (Mar. 27,
2014) ........................................................................................AR-62501–15.............JA-2781

Letter and Supplemental Statement from NOLHGA President
Peter G. Gallanis to Jacob Lew, Sec'y, U.S. Dep't of the
Treasury (Oct. 14, 2014)............................................................AR-62516–44.............JA-2796

Letter from Wayne Goodwin, N.C. Comm'r of Insurance, to FSOC
(Oct. 29, 2014) ........................................................................AR-62545–50.............JA-2825

Nonbank Financial Company Designations Final Rule and
Interpretive Guidance Fact Sheet...............................................AR-62551–56.............JA-2831

Letter from Thomas Leonardi, Conn. Ins. Comm'r, to Jacob Lew,
Sec'y, U.S. Dep't of the Treasury (Oct. 24, 2014) ....................AR-62842–61.............JA-2837

Letter from Kathy Belfi, Connecticut Financial Regulation
Division, to Patrick Pinschmidt, Deputy Assistant Sec'y, FSOC
(May 27, 2014) **REDACTED IN FULL** ...................................AR-62867–71.............JA-2857

v

# TABLE OF CONTENTS
### *(continued)*

| **Item** | **AR Page(s)** | **JA Page** |
|---|---|---|
| Email from Diane Fraser to Michael Maffei (Sept. 11, 2013) | AR-65867–68 | JA-2862 |
| Letter from Benjamin M. Lawsky, Superintendent, N.Y. Dep't of Fin. Servs., to Jacob Lew, Sec'y, U.S. Dep't of the Treasury (July 30, 2014) | AR-66153–57 | JA-2864 |

**VOLUME 16**

Confidential Materials Subject to Protective Order
   **REDACTED IN FULL**