IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

METLIFE, INC.,

               Plaintiff,

    v.

FINANCIAL STABILITY OVERSIGHT
COUNCIL,

               Defendant.

Civil Action No. 1:15-cv-45 (RMC)

**REDACTED BRIEF**

**FINAL MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF METLIFE, INC.'S
CROSS-MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 3

**I.**    MetLife, Inc. ................................................................................................ 3

**II.**    FSOC's Statutory Designation Authority ............................................... 5

**III.**    FSOC's Final Rule And Interpretive Guidance ..................................... 7

    **A.**    FSOC's Designation Criteria ................................................... 7

    **B.**    FSOC's Designation Process ................................................... 9

    **C.**    Board Supervision And Enhanced Prudential Standards ........................ 10

**IV.**    MetLife's Designation ........................................................................ 11

    **A.**    MetLife's Submissions And FSOC's Findings ...................... 11

    **B.**    Dissents From The Final Designation ..................................... 17

**V.**    These Proceedings ........................................................................ 18

STANDARD OF REVIEW ..................................................................................... 18

ARGUMENT ........................................................................................................... 19

**I.**    MetLife Is Not A "U.S. Nonbank Financial Company" Eligible For Designation ........................................................................................ 20

    **A.**    MetLife's Non-U.S. Insurance Activities Are Not Financial Activities Under Sections 4(k)(4)(B) Or (I) Of The Bank Holding Company Act ....................................................................... 21

    **B.**    FSOC's Attempts To Circumvent Section 4(k) Are Unavailing ............. 22

        **1.**    The Federal Reserve Board's Regulation Y Is Irrelevant To These Proceedings ................................................... 23

        **2.**    FSOC Misreads The "Related To" Clause In Section 102(a)(6) Of The Dodd-Frank Act ............................... 24

**TABLE OF CONTENTS**
**(continued)**

**Page**

II.  The Final Designation Violated The Dodd-Frank Act, FSOC's Final Rule And Interpretive Guidance, And Elementary Principles Of Reasoned Decision-Making .................................................................................. 26

A.  FSOC Arbitrarily And Capriciously Refused To Consider MetLife's Vulnerability To Material Financial Distress ........................ 26

1.  FSOC Is Statutorily Required To Consider A Company's Vulnerability To Material Financial Distress ............................ 26

2.  FSOC Violated Its Final Rule And Interpretive Guidance By Refusing To Consider MetLife's Vulnerability To Material Financial Distress .................................................. 29

3.  FSOC Erred By Assuming Distress At MetLife That Was More Severe Than The Definition Of "Material Financial Distress" In Its Final Rule And Interpretive Guidance ............... 30

B.  FSOC Improperly Departed From Section 113(a)(2)'s Designation Criteria And Unduly Emphasized MetLife's Size And Purported Interconnectedness ................................................................................. 31

III.  The Final Designation Is Arbitrary And Capricious Because It Is Based On Unbounded Speculation And Conjecture And Unreasonable Assumptions ............................................................................................... 33

A.  FSOC's Analysis Of The Effects Of MetLife's Material Financial Distress Departed From Settled Principles Of Risk Analysis ................. 34

1.  FSOC Disregarded Accepted Risk Analysis Methodologies And Failed To Define Criteria To Guide Its Analysis ................ 35

2.  FSOC's Assumptions Were Predicated On Illusory Risks ......... 38

B.  Without Any Reasoned Basis, And Contrary To All Historical Evidence, FSOC Assumed The Utter Ineffectiveness Of State Regulators .............................................................................................. 41

C.  FSOC's Exposure Analysis Did Not Meaningfully Appraise The Economic Impact Of MetLife's Material Financial Distress On Counterparties ....................................................................................... 45

D.  FSOC Erred In Assessing MetLife Under The Asset Liquidation Transmission Channel ............................................................................ 49

**TABLE OF CONTENTS**
**(continued)**

**Page**

    E.    No Deference Is Due Because FSOC's "Predictive Judgments" Were *Ipse Dixit* Based On Pure Speculation, Rather Than On Evidence And Reasoned Analysis .......................................................... 55

IV.    FSOC Made Other Fatal Errors That Require Rescission .................................. 57

    A.    FSOC Failed To Give Adequate Consideration To Reasonable Alternatives To MetLife's Designation .................................................. 57

    B.    FSOC Failed To Consider The Effects Of Designation On MetLife And Its Shareholders And Customers...................................................... 60

V.    FSOC's Structure And Designation Procedures Violate Due Process And The Separation Of Powers .................................................................................... 62

    A.    The Final Designation Violated Due Process Because FSOC Denied MetLife Access To The Record And Introduced New Evidence And Analysis............................................................................ 63

    B.    The Final Designation Violated The Separation Of Powers.................... 67

    C.    Injunctive Relief Is Appropriate To Remedy FSOC's Constitutional Violations. ........................................................................ 70

**CONCLUSION** ................................................................................................................**70**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALLTEL Corp. v. FCC,*
  838 F.2d 551 (D.C. Cir. 1988)....................................................................... 28

\* *Am. Gas Ass'n v. FERC,*
  593 F.3d 14 (D.C. Cir. 2010)............................................................... 19, 42, 56

*Appalachian Power Co. v. EPA,*
  249 F.3d 1032 (D.C. Cir. 2001)..................................................................... 38

\* *BellSouth Telecomm., Inc. v. FCC,*
  469 F.3d 1052 (D.C. Cir. 2006)........................................................... 19, 56, 57

*Brady v. Maryland,*
  373 U.S. 83 (1963) ....................................................................................... 65

\* *Bus. Roundtable v. SEC,*
  647 F.3d 1144 (D.C. Cir. 2011)................................................ 19, 45, 54, 60, 61

*Chamber of Commerce v. SEC,*
  443 F.3d 890 (D.C. Cir. 2006)....................................................................... 53

*Chamber of Commerce of U.S. v. SEC,*
  412 F.3d 133 (D.C. Cir. 2005).................................................................. 57, 58

*Chem. Mfrs. Ass'n v. EPA,*
  28 F.3d 1259 (D.C. Cir. 1994)....................................................................... 38

*Clinton Mem'l Hosp. v. Shalala,*
  10 F.3d 854 (D.C. Cir. 1993)......................................................................... 58

*D&F Afonso Realty Trust v. Garvey,*
  216 F.3d 1191 (D.C. Cir. 2000)..................................................................... 57

*Davis v. District of Columbia,*
  158 F.3d 1342 (D.C. Cir. 1998)..................................................................... 70

*Del. Dep't of Natural Res. & Envtl. Control v. EPA,*
  785 F.3d 1 (D.C. Cir. 2015)........................................................................... 46

*DynaLantic Corp. v. U.S. Dep't of Defense,*
  885 F. Supp. 2d 237 (D.D.C. 2012)............................................................... 70

*FCC v. Nat'l Citizens Comm. for Broad.,*
  436 U.S. 775 (1978) ..................................................................................... 55

\* Authorities upon which MetLife, Inc. chiefly relies are marked with an asterisk.

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*FTC v. Atl. Richfield Co.*,
   567 F.2d 96 (D.C. Cir. 1977) .................................................................................. 69

*Gen. Electric Co. v. EPA*,
   53 F.3d 1324 (D.C. Cir. 1995) ............................................................................... 67

*Grand Canyon Trust v. FAA*,
   290 F.3d 339 (D.C. Cir. 2002) ............................................................................... 23

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................................................... 67

*Grolier Inc. v. FTC*,
   615 F.2d 1215 (9th Cir. 1980) ............................................................................... 68

*Hill v. SEC*,
   No. 15-1801, 2015 U.S. Dist. LEXIS 74822 (N.D. Ga. June 8, 2015) ................... 69

* *Int'l Ladies' Garment Workers' Union v. Donovan*,
   722 F.2d 795 (D.C. Cir. 1983) .............................................................. 19, 55, 59

*Judulang v. Holder*,
   132 S. Ct. 476 (2011) ............................................................................................ 33

*Laclede Gas Co. v. FERC*,
   873 F.2d 1494 (D.C. Cir. 1989) ............................................................................ 57

*Manin v. Nat'l Transp. Safety Bd.*,
   627 F.3d 1239 (D.C. Cir. 2011) ............................................................................ 19

*Matthews v. Eldridge*,
   424 U.S. 319 (1976) ............................................................................................... 65

*Meister v. U.S. Dep't of Agric.*,
   623 F.3d 363 (6th Cir. 2010) ................................................................................ 58

*Mellouli v. Lynch*,
   135 S. Ct. 1980 (2015) .......................................................................................... 24

* *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ................................................................ 19, 34, 36, 50, 58, 62

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) ............................................................................................... 24

* *Nat'l Council of Resistance of Iran v. Dep't of State*,
   251 F.3d 192 (D.C. Cir. 2001) ........................................................................ 63, 64

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
   752 F.3d 999 (D.C. Cir. 2014) ........................................................................ 29, 30

* *Nat'l Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006) .......................................................................... 3, 34

*Nat'l Tire Dealers & Retreaders Ass'n v. Brinegar*,
   491 F.2d 31 (D.C. Cir. 1974) ............................................................................... 57

*Newspaper Ass'n of Am. v. Postal Reg'l Comm'n*,
    734 F.3d 1208 (D.C. Cir. 2013) ................................................................. 56

*North Carolina v. EPA*,
    531 F.3d 896 (D.C. Cir. 2008) ........................................................... 60, 61

*Prime Time Int'l Co. v. Vilsack*,
    599 F.3d 678 (D.C. Cir. 2010) ................................................................. 25

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004) ............................................................... 27

*Rural Cellular Ass'n v. FCC*,
    588 F.3d 1095 (D.C. Cir. 2009) ............................................................... 56

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943) ................................................................................... 58

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ................................................................................... 24

\* *Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ........................................... 18, 33, 34, 55

*Stevenson v. Willis*,
    579 F. Supp. 2d 913 (N.D. Ohio 2008) .................................................. 68

*Summer Hill Nursing Home LLC v. Johnson*,
    603 F. Supp. 2d 35 (D.D.C. 2009) .......................................................... 58

*In re Tobacco/Governmental Health Care Costs Litig.*,
    100 F. Supp. 2d 31 (D.D.C. 2000) .......................................................... 21

*U.S. Dep't of Homeland Sec. U.S. Customs & Border Prot. v. Fed. Labor Relations Auth.*,
    751 F.3d 665 (D.C. Cir. 2014) ................................................................. 22

*Withrow v. Larkin*,
    421 U.S. 35 (1975) ................................................................................... 69

**Statutes**

5 U.S.C. § 554(d) ........................................................................................... 68

5 U.S.C. § 706 ................................................................................................... 7

11 N.Y.C.R.R. tit. 11, § 97 ........................................................................... 44

12 U.S.C. § 84 ............................................................................................... 48

12 U.S.C. § 1813(a)(3) ................................................................................... 21

12 U.S.C. § 1841(n) ....................................................................................... 21

\* 12 U.S.C. § 1843(k)(4)(B) ................................................. 20, 21, 22, 24, 25

\* 12 U.S.C. § 1843(k)(4)(I) .................................................. 20, 21, 22, 24, 25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

12 U.S.C. § 1844(c)(3)(ii) ........................................................................... 56

\* 12 U.S.C. § 5311(a)(4) ..................................................................... 5, 20, 22

\* 12 U.S.C. § 5311(a)(6) ................................................ 1, 5, 12, 20, 21, 23

12 U.S.C. § 5311(a)(6)(A) ........................................................................ 25

12 U.S.C. § 5311(a)(6)(B) ................................................................... 24, 25

12 U.S.C. § 5321(b)(1)(J) ......................................................................... 17

12 U.S.C. § 5323(a)(2)(H) ........................................................................ 28

12 U.S.C. § 5322(a)(2)(K) ......................................................................... 58

12 U.S.C. § 5323(a) ............................................................................... 1, 5

\* 12 U.S.C. § 5323(a)(1) ......................................................................... 5, 27

\* 12 U.S.C. § 5323(a)(2) ..................................................................... 6, 28, 33

12 U.S.C. § 5323(a)(2)(A) ........................................................................ 27

\* 12 U.S.C. § 5323(a)(2)(H) ........................................................... 6, 28, 33, 44

12 U.S.C. § 5323(a)(2)(J) ......................................................................... 27

12 U.S.C. § 5323(a)(2)(K) ......................................................................... 62

12 U.S.C. § 5323(g) ............................................................................. 6, 14

12 U.S.C. § 5323(h) ............................................................................. 7, 61

12 U.S.C. § 5331 ...................................................................................... 66

12 U.S.C. § 5361 ...................................................................................... 66

12 U.S.C. § 5365 ................................................................................. 11, 66

12 U.S.C. § 5383(e) .................................................................................... 6

12 U.S.C. §§ 5461-5472 ............................................................................ 58

15 U.S.C. §§ 1011-1015 .............................................................................. 6

15 U.S.C. § 1012(b) .................................................................................. 56

Conn. Gen. Stat. § 38a-135(f) .................................................................. 43

Del. Code Ann. tit. 18, § 5004(*l*) ............................................................. 43

N.Y. Ins. Law § 1501(7) ........................................................................... 43

\* Dodd-Frank Wall Street Reform and Consumer Protection Act,
  Pub. L. No. 111-203, 124 Stat. 1376 (2010) ............................................. 6

**Regulations**

12 C.F.R. § 3.37 ...................................................................................... 44

12 C.F.R. § 3.132 .................................................................................... 44

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

12 C.F.R. § 32.9 .................................................................................................... 44

12 C.F.R. § 217.37 ............................................................................................... 44

12 C.F.R. § 217.132 ............................................................................................. 44

12 C.F.R. pt. 225 .................................................................................................. 26

12 C.F.R. § 225.81 *et seq.* .................................................................................. 23

12 C.F.R. § 225.85(b) .......................................................................................... 23

12 C.F.R. pt. 242 .................................................................................................. 23

12 C.F.R. § 324.13 ............................................................................................... 44

12 C.F.R. § 324.37 ............................................................................................... 44

12 C.F.R. § 1310.10(b) .......................................................................................... 9

* Authority to Require Supervision and Regulation of
   Certain Nonbank Financial Companies,
   77 Fed. Reg. 21,637 (Apr. 11, 2012) .......... 7, 8, 9, 12, 13, 14, 15, 26, 27, 29, 30, 31, 35, 47, 50

* Definitions of "Predominantly Engaged In Financial Activities" and
   "Significant" Nonbank Financial Company and Bank Holding Company,
   78 Fed. Reg. 20,756 (Apr. 5, 2013) ................................................................ 24, 25

Definitions of "Predominantly Engaged In Financial Activities" and
   "Significant" Nonbank Financial Company and Bank Holding Company,
   76 Fed. Reg. 7731 (Feb. 11, 2011) .................................................................... 26

Liquidity Coverage Ratio: Liquidity Risk Measurement Standards,
   79 Fed. Reg. 61,440 (Oct. 10, 2014) .................................................................. 40

Money Market Fund Reform,
   79 Fed. Reg. 47,736 (Aug. 14, 2014) ............................................................. 40, 48

Money Market Fund Reform,
   78 Fed. Reg. 36,834 (June 9, 2013) ................................................................... 49

Policy Statement on the Principles for Development and
   Distribution of Annual Stress Test Scenarios,
   78 Fed. Reg. 72,534 (Dec. 2, 2013) ................................................................... 37

Policy Statement on the Scenario Design Framework for Stress Testing,
   78 Fed. Reg. 71,435 (Nov. 6, 2013) ................................................................... 35

**Other Authorities**

156 Cong. Rec. S5902
   (daily ed. July 15, 2010) ................................................................................. 6, 7

*Assessing the Impact of the Dodd-Frank Act Four Years Later:*
   *Hearing Before the H. Comm. on Fin. Servs.*, 113th Cong. (2014) ............................ 7

TABLE OF AUTHORITIES
(continued)

Basel Committee on Banking Supervision,
  Principles for Sound Liquidity Risk Management and Supervision (Sept. 2008)................... 38

Bd. of Governors of the Fed. Reserve Sys.,
  2014 Supervisory Scenarios for Annual Stress Tests
  Required under the Dodd-Frank Act
  Stress Testing Rules and the Capital Plan Rule (2013),
  *available at* http://www.federalreserve.gov/bankinforeg/bcreg20131101a1.pdf. ................... 36

Bd. of Governors of the Fed. Reserve Sys.,
  Commercial Paper Funding Facility,
  http://www.federalreserve.gov/newsevents/reform_ cpff.htm .................................. 31

Bd. of Governors of the Fed. Reserve Sys.,
  Comprehensive Capital Analysis and Review:
  Objectives and Overview (2011), *available at*
  http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20110318a1.pdf. .................. 36

Bd. of Governors of the Fed. Reserve Sys.,
  Stress Tests and Capital Planning,
  http://www.federalreserve.gov/bankinforeg/stress-tests-capital-planning.htm ...................... 37

Allison Bell, *Fed Airs the Laundry*, LifeHealth Pro (Dec. 2, 2010),
  http://www.lifehealthpro.com/2010/12/02/fed-airs-the-laundry ............................... 31

Charles W. Calomiris,
  Reassessing the Regulatory Role of the Fed: Grappling with the Dual Mandate and More?,
  Pew Charitable Trs. Fin. Reform Project,
  Briefing Paper No. 10 (Oct. 6, 2009) ...................................................... 11

John J. Cohrssen & Vincent T. Covello,
  Risk Analysis: A Guide to Principles and Methods for
  Analyzing Health and Environmental Risks (1989)......................................... 35, 38

Cong. Research Serv., House Fin. Servs. Comm. Holds
  Hearing on the 2010 Fin. Regulatory Overhaul Law (July 23, 2014) ...................... 59

Jean Eaglesham, *Federal Judge Rules SEC In-House Judge's Appointment Likely*
  *Unconstitutional*, Wall St. J. (June 8, 2015),
  http://www.wsj.com/articles/federal-judge-rules-sec-in-house-judges-appointment-
  likely-unconstitutional-1433796161 ......................................................... 69

*Examining the Dangers of the FSOC's Designation Process and*
  *Its Impact on the U.S. Financial System:  Hearing Before the H. Comm. on Fin. Servs.*,
  113th Cong. (2014)......................................................................... 10

FDIC, TLGP Debt Guarantee Program: Issuer Reported Debt Details,
  https://www.fdic.gov/regulations/resources/TLGP/total_debt.html......................... 31

Financial Stability Oversight Council Supplemental Procedures:
  Relating to Nonbank Financial Company Determinations (Feb. 4, 2015) ................ 10

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Scott E. Harrington, *The Use of Captive Reinsurance in Life Insurance* (2014),
 *available at* https://www.acli.com/Issues/Captive%20Insurance%
 20Companies/Documents/Captive_Reinsurance_in_Life_Ins_Harrington2014.pdf. .............. 43

John Heltman,
 *Fed's Tarullo Favors Activities-Based Regulation for Asset Managers*,
 Am. Banker (June 5, 2015) ...................................................................................... 59

Stanley Kaplan & B. John Garrick,
 *On the Quantitative Definition of Risk*, 1 Risk Analysis 11 (1981) ......................................... 35

Joann S. Lublin *et al.*,
 *GE Seeks Exit from Banking Business*, Wall St. J. (Apr. 10, 2015),
 http://www.wsj.com/articles/ge-prepared-to-exit-the-bulk-of-ge-capital-142866210 ............ 61

MetLife, Inc., Annual Report (Form 10-K) (Feb. 27, 2014) ................................................. 22, 66

OCC, FDIC, Federal Reserve & OTS,
 Interagency Supervisory Guidance on Counterparty Credit Risk Management
 (FRB Supervisory Letter SR 11-10) (June 29, 2011) ............................................................. 44

OFR, Asset Management and Financial Stability (2013),
 *available at* http://financialresearch.gov/reports/files/ofr_asset_
 management_and_financial_stability.pdf. ............................................................................. 59

*Oversight of the Financial Stability Oversight Council:*
 *Hearing Before the H. Comm. on Fin. Servs.,*
 *Subcomm. on Oversight & Investigations*, 113th Cong. (2014) ............................................ 10

Richard A. Posner, *Rational Choice, Behavioral Economics, and the Law*,
 50 Stan. L. Rev. 1551 (1998) ...................................................................................... 40

Report of the Attorney General's Committee on Administrative Procedure,
 S. Doc. No. 77-8 (1st Sess. 1941) ............................................................................... 68

Research Subcomm., Fin. Research Advisory Comm.,
 *OFR Study on the Insurance Sector Recommendation* (2014),
 http://financialresearch.gov/frac/2014/02/25/
 committee-meeting/recommendation/ofr-study-on-the-insurance-sector/ ............................ 13

S. Rep. No. 111-176 (2010) ........................................................................................... 33

U.S. Gov't Accountability Office, GAO-14-873T,
 Financial Stability Oversight Council: Status of Efforts to Improve Transparency,
 Accountability, and Collaboration (2014) ............................................................................. 10

Charles Yoe,
 Principles of Risk Analysis: Decision Making Under Uncertainty (2012)...........................38

# GLOSSARY

| | |
|---|---|
| AIG | American International Group, Inc. |
| BHCA | Bank Holding Company Act |
| CCAR | Comprehensive Capital Analysis and Review |
| FIO | Federal Insurance Office |
| FSOC | Financial Stability Oversight Council |
| G-SIB | Global Systemically Important Bank |
| G-SII | Global Systemically Important Insurer |
| OFR | Office of Financial Research |
| NAIC | National Association of Insurance Commissioners |
| NOLHGA | National Organization of Life and Health Insurance Guaranty Associations |
| PD | Proposed Designation |
| RBC | Risk-Based Capital |
| SIFI | Systemically Important Financial Institution |

## INTRODUCTION

Congress established the Financial Stability Oversight Council ("FSOC") to identify those financial companies that warrant heightened federal regulatory oversight because their failure could cause instability throughout the U.S. economy.  But FSOC's authority is not boundless.  Congress directed FSOC to evaluate companies for designation using clear statutory standards and reasoned analysis grounded in empirical evidence and historical fact.  In the case of MetLife, Inc., however, FSOC failed on all counts.  Its decision to designate MetLife as a nonbank systemically important financial institution ("SIFI") was predicated on unbounded speculation, ahistorical analysis, shifting standards, and undisclosed evidentiary material.  It departed from the controlling statutory standards, its own regulations and interpretive guidance, and the overwhelming evidence in the record.[1]  In these and numerous other respects, FSOC's designation of MetLife violates the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), the Administrative Procedure Act ("APA"), and the U.S. Constitution.

As a threshold matter, FSOC erred in identifying MetLife as a "U.S. nonbank financial company" eligible for designation.  Because more than 15% of MetLife's consolidated assets and revenues are derived from *foreign* insurance activities that are not "financial in nature" under the relevant statutory definition, the Company is not "predominantly engaged in financial activities," 12 U.S.C. § 5311(a)(6), and thus is not a valid SIFI candidate, *see id.* § 5323(a).

Even if MetLife were eligible for designation, FSOC's Final Designation could not stand because it departs in numerous respects from Congress's framework for designation and FSOC's

---

[1]  *See* JA 341-727 (Explanation of the Basis of the Financial Stability Oversight Council's Final Determination that Material Financial Distress at MetLife Could Pose a Threat to U.S. Financial Stability and that MetLife Should Be Supervised by the Board of Governors of the Federal Reserve System and Be Subject to Prudential Standards (Dec. 18, 2014) ("Final Designation" or "FD")).

own rules and regulations.  In particular, while both the Dodd-Frank Act and FSOC's regulations require that FSOC consider a company's vulnerability to "material financial distress" as part of the designation inquiry, FSOC ignored that requirement in evaluating MetLife and not only assumed that the Company was subject to material financial distress (the statutory term), but postulated that it was crippled by an insolvency of unknown origins and unprecedented severity. And, instead of examining the potential systemic effects of that hypothetical insolvency by applying Congress's ten-factor framework, FSOC focused myopically on MetLife's size and exaggerated its interconnections with other financial companies, while discounting almost entirely the safeguards built into the existing, comprehensive oversight of MetLife's subsidiaries by state, federal, and international regulators.

Throughout the Final Designation, FSOC offered unsubstantiated—and, at times, downright baffling—conjecture and guesswork.  For example, FSOC postulated that state regulators would inexplicably fail to intervene to stem the potential effects of financial distress at MetLife, but that, if they did intervene, their actions would actually *exacerbate*, rather than mitigate, the crisis by causing a loss of confidence among policyholders at MetLife and other insurers.  FSOC offered no historical or empirical support for either far-fetched assertion or for its equally irrational and ahistorical supposition that distress at MetLife would lead its customers to surrender their policies *en masse*—despite evidence that customers do not hold insurance policies for liquidity purposes and would face adverse tax consequences and contractual penalties associated with surrender.  While FSOC attempts to characterize this speculation as a "predictive judgment" entitled to judicial deference, no deference is due where, as here, the agency disregards the basic features of the business it seeks to regulate, dismisses without explanation relevant historical precedent, ignores the views of its own subject matter experts, and

adopts a mode of analysis utterly divorced from accepted principles of risk assessment, settled

standards of rational decision-making, and the agency's own regulatory framework.

FSOC further departed from the requirements of reasoned analysis by failing to examine

alternatives to MetLife's designation—including the "activities-based" approach that it is

presently considering for asset managers—and by declining to consider the weighty

consequences of designation for MetLife and its customers and shareholders.  These procedural

shortcomings were compounded by FSOC's persistent refusal during the designation process to

grant MetLife access to the administrative record—which still has not been produced in full to

MetLife—and by FSOC's own unprecedented structure, which vests the same officials with

legislative, investigative, and adjudicative responsibilities for the designation inquiry.  With no

access to the record or to the most relevant precedents—the non-public versions of FSOC's three

prior designation determinations—and without a disinterested adjudicator, it was impossible for

MetLife to obtain a full and fair hearing before FSOC.

FSOC's errors are many, and grave.  And because FSOC made clear that "[n]o single

consideration [was] dispositive" in its decision to designate MetLife, JA 374; FSOC Br. 24, each

one of those errors requires rescission of the Final Designation in its entirety, *see Nat'l Fuel Gas

Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

## STATEMENT OF FACTS

### I.      MetLife, Inc.

MetLife, Inc. is a traditional life insurance group that conducts nearly all of its business

through subsidiary insurance companies that sell and issue insurance products, and hold, invest,

and manage the assets required to support the policy liabilities.  *See, e.g.*, JA 2766-67 (Letter

from Dave Jones, Cal. Ins. Comm'r, to Jacob Lew, Sec'y, U.S. Dep't of the Treasury, at 2-3

(Oct. 27, 2014)).  Through its subsidiaries, MetLife provides a range of insurance products, with

life insurance products generating 84% of MetLife's direct premiums.  JA 1623.  As of June 30,

2013—the reference date for much of FSOC's analysis, *see* JA 809—MetLife's highly regulated

insurance subsidiaries owned 98% of MetLife's consolidated assets, owed 96% of its liabilities,

and collected 95% of its revenues.  *Id.*[2]  In contrast, prior to the 2008-2009 financial crisis,

American International Group, Inc. ("AIG") conducted 27% of its business, as measured by total

assets, through its unregulated, non-insurance subsidiaries.  JA 1024.  Unlike AIG, whose

financial troubles during the 2008-2009 financial crisis were principally caused by its large

derivatives activities within unregulated, non-insurance subsidiaries, the overwhelming majority

of MetLife's liabilities are its insurance subsidiaries' obligations to policyholders, which are

backed by high-quality assets monitored by state regulators.  JA 1024; *see also* JA 2865 (Letter

from Benjamin M. Lawsky, Superintendent, N.Y. Dep't of Fin. Servs., to Jacob Lew, Sec'y, U.S.

Dep't of the Treasury, at 2 (July 30, 2014) ("Lawsky Ltr.")).  MetLife's derivatives program is

also "subject to review and careful surveillance by [state regulators]" and is "well collateralized,

conducted almost exclusively for hedging purposes, and not concentrated in any counterparty or

group of counterparties."  *Id.*; *see also* JA 1744.

    Like other conventional life insurers, MetLife writes long-term policies and invests

premiums in long-term assets to satisfy its obligations when they come due.  Unlike banks,

which take liquid, short-term deposits and wholesale funding and invest in long-term assets such

as commercial loans, MetLife matches its long-term liabilities with long-term assets, and its

investment portfolio is linked to, and driven by, the profile of its insurance liabilities.  *See* JA

862, 867; *see also* JA 2864 (Lawsky Ltr. at 1).

---

[2]  MetLife's holding company, MetLife, Inc., is incorporated in Delaware, and is a true holding
company without material independent operations.  *See* JA 848.

The extensive state regulatory oversight of MetLife's activities includes supervisory reporting and disclosure obligations, on-site examinations, and risk-based capital ("RBC") requirements that dictate the amount of capital MetLife must hold.  *See* JA 1893, 1897-98, 1914-28, 1930.  Even during the 2008-2009 financial crisis, MetLife's insurance subsidiaries maintained RBC levels far in excess of required minimums and many times above the level at which regulators would have been required to intervene.  JA 910, 1893.

## II.     FSOC's Statutory Designation Authority

In the Dodd-Frank Act, Congress authorized FSOC to designate certain nonbank financial companies for consolidated supervision and oversight by the Board of Governors of the Federal Reserve System ("Board") upon a finding that (1) "material financial distress at the U.S. nonbank financial company" or (2) "the nature, scope, size, scale, concentration, interconnectedness, or mix of the activities of the U.S. nonbank financial company" "could pose a threat to the financial stability of the United States."  12 U.S.C. § 5323(a)(1).  FSOC's authority to designate these nonbank SIFIs is circumscribed in several respects.

*First*, FSOC's authority to designate U.S. companies for enhanced supervision by the Board extends only to "U.S. nonbank financial companies," a term defined in the Dodd-Frank Act with reference to the Bank Holding Company Act ("BHCA").  *See* 12 U.S.C. § 5323(a).  In order to qualify as a "U.S. nonbank financial company," *id.* § 5311(a)(4), a company must be "predominantly engaged in financial activities," meaning that 85% of its consolidated assets must be "related to," or 85% of its consolidated annual gross revenues must be "derived . . . from," "activities that are financial in nature," as defined in the BHCA, *id.* § 5311(a)(6).

*Second*, where a company qualifies as a U.S. nonbank financial company, FSOC is required to apply ten congressionally mandated, non-exhaustive factors to measure the

company's systemic threat to the broader U.S. economy.  *See* 12 U.S.C. § 5323(a)(2); *see also*

FSOC Br. 7.  These criteria include: (1) the extent of the leverage of the company; (2) the extent

and nature of the transactions and relationships of the company with other significant nonbank

financial companies and significant bank holding companies; (3) the nature, scope, size, scale,

concentration, interconnectedness, and mix of the activities of the company; and (4) the degree to

which the company is already subject to regulation.  12 U.S.C. § 5323(a)(2).

   *Third*, Congress ensured that the designation process for insurance companies reflects the

principles of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, which embodies a federal

policy of deferring to state insurance regulation absent an express congressional directive.  In

particular, Congress directed FSOC to consult with an insurer's primary financial regulator

before making any systemic-threat determination, *see* 12 U.S.C. § 5323(g), and to assess the

regulatory oversight to which the insurance company is already subject, *see id.* § 5323(a)(2)(H).[3]

   The legislative history of the Dodd-Frank Act confirms that Congress did not expect

"insurance companies engaged in traditional insurance company activities to be designated by

the [FSOC] based on those activities alone."  156 Cong. Rec. S5902 (daily ed. July 15, 2010)

(statement of Sen. Collins).  Instead, Congress intended FSOC to "specifically take into

account . . . how the nature of insurance differs from that of other financial products, including

how traditional insurance products differ from various off-balance-sheet and derivative contract

exposures and how that different nature is reflected in the structure of traditional insurance

---

   [3]  Other sections of the Dodd-Frank Act likewise reflect Congress's intention that insurers be
treated differently from other kinds of nonbank financial companies.  *See also, e.g.*, Pub. L. No.
111-203, tit. X, 124 Stat. 1376, 1955-2113 (2010) (excluding the business of insurance from
oversight by the Consumer Financial Protection Bureau); *id.* tit. V, 124 Stat. at 1580-96 (limiting
Federal Insurance Office's authority through consultation and coordination requirements); 12
U.S.C. § 5383(e) (insurance company that becomes subject to Title II's orderly liquidation
authority must still be resolved under state insurance insolvency law).

companies." *Id.*  The principal authors of the Dodd-Frank Act agreed that the designation of an

insurance company engaged in the traditional insurance business, including the sale of policies

and annuities, and the investment of premiums in assets of comparable maturities, would rarely

be appropriate.  *See id.* (statement of Sen. Dodd) ("Where a company is engaged only in

traditional insurance activities, the [FSOC] should also take into account the matters [Senator

Collins] raised."); *see also Assessing the Impact of the Dodd-Frank Act Four Years Later:*

*Hearing Before the H. Comm. on Fin. Servs.*, 113th Cong. 72 (2014) (statement of former Rep.

Frank) ("failure" of "insurance companies that just sell insurance as it is traditionally defined" is

not "going to have that systemic . . . effect").

Finally, FSOC's designation determinations are subject to arbitrary and capricious

review, 12 U.S.C. § 5323(h), which means that FSOC must comply with the basic precepts of

reasoned decision-making under the APA, 5 U.S.C. § 706.

## III.   FSOC's Final Rule And Interpretive Guidance

FSOC has adopted rules and regulations describing the criteria and processes for

designating nonbank financial companies.  *See* Authority to Require Supervision and Regulation

of Certain Nonbank Financial Companies, 77 Fed. Reg. 21,637, 21,640 (Apr. 11, 2012) ("Final

Rule and Interpretive Guidance").  Employing these procedures, FSOC has designated four

companies:  AIG, General Electric Capital Corporation, Prudential Financial, Inc., and MetLife.

### A.   FSOC's Designation Criteria

Dodd-Frank's First Determination Standard is directed at determining whether a

company's "material financial distress"—defined in the Final Rule and Interpretive Guidance as

"imminent danger of insolvency or defaulting on its financial obligations," 77 Fed. Reg. at

21,657—could pose a "threat to the financial stability of the United States," which FSOC defines

as "an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy." *Id.*

To undertake that inquiry, FSOC has translated Congress's ten-factor statutory framework into six designation factors:  size, interconnectedness, substitutability, leverage, liquidity risk and maturity mismatch, and existing regulatory scrutiny.  77 Fed. Reg. at 21,657-58.  By FSOC's own account, the first three factors are intended to assess "the potential impact of a nonbank financial company's financial distress on the broader economy," while the remaining factors "seek to assess the vulnerability of a nonbank financial company to financial distress." *Id.* at 21,641.

In addition to these six designation factors, FSOC evaluates three "risk transmission channels" by which a company's financial distress might be transmitted to other actors in the U.S. economy.  77 Fed. Reg. at 21,641.  The "exposure transmission channel" is intended to assess the circumstances in which "[a] nonbank financial company's creditors, counterparties, investors, or other market participants have exposure . . . significant enough to materially impair those creditors, counterparties, investors, or other market participants and thereby pose a threat to U.S. financial stability." *Id.* at 21,657.  The "asset liquidation transmission channel" seeks to determine whether "[a] nonbank financial company holds assets that, if liquidated quickly, would cause a fall in asset prices and thereby significantly disrupt trading or funding in key markets or cause significant losses or funding problems for other firms with similar holdings." *Id.*  Finally, the "critical function or service transmission channel" examines the circumstances under which a nonbank financial company is no longer able or willing "to provide a critical function or service relied upon by market participants and for which there are no ready substitutes." *Id.*

### B.      FSOC's Designation Process

FSOC designation proceeds in three stages.  In Stages 1 and 2, FSOC analyzes certain

quantitative thresholds and public and regulatory information regarding the company.  *See* 77

Fed. Reg. at 21,660-61.  Under the procedure in effect during MetLife's designation, FSOC did

not inform a company that it was being evaluated or issue information requests to the company

until after the conclusion of Stage 2.  *Id.*  Only after the issuance of a notice of proposed

designation at the close of Stage 3, *id.*, is the company provided with any insight into FSOC's

bases for deeming it a threat to the U.S. economy.  The company then has an opportunity to

submit additional materials and to request a hearing before FSOC's members.  *Id*. at 21,646.

Following the hearing, FSOC's members vote on whether to adopt a final designation of

the company.  77 Fed. Reg. at 21,646.  If two-thirds of FSOC's ten voting members, including

the Secretary of the Treasury, vote to designate the company, FSOC provides the company with

a final designation determination.  *See* 12 C.F.R. § 1310.10(b).  A much shorter summary is

released to the public.

During the process, companies under consideration are not given access to the record on

which FSOC's ten voting members rely when adopting the proposed and final designations,

including the staff's analyses of the company and its supposed risks, correspondence between

FSOC and the company's regulators, and materials furnished to FSOC by those regulators or

other third parties.  Nor are FSOC's prior designation decisions—that is, its precedents—

provided to the company (other than in the truncated summary available to the public).  In

addition, there is no division of responsibility among FSOC staff and members involved in the

various stages of the designation process:  the same staff and members who investigate the

company are also responsible for drafting the rules to be applied to companies under

consideration for designation, preparing the proposed designation, adjudicating the company's challenge to the proposed designation, and deciding whether to adopt a final designation.

FSOC's designation procedures have been widely criticized for being "shrouded in secrecy" and providing "no meaningful metrics." *Examining the Dangers of the FSOC's Designation Process and Its Impact on the U.S. Financial System: Hearing Before the H. Comm. on Fin. Servs.*, 113th Cong. 7 (2014) (statement of Rep. Luetkemeyer). The Government Accountability Office has criticized FSOC for lacking a "systematic and comprehensive approach" to designation. U.S. Gov't Accountability Office, GAO-14-873T, Financial Stability Oversight Council: Status of Efforts to Improve Transparency, Accountability, and Collaboration 6 (2014). And members of Congress have called FSOC "the least transparent Federal entity in the government" with a degree of opacity that "makes it impossible for Congress to conduct effective oversight." *Oversight of the Financial Stability Oversight Council: Hearing Before the H. Comm. on Fin. Servs., Subcomm. on Oversight & Investigations*, 113th Cong. 1-2 (2014) (statement of Rep. McHenry). In response to these criticisms, FSOC adopted supplemental designation procedures in February 2015, two months *after* it designated MetLife. *See* Financial Stability Oversight Council Supplemental Procedures: Relating to Nonbank Financial Company Determinations (Feb. 4, 2015).[4]

### C.     Board Supervision And Enhanced Prudential Standards

Upon designation by FSOC, the company becomes subject to supervision by the Board and to enhanced "prudential" standards issued by the Board, including requirements to retain

---

[4]  Under FSOC's new procedures, it will henceforth notify a company that it is being considered for designation within 30 days of beginning Stage 2. Companies are also permitted to submit non-public information in Stage 2 and to meet with FSOC members' deputies in Stage 3. In addition, FSOC staff will meet with the company at the start of Stage 3 to explain the process.

higher levels of capital.  *See* 12 U.S.C. § 5365.  Board supervision under Section 165 of the

Dodd-Frank Act is recognized to be an intrusive form of regulatory oversight.[5]

## IV.    MetLife's Designation

FSOC informed MetLife that it had reached Stage 3 of the designation process on July

16, 2013, and issued a notice of proposed determination on September 4, 2014.  *See* JA 71-340

(Explanation of the Basis of the Financial Stability Oversight Council's Proposed Determination

Regarding MetLife ("Proposed Designation" or "PD")).  At MetLife's request, FSOC held a

hearing on November 3, 2014.  *See* JA 2372-2512.  On December 18, 2014, FSOC issued the

Final Designation finding MetLife to be a systemic threat to U.S. financial stability.  JA 343-

683.[6]

### A.    MetLife's Submissions And FSOC's Findings

In designating MetLife, FSOC applied the First Determination Standard.  JA 368.

---

[5]  In particular, Board supervision includes risk-based capital requirements and leverage limits, liquidity requirements, overall risk management requirements, resolution plan and credit exposure report requirements, and concentration limits.  12 U.S.C. § 5365(b)(1)(A).  Board supervision may also include contingent capital requirements, enhanced public disclosures, short-term debt limits, and other prudential standards the Board deems appropriate.  *Id.* § 5365(b)(1)(B); *see also* Charles W. Calomiris, *Reassessing the Regulatory Role of the Fed: Grappling with the Dual Mandate and More?*, Pew Charitable Trs. Fin. Reform Project, Briefing Paper No. 10 at 8 n.3 (Oct. 6, 2009) (discussing "intrusive prudential regulation").

[6]  During the designation process, MetLife made multiple requests for access to the record compiled by FSOC and to complete copies of the final decisions designating Prudential and AIG (with confidential financial information redacted).  *See, e.g.*, JA 2755 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt (Oct. 22, 2014)); JA 2740-42 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt (May 21, 2014)).  All of those requests were denied on the ground that the Proposed and Final Designations gave MetLife sufficient information to respond to FSOC's analysis.  *See, e.g.*, JA 2744-46 (Letter from Patrick Pinschmidt to Ricardo A. Anzaldua (Oct. 3, 2014)).  FSOC and its members also dismissed MetLife's Freedom of Information Act requests seeking materials related to FSOC's evaluation of the Company and MetLife's prior designation as a global systemically important insurer ("G-SII") by the Financial Stability Board ("FSB"), an international body charged with designating companies as systemic threats to the global economy.  Those requests were either denied outright or prompted the production of a handful of documents, most of which were publicly available or substantially redacted.

Although MetLife provided FSOC with substantial evidence and analysis demonstrating that it did not meet this standard for designation, *see, e.g.*, JA 787-2327, FSOC ignored or dismissed that evidence at every turn, focusing instead on illusory risks, unbounded speculation, and ahistorical assumptions, while deviating from the requirements of the Dodd-Frank Act and its own regulatory framework.

*Predominantly Engaged in Financial Activities.*  FSOC concluded that MetLife was a "U.S. nonbank financial company" eligible for designation because it is "predominantly engaged in financial activities."  JA 382.  In drawing that conclusion, FSOC disregarded unambiguous statutory language defining what it means to be "predominantly engaged in financial activities," JA 382, and unrebutted evidence that less than 85% of MetLife's consolidated revenue and assets—the statutory threshold for establishing that a company is "predominantly engaged" in financial activities—are derived from or related to insurance activities that are "financial in nature" under the relevant statutory definition, *see* JA 2517-21 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt (Oct. 30, 2014)); JA 759-86 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt (Nov. 10, 2014)); *see also* 12 U.S.C. § 5311(a)(6).

*Vulnerability to Material Financial Distress*.  In evaluating MetLife, FSOC began by assuming MetLife's "material financial distress," without any consideration of the likelihood of that distress.  JA 369-70.  Although FSOC's Final Rule and Interpretive Guidance states that three of its six designation factors reflect FSOC's obligation to assess a company's vulnerability to financial distress, 77 Fed. Reg. at 21,657; *see also* JA 1888-90; JA 1595-98, FSOC ignored that statement and insisted in the Final Designation that the Dodd-Frank Act does not require any such assessment, JA 369-70.  Indeed, FSOC not only assumed MetLife's "material financial distress," which FSOC had previously defined as a state of imminent insolvency, *see* 77 Fed.

Reg. at 21,657, but assumed *even worse degrees of distress* without any assessment of likelihood, *see* JA 643.

**Activities-Based Review.**  FSOC currently is considering addressing the systemic risk posed by mutual funds and other large asset managers—whose assets under management vastly exceed MetLife's assets—on an activity-by-activity basis, rather than on a company-by-company basis.  MetLife and others repeatedly requested that FSOC consider the same activities-based approach for insurers,[7] but FSOC refused on the ground that consideration of such an approach is not mandated by the Dodd-Frank Act.  *See* JA 373.

**Existing Regulation and Oversight.**  MetLife submitted detailed evidence concerning the extensive state oversight of its insurance subsidiaries.  MetLife described, for example, the comprehensive risk-based capital framework that was developed specifically to address the risks of the insurance business; state regulators' detailed licensing requirements and their regulatory supervision of the Company through examinations, review of insurance products, and review and approval of material transactions involving MetLife and its affiliates (and certain third parties), including reinsurance arrangements; and state regulators' authority to stay payment of MetLife's life insurance liabilities to limit outflows.  *See* JA 932-48, 1899-901, 1912-28.  State regulators who supervise MetLife's principal U.S. subsidiaries corroborated MetLife's evidence, emphasizing that "MetLife's life insurance businesses already are closely and carefully regulated" and that, "in the event that MetLife or one or more of its insurance subsidiaries were to fail," the New York Department of Financial Services ("NYDFS") "and other state regulators

---

7  *See* Letter from Rep. Scott Garrett to Jacob J. Lew, Sec'y, U.S. Dep't of the Treasury, at 2 (Sept. 2, 2014), *available at* http://online.wsj.com/public/resources/documents/ LettertoLew09022014.pdf; JA 2513-14 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt, at 1-2 (Aug. 6, 2014)); *see also* Research Subcomm., Fin. Research Advisory Comm., *OFR Study on the Insurance Sector Recommendation* (2014), http://financialresearch.gov/frac/2014/ 02/25/committee-meeting/recommendation/ofr-study-on-the-insurance-sector/.

would be able to ensure an orderly resolution." JA 2864 (Lawsky Ltr. at 1). The record also

detailed the efficacy of state-imposed stays on insurers' policy payments in the event of a

liquidity strain, *see* JA 2790 (Statement of NOLHGA President Peter G. Gallanis at 10 (Mar. 27,

2014) ("Gallanis")), and of state "Guaranty Associations" that coordinate the continuing

coverage of a failed insurer's policyholders, JA 2782 (Gallanis at 2); *see also* JA 1918-28.

FSOC largely disregarded this "existing regulatory scrutiny" without explanation, 77 Fed.

Reg. at 21,641, discounting MetLife's evidence and the views of MetLife's state regulators, *cf.*

12 U.S.C. § 5323(g), based on events that FSOC claimed "could" happen, without ever

addressing the probability—which is almost certainly negligible—that they would actually

occur. For example, FSOC perfunctorily dismissed state regulators' authority to stay surrenders

on the ground that doing so "could" depress consumer confidence and thus exacerbate financial

instability, despite ample evidence that state intervention has historically had ameliorative, rather

than destructive, effects. JA 486-87. Similarly, in response to MetLife's explanation of the

distinctions between the Company and two insurers that failed in the early 1990s—namely, that

those insurers had failed as a result of a heavy concentration in junk bonds, which had prompted

state regulators to impose new limits on insurers' investments in risky assets—FSOC

nevertheless asserted that "a similar type of concern could arise, on a much larger scale, in the

context of MetLife's material financial distress." JA 481. That response completely ignored

MetLife's evidence that subsequent state regulatory requirements, including concentration limits

and the state-based RBC regime, substantially mitigated such risks.

***Exposure Transmission Channel.*** MetLife submitted extensive evidence demonstrating

that counterparties' exposures to MetLife were not so large as to pose a threat to the

counterparties, much less to U.S. financial stability. For example, consulting firm Oliver

Wyman analyzed the effect on global systemically important banks ("G-SIBs") and G-SIIs of defaults following a hypothetical MetLife insolvency and found that none of those counterparties would lose more than 2% of its total capital.  *See* JA 1649, 1652-53 (Tbl. II-1).  FSOC cast aside this evidence in favor of unsupported speculation that the direct exposures to MetLife of counterparties, investors, and policyholders, together with some hypothetical quantum of indirect exposures to MetLife of market participants with which MetLife lacks a transactional relationship, "*could* cause losses," without any attempt to quantify those "losses" or to measure their "significance" to either the counterparty or the U.S. economy at large.  *See, e.g.*, JA 347, 353-54, 375-76, 378, 390, 394, 395-409, 410, 417, 430, 439-474 (emphasis added); *see also* JA 473, 442, 468, 497.  Despite FSOC's prior acknowledgment that systemic importance results only from those exposures "significant enough to materially impair" the counterparty, 77 Fed. Reg. at 21,657, FSOC obdurately refused to make any "estimate of expected losses to counterparties," JA 420 n.381.

*Asset Liquidation Transmission Channel*.  In response to FSOC's stated concerns about the possible systemic effects of a sudden fire sale of MetLife's assets, MetLife submitted a study by Oliver Wyman demonstrating that, even under extremely adverse and wholly implausible economic assumptions, the Company could liquidate its assets to cover its liabilities without having an impact on market prices that would threaten the U.S. economy.  *See* JA 985-1016; *see also* JA 1734-38, 1777-81; JA 2692-733.  FSOC summarily rejected the findings of that study, and concluded that the sale of MetLife's assets "could" have systemic effects on the broader economy, without explaining the basis for its conclusion or identifying the techniques or criteria it employed in assessing MetLife's asset-liquidity risks.  *See* JA 551, 567.  FSOC likewise ignored MetLife's evidence confirming that the failure of an insurer has never produced

"contagion" effects at other insurers and demonstrating that the *only* historical example of insurance companies failing in tandem was due not to contagion but to substantial losses separately incurred by the two firms on their similarly structured investment portfolios. *See* JA 1767; *see also* JA 998-1000, 1018-28.

Rather than address this evidence, FSOC based its conclusion that MetLife could pose systemic risk on a chain of events it claimed *might* materialize, with no attempt to assess their likelihood or the magnitude of their consequences. *See* JA 488. First, FSOC assumed, contrary to all historical experience, that policyholders would act against their own self-interest and surrender their policies *en masse*, despite significant contractual and tax penalties. *See* JA 432-33. FSOC further assumed that MetLife would not invoke its contractual right to restrict policyholder withdrawals. *Id.* Finally, FSOC assumed that state regulators would either fail to use the stays, moratoria, and other tools at their disposal to avert distress and systemic effects, or, if they did, that those regulatory actions would "cause a loss of confidence" that would exacerbate distress. JA 486-87.

In addition to deploying these illogical assumptions, FSOC disclosed that it had utilized a "Monte Carlo" simulation to test variations in the order in which MetLife would sell its assets in hypothetical asset-liquidation conditions. JA 563-64. In contrast to MetLife's analysis, which assumed that MetLife's senior management would uphold their fiduciary duties and sell assets in a manner to minimize losses, the Monte Carlo technique randomizes the order of asset sales and therefore assumes that to raise cash MetLife would be as likely to sell, for example, illiquid securities on which it would suffer a financial loss as highly liquid securities on which it would incur little or no loss. Because FSOC's Monte Carlo analysis was not disclosed until the Final

Designation, MetLife had no opportunity to demonstrate to FSOC its utter absurdity in this context.

*Consequences of Designation*.  MetLife submitted extensive evidence demonstrating that designation and the resulting increased capital requirements could have severe consequences for MetLife and its shareholders and customers.  JA 1929-34.  At the hearing, MetLife's Chief Executive Officer confidentially disclosed to FSOC that the Company had retained a firm to assess the potential effects of designation and to evaluate options for breaking up the Company in the event it was designated.  JA 2390-92.  FSOC nevertheless declined to consider the effects of designation, insisting instead that the Dodd-Frank Act does not expressly require a cost-benefit analysis and thus that it need not consider the consequences of its regulatory action.  *See* JA 371.

## B.    Dissents From The Final Designation

Two of FSOC's members dissented from the Final Designation.  S. Roy Woodall, who serves as the statutorily-mandated "independent member . . . having insurance expertise," 12 U.S.C. § 5321(b)(1)(J), criticized FSOC for declining to adopt an activities-based approach for assessing the risks associated with MetLife's capital markets activities, and for conducting an asset-liquidation analysis that was based on "implausible, contrived scenarios" rather than "substantial evidence in the record" and "logical inferences from the record."  JA 641.  He further criticized FSOC for assuming, as "the central foundation for [the] designation," a "sudden and unforeseen insolvency of unprecedented scale, of unexplained causation, and without effective regulatory responses or safeguards," JA 643, and for being generally "dismissive of" the "U.S. State insurance regulatory framework, the panoply of State regulatory authorities, and the willingness of State regulators to act," JA 641-42.

Adam Hamm, FSOC's non-voting State Insurance Commissioner Representative, also dissented. Hamm criticized FSOC for failing "to appropriately consider the efficacy of the state insurance regulatory system," including regulators' "expansive authorities and wide discretion to utilize them." JA 646. Hamm emphasized that his staff was "correct[ing] basic factual errors regarding the operation of the state regulatory system just days before the vote" on MetLife's designation and that it remained "unclear whether [FSOC] ever fully considered the nature and scope of the state insurance regulatory system." JA 646-47. Hamm also took issue with FSOC's asset-liquidation and exposure analyses because FSOC never identified the "specific scenarios" upon which it purported to rely for its liquidity analysis, made "hypothetical and highly implausible claims of significant policyholder surrenders," JA 649-50, ignored insurance regulators' "authority to impose stays or apply similar powers to manage heightened policyholder surrender activity," JA 648, and never translated exposures into losses that threaten U.S. financial stability, JA 650-51.

## V.    These Proceedings

MetLife filed suit under Section 113(h) of the Dodd-Frank Act, alleging ten claims. Dkt. 1 (Jan. 13, 2015). FSOC filed a motion to dismiss or for summary judgment on May 7, 2015. MetLife now opposes FSOC's motion and cross-moves for summary judgment on all claims.

## STANDARD OF REVIEW

Agency action is arbitrary and capricious when, among other things, it is based on "sheer speculation" instead of "logic and evidence," *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (internal quotation marks omitted), or the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agencies may not base regulatory action on pronouncements that are mere "*ipse dixit*." *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1155 (D.C. Cir. 2011). And while agencies typically receive some deference when they make genuine "predictive judgments," they still must satisfy the requirements of "reasoned decisionmaking"; courts do not "treat the predictive nature of the judgment as though it were a talisman under which any agency decision is by definition unimpeachable." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 821 (D.C. Cir. 1983) (internal quotation marks omitted). Nor is an agency's predictive judgment "license to ignore the past when the past relates directly to the question at issue." *BellSouth Telecomm., Inc. v. FCC*, 469 F.3d 1052, 1060 (D.C. Cir. 2006). An agency's decision must "respond to the reasonable concerns" of dissenting decision-makers, *Am. Gas Ass'n v. FERC*, 593 F.3d 14, 16 (D.C. Cir. 2010), and may not be affirmed "on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## ARGUMENT

In designating MetLife, FSOC ignored statutory and regulatory requirements, disregarded uncontradicted record evidence, and turned a blind eye to real-world experience, relying instead on its own ad hoc standards, unbounded speculation, ahistorical assumptions, and unreasoned analysis. At the outset, FSOC disregarded the statutory limits on its designation powers by declaring MetLife a "U.S. nonbank financial company" despite the Company's substantial revenues and assets attributable to foreign insurance activities that are not deemed "financial in nature" under the relevant statutory definition. FSOC showed equally little regard for its own regulations, refusing to undertake the assessment of MetLife's vulnerability to financial distress

mandated by its Final Rule and Interpretive Guidance and assuming distress that was far more severe than the definition of "material financial distress" adopted in its regulatory guidance.

Then, in assessing the systemic impact of that assumed distress, FSOC persistently ignored statutory requirements and principles of reasoned decision-making, opting instead to predicate its inquiry on ill-defined criteria, shifting standards, unprecedented doomsday scenarios, and unreasonable assumptions, yielding an assessment that bears no resemblance to accepted principles of risk analysis.  FSOC compounded these errors by refusing to consider viable alternatives to the designation of MetLife and the far-reaching implications of designation for the Company and its shareholders and customers.

In short, having selected MetLife for review and proposed it for designation, FSOC proceeded to ratify its own proposal through a process in which all evidence and argument MetLife might offer were summarily dispatched by shifting standards, wholesale speculation, and blunt *ipse dixit*.  This violated settled principles of administrative procedure, denied MetLife a meaningful opportunity to be heard, and produced a deeply flawed designation determination.

## I.      MetLife Is Not A "U.S. Nonbank Financial Company" Eligible For Designation.

FSOC erred at the first step of its designation inquiry when it concluded that MetLife qualifies as a "U.S. nonbank financial company" eligible for designation under Section 113(a) of the Dodd-Frank Act.  12 U.S.C. § 5311(a)(4).  A company qualifies as a "U.S. nonbank financial company," *id.*, if it is "predominantly engaged in financial activities," meaning that 85% of its consolidated assets are "related to," or 85% of its consolidated annual gross revenues are "derived . . . from," "activities that are financial in nature," as that phrase is defined in "section 4(k) of the Bank Holding Company Act," *id.* § 5311(a)(6).  FSOC relied on two subsections of Section 4(k) in concluding that MetLife is predominantly engaged in financial activities: 4(k)(4)(B) and 4(k)(4)(I).  MetLife's non-U.S. insurance activities, however, are not covered by

either subsection.  As a result, FSOC's designation of MetLife violates the Dodd-Frank Act's threshold requirement because more than 15% of MetLife's consolidated assets and annual gross revenues are related to or derived from non-U.S. insurance activities.

### A.   MetLife's Non-U.S. Insurance Activities Are Not Financial Activities Under Sections 4(k)(4)(B) Or (I) Of The Bank Holding Company Act.

Section 4(k)(4)(B) addresses activities associated with underwriting insurance and providing annuities, and expressly characterizes as a "financial" activity:

> Insuring, guaranteeing, or indemnifying against loss, harm, damage, illness, disability, or death, or providing or issuing annuities, and acting as principal, agent, or broker for purposes of the foregoing, *in any State*.

12 U.S.C. § 1843(k)(4)(B) (emphasis added).  The "in any State" clause makes clear that Congress intended the definition to extend only to activities that occur within the United States. *Id.*; *see also* 12 U.S.C. § 1841(n) (defining "State bank supervisor" for purposes of the BHCA as "hav[ing] the same meanings as in" 12 U.S.C. § 1813(a)(3), which provides that "[t]he term 'State' means any State of the United States, the District of Columbia, [and] any territory of the United States"); *cf. In re Tobacco/Governmental Health Care Costs Litig.*, 100 F. Supp. 2d 31, 39 (D.D.C. 2000) (construing 28 U.S.C. § 1332(d)).

Section 4(k)(4)(I) also characterizes certain investment activities of insurance companies as "financial" but expressly requires that covered investments be made by an insurance company in the "ordinary course" and "in accordance with relevant State law governing such investments," and that the insurance company's parent company not "routinely manage or operate" the company holding the investment.  12 U.S.C. § 1843(k)(4)(I).

Congress spoke clearly in the BHCA in limiting the scope of insurance activities that are "financial in nature," 12 U.S.C. § 5311(a)(6), and was equally clear when it incorporated that unambiguous statutory language into the Dodd-Frank Act's definition of "U.S. nonbank financial

companies," *id.* § 5311(a)(4).  That definition does not encompass MetLife because it is undisputed that more than 15% of MetLife's consolidated assets and annual gross revenues are generated from non-U.S. insurance activities.  Indeed, more than 25% of MetLife's consolidated assets and more than 30% of its consolidated revenues are associated with insurance activities outside the United States, as reported in the Company's 10-K for the fiscal year ending on December 31, 2013.  *See* JA 2350, 2355 (MetLife, Inc., Annual Report (Form 10-K), at 203, 208 (Feb. 27, 2014)).  Those non-U.S. insurance activities are not conducted "in any State" under Section 4(k)(4)(B) and are not covered by Section 4(k)(4)(I) because they are not made in the ordinary course and are managed by the parent holding company, MetLife, Inc.  *Id.* at 224. Under Dodd-Frank, MetLife therefore is not "predominantly engaged in financial activities" and does not qualify as a "U.S. nonbank financial company" eligible for designation. 12 U.S.C. § 5311(a)(4), (6).[8]

### B.     FSOC's Attempts To Circumvent Section 4(k) Are Unavailing.

FSOC attempts to bypass Section 4(k)'s unambiguous language by offering a panoply of extra-textual arguments.  Each of those arguments fails, and none of them is entitled to deference.  *See U.S. Dep't of Homeland Sec. U.S. Customs & Border Prot. v. Fed. Labor Relations Auth.*, 751 F.3d 665, 668 (D.C. Cir. 2014) (courts "accord no deference to [an agency's] interpretation of [a] statute [it does not administer]").

---

[8]  FSOC attempts to capture under Section 4(k)(4)(I) the investments of MetLife's subsidiary, ALICO, in non-U.S. insurance subsidiaries.  *See* FSOC Br. 54-55.  While ALICO holds investments in non-U.S. insurance companies "in accordance with relevant State law," the investments do not meet the other conditions in Section 4(k)(4)(I).  Specifically, ALICO's investments in non-U.S. insurance companies are strategic—not portfolio—investments that MetLife, Inc. routinely manages and operates through, among other things, the use of interlocking directors and officers, common corporate policies, and corporate reporting lines. *See* 2364 (MetLife, Inc., Annual Report (Form 10-K), at 305 (Feb. 27, 2014)).  In fact, ALICO is not an insurance operating company with ordinary-course portfolio investments; its only assets are equity interests in insurance subsidiaries, and ALICO writes no insurance and functions exclusively as a holding company for strategic investments.

1.      **The Federal Reserve Board's Regulation Y Is Irrelevant To These Proceedings.**

FSOC contends that the Board, through Regulation Y, 12 C.F.R. § 225.81 *et seq.*, has broadly interpreted Section 4(k) of the BHCA to include all non-U.S. insurance activities, FSOC Br. 47, and that MetLife has acceded to that interpretation in previous applications to become a financial holding company and to acquire ALICO, a former division of AIG, *id.* at 47-48; *see also* JA 382 & nn. 153-54.  FSOC's reliance on Regulation Y is misplaced, and its interpretation is not entitled to deference because the regulation was promulgated by the *Board*, not FSOC. *See Grand Canyon Trust v. FAA*, 290 F.3d 339, 341-42 (D.C. Cir. 2002).

The Dodd-Frank Act makes no reference to Regulation Y, instead predicating its definition of "predominantly engaged in financial activities" on "*section 4(k) of the Bank Holding Company Act*."  12 U.S.C. § 5311(a)(6) (emphasis added).[9]  The Board's interpretation of Section 4(k) in a separate regulation—nowhere referenced in Dodd-Frank—has no bearing on the definition adopted by Congress, which is premised on the *statutory* language of the BHCA, not the Board's *regulatory* gloss on that language.

In fact, the Board has adopted a *different* regulation, Regulation PP, to implement Section 113 of the Dodd-Frank Act.  *See* Definitions of "Predominantly Engaged In Financial Activities" and "Significant" Nonbank Financial Company and Bank Holding Company, 78 Fed. Reg. 20,756 (Apr. 5, 2013) (to be codified at 12 C.F.R. pt. 242).  According to the Board, it is Regulation PP—not Regulation Y—that delineates those activities that are "financial in nature"

---

[9]  Regulation Y governs financial holding company applications and activities, a context wholly distinct from FSOC's designation authority.  Moreover, even if Regulation Y were instructive here, the regulation does not define "financial" activities to include foreign insurance activities, as FSOC suggests.  In a different, non-definitional section, the regulation does authorize a financial holding company to "conduct [these] financial activities" in foreign jurisdictions, but that authorization does not change the statutory or regulatory definition of "financial" activities.  *See* 12 C.F.R. § 225.85(b) ("A financial holding company may conduct any activity listed in § 225.86 . . . at any location outside of the United States").

within the meaning of Section 4(k) of the BHCA for purposes of FSOC's designation authority. *See id.* at 20,758.  Regulation PP expressly refers to the territorial limitations and other requirements of Sections 4(k)(4)(B) and 4(k)(4)(I) in defining "financial" activities in the insurance context. *Id.* at 20,761-62, 20,764.  Significantly, the Board adopted these limitations even as it declined to incorporate other aspects of Section 4(k)'s definitions because they were not "essential element[s]" of the activities and thus were irrelevant to whether the activities were "financial." *See, e.g., id.* at 20,762-64.  FSOC never cites or acknowledges Regulation PP.

### 2.      FSOC Misreads The "Related To" Clause In Section 102(a)(6).

Section 102(a)(6)(B) of the Dodd-Frank Act provides that a company is predominantly engaged in financial activities if 85% of its consolidated assets are "related to" activities that are "financial in nature" under Section 4(k).  12 U.S.C. § 5311(a)(6)(B).  FSOC insists that the phrase "related to" should be broadly construed to encompass the assets of MetLife's foreign insurance subsidiaries.  FSOC Br. 51 (citing JA 384-85).

FSOC's interpretation of Section 106(a)(2)(B) stretches the phrase "related to" beyond its breaking point.  Although the Supreme Court has interpreted "relate[d] to" broadly in some contexts, *see, e.g., Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983), it has also acknowledged that "relate[d] to" are "words of limitation," *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 656 (1995); *see also Mellouli v. Lynch*, 135 S. Ct. 1980, 1990 (2015) (rejecting interpretation of "related to" as "hav[ing] some connection . . . indirectly" (internal quotation marks omitted)).

FSOC claims that the activities of foreign subsidiaries are "related to" the activities of domestic subsidiaries through shared services, agreements, ownership, and otherwise and thus that the foreign subsidiaries' assets are covered by Section 102(a)(6)(B) of Dodd-Frank.  JA 384-85.  But the phrase "related to" refers to the relationship between a company's *assets* and the

*financial activities covered by Section 4(k)*.  Because Section 4(k) does not cover the activities of

MetLife's foreign subsidiaries, Section 102(a)(6)(B) does not reach those entities' assets because

their assets are two steps removed from—and accordingly not related to—the domestic insurance

activities that qualify as "financial in nature" under Sections 4(k)(4)(B) and 4(k)(4)(I).  In other

words, any purported "relat[ionship]" between the activities of MetLife's domestic and foreign

subsidiaries would be stretched beyond its breaking point if extended to encompass the foreign

subsidiaries' assets.

This conclusion is confirmed by the statutory context in which the phrase "related to"

appears.  Congress prescribed two tests in Section 102(a)(6) of Dodd-Frank for defining nonbank

financial companies: the first prong focuses on *revenues* "derived . . . from" financial activities,

12 U.S.C. § 5311(a)(6)(A), while the second prong considers the *assets* associated with these

activities (to address situations where revenues associated with financial activities do not reflect

the extent of a company's involvement in those activities), *id.* § 5311(a)(6)(B).  Despite the

principle that courts must "interpret [a statute's] provisions consistently and in harmony," *Prime

Time Int'l Co. v. Vilsack*, 599 F.3d 678, 683 (D.C. Cir. 2010), FSOC has adopted completely

divergent approaches to these two provisions, advocating a boundless definition of "related to"

that would sweep in even the most tenuous connections worldwide and effectively strip the

"derived from" provision of any independent force or effect.  There is no indication that

Congress intended to enact such an internally incoherent measure.[10]

---

[10] FSOC claims that, in stating that "less than 85% of MetLife's consolidated revenues and assets are *attributable to* activities that are 'financial in nature,'" MetLife "conflates the distinct tests and at once proposes a third test found nowhere in the statute."  FSOC Br. 50 (internal quotation marks omitted).  But the Board itself has construed these tests to require a determination of whether revenues or assets are attributable to financial activity, including when promulgating Regulation PP.  *See* Definitions of "Predominantly Engaged In Financial Activities" and "Significant" Nonbank Financial Company and Bank Holding Company, 76 Fed.

## II.     The Final Designation Violated The Dodd-Frank Act, FSOC's Final Rule And Interpretive Guidance, And Elementary Principles Of Reasoned Decision-Making.

FSOC's cavalier approach to the threshold statutory constraints on its designation authority is mirrored in virtually every other aspect of the Final Designation, which showed equally little regard for the statutory and regulatory standards that should have guided FSOC's analysis and for the real-world realities of the business of insurance that should have informed its decision-making.  In grounding its decision on baseless speculation that defied the evidentiary record and statutory and regulatory constraints on its authority, FSOC violated the Dodd-Frank Act and its own Final Rule and Interpretive Guidance in the three respects addressed below.

### A.     FSOC Arbitrarily And Capriciously Refused To Consider MetLife's Vulnerability To Material Financial Distress.

The Dodd-Frank Act authorizes FSOC to designate a company if the agency determines that "material financial distress" at the company could pose a "threat to the financial stability of the United States."  12 U.S.C. § 5323(a)(1).  In its Final Rule and Interpretive Guidance, FSOC defined "material financial distress" as "*imminent* danger of insolvency or default[ ] on [the company's] financial obligations."  77 Fed. Reg. at 21,657 (emphasis added).  FSOC improperly departed from the terms of the Dodd-Frank Act and its own regulatory guidance by simply assuming MetLife's material financial distress, with no consideration at all of its likelihood, and then by hypothesizing degrees of financial turmoil at the Company far more severe than FSOC's own definition of material financial distress.

### 1.     FSOC Is Statutorily Required To Consider A Company's Vulnerability To Material Financial Distress

Section 113(a)(1) of the Dodd-Frank Act provides that FSOC "shall" determine whether

---

Reg. 7731, 7734 (Feb. 11, 2011) (to be codified at 12 C.F.R. pt. 225) ("The Dodd-Frank Act specifically provides that *revenues or assets attributable to* an insured depository institution are to be considered as 'financial' revenues or assets for purposes of determining whether a company is predominantly financial.") (emphasis added).

material financial distress at a company "could pose a threat to the financial stability of the United States," 12 U.S.C. § 5323(a)(1), by evaluating ten non-exhaustive statutory criteria, *id.* § 5323(a)(2). Several of those criteria reflect Congress's intent that FSOC determine the degree of a company's *vulnerability* to material financial distress.

In particular, Section 113(a)(2) directs FSOC to consider the extent of a company's leverage, 12 U.S.C. § 5323(a)(2)(A), the degree to which the company is already subject to regulatory monitoring and oversight that might mitigate risk, *id.* § 5323(a)(2)(H), and the amount and types of the liabilities of the company, including the degree of reliance on short-term funding, *id.* § 5323(a)(2)(J), three factors that plainly relate to a company's vulnerability to financial distress. *See* 77 Fed. Reg. at 21,658 ("[n]onbank financial companies that are highly leveraged . . . and are under little or no regulatory scrutiny are more likely to be more vulnerable to financial distress"). MetLife provided substantial evidence demonstrating its low levels of leverage and the robust regulatory oversight to which it is subject, only to have FSOC adopt a head-in-the-sand approach and ignore the evidence simply because Dodd-Frank does not incant the words "vulnerability," "likelihood," or "probability." JA 370. It would have been utterly unreasonable, however, for Congress to impose the burdens of heightened federal regulatory oversight on companies without requiring consideration of the plausibility of those companies experiencing material financial distress, which explains why a number of the statutory factors address the degree of a company's vulnerability. FSOC's failure to undertake this congressionally mandated inquiry was arbitrary and capricious. *See Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).[11]

---

[11] Even if FSOC were not statutorily required to consider vulnerability, it would be arbitrary and capricious for FSOC not to consider vulnerability as an additional "risk-related factor" under Section 113(a)(2)(K) because it would be unreasonable for FSOC to subject a company to

The structure of Section 113 also indicates that FSOC cannot base designation on a company's material financial distress without consideration of vulnerability. That section establishes two grounds for designation—the "First Determination Standard," based on the impact of a company's material financial distress, and a second standard that considers whether a company's present characteristics pose a threat even in the absence of material distress. Under FSOC's reading—where a company can simply be assumed to be in distress, and evaluated in that condition—FSOC has no reason to consider designation under the Second Determination Standard, which looks at current reality. In fact, that standard has never been used by FSOC, and is effectively dead letter. The plain implication is that for the statutory framework to function, FSOC must establish a *basis* for evaluating a company under the First Determination Standard. Otherwise, the Second Determination Standard must be used.

Nothing in the other Dodd-Frank provisions invoked by FSOC indicates that no vulnerability assessment should occur. For example, FSOC's reliance (at 32) on Section 112(a)(2) of the Act—which provides that FSOC "shall . . . require supervision by the [Board] for nonbank financial companies that may pose risks to the financial stability of the United States in the event of their material financial distress or failure," 12 U.S.C. § 5322(a)(2)(H)—is misplaced because that section in no way implies that "the event" should simply be assumed.

Moreover, the fact that FSOC's authority is intended to be prophylactic and avert crises before they occur does not dispense with FSOC's obligation to consider the *likelihood* of the crisis it is purporting to prevent. FSOC Br. 33. FSOC implicitly concedes that it must consider probability when it insists that its designation authority is intended to "address risks of low-probability but high-impact events." *Id.*; *see also* Professors of Law and Finance Amicus Br. 2

---

enhanced federal oversight in the absence of a meaningful risk that the company will experience material financial distress. *See ALLTEL Corp. v. FCC*, 838 F.2d 551, 561 (D.C. Cir. 1988).

(Dkt. 30-1) ("[FSOC's] work . . . demand[s] . . . probabilistic judgments"). Even a determination of "low probability" requires *some* assessment of probability, which FSOC refused to undertake.

### 2. FSOC Violated Its Final Rule And Interpretive Guidance By Refusing To Consider MetLife's Vulnerability To Material Financial Distress.

Although FSOC insists that the Court should defer to its determination that Dodd-Frank does not require an assessment of vulnerability, FSOC Br. 35, that position crystallized for the first time during the designation proceedings, *see* JA 370. FSOC's own regulatory guidance construed the statute *to require* an assessment of a company's vulnerability. *See* 77 Fed. Reg. at 21,641. FSOC's failure to adhere to its own regulations was arbitrary and capricious. *See Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("an agency is bound by its own regulations") (internal quotation marks omitted).

FSOC's Final Rule and Interpretive Guidance states that FSOC will consider "the vulnerability of a nonbank financial company to financial distress" and that three of six designation factors—"leverage, . . . liquidity risk and maturity mismatch, and . . . existing regulatory scrutiny"—are barometers of such vulnerability. 77 Fed. Reg. at 21,641. FSOC reiterated this understanding to state regulators in March 2014, assuring them that it intended "to assess the vulnerability of a company to financial distress based on its leverage, liquidity risk and maturity mismatch, and existing regulatory scrutiny." JA 2834. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████.

In the Final Designation, however, FSOC changed the rules, refusing to assess MetLife's vulnerability and insisting that its Final Rule and Interpretive Guidance actually "stated its intent

to assess how the company's material financial distress or activities could be *transmitted to*, or *otherwise affect*, other firms or markets, thereby causing a broader impairment of financial intermediation or of financial market functioning." JA 370 (emphases added). FSOC repeats that argument here, insisting that its references to the vulnerability of the company in its Final Rule and Interpretive Guidance were intended to "evaluate whether, and how, the company's vulnerabilities, in a distress situation, could impact the broader financial system—not to assess whether distress could occur." FSOC Br. 34. FSOC's characterization of the Final Rule and Interpretive Guidance is facially implausible: There, FSOC stated that the statutory criteria fell into two basic categories—first, those that "*seek to assess the vulnerability of a nonbank financial company to financial distress*" and, second, those that "seek to assess the potential impact of a nonbank financial company's financial distress on the broader economy." 77 Fed. Reg. at 21,641 (emphasis added). Now, FSOC claims that all of the criteria fall into the second category regarding the company's "impact [on] the broader financial system." FSOC Br. 34. FSOC's change of heart is both nonsensical and improper, *see Nat'l Envtl. Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009, and its failure to explain how it can fulfill its statutory mandate to guard against systemic risk without considering the likelihood of that risk is the epitome of arbitrary and capricious action.

> **3.** **FSOC Erred By Assuming Distress At MetLife That Was More Severe Than The Definition Of "Material Financial Distress" In Its Final Rule And Interpretive Guidance.**

Even if Dodd-Frank had authorized FSOC to assume material financial distress at MetLife without analysis or support, that would not have given FSOC free rein to invent ever-worsening states of economic turmoil. Rather, the *degree* of distress that FSOC assumes must have some basis in the record. Here, it had none. Yet, FSOC justified its designation of MetLife by assuming—without evidence or explanation—a state of financial distress far more severe than

the "imminent . . . insolvency" that is the definition of "material financial distress" in the Final Rule and Interpretive Guidance.  77 Fed. Reg. at 21,657.

Taking FSOC at its word regarding the standards it would apply, MetLife provided ample evidence demonstrating not only its low vulnerability to material financial distress, including its strength throughout the financial crisis, but also that, in the unlikely event of its imminent insolvency, it would not pose systemic risks.  *See, e.g.*, JA 979-1339; JA 1639-817.[12]  Rather than meaningfully consider this evidence, however, FSOC moved the goalposts in its Final Designation by assuming not the imminent insolvency described in its Final Rule and Interpretive Guidance, but a "massive and total insolvency" of "unprecedented scale, of unexplained causation, and without effective regulatory responses," including the total inability of MetLife to satisfy its debts.  JA 642-43 (Woodall Dissent).

By repeatedly heightening the distress standard in order to overcome MetLife's evidence, FSOC denied MetLife proper notice, due process, and a meaningful opportunity to demonstrate that its financial distress would not have systemic effects.

### B.     FSOC Improperly Departed From Section 113(a)(2)'s Designation Criteria And Unduly Emphasized MetLife's Size And Purported Interconnectedness.

In addition to failing to assess MetLife's vulnerability, FSOC gave only cursory attention to most of the statutory criteria set forth in Dodd-Frank in favor of a virtually single-minded

---

[12] FSOC's suggestion that MetLife relied on "emergency federal lifelines during the 2008-09 financial crisis" is seriously misleading.  FSOC Br. 17-18.  In fact, MetLife was a source of stability during the financial crisis.  *See* JA 1741, 1760.  Like many other financially sound companies, MetLife participated in the government's Temporary Liquidity Guarantee Program and the Federal Reserve's Commercial Paper Funding Facility.  *See* FDIC, TLGP Debt Guarantee Program: Issuer Reported Debt Details, https://www.fdic.gov/regulations/resources/TLGP/total_debt.html; Bd. of Governors of the Fed. Reserve Sys., Commercial Paper Funding Facility, http://www.federalreserve.gov/newsevents/reform_ cpff.htm.  MetLife did so not out of need but because the federal government was offering funding at attractive interest rates and encouraged MetLife's participation.  *See, e.g.*, Allison Bell, *Fed Airs the Laundry*, LifeHealth Pro (Dec. 2, 2010), http://www.lifehealthpro.com/2010/12/02/fed-airs-the-laundry.

focus on MetLife's size and the purported extent of its interconnectedness.

By its terms, Section 113(a)(2) directs FSOC to "consider" the "nature" of various characteristics of the company being considered for designation, including the "nature" of the company's "exposures," the "nature" of the company's "transactions and relationships" with other "significant" financial companies, and the "nature of the financial assets of the company." 12 U.S.C. § 5323(a)(2).  Section 113(a)(2) thus makes clear that Congress intended for FSOC to conduct a partly *qualitative* analysis that measures the significance of these factors and their bearing on the likelihood that material financial distress at the company could pose a systemic threat.  FSOC disregarded this statutory mandate, engaging in an unreasoned exercise in ahistorical speculation that gave dispositive weight to a small subset of the statutory criteria— namely, MetLife's size and purported interconnectedness—and ignored or distorted others, like the extent to which MetLife is already regulated.  *See id*. § 5323(a)(2)(H).

As noted by Adam Hamm, FSOC's non-voting State Insurance Commissioner Representative, FSOC misunderstood or disregarded several state regulatory tools and "fail[ed] to fully consider the range of mechanisms insurance regulators use to identify and address problems," including state regulators' authority to declare that a company is in "Hazardous Financial Condition."  JA 647.  That declaration triggers various regulatory powers, "including reducing, limiting, or suspending the volume of business; limiting or withdrawing from certain investments and investment practices; suspending or limiting dividends; correcting corporate governance deficiencies; and imposing stays, among others."  JA 647.  Each of these tools facilitates early intervention to minimize the impact of material financial distress on policyholders, other counterparties, and the broader financial system.  FSOC's failure to grasp the significance and efficacy of these tools—and its insistence on assuming without basis that

seasoned state regulatory systems would malfunction and destabilize the very companies they are

designed to protect—violated Section 113(a)(2)(H) of the Dodd-Frank Act and Congress's intent

that designation be premised on a company-specific, multi-factor inquiry, rather than a one-size-

fits-all, size- and outcome-driven analysis. *See* S. Rep. No. 111-176, at 48 (2010) ("Size alone

should not be dispositive in the Council's determination[.]").[13]

FSOC's insistence that its perfunctory attention to the factors set forth in Section

113(a)(2) satisfied its statutory obligation to "consider" those factors is unavailing. FSOC Br.

23-24. The task of determining "whether [a] decision was based on a *consideration* of the

relevant factors" "involves *examining the reasons for agency decisions*—or, as the case may be,

the absence of such reasons." *Judulang v. Holder*, 132 S. Ct. 476, 484 (2011) (emphasis added).

In other words, "consider[ation]" of statutory factors requires that the agency provide *reasons*

*explaining* how those factors influenced its analysis. FSOC failed to perform that critical step.

III.   **The Final Designation Is Arbitrary And Capricious Because It Is Based On Unbounded Speculation And Conjecture And Unreasonable Assumptions.**

FSOC's 341-page Final Designation is a house of cards predicated on flimsy speculation

and faulty suppositions, rather than concrete evidence and plausible predictions. *See Sorenson*

*Commc'ns*, 755 F.3d at 708. For example, FSOC's analysis of the risks posed by MetLife's

assumed "material financial distress" conflicts with longstanding principles of risk analysis,

thoroughly undermining FSOC's insistence that it deployed established expertise to which this

Court should defer. FSOC Br. 29-30. Moreover, each of the three principal underpinnings of

FSOC's conclusion that MetLife's material financial distress could be transmitted to the broader

---

[13] FSOC defends its cursory consideration of state regulatory oversight by suggesting that MetLife "conceded" during the oral hearing the inadequacy of state insurance regulation in monitoring and mitigating systemic risks. FSOC Br. 28. But the quoted statements did not address the efficacy of state regulators in mitigating systemic risk or resolving failed insurers, which is addressed at length elsewhere in the hearing transcript and in the numerous submissions to FSOC by MetLife and state regulators. *See* JA 2397-413.

economy was predicated on conjecture and unsubstantiated assumptions, rather than logic, evidence, and real-world experience.  FSOC's risk assessment is therefore arbitrary and capricious because it is based not on an analysis of risks but on "'sheer speculation,'" *Sorenson Commc'ns*, 755 F.3d at 708, and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43.

FSOC explained in the Final Designation that "[n]o single consideration [was] dispositive" in its decision to designate MetLife, JA 374; FSOC Br. 24, conceding, for example, that its exposure and asset liquidation analyses were interconnected, JA 475.  As a result, any one of these errors, alone, requires rescission of the Final Designation in its entirety.  *See Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 839 ("[W]here [an agency] has relied on multiple rationales (and has not done so in the alternative), and we conclude that at least one of the rationales is deficient, we will ordinarily vacate the order unless we are certain that [the agency] would have adopted it even absent the flawed rationale.").  Taken together, these errors leave no doubt that the entire designation process was fatally flawed.

### A.     FSOC's Analysis Of The Effects Of MetLife's Material Financial Distress Departed From Settled Principles Of Risk Analysis.

In examining the "risk" that MetLife poses to the broader U.S. economy, FSOC ignored settled principles of risk analysis by relying on implausible scenarios divorced from real-world experience, and failing to utilize risk scenarios based on objective economic indicia and historical experience.  FSOC's failure to define and explain the parameters of its risk analysis enabled it repeatedly to shift its standards and redefine the inquiry in response to MetLife's evidence and analysis, and to assume increasingly dire, and speculative, levels of financial distress, in violation of both the Dodd-Frank Act and the APA.

1.      **FSOC Disregarded Accepted Risk Analysis Methodologies And Failed To Define Criteria To Guide Its Analysis.**

FSOC failed to describe or define the elements that guided its risk analysis, instead insisting that "[t]here is no quantitative, bright line test for . . . [a designation] determination." FSOC Br. 26.  FSOC's brand of risk analysis finds no support in either the academic literature or in the approaches of other federal regulatory agencies, which require that risk analysis be premised on plausible, concrete, and well-defined scenarios.

The "goal [of risk assessment] . . . is to estimate the severity and *likelihood* of harm . . . occurring from exposure to a substance or activity that under *plausible* circumstances can cause harm."  John J. Cohrssen & Vincent T. Covello, Risk Analysis: A Guide to Principles and Methods for Analyzing Health and Environmental Risks 3 (1989) ("CEQ Risk Analysis") (emphases added); *see also* Policy Statement on the Scenario Design Framework for Stress Testing, 78 Fed. Reg. 71,435, 71,444 n.36 (Nov. 6, 2013) (final rule) (in bank stress testing, "the severity of the [most severely adverse of three testing] scenario[s] would not exceed an implausible level").  A proper "risk analysis consists of an answer to the following three questions: (i) What can happen? . . . [;] (ii) How likely is it that that will happen?[; and] (iii) If it does happen, what are the consequences?"  Stanley Kaplan & B. John Garrick, *On the Quantitative Definition of Risk*, 1 Risk Analysis 11, 13 (1981).  A risk analysis that does not meaningfully examine *both* the probability and magnitude of harm is no risk analysis at all.

In the Final Designation, FSOC purported to describe events stemming from "material financial distress" at MetLife "in the context of a period of overall stress in the financial services industry and in a weak macroeconomic environment."  77 Fed. Reg. at 21,657.  But FSOC never assigned a fixed meaning to concepts like "overall stress" or "weak macroeconomic environment."  Compounding this flaw, FSOC disavowed reliance on any particular scenario,

instead asserting that it had "address[ed] a range of outcomes that are possible but vary in likelihood." JA 351; *see also* JA 552-53 (asserting that its "analysis [based on Oliver Wyman's four-scenario asset liquidation study] does not rely on any single scenario based on a particular set of assumptions").

FSOC's failure to define even a *single* scenario on which it purported to base its designation decision—denying MetLife the ability to address the scenarios and their likelihood—is a heretofore-unknown mode of analysis that resembles sheer guesswork and fear-mongering more than accepted principles of risk analysis. *See State Farm*, 463 U.S. at 43. FSOC's approach departs entirely, for example, from the approach in the Board's Comprehensive Capital Analysis and Review ("CCAR"), which objectively defines designated conditions of "stressed economic and financial market conditions" in order to assess banks' ability to withstand economic pressures. Bd. of Governors of the Fed. Reserve Sys., Comprehensive Capital Analysis and Review: Objectives and Overview 2-3 (2011), *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20110318a1.pdf.

Specifically, CCAR tests the resilience of bank holding companies by subjecting them to a series of hypothetical "stress scenarios," ranging from a "baseline" scenario to "adverse" and "severely adverse" economic conditions with numerical assumptions for each. These scenarios rely on assigning values to 28 variables, including unemployment, exchange rates, prices, incomes, and interest rates. Qualitative concepts—such as "severe recession" and a "sharp slowdown in economic activity"—are thus given clear and concrete meaning because they are associated with known combinations and values of those variables.[14] The CCAR regime

---

[14] *See, e.g.*, Bd. of Governors of the Fed. Reserve Sys., 2014 Supervisory Scenarios for Annual Stress Tests Required under the Dodd-Frank Act Stress Testing Rules and the Capital Plan Rule 3-4 (2013), *available at* http://www.federalreserve.gov/bankinforeg/bcreg20131101a1.pdf.

demonstrates that it would have been feasible for FSOC to provide a similarly quantitative, objective definition of "material financial distress."

The CCAR regime shares much in common with the risk-analysis tools that banks use to perform the "stress testing" mandated by Dodd-Frank.  *See* Bd. of Governors of the Fed. Reserve Sys., Stress Tests and Capital Planning, http://www.federalreserve.gov/bankinforeg/stress-tests-capital-planning.htm.  In conducting stress testing to assess the resilience of financial institutions to likely shocks, regulators typically specify scenarios in terms of objective variables.  *See* Policy Statement on the Principles for Development and Distribution of Annual Stress Test Scenarios, 78 Fed. Reg. 72,534, 72,537 (Dec. 2, 2013) (requiring banks conducting stress tests to examine baseline, adverse, and "severely adverse" scenarios—where even in the "severely adverse" scenarios, macroeconomic variables "would be expected to follow paths consistent with the depth and duration of previous recessions and with models of macroeconomic activity").

In designating MetLife, however, FSOC declined to identify or delineate the scenarios it claimed to have considered and offered no explanation for its failure to provide scenarios modeled on objective macroeconomic variables.  Nor did FSOC explain why it is feasible and appropriate to provide an objective definition of "stress" scenarios in the CCAR and bank stress-testing contexts, but not in applying Section 113.  Jettisoning all recognized approaches to risk analysis, FSOC turned "material financial distress" into a "black box" standard under which it could construct new, and increasingly dire, economic conditions with no evident or disclosed empirical basis, and could then assert that these completely imaginary, cataclysmic scenarios refuted all of MetLife's contrary evidence and explanations.  That is not reasoned decision-making, and it conflicts with the "quantitative analysis" of insurers' alleged systemic risk championed by FSOC's own *amici*.  *Cf.* Prof. Acharya *et al*. Amicus Br. 16-19 (Dkt. 32).

## 2.    FSOC's Assumptions Were Predicated On Illusory Risks.

FSOC also failed to tailor its approach in light of real-world experience, contrary to established risk-analysis principles.  While risk analysis is inherently prospective, it uses history as a guide to "the likely behavioural response of other market participants to events of market stress and the extent to which a common response might amplify market movements and exacerbate market strain."[15]  Courts have therefore repeatedly warned agencies that their analytical models cannot unreasonably contradict real-world experience.  *See, e.g.*, *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1054 (D.C. Cir. 2001) (per curiam); *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265 (D.C. Cir. 1994).

But, in yet another example of heads-I-win-tails-you-lose reasoning, FSOC treated historical evidence in the record as a one-way ratchet:  If an adverse economic event had happened in the past, FSOC said it would happen again.  *See, e.g.*, JA 518-19 (discussing AIG).  Conversely, if an adverse event had *never* happened, FSOC asserted that it might happen someday.  *See, e.g.*, JA 432-33, 480, 617-18.  Using this outcome-driven analysis, FSOC disregarded historical evidence regarding successful navigation of past periods of economic turbulence, including the strength of MetLife and other insurers during the 2008-2009 financial crisis.  Instead, FSOC subordinated real-world experience to its own unbounded conjecture, thereby depriving MetLife of any meaningful opportunity to refute the agency's analysis.  *Cf.* CEQ Risk Analysis, *supra*, at 93-94 (CEQ abandoned "worst-case analysis" and instead requires examination of "impacts of low probability but high consequence that are supported by credible scientific evidence"); Charles Yoe, Principles of Risk Analysis: Decision Making Under

---

[15] Basel Committee on Banking Supervision, Principles for Sound Liquidity Risk Management and Supervision ¶ 104 (Sept. 2008); *see also* 78 Fed. Reg. at 72,537 (the macroeconomic variables used to define a "stress" scenario objectively are "expected to follow paths consistent with the depth and duration of previous recessions").

Uncertainty 429-30 (2012) (criticizing worst-case scenario manipulation in which "given any worst-case scenario, an even worse case can, paradoxically, still be defined").

For example, FSOC speculated that, on learning of MetLife's presumed material financial distress, MetLife's retail policyholders could terminate their insurance coverage *en masse* through "surrenders" or "withdrawals." JA 484-87, 507-08. This speculation directly contradicted evidence showing that policyholders historically have maintained their policies in times of financial distress. JA 917-19 (Tbl. III-20 & Charts III-21 & 22). In fact, FSOC collected data from state regulators on surrender rates for insurance policies during the 2008-2009 financial crisis, but that data did not indicate that AIG surrenders occurred at anywhere near the astronomic rates FSOC posited for MetLife. JA 1758-59. FSOC's speculation also failed to engage—much less rebut—MetLife's explanation that it would be *irrational* for the average policyholder to terminate early. In most insolvencies, coverage for the majority of policyholders continues uninterrupted because state insurance regulators typically arrange for the assumption of the insolvent insurer's obligations by solvent insurers that acquire blocks of the "in-force" business. JA 902, 950, 1281; JA 1924-25.[16] Moreover, a policyholder would have strong disincentives to terminate early because doing so triggers penalties and taxes that make it more costly than adhering to the policy's contractual terms, and because of age, changes in health, or other factors, a terminating policyholder might no longer be able to obtain insurance to mitigate the risk that originally motivated purchase of the policy. JA 2790 (Gallanis at 10); JA 304-05 (Huff Dissent).

---

[16] In any case, coverage would continue for all policyholders, backed by the remaining assets in the insurer's estate. The asset shortfall in a typical insurer's insolvency is only 5%-10%. *See* JA 2784-85 (Gallanis at 4-5).

FSOC's insistence that a substantial portion of MetLife's policyholders will simultaneously make the same irrational decision to surrender their policies not only lacked support in the record, but also contradicted the basic economic principle that market participants generally behave in a manner consistent with their rational self-interests.  *See* Richard A. Posner, *Rational Choice, Behavioral Economics, and the Law*, 50 Stan. L. Rev. 1551, 1556-57 (1998); *see also* JA 1921 & n.258.  It likewise ignored the observation of both the SEC and federal banking regulators in two separate 2014 rulemakings that retail investors respond to economic distress more slowly than their institutional counterparts because they are comparatively less sophisticated and have fewer resources to monitor markets.[17]

FSOC's irrational reasoning was compounded by its further speculation that MetLife would not invoke its contractual right to limit policyholder terminations in the event of "material financial distress," JA 487, flatly disregarding MetLife's own statements that in the dire circumstances posited by FSOC, the Company, as a matter of fiduciary responsibility, would exercise its deferral rights to limit outflows, *see* JA 1761-63; *see also* JA 1763 (citing situations in which deferral rights would be invoked).  FSOC's vaunted "predictive judgment" does not extend to contradicting, without evidentiary basis, MetLife's own statements about measures it would take in a crisis, particularly when MetLife's representations are supported by the historical record and every insurance expert who spoke to the issue.

---

[17] The two rulemakings concluded just months before FSOC issued the Final Designation.  *See* Money Market Fund Reform (Final Rule), 79 Fed. Reg. 47,736, 47,743 n.67, 47,774, 47,795, 47,867 n.1566 (Aug. 14, 2014) (observing that, after the collapse of Lehman Brothers put stress on money market funds, institutional investors redeemed their shares more quickly than retail investors); *see also* Liquidity Coverage Ratio: Liquidity Risk Measurement Standards (Final Rule), 79 Fed. Reg. 61,440, 61,482 (Oct. 10, 2014) (observing that wholesale deposits change more quickly because of the greater "sophisticat[ion]" of entities that maintain those deposits).  FSOC ignored these findings altogether.

**B.     Without Any Reasoned Basis, And Contrary To All Historical Evidence, FSOC Assumed The Utter Ineffectiveness Of State Regulators.**

FSOC doubled down on its speculation concerning the behavior of MetLife and its policyholders in the event of the Company's material financial distress by further assuming the total ineffectiveness of state regulators to mitigate systemic risks, respond to MetLife's financial distress, or unwind and "resolve" MetLife in the event of the Company's failure.  FSOC Br. 16-17.  FSOC did not identify a single example of any insurer whose failure caused contagion in the insurance markets, and an Oliver Wyman study showed that it had never happened, JA 1016-28, 1256-339, but FSOC nevertheless speculated that such contagion could occur, and that state regulatory tools would malfunction and *exacerbate, rather than mitigate*, it.  FSOC went so far as to posit that, if state insurance regulators were to impose a stay on policyholder withdrawals to limit the consequences of material financial distress at MetLife, their intervention would spur a "crisis of confidence" in the stability of other insurers and lead to a "run" across multiple insurance companies.  JA 480, 486-87.  The record provided no support for this unvarnished speculation or for FSOC's presumption that state insurance regulators would not only be inadequate and ineffective but also affirmatively harmful, which contravenes the Dodd-Frank Act and basic principles of federalism.  JA 2788-91, 2795 (Gallanis at 8-11, 15); *see also* JA 305 (Huff Dissent); JA 1761-68; *see supra* at 13-14, 32-33.

The non-voting State Insurance Commissioner Representative, Adam Hamm, warned FSOC that its speculation on this point could not be reconciled with the record.  Hamm explained that state insurance capital requirements and numerous other regulatory powers "[n]ot only . . . help prevent solvency concerns" for an insurance company, "but, as a result of [state] authorities allowing for early regulatory intervention and ongoing supervision, they also minimize the impact of any material financial distress."  JA 647.  Moreover, Hamm's conclusion

that the broad array of state regulatory tools provided "substantial means to quell panic," JA 648, directly undermined FSOC's presupposition that state regulatory moratoria would actually make matters worse.  Hamm's explanation carries special weight because he possesses deep expertise in state insurance regulation that was shared with the Independent Member with insurance expertise, Roy Woodall, who also dissented from the Final Designation.  FSOC had no legitimate ground for ignoring the informed views of its dissenting members.  *See Am. Gas Ass'n*, 593 F.3d at 16 (agency must respond to dissents).

In addition, FSOC ignored the extensive evidence demonstrating that MetLife's insurance operations are "closely and carefully regulated" by state regulatory agencies.  JA 2866 (Lawsky Ltr. at 3).  As MetLife's primary regulator made clear in a submission to FSOC, state regulators consistently deploy tools to address stress situations *before* a company experiences insolvency and well before the U.S. economy as a whole could be threatened as a result of contagion.  *See id*.  Similarly, as the Louisiana Insurance Commissioner explained, state regulators are not only authorized but legally obligated "to intervene when risk-based capital levels deteriorate, which would occur long before . . . hypothetical distress levels would be reached."  JA 2686 (Letter from James Donelon, La. Ins. Comm'r, to Jacob Lew, Sec'y, U.S. Dep't of the Treasury, at 1 (Nov. 7, 2014) ("Donelon Ltr.")).

FSOC likewise disregarded evidence of the effective coordination between state regulators, including through the National Association of Insurance Commissioners ("NAIC") and supervisory colleges, as well as evidence regarding the state Guaranty Associations working through the National Organization of Life and Health Guaranty Associations ("NOLHGA").  JA 1601; JA 1923-24; JA 2838-42 (Letter from Thomas Leonardi, Conn. Ins. Comm'r, to Jacob

Lew, Sec'y, U.S. Dep't of the Treasury (Oct. 24, 2014)).[18]  FSOC dismissed the state Guaranty

Associations as presumptively unable to handle a resolution of MetLife solely because of

MetLife's size, despite record evidence regarding the funding capacity of the Guaranty

Associations and the success of state regulatory regimes in resolving complex multi-state

insurance companies.  JA 1922-28; *see also* JA 1271-78, 1832-38; JA 2786-87, 2791-92

(Gallanis at 6-7, 11-12).  For good measure, FSOC ignored state regulators' explanation that

because of MetLife's prominence, they would be particularly likely to intervene and coordinate

at the first sign of potential financial distress at the Company.  *See* JA 2686 (Donelon Ltr. at 1).

        FSOC also manufactured illusory shortcomings in regulatory oversight of several

activities carried of MetLife's insurance subsidiaries (FSOC Br. 14-17):

- **Captive Reinsurance**.  FSOC's reliance on MetLife's "captive reinsurance" activities to justify the Company's designation was misplaced.  FSOC Br. 16-17.[19]  MetLife's captive reinsurance subsidiaries are subject to extensive state regulatory oversight.  *See, e.g.*, JA 2775, 2777-79 (Letter from Karen Weldin Stewart, Del. Ins. Comm'r, to Jacob Lew, Sec'y, U.S. Dep't of the Treasury, at 2, 4-6 (Oct. 13, 2014)).  In particular, MetLife must file annual enterprise risk reports with state regulators that describe all activities involving one or more of its affiliates that are likely to have a material adverse effect upon the Company's financial condition or liquidity.  *See* Conn. Gen. Stat. § 38a-135(f); Del. Code Ann. tit. 18, § 5004(*l*); N.Y. Ins. Law § 1501(7).  In addition, reinsurance transactions with affiliates, including

---

[18] The Guaranty Association system plays an important role in the resolution of U.S. life insurers.  *See* JA 1353.  Each State has a Guaranty Association, the members of which are life insurance companies licensed in that State.  *Id.*  An order of liquidation, combined with a judicial determination that the insurer is insolvent, triggers coverage by the Guaranty Associations in all States in which the insurer was licensed to issue policies.  *Id.*  Each Guaranty Association assumes the payment of claims of policyholders residing in its State up to statutory limits as of the date of an insurer's liquidation, and ensures the continuation of coverage for policies and contracts that the insurer cannot cancel.  *Id.*  The actions of Guaranty Associations operating in different States are coordinated by NOLHGA.  *Id.*

[19] "With captive reinsurance, the insurer writing the policy (the 'ceding' insurer) enters into a reinsurance agreement with an affiliated reinsurer that is wholly-owned by the insurer or its parent" under which "the ceding insurer [is able] either to take credit for reserves ceded to the captive or in some transactions reduce its . . . [RBC requirements] while keeping the reserves on the ceding insurer's balance sheet."  Scott E. Harrington, *The Use of Captive Reinsurance in Life Insurance* 3 (2014), *available at* https://www.acli.com/Issues/Captive%20Insurance% 20Companies/Documents/Captive_Reinsurance_in_Life_Ins_Harrington2014.pdf.

captives, are subject to specific approval by the ceding company's regulator in most States, and the domestic state regulator of a U.S. captive holds approval authority over the captive insurer's entire business plan, including its reinsurance agreements. JA 1898. These reinsurance arrangements are often backed by letters of credit that provide reserves in the unlikely event that the assets available to fund policy obligations are insufficient. The only event that would force captives to draw on those letters of credit would be an event causing unprecedented numbers of policyholder deaths, such as a sudden pandemic, not the type of global macro-economic weakness on which FSOC's designation inquiry is predicated. JA 1682. Moreover, FSOC's failure to take into account the nature of those letters of credit and its double counting of a collateral financing arrangement caused it to overstate MetLife's unsecured credit and committed facilities exposure by a factor of three. JA 1681-82; JA 2415-16.

- **Securities Lending**. MetLife subsidiaries lend only high-quality securities (U.S. Treasury, U.S. Agency or Japan Treasury Securities, and Agency RMBS), which gain in value during times of market stress because investors favor them over riskier assets. JA 1692-95. FSOC also inexplicably ignored that these loans are nearly fully collateralized.[20]

- **Guaranteed Investment Contracts**. When a retirement plan offers participants a stable-value investment option through MetLife, the stable-value product is based on a guaranteed investment contract ("GIC")—a fixed income investment management arrangement— between the retirement plan and a MetLife insurance subsidiary supervised by the NYDFS. Contrary to FSOC's speculation, *see* JA 401-402 & n.285, MetLife's material financial distress would not impose material losses on retirement plans through stable-value GICs because most GIC liabilities are backed by separate account assets. MetLife's methods for testing the adequacy of assets to support the liabilities arising from GICs are dictated by New York law, *see* 11 N.Y.C.R.R. tit. 11, § 97, which also requires MetLife to submit an actuarial opinion and memorandum to the NYDFS each year stating that the assets in the separate account sufficiently cover contract liabilities, *see* JA 1662. FSOC's claim that these procedures nevertheless "could be less effective in the event of broader financial market distress," JA 402 n.285, was pure *ipse dixit* unsupported by evidence.

FSOC's failure to account for the fact that these activities are undertaken to support

MetLife's insurance business and are subject to existing regulatory oversight contravened its

statutory obligations under the Dodd-Frank Act, *see* 12 U.S.C. § 5323(a)(2)(H), and also violated

---

[20] "Collateral is a fundamental mitigant" of risk to counterparties. OCC, FDIC, Federal Reserve & OTS, Interagency Supervisory Guidance on Counterparty Credit Risk Management 15 (FRB Supervisory Letter SR 11-10) (June 29, 2011). FSOC nevertheless excluded collateral from its computation of counterparty exposures, even though MetLife's securities borrower counterparties provide cash collateral to MetLife equal to 102% of the borrowed securities' market value. JA 1693. By disregarding this collateralization, FSOC deviated without explanation from the standard treatment of collateral in comparable regulatory contexts. *See, e.g.*, 12 C.F.R. §§ 3.37 & 3.132, 217.37 & 217.132, and 324.37 & 324.13 (risk-based capital rules applicable to depository institutions and depository institution holding companies); *id.* § 32.9 (national bank lending limit regulations).

the APA, which imposed a minimum obligation on FSOC to account for state law in its analysis. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1151 (D.C. Cir. 2011).

### C.      FSOC's Exposure Analysis Did Not Meaningfully Appraise The Economic Impact Of MetLife's Material Financial Distress On Counterparties.

FSOC's exposure analysis was also fatally flawed because FSOC overstated counterparties' exposures to MetLife, arbitrarily equated insignificant and massive exposure amounts, and did not estimate the losses counterparties would be likely to experience as a result of MetLife's distress, much less their effects on the U.S. financial system.

FSOC stubbornly disregarded evidence that its calculation of the "aggregate capital markets exposures" of counterparties to MetLife overstated those exposures by as much as $98 billion, JA 1669-71, insisting in the Final Designation that any overestimated exposures had no effect on its analysis because even exposures at the lower ends of the estimated ranges "could" result in MetLife's material financial distress posing a threat to the broader economy. JA 424. This conclusion was erroneous in multiple respects.

**1.** *CCAR Comparison*.  FSOC ignored without explanation MetLife's evidence that its counterparties' exposures were not at a level sufficient to materially impair the counterparties and threaten the U.S. economy, as reflected by the CCAR regime used by the Board to assess banks' vulnerability to external economic impacts.  Specifically, MetLife demonstrated that if the eight U.S. G-SIBs—that is, banks designated by international banking regulators as "global systemically important banks"—were to lose the full value of their "exposure" to MetLife (adjusted for expected recovery on policyholder liabilities), the resulting reduction in the U.S. G-SIBs' capital would be many times *smaller* than the reduction postulated in the U.S. G-SIBs' CCAR analyses under the Board's "severely adverse" economic scenario.  In particular, the CCAR's "severely adverse" economic scenario is expected to cause the U.S. G-SIBs' capital to

fall by amounts ranging from 37 times to 173 times *greater* than the reduction in capital

attributable to the total failure of MetLife.  *See* JA 1656-57 (Tbl. II-3).  Because the U.S. G-SIBs

all passed the CCAR examination, the Board necessarily concluded that they could withstand the

economic conditions underlying the CCAR's "severely adverse" scenario and still meet the

Board-required minimums designed to prevent the banks from faltering.  It follows that even if

the G-SIBs all incurred a loss of 100% of their exposure to MetLife, they would still be well

above minimum capital requirements.  FSOC's Final Designation neither deployed an analysis

similar to CCAR nor responded in any manner to MetLife's CCAR comparison.  *See Del. Dep't*

*of Natural Res. & Envtl. Control v. EPA*, 785 F.3d 1, 15 (D.C. Cir. 2015) ("[A]n agency must

respond sufficiently [to submissions made to it] to enable [a court] to see what major issues of

policy were ventilated . . . and why the agency reacted to them as it did.") (internal quotation

marks omitted; ellipsis in original).

     **2.  *Penalties and Fines Comparison*.**  Likewise, FSOC ignored MetLife's illustration

that the damages and fines paid to the U.S. Government by several banks demonstrated that

counterparties' adjusted "exposure" to MetLife could not produce systemic effects.  The largest

exposure by dollar amount that an individual G-SIB has to MetLife is $3.2 billion (based on the

exposure amount corrected for overstatements and adjusted for expected recoveries on

policyholder liabilities).  JA 1657.  That is well below the amount of fines and settlements paid

by G-SIBs in recent years in connection with mortgage settlements (JPMorgan Chase & Co. at

$13 billion and Bank of America Corporation at $16.65 billion) and alleged violations of U.S.

foreign asset control restrictions (BNP Paribas at $8.9 billion).  *Id.*  None of the fines caused

material financial distress at the G-SIB.  *Id.*  As with MetLife's CCAR analysis, FSOC neither

responded to this evidence nor provided any standard for determining when "exposure" to MetLife is so great as to pose a threat.

**3.  *Amorphous Exposures.***   Ultimately, FSOC relied on an amorphous and ill-defined concept of "exposure."  Although FSOC's Final Rule and Interpretive Guidance attributed systemic importance only to those exposures "significant enough to materially impair" the firm, 77 Fed. Reg. at 21,657, in designating MetLife, FSOC dispensed with the material-impairment inquiry, leaping from the bare notion of exposure to systemic effects without any further analysis and without stopping to assess expected losses.  MetLife's explanation that the exposures on which FSOC focused were not sufficient to cause systemic effects went wholly unanswered.  FSOC was so indifferent to the potential magnitude of losses that its conclusions did not change even when MetLife demonstrated, for example, that FSOC's estimated exposure was as many as *four* times greater than any reasonably possible counterparty loss.  *See* JA 424-26, 474-77; *see also* JA 1652-53 (Tbl. II-1).

In fact, FSOC failed to estimate the likelihood of potential losses—as opposed to mere "exposure"—at all, beyond saying that the exposures "*could* cause losses."  JA 423, 427, 453, 497 (emphasis added); *see also* JA 420 n.381 (refusing to make any "estimate of expected losses to counterparties").  The entire "methodology" of FSOC's exposure analysis was to identify and describe, one-by-one, the different types of financial arrangements that MetLife enters, and then to observe that if MetLife experienced distress, "losses could" occur to its counterparties.  Thus, for example, after describing MetLife's GICs, the totality of FSOC's analysis was that in the event MetLife experienced material financial distress and failed to honor the contracts, certain entities "could suffer losses."  JA 429.  No estimate was provided of the size of the losses or—critically—their actual impact on the counterparties, much less the broader economy.  *Id*.

Turning to "Pension Closeouts and Structured Settlements," FSOC concluded only that "payments to beneficiaries could be *interrupted or reduced*"—and might be covered by state guaranty funds in any event.  JA 430 (emphasis added).  FSOC also erred in identifying the relevant counterparties—plan participants, not plan sponsors, bear the exposure to MetLife, and thus any losses would be widely dispersed.  *See* JA 1659.  For page after page in FSOC's exposure analysis, this was the supposed expertise and "predictive judgment" it brought to bear.

### 4.   *Presumed Inadequacy of Risk Mitigants, Including Money Market Reform.*

FSOC's assumption that "exposures" automatically translated into losses of systemic importance also ignored private risk-reduction practices and state and federal regulatory requirements that, as MetLife explained, would blunt the impact of MetLife's "material financial distress" on market participants.  For example, FSOC's exposure calculations ignored the availability of collateral, even though a lender holding collateral is protected from loss to the extent of the value of that collateral, JA 1645, 1650-51, 1671 & n.88, 1687, 1692-95, 1710-17 (Tbls. II-10-11), an elementary principle reflected in numerous statutory schemes, including Dodd-Frank's swaps reform provisions and the National Bank Act's lending limit, *see* 12 U.S.C. § 84.

FSOC likewise substantially disregarded new risk-reducing measures the SEC had imposed on money market mutual funds two months before the Final Designation.  In its new rules, the SEC authorized money market mutual funds to impose measures to limit investor redemptions during times of market stress, concluding that this would sharply reduce the likelihood of a "run" that could force the fund to "break the buck."  *See* 79 Fed. Reg. at 47,747-

49.[21]  The SEC also withdrew permission for institutional funds to maintain a stable $1.00 share

price, thus eliminating the possibility of those funds' "breaking the buck."  *See id*. at 47,775.

By relying in its Final Designation on the assertion that as many as 65 money market

mutual funds that hold MetLife securities could "break the buck," FSOC failed to take any

account of these measures—or of the fact that only two U.S. money market funds had ever

"broken the buck."  JA 1677.  The Final Designation maintained that "breaking the buck"

remained a serious concern because "a *majority* of the 69 [money market mutual funds] holding

MetLife's [securities] are estimated to be retail [funds]," which under the SEC rule continue to

be allowed to offer a stable $1.00 share price and therefore remain at least theoretically

susceptible to "buck breaking."  JA 354 n.39 (emphasis added).  This did not justify FSOC's

continuing assertion that "as many as" 65 funds could "break the buck," because institutional

funds without a stable $1.00 share price should have been excluded from FSOC's tally.  And

FSOC did not account at all for the new availability of liquidity fees and redemption gates at *all*

funds as tools for stopping panic and preventing "breaking the buck."  For these reasons, it was

entirely arbitrary and capricious for FSOC to premise its designation of MetLife in part on the

claim that financial distress at the Company could cause as many as 65 instances of an event that

had occurred only twice in U.S. financial history.  JA 1676-81.

### D.      FSOC Erred In Assessing MetLife Under The Asset Liquidation Transmission Channel.

FSOC fared no better in assessing MetLife under the "asset liquidation transmission

channel."  The asset liquidation channel addresses the possibility that a troubled company, to

satisfy obligations as they come due, sells off assets at such a pace and volume that they flood

---

[21] *See also* Money Market Fund Reform (Notice of Proposed Rulemaking), 78 Fed. Reg.
36,834, 36,835-37 (June 9, 2013) (describing conventions that allow money market mutual funds
to "sell and redeem shares at a stable share price [typically $1.00 per share] without regard to
small variations in the value of the securities that comprise its portfolio").

the markets, depressing prices and perilously devaluing the portfolios of other firms that hold similar assets.  *See* 77 Fed. Reg. at 21,641.

The simple, and dispositive, response to FSOC's asset liquidation analysis is that, in MetLife's case, such a massive asset liquidation will not occur.  That is shown by indisputable record evidence, and FSOC's suggestions to the contrary are utterly fanciful.  This Court may rescind FSOC's designation of MetLife on that basis alone, without reaching the Final Designation's flawed analysis of what might occur *assuming there were* a massive MetLife asset liquidation.  *Cf. State Farm*, 463 U.S. at 42-43 (agency's reasoning cannot be implausible).  That incoherent analysis is, however, a separate and independent basis to rescind the designation.

A sudden, sweeping liquidation of assets by MetLife would not occur because customers will not irrationally act contrary to their own economic self-interest, and because state regulators and MetLife itself would deploy familiar and time-tested tools whose very purpose is to forestall a sudden demand for payments by an insurer.  *See* JA 2864, 2866 (Lawsky Ltr. at 1, 3); JA 2686 (Donelon Ltr. at 1).  As discussed above, state regulators can impose moratoria to prevent policyholder surrenders for a period of time and thereby obviate any risk that a distressed company will be forced to dump assets to meet obligations.  And MetLife itself has the ability to defer payments for up to six months on a substantial majority of its surrenderable policies, *see* JA 956, further ensuring that it would never have reason to engage in the sudden, massive "asset liquidation" that FSOC hypothesized.

In the proceedings before FSOC, MetLife stated that it would exercise deferral if it confronted severe financial distress, and state regulators—as well as a dissenting Council member who is an insurance expert—all said that States would impose regulatory moratoria in the event of a "run" by MetLife customers.  *See* JA 1761-68, 1782-84; *see also* JA 2864 (Lawsky

Ltr. at 1); JA 2686 (Donelon Ltr. at 1); JA 2788-91, 2795 (Gallanis at 8-11, 15); JA 647-48

(Hamm Dissent); JA 305 (Huff Dissent).  There is no evidence to the contrary, and no rational

basis to believe these events would not occur.  For these reasons alone, "asset liquidation" is not

a means by which MetLife could destabilize the U.S. financial system, and that should have been

the end of FSOC's asset liquidation analysis.

    In half-hearted recognition that these preventive measures would be deployed and that

asset liquidation by MetLife did not pose a systemic threat, FSOC pivoted and—under the guise

of evaluating MetLife under the asset liquidation channel—departed yet again from the

methodology of its own regulatory framework by conjuring an entirely new rationale for

designation.  This alternative scenario, under which protective measures exercised by an

insurance company and insurance regulators would themselves cause a "crisis of confidence"

throughout the U.S. economy, *see* JA 480, 486-87, has never occurred, squarely conflicts with

Oliver Wyman's "contagion" study, *see* JA 1700-09, and was soundly rejected in the proceeding

by observers with expertise regarding insurance markets and regulation.  Indeed, federal

regulators' ability to "requir[e] [a] company to terminate one or more of its activities" or product

offerings was one of the *benefits* FSOC claimed for designation, but when it suited FSOC's

purpose, state regulators' ability to impose a stay on an insurer's deferral payments became a

source of economic calamity.  JA 593.

    It was arbitrary and capricious for FSOC to depart from the three "transmission channels"

in its own regulatory guidance, designating MetLife based on a fourth unsubstantiated,

ahistorical, and entirely invented rationale.

    Even if one were to suppose against all record evidence that there were a significant

liquidation of assets by MetLife, the scale and effects suggested by FSOC were baseless.  To test

specific unsubstantiated conclusions about the effects of asset liquidation in FSOC's public

designations for AIG and Prudential, JA 997, 2695, Oliver Wyman modeled certain scenarios

that began with MetLife's experiencing financial distress, and then—solely to demonstrate that

asset liquidation by MetLife could not have systemic effects—incorporated conservative,

implausible, and ahistorical assumptions to maximize the volume of asset sales by MetLife and

measure their effects on asset markets.  In particular, MetLife would write no new business,

derive no benefit from declining interest rates associated with a market downturn, and be forced

to sell assets in market conditions substantially worse than those observed for each asset class in

any 30-day period during the 2008-2009 financial crisis, and—of critical importance—no state

regulators would intervene.  *See* JA 2701-02, 2708.  Oliver Wyman also assumed, for purposes

of its Scenario 3, that MetLife would not invoke its contractual rights to defer policy payments.

JA 2701.  In Scenario 4, Oliver Wyman added the assumptions that *all* general account

policyholders who could surrender would do so, and all other liabilities capable of acceleration

would come due.  *Id.*  Oliver Wyman repeatedly emphasized that these assumptions had no basis

in history or logic, were extremely economically conservative, and were inconsistent with

MetLife's own representations that it would invoke its contractual right to defer surrenders in

Scenario 3 and that the scenarios were developed solely to examine the *impacts* on various asset

class markets of a far-fetched and unprecedented volume of asset sales.  *See, e.g.*, JA 985-86,

991, 994, 997-98, 1000-01.

Even under those conditions, Oliver Wyman's analysis demonstrated that asset sales from

MetLife's portfolio would generate liquidity sufficient to satisfy all demands arising from the

surrender of all surrenderable insurance policies, other surrenderable liabilities, and its financial

and operating debt *without* causing price impacts that would significantly disrupt financial markets.  JA 1008-16; JA 1735, 1756, 1791 & n.162.[22]

After disclaiming reliance on Scenario 4, FSOC purported to adopt Oliver Wyman's Scenario 3 but then "adjust[ed] . . . [its] parameters" in unspecified ways and added indeterminate assumptions.  JA 553.  Based on this undefined "adjust[ed]" Scenario 3, FSOC concluded that MetLife's asset sales under the hypothesized conditions "could" disrupt markets. Contrary to FSOC's representations in its brief, FSOC has refused to disclose the calculations it undertook using the "adjust[ed] . . . parameters," instead providing only a vague description of the work it performed and tables and figures purporting to describe "Council Analysis."  JA 551-68 (Tbl. 43, Tbl. 44, Fig. 15; Fig. 16).  Not even FSOC claims that MetLife saw this modified analysis *before* the Final Designation.

FSOC's bid to insulate its calculations from MetLife's scrutiny and from meaningful judicial review violates the APA, the Dodd-Frank Act, and due process.  *See infra* Part V; *cf. Chamber of Commerce v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) ("the most critical factual material . . . used to support the agency's position . . . [must be] exposed to refutation") (internal quotation marks omitted).  In any event, FSOC's treatment of Scenario 3 was unreasonable.  In describing its "adjustments" as "plausible," FSOC offered no explanation for why Scenario 3 as "adjust[ed]" was a realistic scenario from which valid conclusions could be drawn, beyond the

---

[22] In criticizing Oliver Wyman for relying on conditions insufficiently adverse to MetLife, FSOC did not address, among other things, Oliver Wyman's assumption that MetLife would *not* benefit from a number of its risk-reducing practices, such as hedging.  But were extreme market distress to occur, many of MetLife's equity derivatives contracts, which are used to hedge for its variable annuity portfolio, would be "in the money" (that is, MetLife would be owed money by its counterparty).  JA 1793.  FSOC's analysis gave virtually no weight to hedging, even though 97% of MetLife's aggregate derivatives usage consists of hedging transactions that reduce risk. *See* JA 891-92 & n.16; *see also* Prof. Acharya *et al*. Amicus Br. 22-23 (Dkt. 32) (acknowledging hedging as a potentially effective risk mitigant).

agency's bald "*ipse dixit*, without any evidentiary support." *Bus. Roundtable*, 647 F.3d at 1155.

Given the numerous adverse and ahistorical assumptions on which Oliver Wyman premised

Scenario 3, the plausibility of FSOC's even-more-dire modified scenario cannot simply be

assumed. Rather, FSOC's suggestion that MetLife's policyholders would surrender their

policies *en masse* is at odds not only with logic and historical experience, but also with the

findings of the International Association of Insurance Supervisors ("IAIS"), which was

commissioned by the FSB to develop the assessment methodology for large insurers and

expressly acknowledged that "[t]he financial distress of an insurer usually plays out over a long

time horizon. That is, assets of the insurer do not need to be liquidated until claims or benefits

under the policies need to be paid, and this will not occur until months or even years in the

future." IAIS Assessment Methodology, at 8 n.12, *available at* https://www.lloyds.com/~/

media/files/the%20market/operating%20at%20lloyds/regulation/gpa/final_initial_assessment_

methodology_18_july_2013.pdf.

FSOC also introduced, for the first time in its Final Designation, a "Monte Carlo"

simulation to model the order in which MetLife would sell its assets under the hypothetical

conditions of adjusted Scenario 3. JA 563-64. Because the "Monte Carlo" analysis assumes all

assets are equally likely to be sold, FSOC's adjustment was equivalent to assuming that MetLife

would sell its assets in a *random* order—as with the roll of a dice—rather than in an order that

would maximize the recovery for MetLife's shareholders and policyholders. MetLife's directors

and officers, however, have fiduciary obligations to maximize that recovery, and FSOC's

assumption that they would act contrary to those duties was arbitrary and capricious. *See Bus.*

*Roundtable*, 647 F.3d at 1150 (arbitrary and capricious for an agency to assume action contrary

to board members' fiduciary duties).

In all of these respects, FSOC departed from the basic precept of administrative law that the ends do not justify the means, instead conducting a stacked-deck proceeding in which whatever evidence and argument MetLife offered was one-upped through unbounded speculation, new and undisclosed analysis, and repudiation of the regulatory framework that FSOC had adopted scarcely two years earlier.  This was arbitrary and capricious.

### E.   No Deference Is Due Because FSOC's "Predictive Judgments" Were *Ipse Dixit* Based On Pure Speculation, Rather Than On Evidence And Reasoned Analysis.

In defense of its unreasoned and speculative analysis, FSOC claims that it is entitled to deference because it based its analysis on "predictive judgments"—a phrase it incants no fewer than seven times in its brief.  *See* FSOC Br. 3, 19, 20, 25, 26.  The phrase "predictive judgment" is not a "talisman," however, "under which any agency decision is by definition unimpeachable."  *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 821 (internal quotation marks omitted).  And in fact, it was a distinguishing trait of the Final Designation that it repeatedly declined to "predict" and "judge," as when it declined to estimate expected losses to MetLife counterparties, much less to predict the impact of those losses on the counterparties (as in a "stress test") or on the broader economy.

A "factual determination[ ] . . . of a judgmental or predictive nature . . . necessarily involves *deductions based on the expert knowledge* of the agency," *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-14 (1978) (internal quotation marks omitted), and grounded in "reasoned decisionmaking," *Int'l Ladies Garment Workers' Union*, 722 F.2d at 821; *see also Sorenson Commc'ns*, 755 F.3d at 708 ("deference to [predictive] judgments must be based on some logic and evidence, not sheer speculation" (alteration and internal quotation marks omitted)).  But far from making predictions and applying "expert knowledge" concerning the insurance business, FSOC ignored both the evidence and the experts, including numerous state

insurance regulators who expressly opposed MetLife's designation. *See, e.g.*, JA 2825 (Letter from Wayne Goodwin, N.C. Comm'r of Insurance, to FSOC at 1 (Oct. 29, 2014)); JA 2686 (Donelon Ltr. at 1).  In light of the long-standing federal policy of leaving insurance regulation to the States, *see* 15 U.S.C. § 1012(b); 12 U.S.C. § 1844(c)(3)(ii)), it was FSOC's dissenting members—the Independent Member with insurance expertise and the State Insurance Commissioner Representative—as well as the state insurance commissioners who spoke with "expert knowledge."  Yet, not only did FSOC fail to make anything more than passing reference to the considered views of the state insurance commissioners who submitted letters regarding the Proposed Designation, FSOC also neglected even to acknowledge the dissenting opinions by two FSOC members with deep "expert knowledge" about insurance.  This failure, standing alone, warrants rescission.  *See Am. Gas Ass'n*, 593 F.3d at 19.

Moreover, agencies have "no license to ignore the past when the past relates directly to the question at issue."  *BellSouth*, 469 F.3d at 1060.  The chain of events FSOC posited did not purport to "predict" anything and defied historical fact and real-world experience at every turn, especially in presupposing the inadequacy of state regulation (as, for example, with FSOC's assertions that state-imposed moratoria would fan contagion).  *See supra* at 41-43.

The cases on which FSOC relies only confirm the divergence between prior decisions concerning predictive judgments and the kind of ahistorical worst-of-all-possible-worlds account FSOC posited here.  *See* FSOC Br. 19-20.  In *Rural Cellular Association v. FCC*, 588 F.3d 1095 (D.C. Cir. 2009), for example, the D.C. Circuit sustained a regulation because the conclusions about the consequences of "future growth" underpinning the regulation were grounded in "undisputed historical . . . figures."  *Id.* at 1106-07.  And in *Newspaper Association of America v. Postal Regional Commission*, 734 F.3d 1208 (D.C. Cir. 2013), it was the *challenger's* contention

that the court rejected as "too speculative to be useful," with an admonition that the challenger had "projected, with little support, only the very worst case" scenario—an apt description of FSOC's analysis of "material financial distress" at MetLife.  *Id.* at 1216-17; *see also BellSouth*, 469 F.3d at 1060 ("We cannot overlook the absence of record evidence" supporting the agency's conclusion "simply because the Commission cast its analysis as a prediction of future trends.").

In short, what FSOC offered was not predictions and judgments grounded in evidence, but pure *ipse dixit*.  *See D&F Afonso Realty Trust v. Garvey*, 216 F.3d 1191, 1196-97 (D.C. Cir. 2000) (rejecting FAA's "*ipse dixit* approach to making a hazard determination"); *see also Nat'l Tire Dealers & Retreaders Ass'n v. Brinegar*, 491 F.2d 31, 40 (D.C. Cir. 1974).  FSOC's designation boils down to its conclusion that MetLife poses a systemic threat because FSOC "sa[id] so."  *D&F Afonso*, 216 F.3d at 1196.  Even courts' generally "deferential standard of review requires more than [FSOC] offers."  *Id.*

## IV.    FSOC Made Other Fatal Errors That Require Rescission.

The Final Designation must also be rescinded because FSOC failed to consider reasonable alternatives to designation and disregarded the profound effects that designation will have on MetLife and its shareholders and customers.

### A.    FSOC Failed To Give Adequate Consideration To Reasonable Alternatives To MetLife's Designation.

An agency has an "obligation to consider" alternatives that are "neither frivolous nor out of bounds," and its "failure to consider [these] alternative[s] violate[s] the APA."  *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 144-45 (D.C. Cir. 2005); *see also Laclede Gas Co. v. FERC*, 873 F.2d 1494, 1498 (D.C. Cir. 1989).  Throughout the designation process, MetLife urged FSOC to adopt an "activities-based approach" to regulating insurers—which would subject only particular aspects of insurers' operations to enhanced federal oversight—rather than

designating entire insurance companies for enhanced supervision.  *See, e.g.*, JA 2513-14 (Letter from Ricardo A. Anzaldua to Patrick Pinschmidt, at 1-2 (Aug. 6, 2014)).  FSOC consistently spurned this alternative without meaningful explanation.[23]

As an initial matter, FSOC is wrong to suggest that Congress relieved it of any obligation to consider an activities-based alternative to the company-specific designation of MetLife.  To be sure, nothing in Dodd-Frank expressly *requires* FSOC to consider an activities-based approach, but nothing *precludes* such an option either.  FSOC's company-specific designation authority under Section 113 is only one of several tools at its disposal to fulfill its statutory mandate.  Other provisions of Dodd-Frank make clear that FSOC may refrain from designating a nonbank financial company, and instead designate certain "payment, clearing, and settlement" activities, 12 U.S.C. §§ 5461-5472, or "make recommendations to [the company's] primary financial regulatory agenc[y] to apply new or heightened standards and safeguards for financial *activities or practices* that could create or increase [systemic] risks."  *Id.* § 5322(a)(2)(K) (emphasis added).  While it was not necessarily obligated to adopt one of those options, FSOC was required to consider each of these alternatives to the company-specific designation of MetLife and to explain its decision not to adopt them.  *See, e.g.*, *Chamber of Commerce*, 412 F.3d at 144.

---

[23] FSOC argues for the first time in its brief that the activities-based approach is an inadequate substitute for designation and is authorized by a different provision of Dodd-Frank than FSOC's designation authority under Section 113.  FSOC Br. 42-43.  FSOC's attempt to supplement the grounds it offered in the Final Designation for rejecting the activities-based alternative is improper.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see also Summer Hill Nursing Home LLC v. Johnson*, 603 F. Supp. 2d 35, 39 (D.D.C. 2009) (Collyer, J.).  In any event, the activities-based approach is "an alternative within the ambit of the existing standard," *State Farm*, 463 U.S. at 51, because it uses similar tools to achieve the same statutory objective of reducing systemic risk, *cf. Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 379 (6th Cir. 2010).  *Clinton Memorial Hospital v. Shalala*, 10 F.3d 854 (D.C. Cir. 1993), is not to the contrary because, in that case, there were *no* alternative proposals.  *Id.* at 859.

FSOC's contention that it was not "appropriate" to consider an activities-based approach because it had decided to designate MetLife under the First Determination Standard is circular. An agency may not ignore an alternative on the ground that it has already chosen *another* approach—this reasoning would eviscerate the APA's requirement to consider reasonable alternatives, and "such an 'artificial narrowing of options[ ]' is antithetical to reasoned decisionmaking." *Int'l Ladies' Garment Workers' Union*, 722 F.2d at 817 (citation omitted).

FSOC's duty to consider an activities-based approach was all the greater because it is presently exploring exactly that approach for asset managers, "direct[ing] [its] staff to undertake a more focused analysis of industry-wide *products and activities* to assess potential risks associated with" the asset management industry.  Garrett Letter at 2, *available at* http://online.wsj.com/public/resources/documents/LettertoLew09022014.pdf.  FSOC has adopted this approach despite OFR's conclusion that "[d]istress at a large asset manager could amplify or transmit risks to other parts of the financial system."  OFR, Asset Management and Financial Stability 18 (2013), *available at* http://financialresearch.gov/reports/files/ofr_asset_ management_and_financial_stability.pdf.

FSOC has never articulated a reasonable basis for using "a market-wide, activities-based [approach], rather than a firm-by-firm designation," for asset managers but not insurers.  *See* John Heltman, *Fed's Tarullo Favors Activities-Based Regulation for Asset Managers*, Am. Banker (June 5, 2015) (quoting Daniel Tarullo).  Nor could it.  As explained by former Representative Barney Frank, a principal co-sponsor of Dodd-Frank, the "asset managers or insurance companies that just sell insurance as it's [traditionally] defined" do not have "systemic . . . effect" and thus should *both* be regulated based on the "activities they engage in."  Cong. Research Serv., House Fin. Servs. Comm. Holds Hearing on the 2010 Fin. Regulatory Overhaul

Law (July 23, 2014).  The case for adopting an activities-based approach may actually be

stronger for insurers because liquidation of the largest mutual funds could have a substantially

larger impact on market prices than the liquidation of an insurer like MetLife due to the greater

size and vulnerability to runs of many mutual funds.  *See* JA 1876 n.54.  FSOC ignored this

possibility.  JA 373.  Before saddling MetLife with the unique burdens of SIFI regulation, FSOC

was required to consider this superior alternative that it is simultaneously considering for other

large financial institutions.

### B.     FSOC Failed To Consider The Effects Of Designation On MetLife And Its Shareholders And Customers.

It is a basic principle of reasoned decision-making that an agency must consider the

consequences of its actions.  *See, e.g.*, *North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir. 2008)

(per curiam).  And it is the height of arbitrary and capricious action for an agency to impose

onerous requirements on a company heedless of the effect on the company and its shareholders

and customers.  Yet, by FSOC's own admission, that is precisely what it did here.

FSOC attempts to evade its obligation to consider the effects of designation by

characterizing MetLife's position as a call for mandatory cost-benefit analysis, and insisting that

it has discretion to determine what "other risk-related factors" are "appropriate[ly]" considered

under Section 113(a)(2)(K) of the Dodd-Frank Act.  FSOC Br. 35-37.  FSOC misconstrues

MetLife's argument and distorts its obligations under Dodd-Frank and the APA.

MetLife has not argued that FSOC is required to weigh the relative costs and benefits of

designation, only that FSOC is required to consider the consequences of its regulatory action,

including the effect that designation will have on MetLife, its stakeholders, and consumers.

Compl. ¶¶ 131-34.  In fact, the failure to consider the effects of regulatory action—and in light of

those effects, whether an alternative regulatory approach would be preferable (*see supra* at 57-

60)—is among the grounds on which agency actions are most commonly invalidated.  *See Bus.*

*Roundtable*, 647 F.3d at 1150-52 (striking down rule because the SEC "relied upon insufficient

empirical data" when considering its effects); *see also North Carolina*, 531 F.3d at 906-08.

FSOC's duty to consider the consequences of designation emanates from both Dodd-

Frank and the APA.  Specifically, Section 113(a)(2)(K) of Dodd-Frank makes clear that the

statutory factors enumerated by Congress are not intended to be exhaustive and should be

supplemented by FSOC as "appropriate."  12 U.S.C. § 5323(a)(2)(K).  Relatedly, Section 113(h)

of Dodd-Frank imposes on FSOC the duty to refrain from arbitrary and capricious action.  *Id.*

§ 5323(h).  Section 113(h) therefore imports into the designation inquiry an agency's obligation

to consider the effects of its regulatory action as an additional "appropriate" consideration.  *See*

*Bus. Roundtable*, 647 F.3d at 1150-52.  That duty is particularly important in the SIFI

designation setting because Congress plainly did not intend FSOC to take regulatory actions that

weaken the designated company and leave it more susceptible to material financial distress.

Had FSOC considered the consequences of designation, it would have been compelled to

conclude that the imposition of enhanced prudential standards on MetLife would increase the

Company's costs and capital requirements, resulting in higher prices for policyholders, a

reduction in benefits, and MetLife's possible departure from certain product markets.  *See* JA

1603-04; JA 1929-34.  Indeed, General Electric Company has already announced plans to sell off

most of the assets of General Electric Capital Corporation—one of the four nonbank SIFIs—in a

move widely perceived as a response to the burdens of SIFI designation, Joann S. Lublin *et al.*,

*GE Seeks Exit from Banking Business*, Wall St. J. (Apr. 10, 2015), http://www.wsj.com/articles/

ge-prepared-to-exit-the-bulk-of-ge-capital-1428662109.  In the case of MetLife, the Chief

Executive Officer advised FSOC that designation could result in the break-up of the Company—

yet the designation reflects not the slightest consideration of that prospect.  *See* JA 2390-92.

Surely, in an agency decision about a single company, to ignore this was to ignore an "important

aspect of the problem."  *State Farm*, 463 U.S. at 43.

FSOC further compounded its arbitrary and capricious treatment of the designation's

effects by improperly relying on the purported benefits of federal oversight *before knowing what

that oversight will entail*.  *See* JA 584 (noting that supervisory colleges "are not equivalent to the

supervisory and regulatory authorities to which a nonbank financial company that the Council

determines shall be subject to supervision by the Board of Governors is subject"); JA 593

(asserting that designation "would provide the Council and the Board of Governors with a

broader range of tools to address potential threats to U.S. financial stability posed by MetLife").

The Board has not yet promulgated the capital requirements or most of the other enhanced

prudential standards that will be applicable to designated insurance companies.  In the absence of

those standards, FSOC could not reasonably rely on the purported benefits of federal regulation

in determining that designation was warranted and that existing regulatory scrutiny was not

sufficiently comprehensive.  And it certainly could not rely on the purported benefits of federal

oversight in justifying MetLife's designation, while pleading agnosticism regarding the effects of

federal oversight on MetLife itself.  *See* FSOC Br. 39.

## V.     FSOC's Structure And Designation Procedures Violate Due Process And The Separation Of Powers.

The errors that pervaded the designation of MetLife were ultimately of a constitutional

dimension.  FSOC—which lacks any separation in its legislative, investigative, prosecutorial,

and adjudicative functions—investigated MetLife and proposed it for designation and then, as

MetLife sought to make its case, FSOC improperly denied it access to the record and relied upon

new analyses, new reasoning, and cherry-picked evidence to ratify its own proposal.

**A.    The Final Designation Violated Due Process Because FSOC Denied MetLife Access To The Record And Introduced New Evidence And Analysis.**

Throughout the designation process, MetLife repeatedly requested access to the record on which FSOC was basing its designation determination.  FSOC uniformly denied those requests on the ground that the Proposed and Final Designations provided MetLife with sufficient information about the agency's reasoning.  In fact, even now, FSOC still has not disclosed the entire record to MetLife, instead delivering a subset of the record that includes numerous documents that have been either partially redacted or redacted in full.  According to FSOC, keeping MetLife in the dark about the materials underpinning its consideration of MetLife is perfectly compatible with due process because the Company "received ample opportunity to be heard" and because, as FSOC bafflingly asserts, designation as a non-bank SIFI does not impose any regulatory consequences on MetLife.  FSOC Br. 57-60.  FSOC is mistaken on both counts.

Due process guarantees both the right to review and the right to respond to the administrative record *prior* to any adverse agency determination.  In *National Council of Resistance of Iran v. Department of State*, 251 F.3d 192 (D.C. Cir. 2001), the D.C. Circuit held that "the fundamental norm of due process clause jurisprudence requires that *before* the government can constitutionally deprive a person of the protected liberty or property interest, it must afford him notice and hearing." *Id*. at 205 (emphasis added).  Applying that principle, the court determined that, before the Secretary of State designates an entity a "foreign terrorist organization," the Secretary must provide the entity with "notice of those unclassified items upon which he [or she] proposes to rely," as well as an "opportunity to present . . . such evidence as [the] entit[y] may be able to produce to rebut the administrative record." *Id*. at 209.  Due process requires that the Secretary provide this notice and access to the record "as soon as the Secretary has reached a tentative determination that the designation is impending." *Id.*

MetLife was entitled to no less process in these proceedings:  "as soon as [FSOC] ha[d] reached a tentative determination that the designation" of MetLife was "impending"—*i.e.*, at the time FSOC issued the Proposed Designation—it was required to provide MetLife with "notice of those [non-confidential] items upon which [FSOC] propose[d] to rely" in making its designation determination and an "opportunity to present . . . evidence . . . rebut[ting] the administrative record."  *Nat'l Council of Resistance of Iran*, 251 F.3d at 209.  Instead, FSOC reflexively denied MetLife's repeated requests for access to the record and then, on the same day it filed its opening brief in these proceedings, produced an administrative record comprising roughly 80,000 pages, thousands of which constituted communications between FSOC and state insurance regulators that MetLife had never seen before and more than 1,500 pages of which were redacted in full or in part without a privilege log justifying those redactions.[24]  FSOC also failed to disclose any of the communications between its staff and members regarding MetLife's designation, as well as the evidence and analysis that did *not* support FSOC's case for designation and that it therefore chose not to cite in the Final Designation.  FSOC's belated disclosure of a partial and cherry-picked "record" simply does not comport with due process.  *Id.* at 205.

The denial of access was no mere technical irregularity but instead concretely prejudiced MetLife by concealing evidence in the administrative record on which the Company could have relied in its case against designation. ██████████████████████████

████████████████████████████████████████████

---

[24] MetLife finally obtained access to a portion of the redacted materials when this Court entered the parties' proposed protective order on June 12, 2015, but, even then, FSOC refused to disclose several hundred pages of materials that it obtained from state insurance regulators. MetLife has a right to *all* of the regulatory information that FSOC collected as part of the designation process—whether or not it was actually cited in the Final Designation—because those materials were part of the record before the agency at the time that it rendered its determination.



FSOC's withholding of these materials—and of the materials it claimed not to "rely upon" at all—was thus tantamount to "suppression by the prosecution of evidence favorable to an accused." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

The fact that MetLife was permitted to meet with FSOC's staff and produce submissions to FSOC in advance of its designation does not substitute for MetLife's right to review and rebut the record prior to designation. FSOC Br. 57. Without access to the record, MetLife lacked a meaningful opportunity to respond to FSOC's evidentiary showing *before* the Company was designated. *See Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard *at a meaningful time* and in a meaningful manner.") (emphasis added; internal quotation marks omitted). Absent an opportunity to review the record *prior to* final agency action, MetLife's right to respond was illusory.

FSOC is likewise wrong to suggest that designation does not impose immediate consequences and therefore does not implicate due process. FSOC Br. 57, 59. MetLife became

subject to additional regulatory burdens the moment it was designated, *see, e.g.*, 12 U.S.C. §§ 5331, 5361, 5365, including regulation and examination by, and reporting to, the Federal Reserve.  Additionally, it is now required to prepare a resolution plan detailing how the Company could be resolved in the event of material financial distress and insolvency, which will entail a significant expenditure of time, resources, and money.  *See* JA 2346 (MetLife, Inc., Annual Report (Form 10-K), at 18 (Feb. 27, 2014)).

Several other features of FSOC's designation process compound these constitutional shortcomings.  In particular, FSOC relied on new methodologies in the Final Designation that were not included in its Proposed Designation.  For example, FSOC introduced for the first time in the Final Designation its Monte Carlo simulation, which assumed that MetLife's management would irrationally sell assets in a random order.  JA 551, 563-64.  Had MetLife known that FSOC was considering using a Monte Carlo simulation, it could have shown FSOC that the simulation was flawed when used in this context.  *See supra* at 54.  Because FSOC revealed this and other aspects of its analysis only in the Final Designation, MetLife had no opportunity to respond before it was designated.  *See also, e.g.*, JA 437 (introducing a new calculation purportedly resulting in a lower liability coverage ratio for the Executive Life insolvency).

In addition, MetLife was unable to respond to FSOC's assessment of the effects of material financial distress at MetLife because FSOC never identified with any measure of specificity the cause of that distress, the dimensions of the distress, or the broader macroeconomic environment in which the distress occurred.  By assuming a cataclysmic event that caused both financial distress at MetLife and serious damage to the broader U.S. economy, but failing to identify that event or its origins, the Final Designation deprived MetLife of the

ability to present evidence establishing that the event would not occur, or that, even in that

hypothetical context, MetLife would not pose any risk to U.S. financial stability.

Finally, FSOC's designation methodology violated MetLife's due process rights because

it is unconstitutionally vague.  It is well established that "if arbitrary and discriminatory

enforcement is to be prevented, laws must provide explicit standards for those who apply them,"

and must give a "person of ordinary intelligence a reasonable opportunity to know" what the law

is, so that "he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

This bedrock principle of due process has been "thoroughly incorporated into administrative

law."  *Gen. Electric Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995) (internal quotation marks

omitted).  FSOC, however, refused to define the thresholds that it applied to designate MetLife

or how the designation factors were weighed against one another.  It also repeatedly declined to

provide MetLife copies of FSOC's *only precedents* to date, the non-public designation

determinations of AIG, General Electric Capital Corporation, and Prudential—even though in

this litigation, it produced copies of the MetLife designation decision (with confidential business

information redacted) to various professors and other third parties so they could prepare *amicus*

briefs supporting FSOC.  FSOC's refusal to disclose the earlier precedents to MetLife deprived it

of the ability to tailor its submissions in a manner responsive to FSOC's concerns and to take

measures that could have potentially avoided designation altogether.  In all of these respects,

FSOC violated MetLife's due process rights.

### B.      The Final Designation Violated The Separation Of Powers.

FSOC's designation of MetLife also violated the separation of powers because the same

officials who investigated MetLife's eligibility for designation and produced the Proposed

Designation presided at MetLife's oral hearing and issued the Final Designation adopting their

own "proposed" judgments.  FSOC does not dispute that its ten voting and five non-voting

members exercise legislative, investigative, prosecutorial, and adjudicative functions with no divisions among them. This conflation of the roles of advocate and adjudicator cannot be reconciled with bedrock separation-of-powers principles.[25]

In *Stevenson v. Willis*, 579 F. Supp. 2d 913 (N.D. Ohio 2008), for example, the court concluded that the plaintiff had stated a claim under 42 U.S.C. § 1983 for denial of her due process rights in a suit against a metropolitan housing authority that had rescinded the plaintiff's housing benefits because "a *single individual* in the agency's employ performing the dual functions of advocate and adjudicator . . . raise[d] very serious constitutional concerns." *Id.* at 920. The court explained that, even absent any allegation of partiality, due process may be violated where a person serving as both advocate and adjudicator "[a]ct[ed] as a filter . . . [and] had an opportunity as advocate to construct the proof in a way that she could anticipate—even before the hearing started—[that] she, in her capacity as adjudicator for the agency would find to suffice to rule [on] its behalf." *Id.*; *see also* Report of the Attorney General's Committee on Administrative Procedure, S. Doc. No. 77-8, at 56 (1st Sess. 1941) (recommending the creation of independent administrative law judges because an official "who has buried himself in one side of an issue is disabled from bringing to its decision . . . dispassionate judgment").

That is precisely what happened here. FSOC subjects companies to new, burdensome, and costly regulation following an adversarial process in which the very same people who *built the case* against the company, and *assess the sufficiency of the evidence* that they collected

---

[25] This combination of distinct powers in the same officials also violates the APA. *See* 5 U.S.C. § 554(d) ("An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review"); *see also Grolier Inc. v. FTC*, 615 F.2d 1215 (9th Cir. 1980).

relative to evidence submitted by the company, *determine the company's procedural rights* in the proceeding, and ultimately *decide* whether the company should be designated.

FSOC's attempt to equate what even the agency's own *amici* describe as its "unusual structure," Professors of Law and Finance Amicus Br. 12 (Dkt. 30-1), with those of other "administrative process[es]" is unavailing.  FSOC's composition differs substantially from that of other agencies—including the Securities and Exchange Commission and Federal Trade Commission—that are divided into separate investigative, enforcement, and adjudicatory offices and required to have no more than a fixed number of members of the same political party as the President.  *See FTC v. Atl. Richfield Co.*, 567 F.2d 96, 102 (D.C. Cir. 1977) (The FTC "and the other regulatory agencies have two separate functions to perform, investigative and adjudicative. It is also recognized that the regulatory agencies have an obligation to keep those roles separate insofar as is possible, in order to insure the judicial fairness of adjudicative proceedings . . . ."). None of these structural protections exists at FSOC, which, rather than a formally structured agency, is a committee of individuals who hold positions likely to be filled by close presidential confidants and who each perform investigative, prosecutorial, and judicial functions that the Constitution requires be undertaken by separate officials.[26]  Moreover, the constitutionality of proceedings before the SEC is itself the subject of active dispute.  *See* Jean Eaglesham, *Federal*

---

[26] *Withrow v. Larkin*, 421 U.S. 35 (1975), is not to the contrary.  There, the Supreme Court rejected a doctor's due process challenge to a procedure in which a medical board collected information about the doctor's activities, determined that he had engaged in proscribed conduct, and temporarily suspended his license. *Id.* at 41-42.  The Court determined that "[t]he processes utilized by the Board . . . [did] not in themselves contain an unacceptable risk of bias" because the doctor "and his counsel were permitted to be present throughout" the hearing and "counsel . . . knew the facts presented to the Board," *id.* at 54-55.  The Court further emphasized that the investigative and prosecutorial functions had apparently been divided among the board's staff. *Id.* at 54 n.20.  Here, in contrast, MetLife was repeatedly denied access to the administrative record, and the same agency officials were responsible for the investigative, prosecutorial, and adjudicative elements of the designation proceeding.

*Judge Rules SEC In-House Judge's Appointment "Likely Unconstitutional,"* Wall St. J. (June 8, 2015), http://www.wsj.com/articles/federal-judge-rules-sec-in-house-judges-appointment-likely-unconstitutional-1433796161; *see also Hill v. SEC*, No. 15-1801, 2015 U.S. Dist. LEXIS 74822, *54-*55 (N.D. Ga. June 8, 2015) (preliminarily enjoining SEC proceeding on ground that administrative law judge's appointment likely violated the separation of powers).

### C.     Injunctive Relief Is Appropriate To Remedy FSOC's Constitutional Violations.

These constitutional infirmities warrant injunctive relief.  The fact that the Dodd-Frank Act provides for rescission of arbitrary and capricious designation determinations, *see* FSOC Br. 60, does not preclude this Court from exercising its inherent equitable powers to grant an injunction preventing the *further* deprivation of MetLife's constitutional rights.  *See Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998).  MetLife satisfies the requirements for injunctive relief because a constitutional violation constitutes irreparable harm, monetary damages are inadequate to compensate MetLife for FSOC's constitutional violations, and the balance of hardships and the public interest favor the vindication of MetLife's constitutional rights.  *See DynaLantic Corp. v. U.S. Dep't of Defense*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012).

### CONCLUSION

For the foregoing reasons, the Court should deny FSOC's motion and grant MetLife summary judgment on all of its claims, and declare FSOC's designation of MetLife to be arbitrary and capricious, direct FSOC to rescind the Final Designation, and enjoin FSOC from instituting further designation proceedings with respect to MetLife.

Respectfully submitted,

Dated: June 16, 2015

/s/ Eugene Scalia
Eugene Scalia (D.C. Bar No. 447524)
   *Counsel of Record*
EScalia@gibsondunn.com
Amir C. Tayrani (D.C. Bar No. 490994)

Indraneel Sur (D.C. Bar No. 978017)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:  (212) 351-4000
Facsimile:  (212) 351-4035

Ashley S. Boizelle (D.C. Bar No. 1010322)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539

*Attorneys for Plaintiff MetLife, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 27th day of January, 2016, I caused the foregoing Final Redacted Motion for Summary Judgment and Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion to Dismiss, or, in the alternative, for Summary Judgment to be filed with the Clerk of the Court for the United States District Court for the District of Columbia via the Court's CM/ECF system.  I further certify that service was accomplished on all parties via the Court's CM/ECF system.


/s/ Eugene Scalia
Eugene Scalia