## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**METLIFE, INC.,**                      )
                                        )
      **Plaintiff,**            )
                                        )
      **v.**                   )     **Civil Action No. 15-0045 (RMC)**
                                        )
**FINANCIAL STABILITY**                 )
**OVERSIGHT COUNCIL,**                  )
                                        )
      **Defendant.**            )
_____ )

### SEALED OPINION

The Financial Stability Oversight Council (FSOC) has determined that "material financial distress" at MetLife, Inc. could "pose a threat to the financial stability of the United States." The quoted phrases come from the Dodd-Frank Act, 12 U.S.C. § 5323(a)(1), and were defined by FSOC in formal guidance issued years before MetLife's designation. During the designation process, two of FSOC's definitions were ignored or, at least, abandoned. Although an agency can change its statutory interpretation when it explains why, FSOC insists that it changed nothing. But clearly it did so. FSOC reversed itself on whether MetLife's vulnerability to financial distress would be considered and on what it means to threaten the financial stability of the United States.

FSOC also focused exclusively on the presumed benefits of its designation and ignored the attendant costs, which is itself unreasonable under the teachings of *Michigan v. Environmental Protection Agency*, 135 S. Ct. 2699 (2015). While MetLife advances many other arguments against its designation, FSOC's unacknowledged departure from its guidance and express refusal to consider cost require the Court to rescind the Final Determination.

# I. FACTS

The following facts are culled from the Complaint, the Joint Appendix (JA) and the parties' four final briefs: Def. Mot. for Summ. J. [Dkt. 84-1] (FSOC Mot.); Pl. Opp'n & Mot. for Summ. J. [Dkt. 86-1] (MetLife Mot.); Def. Opp'n & Reply [Dkt. 84-2] (FSOC Reply); and Pl. Reply [Dkt. 86-2] (MetLife Reply).[1]

## A.  Designation under the Dodd-Frank Act

The 2008 financial crisis is widely considered the worst since the Great Depression.  During that crisis, "financial distress at certain nonbank financial companies contributed to a broad seizing up of financial markets and stress at other financial firms." *Authority to Require Supervision & Regulation of Certain Nonbank Financial Companies*, 77 Fed. Reg. 21,637, 21,637 (Apr. 11, 2012).  Aimed at preventing a reoccurrence, Section 113 of the Dodd-Frank Act empowers FSOC to designate certain nonbank financial companies for supervision by the Board of Governors of the Federal Reserve System (Federal Reserve) under enhanced prudential standards.  *See* 12 U.S.C. § 5323(a).

### 1.  Eligibility for designation

To be eligible for designation under Section 113(a), a designee must be a "U.S. nonbank financial company."  That term is defined under Dodd-Frank as a company incorporated or organized in the United States and "predominantly engaged in financial activities."  12 U.S.C. § 5311(a)(4)(B).  Dodd-Frank borrowed the definition of "financial activities" from Section 4(k) of the Bank Holding Company Act (BHCA), as amended, which

---

[1] These citations are to the public (redacted) versions of the briefs.  MetLife has since filed less redacted versions of their briefs, Dkts. 100-1 and 100-2, which do not differ in material respect from the versions cited herein.

lists nine activities that are "financial in nature."  *See* 12 U.S.C. § 1843(k)(4)(A)-(I).  Two of

those activities are relevant here:

> (B) Insuring, guaranteeing, or indemnifying against loss, harm, damage, illness, disability, or death, or providing and issuing annuities, and acting as principal, agent, or broker for purposes of the foregoing, in any State.
> . . .
> (I) Directly or indirectly acquiring or controlling, whether as principal, on behalf of 1 or more entities (including entities, other than a depository institution or subsidiary of a depository institution, that the bank holding company controls) or otherwise, shares, assets, or ownership interests (including debt or equity securities, partnership interests, trust certificates or other instruments representing ownership) of a company or other entity, whether or not constituting control of such company or entity, engaged in any activity not authorized pursuant to this section if-
>
> > (i) the shares, assets, or ownership interests are not acquired or held by a depository institution or a subsidiary of a depository institution;
> >
> > (ii) such shares, assets, or ownership interests are acquired and held by an insurance company that is predominantly engaged in underwriting life, accident and health, or property and casualty insurance (other than credit-related insurance) or providing and issuing annuities;
> >
> > (iii) such shares, assets, or ownership interests represent an investment made in the ordinary course of business of such insurance company in accordance with relevant State law governing such investments; and
> >
> > (iv) during the period such shares, assets, or ownership interests are held, the bank holding company does not routinely manage or operate such company except as may be  necessary or required to obtain a reasonable return on investment.

*Id.* §§ 1843(k)(4)(B), (I).

These provisions were added to the BHCA by the Gramm-Leach-Bliley Act, Pub.

L. 106-102, § 103(a), 113 Stat. 1338, 1342-45 (1999).  The purpose of Gramm-Leach-Bliley was

to repeal the Glass-Steagall Act's prohibition on banks affiliating with securities firms and other

financial institutions, and thus to "enhance competition in the financial services industry."  *See*

*id.* § 101.

The Federal Reserve promulgated regulations to implement Gramm-Leach-Bliley. *See Regulation Y, Bank Holding Companies & Change in Bank Control*, 66 Fed. Reg. 400 (Jan. 3, 2001) (codified at 12 C.F.R. § 225).  Referring to the activities listed above, the Federal Reserve indicated that they may be conducted "at any location in the United States or at any location outside of the United States subject to the laws of the jurisdiction in which the activity is conducted."  12 C.F.R. § 225.85(b) (citing *id.* § 225.86(c) (citing Section 4(k) of the BHCA, 12 U.S.C. §§ 1843(k)(4)(A)-(E), (H), (I))).  This regulation had been in place for nine years before Dodd-Frank incorporated the BHCA definition of "financial in nature."  When the Federal Reserve later promulgated regulations specifically for Dodd-Frank, those regulations merely parroted the statutory definitions above.  *See* 78 Fed. Reg. 20,756, 20,778, 20,781 (Apr. 5, 2013).

To be "predominantly engaged" in financial activities, a company must satisfy either of two tests under Dodd-Frank Section 102.  *See* 12 U.S.C. § 5311(a)(6).  Under the first test, 85 percent or more of a company's "consolidated annual gross revenues" must be "derived" from activities that are "financial in nature."  *Id.* § 5311(a)(6)(A).  Under the second test, 85 percent or more of the "consolidated assets of the company" must be "related to activities that are financial in nature."  *Id.* § 5311(a)(6)(B).  If either test is satisfied, a company is "predominantly engaged" in financial activities and eligible for designation by FSOC.

### 2.  Statutory considerations and consequences

Eligible companies may be designated by FSOC for enhanced supervision under either of two determination standards: (1) when "material financial distress" at a company "could pose a threat to the financial stability of the United States"; or (2) when the very "nature, scope, size, scale, concentration, interconnectedness, or mix of the [company's] activities" could pose

the same threat.  12 U.S.C. § 5323(a)(1).  *See generally* 12 C.F.R. § 1310 App. A.  FSOC relied

only on the First Determination Standard when designating MetLife.

      Congress identified ten factors that FSOC must consider when assessing whether

material financial distress at a company could pose a threat to the national economy:

> (A) the extent of the leverage of the company;
>
> (B) the extent and nature of the off-balance-sheet exposures of the company;
>
> (C) the extent and nature of the transactions and relationships of the company with other significant nonbank financial companies and significant bank holding companies;
>
> (D) the importance of the company as a source of credit for households, businesses, and State and local governments and as a source of liquidity for the United States financial system;
>
> (E) the importance of the company as a source of credit for low-income, minority, or underserved communities, and the impact that the failure of such company would have on the availability of credit in such communities;
>
> (F) the extent to which assets are managed rather than owned by the company, and the extent to which ownership of assets under management is diffuse;
>
> (G) the nature, scope, size, scale, concentration, interconnectedness, and mix of the activities of the company;
>
> (H) the degree to which the company is already regulated by 1 or more primary financial regulatory agencies;
>
> (I) the amount and nature of the financial assets of the company;
>
> (J) the amount and types of the liabilities of the company, including the degree of reliance on short-term funding.

12 U.S.C. § 5323(a)(2).  In addition, FSOC "shall consider . . . any other risk-related factors that

[it] deems appropriate."  *Id.* § 5323(a)(2)(K).

Upon designation, a company becomes subject to "enhanced supervision" and "prudential standards" that are not yet set by the Federal Reserve.  *See generally* 12 U.S.C. § 5365.  The prudential standards shall include, at a minimum:

> (i) risk-based capital requirements and leverage limits, [subject to limited exception];
>
> (ii) liquidity requirements;
>
> (iii) overall risk management requirements;
>
> (iv) resolution plan and credit exposure report requirements; and
>
> (v) concentration limits.

*Id.* § 5365(b)(1)(A).  The Federal Reserve may also establish "additional standards," such as:

> (i) a contingent capital requirement;
>
> (ii) enhanced public disclosures; [and]
>
> (iii) short-term debt limits;

*Id.* § 5365(b)(1)(B).  Further, the Federal Reserve is authorized to establish "such other prudential standards as [it] determines are appropriate."  *Id.* § 5365(b)(1)(B)(iv).[2]

It is undisputed here that no specific prudential standards had been established by the Federal Reserve for MetLife when it was designated by FSOC.  *See* Compl. ¶ 82 ("[T]he Board [of Governors of the Federal Reserve] has not yet promulgated enhanced prudential standards for designated insurers . . .");  *id.* ¶ 86 ("FSOC's designation of MetLife in the absence of these yet-to-be-promulgated rules and procedures was arbitrary and capricious . . .");  *cf.* FSOC

---

[2] Any such "other prudential standards" must be consistent with 12 U.S.C. § 5325(b)(1), which generally cabins FSOC recommendations to: (A) risk-based capital requirements; (B) leverage limits; (C) liquidity requirements; (D) resolution plan and credit exposure report requirements; (E) concentration limits; (F) a contingent capital requirement; (G) enhanced public disclosures; (H) short-term debt limits; and (I) overall risk management requirements.

Mot. at 39 ("[T]he statute plainly contemplates that the Council's designation may precede the adoption of prudential standards.").[3]

### 3. FSOC's Guidance

FSOC promulgated through formal rulemaking both a Final Rule and an Appendix to that Rule, entitled "[FSOC] Guidance for Nonbank Financial Company Determinations" (Guidance). FSOC issued an advanced notice of proposed rulemaking, 75 Fed. Reg. 61,653 (Oct. 6, 2010) (ANPR), and two further notices of proposed rulemaking, 76 Fed. Reg. 4,555 (Jan. 26, 2011) (1st NPR) and 76 Fed. Reg. 64,264 (Oct. 18, 2011) (2d NPR). The Final Rule was published on April 11, 2012. *See* 77 Fed. Reg. 21,637 (FR), *codified at* 12 C.F.R. § 1310. Along with its second notice of proposed rulemaking, FSOC had also proposed the Guidance. 2d NPR at 64,277.[4] Public comments were received on the Guidance, *see* FR at 21,640-47, which was somewhat modified in the Final Rule. *See* FR at 21,656-62, *codified at* 12 C.F.R. § 1310 App. A.

### a. Vulnerability

In its first notice of proposed rulemaking, FSOC reorganized the ten statutory factors into six "categories" of consideration: (1) Interconnectedness; (2) Substitutability; (3)

---

[3] The Federal Reserve had promulgated some categorical rules, such as one governing "Supervisory and Company-Run Stress Test Requirements for Covered Companies," 77 Fed. Reg. 62,378 (Oct. 12, 2012). After MetLife was designated, FSOC did promulgate its "Application of Enhanced Prudential Standards and Reporting Requirements to General Electric Capital Corporation," another company designated under Dodd-Frank Section 113. *See* 80 Fed. Reg. 44,111 (July 24, 2015).

[4] FSOC issued its regulations "to set forth the standards and procedures governing Council determinations under section 113 of the Dodd-Frank Act (12 U.S.C. 5323), including whether material financial distress at a nonbank financial company . . . could pose a threat to the financial stability of the United States, and whether a nonbank financial company shall be supervised by the Board of Governors . . . ." 12 C.F.R. § 1310.1(b).

Size; (4) Leverage; (5) Liquidity Risk and Maturity Mismatch; and (6) Existing Regulatory Scrutiny.  1st NPR at 4,560.  According to FSOC, the first three categories "seek to assess the potential for spillovers from the firm's distress to the broader financial system or real economy."  *Id.*  The second three categories "seek to assess how vulnerable a company is to financial distress."  *Id.*  FSOC reasoned that companies "that are highly leveraged, that have a high degree of liquidity risk or maturity mismatch, and that are under little or no regulatory scrutiny are more vulnerable to financial distress."  *Id.*[5]

This characterization of the second three factors remained in the Final Rule.  *See* FR at 21,641 ("The remaining three categories . . . seek to assess the vulnerability of a nonbank financial company to financial distress.").[6]

### b.  Threat to the financial stability of the United States

The phrase "could pose a threat to the financial stability of the United States" is open to numerous interpretations.  In its Guidance, FSOC explained how it interpreted the term:

---

[5] The public questioned FSOC's hypothesis, specifically as it related to liquidity risk and maturity mismatch in the insurance industry.  2d NPR at 64,266-67 ("Commenters from the insurance industry noted that the insurance industry has had very little liquidity risk traditionally.")  *Id.*  FSOC did not address these comments.

[6] Inasmuch as FSOC engaged in notice-and-comment procedures before issuing its Guidance, the Court treats it as resulting from formal rulemaking.  *See* 5 U.S.C. §§ 553(b)-(c).  FSOC has never argued that the Guidance was an "interpretive rule" within the meaning of 5 U.S.C. § 553(b)(3)(A) and thus exempt from notice-and-comment requirements.  *See generally* FSOC Mot.; FSOC Reply.  Despite being titled "Guidance," and often called "interpretive guidance" by FSOC, *e.g.* FR at 21,637, "the label an agency places on a rule is not dispositive."  *Pharm. Research & Mfrs. of Am. v. United States Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 46 n.18 (D.D.C. 2014) (quoting *Truckers United for Safety v. Fed. Highway Admin.*, 139 F.3d 934, 939 (D.C. Cir. 1998)).  And even if the Guidance were an "interpretive rule" under 5 U.S.C. § 553(b)(3)(A), the agency would still be required—to avoid acting arbitrarily and capriciously—to explain any changes.  *See Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) (making clear that *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) applies to interpretive rules as well as to legislative rules).

> The Council will consider a "threat to the financial stability of the United States" to exist if there would be an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy.

2d NPR at 64,277.  This definition was unchanged in the Final Rule, FR at 21,657, *codified at* 12 C.F.R. § 1310 App. A.II.a.

FSOC further elaborated that "significant damage on the broader economy" might be inflicted through any of three "transmission channels": (1) Exposure, (2) Asset Liquidation, or (3) Critical Function or Service.  *Id.*  In designating MetLife, FSOC relied on the Exposure and Asset Liquidation channels.  The Guidance defined the Exposure channel:

> A nonbank financial company's creditors, counterparties, investors, or other market participants have exposure to the nonbank financial company that is significant enough to materially impair those creditors, counterparties, investors, or other market participants and thereby pose a threat to U.S. financial stability.

12 C.F.R. § 1310 App. A.II.a.  The Guidance added that FSOC "expects to consider metrics including total consolidated assets, credit default swaps outstanding, derivative liabilities, total debt outstanding, and leverage ratio" in its analysis of Exposure.  *Id.*

The Guidance also defined Asset Liquidation and described how financial distress might destabilize the United States through that channel:

> A nonbank financial company holds assets that, if liquidated quickly, would cause a fall in asset prices and thereby significantly disrupt trading or funding in key markets or cause significant losses or funding problems for other firms with similar holdings.  This channel would likely be most relevant for a nonbank financial company whose funding and liquid asset profile makes it likely that it would be forced to liquidate assets quickly when it comes under financial pressure.  For example, this could be the case if a large nonbank financial company relies heavily on short-term funding.  In its initial analysis of nonbank financial companies with respect to this channel, [FSOC] expects to consider metrics including total consolidated assets and short-term debt ratio.

*Id.*

### d. The evaluation and designation process

The Guidance unveiled a phased analytical process which FSOC "expect[ed] generally" to follow. *Id.* App. A.III. During Stage 1, a "set of uniform quantitative metrics" would be applied "to a broad group of nonbank financial companies" for the purpose of identifying "a group of nonbank financial companies that are most likely to satisfy one of the Determination Standards." *Id.* The Guidance stated that this preliminary analysis would be based solely on "existing public and regulatory sources." *Id.* In Stage 1, FSOC intended to "apply thresholds that relate to the framework categories of size, interconnectedness, leverage, and liquidity risk and maturity mismatch." *Id.* III.a. The Guidance informed the public that "[t]hese thresholds are intended to measure both the susceptibility of a nonbank financial company to financial distress and the potential for that nonbank financial company's financial distress to spread throughout the financial system." *Id.*

A further evaluation would be conducted at Stage 2, during which the selected group of nonbank financial companies would be "analyzed and prioritized." *Id.* App. A.III. Stage 2 was to be "based on a wide range of quantitative and qualitative information available to [FSOC] primarily through public and regulatory sources." *Id.* FSOC would consult with "primary financial regulatory agencies or home country supervisors," including those for "each significant subsidiary," and would rely on information from the Office of Financial Research and FSOC's member agencies. *Id.* When MetLife was being considered by FSOC, Stages 1 and 2 were completely internal to FSOC; they were not made public, even to MetLife.

Only when a company was selected for a Stage 3 "in-depth evaluation," was it notified that it was under scrutiny.  At that point, a company was invited to submit information and request a hearing.  *Id.* (citing Dodd-Frank Section 113(e), 12 C.F.R. § 1310.21(c)).

## B. MetLife's Designation

On July 16, 2013, FSOC notified MetLife that it was being considered for designation, *i.e.*, that it had reached Stage 3.  JA 345.  Between September 2013 and September 2014, FSOC staff[7] met with MetLife's representatives 12 times, and MetLife submitted more than 21,000 pages of materials for evaluation.  *Id.*  On September 4, 2014, FSOC voted to make a proposed determination regarding MetLife.  *Id.*  A hearing was held on November 3, 2014, before and after which MetLife was allowed to submit additional materials on its behalf.  *Id.*

On December 18, 2014, FSOC voted 9-1 to designate MetLife under Dodd-Frank Section 113.  JA 342.  On that same day, MetLife was given FSOC's *Explanation of the Basis of Final Determination*, JA 342-644 (Final Determination or FD).  FSOC determined that MetLife was eligible for designation under Dodd-Frank Section 102(a)(6), 12 U.S.C. § 5311(a)(6).  *See* JA 381.  FSOC based its designation on the First Determination Standard, *i.e.*, FSOC concluded that "material financial distress" at MetLife "could pose a threat to the financial stability of the United States."  *See* JA 368.  FSOC did not expressly rely on MetLife's nature, scope, size, scale, concentration, interconnectedness, or the mix of its activities to forecast such a threat.

---

[7] "FSOC staff" is not really an accurate term.  The agencies that comprise FSOC, *see* 12 U.S.C. § 5321(b), are authorized to loan personnel to perform work for FSOC, but loaned staff members remain employees of, and are paid by, their originating agencies.  2/10/2016 Hr'g Tr. at 29:14-18 ("[FSOC]: [T]he statute provides that any federal agency may provide the Council with facility, staff and support and that's in Section 111[(d)] of Dodd-Frank.  So that's generally how the agency is staffed.  In other words, Council's staff are employees of other federal agencies.").

FSOC analyzed instead whether material financial distress could spread through the Exposure or Asset Liquidation channels.

The Final Determination reached four primary conclusions.  *See* FSOC Mot. at 15-18.  First, exposed counterparties could suffer significant losses if MetLife experienced material financial distress.  JA 417 (FD § 4.2).  Second, the same financial distress might prompt MetLife to liquidate assets quickly and thereby disrupt capital markets.  JA 484 (FD § 4.3).  Third, existing regulatory scrutiny would not be able to stop either threat from being realized.  JA 579 (FD § 5).  Fourth, MetLife's complexity would hamper its resolution and thus "prolong uncertainty, requiring complex coordination among numerous regulators, receivers, or courts that would have to disentangle a vast web of intercompany agreements."  FSOC Mot. at 17; *see also* JA 593 (FD § 6).

## II.  LEGAL STANDARD

Dodd-Frank Section 113(h) provides that a designated company may seek judicial review "in the United States district court for the judicial district in which the home office of such nonbank financial company is located, or in the United States District Court for the District of Columbia."  12 U.S.C. § 5323(h).  The district court is empowered either to "dismiss such action or [to] direct the final determination to be rescinded."  *Id.*  The court's review is expressly "limited to whether the final determination made under this section was arbitrary and capricious."  *Id.*

The "arbitrary and capricious" standard is a familiar one.  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Under this "[h]ighly deferential" standard, *AT&T Corp.*

*v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000), a court "will not disturb the decision of an agency

that has examined the relevant data and articulated a satisfactory explanation for its action," *MD*

*Pharm., Inc. v. DEA*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quotation marks and alterations omitted).

The Court considers only "whether the decision was based on a consideration of the relevant

factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43

(citation omitted).  The Court must affirm "if a rational basis for the agency's decision is

presented, even though [the court] might otherwise disagree." *Envtl. Def. Fund, Inc. v. Costle*,

657 F.2d 275, 283 (D.C. Cir. 1981) (internal citation omitted).

  The standard is not toothless.  "An agency may not, for example, depart from a

prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683,

696 (1974)).  "It would be arbitrary or capricious to ignore such matters." *Fox Television*, 556

U.S. at 515.  Indeed, "when its prior policy has engendered serious reliance interests that must be

taken into account," the agency must "provide a more detailed justification than what would

suffice for a new policy created on a blank slate." *Id.* (citing *Smiley v. Citibank (South Dakota),*

*N.A.*, 517 U.S. 735, 742 (1996)).

  Agencies must also engage in "reasoned decisionmaking," which requires

"consideration of [all] the relevant factors." *Michigan v. EPA*, 135 S. Ct. 2699, 2706 (2015)

(quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998), *State Farm*,

463 U.S. at 43 (internal quotation marks omitted)).

### III.  ANALYSIS

  The Court will rescind the Final Determination on two grounds.  First, FSOC

made critical departures from two of the standards it adopted in its Guidance, never explaining

such departures or even recognizing them as such.  That alone renders FSOC's determination

process fatally flawed.  Additionally, FSOC purposefully omitted any consideration of the cost

of designation to MetLife.  Thus, FSOC assumed the upside benefits of designation (even

without specific standards from the Federal Reserve) but not the downside costs of its decision.

That is arbitrary and capricious under the latest Supreme Court precedent.  *See Michigan*, 135 S.

Ct. 2699.  The Court will grant summary judgment on Counts IV, VI (in part) and VII, rescind

the Final Designation, and enter judgment in favor of MetLife.[8]

Before reaching those arguments, however, the Court addresses MetLife's

preliminary argument that it is ineligible for designation under Dodd-Frank.

**A.  MetLife is Eligible for Designation**

The Court concludes as an initial matter that MetLife is eligible for designation.

Count I of the Complaint (¶¶ 75-79) alleges that foreign activities cannot qualify as "financial"

under Section 4(k) of the BHCA.  MetLife draws from the terms "in any State" in 12 U.S.C.

§ 1843(k)(4)(B) and "relevant State law" from § 1843(k)(4)(I)(iii).  Because more than 30% of

MetLife's consolidated assets and more than 25% of its consolidated revenues are

extraterritorial, MetLife argues that it cannot be "predominantly engaged" in "financial"

activities.  Compl. ¶ 78.

FSOC calls this argument disingenuous.  It points out that when MetLife sought

registration as a financial holding company in 2000, it certified that "the vast majority of [its

subsidiaries] are engaged in activities that are 'financial in nature' as expressly identified and

described in the BHCA."  JA 2522 (9/29/2000 Memorandum from Mayer, Brown & Platt on

---

[8] Because these failures are fatal to the Final Determination, the Court does not reach MetLife's
other arguments for rescission.

Behalf of MetLife, Inc. to the Federal Reserve).[9]   The Federal Reserve conferred financial-holding-company status upon MetLife, agreeing that it was engaged "in a variety of other financial activities in the United States *and internationally*."   JA 383-84 & n.162 (citing MetLife, Inc., 87 Federal Reserve Bulletin 268, at 2 (2001) (emphasis added)).   Some years later, MetLife proposed to acquire American Life Insurance Company (ALICO).   The Board approved this acquisition by letter dated October 29, 2010.   *See* JA 2566-70.   While acknowledging that only 2% of ALICO's revenues came from domestic operations, JA 2568 n.10, the Board nonetheless concluded that all of ALICO's activities were "financial in nature under section 4(k)(4) of the BHC Act."   JA 2566.   Having achieved the benefit of bank-holding-company and financial-holding-company statuses, MetLife cannot now, according to FSOC, reverse course.   FSOC adds that the Board's characterization in its 2010 letter was consistent with its long-held view that the activities identified in Section 4(k)(4) comprise both domestic and foreign operations.   *See* 12 C.F.R. § 225.85(b), *supra*.   The Board has exclusive authority to interpret the BHCA.   *See* 12 U.S.C. § 1844(b); *Whitney Nat'l Bank v. Bank of New Orleans & Trust Co.*, 379 U.S. 411, 419-21 (1965).

---

[9] This memorandum is interesting in several respects.   *See generally* JA 2522-33.   MetLife's primary argument at the time was that it qualified under § 1843(k)(4)(I), the portfolio-investment activity.   MetLife argued that all of its subsidiaries "are permissible investments" because "they satisfy each of the four conditions" in § 1843(k)(4)(I).   MetLife argued further that the vast majority of "Metropolitan Life Companies" were also authorized under § 1843(4)(k)(B) (the insurance activity).   *See* JA 2529, 2531.   In Chart A, JA 2534-47, MetLife listed all of its companies and denoted which were "financial" and under which BHCA category.   Chart A included some foreign subsidiaries listed under § 1843(k)(4)(B).   For example, "Metropolitan Life Seguros De Vida, S.A." was denoted as "financial" because it "[s]ells individual life insurance products in Uruguay," JA 2542; "P.T. MetLife Sejahtera (Indonesia)" was denoted as "financial" because it is an "Insurance agency," JA 2543; and "RGA International Ltd. (Canada)" was deemed "financial" because it is a "Reinsurer," JA 2544.   These subsidiaries would not qualify as engaged in "financial activities" if "in any State" meant only domestically.

MetLife seeks cover under Dodd-Frank's text, which says and "in accordance with relevant State law."  12 U.S.C. § 1843(k)(4)(I)(iii).[10]  However, MetLife's motion departs in significant respect from its Complaint.  The Complaint alleged that MetLife's foreign subsidiaries were not engaged in "financial activities" under Subsection (I) because foreign investments cannot, by definition, be made "in accordance with relevant State law."  *See* Compl. ¶ 77 ("Section[] 4(k)(4)(I) extend[s] only to the activities of an insurer that occur in the United States or are otherwise subject to state law.").  MetLife concedes in its motion that ALICO's foreign investments actually are made in accordance with Delaware law.  MetLife Mot. at 22 n.8. MetLife now argues that ALICO's investments "do not meet the other conditions in Section 4(k)(4)(I)," an allegation not made in the Complaint.  *Id.*  MetLife's current arguments with regard to Subsection (I) are thus (1) that ALICO's investments are "strategic," not "portfolio"; and (2) that MetLife "routinely manages and operates through, among other things, the use of interlocking directors and officers, common corporate policies, and corporate reporting lines." MetLife Mot. at 22 n.8.

### 1.  MetLife's foreign activities are "financial" under 12 U.S.C. § 1843(k)(4)(I) (Investments)

Neither of MetLife's current arguments was made in its Complaint or, apparently, before FSOC.  *Cf.* JA 381 (Final Designation) ("MetLife argues that section 4(k)(4)(I)'s requirement that investments be made 'in accordance with relevant State law' means that MetLife's activities outside of the United States are not financial activities under section 4(k)(4)(I).").  The arguments were therefore waived.  *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) ("It is a hard and fast rule of administrative law, rooted in

---

[10] Because it concludes that MetLife qualifies under Subsection (I), the Court does not address whether it qualifies under Subsection (B).

simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.") (internal alterations omitted).

Apart from being waived, the arguments have no merit. MetLife proposes a novel distinction between "portfolio" investments and "strategic" investments, arguing that ALICO holds the latter but not the former. That distinction is nowhere in the statute, and the Court sees no reason to adopt it. In addition, there is legislative history to suggest that "the use of interlocking directors and officers, common corporate policies, and corporate reporting lines," MetLife Mot. at 22 n.8, does not suffice for "routine[] manage[ment] or operat[ion]" under Section 4(k)(4)(I)(iv). *See* H.R. Rep. No. 106-434 at 155 (1999) (Conference Report) (suggesting that a parent company's limited management, in accordance with requirements of state insurance law, was acceptable "irrespective of any overlap between board members and officers of the [parent company] and the portfolio company."). Section 4(k)(4)(I) also provides an exception for parental management "as may be necessary or required to obtain a reasonable return on investment." 12 U.S.C. § 1843(k)(4)(I)(iv). MetLife does not argue that MetLife, Inc. manages ALICO for any purpose other than to ensure a reasonable return on investment.

The first of MetLife's arguments has been abandoned; the other two were waived. Even if they were considered, they would fail. MetLife qualifies for designation under 12 U.S.C. § 1843(k)(4)(I).

### 2. MetLife's foreign assets are "related to" financial activities

At a bare minimum, MetLife's foreign insurance subsidiaries (*i.e.*, its foreign assets) are "related to" its financial activities even if the foreign insurance activities are not themselves "financial."

MetLife alleges in its Complaint that "FSOC further posited, without support, that the consolidated assets of MetLife and its subsidiaries need only be 'related to'—rather than directly attributable to—financial activities to count toward the 85% threshold." Compl. ¶ 72(a). MetLife puts "related to" in quotes as if to chide FSOC for using that language, but that is the statutory language. *See* 12 U.S.C. § 5311(a)(6)(B). MetLife's proposed standard ("directly attributable to") finds no mention in the statute.[11]

MetLife's response is that its foreign assets are "two steps removed" from its domestic financial activities "and accordingly not related to" them. MetLife Mot. at 25. MetLife cuts its "two steps" test from whole cloth and gives no reason why the assets are "accordingly" not related. Although no case has interpreted "related to" in this provision of the BHCA, courts have held that the ordinary meaning of "related to" is "'a broad one'" that generally means "'to have [some] bearing or concern []; refer; to bring into association with or connection with.'" *Friedman v. Sebelius*, 686 F.3d 813, 820 (D.C. Cir. 2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). Under this broad meaning, MetLife's foreign assets are clearly related to its domestic financial activities.

The Court affirms FSOC's conclusion that MetLife is eligible for designation under Dodd-Frank Section 102(a).

## B.  The Agency Reversed Itself without Acknowledgement or Explanation

"An initial agency interpretation is not instantly carved in stone." *Verizon v. FCC*, 740 F.3d 623, 636 (D.C. Cir. 2014) (quoting *Chevron U.S.A., Inc. v. Natural Resources*

---

[11] Recall the difference in tests between revenues (which must be "derived . . . from" financial activities) and assets (which need only be "related to" financial activities). *Compare id.* § 5311(a)(6)(A) *with id.* § 5311(a)(6)(B).

*Defense Council, Inc.*, 467 U.S. 837, 863 (1984)).[12]  However, the "reasoned decision-making ordinarily demands that an agency acknowledge and explain the reasons for a changed interpretation."  *Verizon*, 740 F.3d at 636.  The leading exposition of this rule comes from *Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).  Although it denies having changed course, FSOC invokes *Fox Television* for the proposition that any change was explained and, therefore, permissible.  FSOC is incorrect on both points.

### 1.  Vulnerability to material financial distress

MetLife argues that FSOC violated its own Guidance by failing to assess MetLife's vulnerability to material financial distress before addressing the potential effect of that distress.  *See* Compl. ¶¶ 95-99 (Count IV).  The Guidance said that FSOC would do so.  *See* 12 C.F.R. § 1310 App. A.II.d.1 (explaining that three categories of analysis "seek to assess the vulnerability of a nonbank financial company to financial distress"); *id.* (reasoning that companies "that are highly leveraged, that have a high degree of liquidity risk or maturity mismatch, and that are under little or no regulatory scrutiny are more likely to be more vulnerable to financial distress").  FSOC's explanation is that "the very risks that can make a company vulnerable to distress are the ones that can cause its distress to pose a threat to the broader economy."  FSOC Mot. at 34.  It reads the Guidance to dictate an evaluation of "whether, and how, the company's vulnerabilities, in a distress situation, could impact the broader financial system—not to assess whether distress could occur."  *Id.*

FSOC's current argument misstates its Guidance in consequential fashion.  The Guidance divided six categories of analysis into two distinct groups.  The first group (size,

---

[12] Under the *Chevron* framework, an agency merits deference to a reasonable interpretation of an ambiguous statute.  *King v. Burwell*, 135 S. Ct. 2480, 2488 (2015).

substitutability, and interconnectedness) was meant "to assess the potential impact of the

nonbank financial company's financial distress on the broader economy." 12 C.F.R. § 1310

App. A.II.d.1.  The second group (leverage, liquidity risk, and maturity mismatch) was meant "to

assess the vulnerability of a nonbank financial company to financial distress."  *Id.*  The

distinction was clear: FSOC intended the second group of analytical categories to assess a

company before it became distressed and the first group to assess the impact of such distress on

national financial stability.  Yet in the Final Determination, FSOC posited that all six categories

were meant *only* "to assess the potential effects of a company's material financial distress."  JA

370.  That is undeniably inconsistent.

FSOC's fallback position, taken for the first time at oral argument, is that any

change in position was justified and explained.  *See* 2/10/2016 Hr'g Tr. at 68:22-69:10 (alluding

to *Fox Television*, 556 U.S. 502).  *Compare* Hr'g Tr. at 68:22-69:10 *with* FSOC Mot. at 34

(arguing *only* that there was no change in position) *and* FSOC Reply at 41-43 (same).[13]  FSOC's

new argument requires a careful examination of the Final Determination:

> The Interpretive Guidance does, as MetLife notes, state that three of
> those six categories—leverage, liquidity risk and maturity
> mismatch, and existing regulatory scrutiny—"seek to assess the
> vulnerability of a nonbank financial company to financial distress."
> MetLife suggests that the Council's consideration of these three
> categories requires a determination as to the likelihood or
> probability of a nonbank financial company's material financial
> distress.  However, neither the Dodd-Frank Act nor the Interpretive
> Guidance requires or states that the Council will evaluate the
> probability or likelihood of material financial distress at a nonbank
> financial company.  The Council instead stated its intent to assess

---

[13] Arriving so late, this argument could be disregarded completely.  *See United States ex rel.
Davis v. District of Columbia*, 793 F.3d 120, 127 (D.C. Cir. 2015).  "Oral argument gives parties
a chance to flesh out their existing theories of the case, but it does not properly serve as an
opportunity for either party to present an entirely new theory of the case."  *United States v.
Liggins*, -- F. Supp. 3d --, No. 1:15-cr-53, 2016 WL 109861, at *2 (N.D. Miss. Jan. 11, 2016).
FSOC's argument was waived; the Court addresses it for the benefit of a reviewing court.

> how the company's material financial distress or activities could be transmitted to, or otherwise affect, other firms or markets, thereby causing a broader impairment of financial intermediation or of financial market functioning. Additionally, as noted in the Interpretive Guidance and illustrated in the analysis herein regarding these three categories, an assessment of the vulnerabilities at MetLife relating to the company's leverage, liquidity risk and maturity mismatch, and existing regulatory scrutiny is relevant to an assessment of whether and how material financial distress at MetLife could be transmitted to other financial firms and markets and thereby pose a threat to U.S. financial stability.

JA 370. FSOC's present argument—that *if* it changed position from the Guidance to the Final Determination, it did so with sufficient explanation—is inconsistent with the passage above. FSOC denied in the Final Determination, as it denies in its briefs and denied at oral argument, that it had changed positions at all. *See* Hr'g Tr. at 68:15-20 (FSOC: "I want to be perfectly clear about this. Our position is not that the Council changed its position. . . . Our position has been consistent all the way along.").

Because FSOC insists that it did not change its position in the Final Determination, the precedent upon which FSOC relies is unavailing. *See Fox Television*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.") (emphasis in original). FSOC has steadfastly refused (and still refuses) to acknowledge that it changed positions on whether Dodd-Frank requires FSOC to assess vulnerability to financial distress. Even if FSOC conceded the point, *Fox Television* would require more: "of course the agency must show that there are good reasons for the new policy." *Id.* There were no "good reasons" offered in the Final Determination because FSOC stated that there was no "new policy" to begin with. *See* JA 370-71.[14]

---

[14] The real import of *Fox Television* is that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." 556

FSOC was wrong then and is wrong now; the Final Determination changed policies.  Once again, the Guidance had stated clearly:

> The remaining three categories—leverage, liquidity risk and maturity mismatch, and existing regulatory scrutiny of the nonbank financial company—*seek to assess the vulnerability of a nonbank financial company to financial distress*.  Nonbank financial companies that are highly leveraged, have a high degree of liquidity risk or maturity mismatch, and are under little or no regulatory scrutiny are *more likely to be more vulnerable* to financial distress.

12 C.F.R. § 1310 App. A.II.d.1 (emphasis added); *see also id.* § A.II.d.2 (stating under the "Liquidity Risk and Maturity Mismatch" category that FSOC might consider "[a]sset-backed funding versus other funding, to determine a nonbank financial company's *susceptibility to distress* in particular credit markets") (emphasis added).[15]  The Guidance is thus inarguably different from FSOC's position in the Final Determination: that all six categories only meant "to assess the potential effects of a company's material financial distress."  JA 370.

Responding to MetLife's arguments before it, FSOC declared in the Final Determination—and maintains now—that the Guidance neither "requires [n]or states that [FSOC] will evaluate the probability or likelihood of material financial distress at a nonbank financial company."  JA 370; *see* FSOC Reply at 41-42.  Thus, FSOC attempts to distinguish between assessing vulnerability to distress and evaluating likelihood of distress.  That facile

---

U.S. at 515 (emphasis in original).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.* (emphasis in original).  In short, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 516.  The Court cannot begin that analysis here, because FSOC never compared two policies; it evidenced no "conscious change of course."  *Id.* at 515.

[15] Liquidity Risk and Maturity Mismatch was one of the categories that, according to FSOC, was meant "to assess the vulnerability of a nonbank financial company to financial distress."  12 C.F.R. § 1310 App. A.II.d.1.

distinction erodes completely when one returns to the text of the Guidance: "Nonbank financial

companies that are highly leveraged, have a high degree of liquidity risk or maturity mismatch,

and are under little or no regulatory scrutiny are *more likely* to be more vulnerable to financial

distress." 12 C.F.R. § 1310 App. A.II.d.1 (emphasis added). The term "more likely"

demonstrates that FSOC did indeed commit to "evaluat[ing] the . . . likelihood of material

financial distress" at a target company. JA 370; FSOC Reply at 41-42.[16] FSOC's arguments to

the contrary ignore its own straightforward Guidance.

   Having changed policies from the Guidance to its Final Determination, FSOC was

required to state "good reasons" for doing so. *Fox Television*, 556 U.S. at 515. At oral

argument, FSOC offered the following:

> Even if Your Honor concludes that Council did change its position,
> it clearly explained why. As the Council explained in the final
> basis[,] the vulnerability analysis that Met[Life] is requesting would
> impose an unduly high and falsely precise standard.

Hr'g Tr. at 68:22-69:1. Counsel was referring to page 27 of the Final Determination, where

FSOC said that "MetLife's interpretation of the First Determination Standard would set an

unduly high and falsely precise threshold." JA 369. Two observations are necessary. First, as

noted above, the statement does not acknowledge or explain any change in policy; to the

contrary, FSOC denied that Dodd-Frank required a probability analysis to begin with. In other

words, FSOC maintained that it was right all along. Second, the quoted remark comes from the

parties' dispute over what the statute required. *See generally* JA 369-70.[17] It was not until the

---

[16] The first passage also shows FSOC using "likely" and "vulnerable" in the same breath, belying
the argument in litigation that FSOC saw them as distinct analytical concepts. *Compare* 12
C.F.R. § 1310 App. A.II.d.1 *with* FSOC Reply at 41-42.

[17] The passage also seems to address the probability of market destabilization, not of MetLife's
incurring distress in the first place: "MetLife's interpretation of the First Determination Standard
would set an unduly high and falsely precise threshold and would thereby impede the Council's

next page of the Final Determination, JA 370, that FSOC addressed MetLife's argument that the Guidance had called for a vulnerability analysis.  There was no acknowledgment of FSOC's departure from that Guidance, and certainly no explanation for it.  *See id.*

In sum, FSOC's argument was not only waived; it fails on the merits.  Because FSOC made no "conscious change in course," *Fox Television*, 556 U.S. at 515, it has never explained why it abandoned the Guidance and refused to evaluate MetLife's vulnerability to material financial distress.  The only explanation offered was out of context and admitted no change.  The Final Determination was therefore arbitrary and capricious and must be rescinded.[18]

### 2.  ". . . could pose a threat to the financial stability of the United States."

In its Guidance, FSOC stated that a nonbank financial company could only threaten U.S. financial stability "if there would be an impairment of financial intermediation or of financial market functioning that would be sufficiently severe to inflict significant damage on the broader economy."  12 C.F.R. § 1310 App. A.II.a.  MetLife alleges that the Final Determination did not abide by that standard.  Compl. ¶ 72(d) ("Because it never projected any

---

ability appropriately to address *potential threats to U.S. financial stability*." JA 369 (emphasis added); *see also* FSOC Reply at 14 ("The Council properly declined to quantify the 'probability' or 'likelihood' *of a threat to U.S. financial stability*, explaining that such a standard would set 'an unduly high and falsely precise threshold' and 'impede the Council's ability appropriately to address potential threats to U.S. financial stability.'") (quoting JA 369) (emphasis added).

[18] The Court does not deny that FSOC has the authority to interpret the statute.  *See* FSOC Mot. at 35 ("At a minimum, the Council's interpretation of the statute is a permissible one that merits *Chevron* deference.").  However, having formally interpreted congressional intent to require a vulnerability analysis under three separate analytical categories, FSOC was not free to abandon that approach without explanation.  *Fox Television*, 556 U.S. at 515.  MetLife relied on the Guidance for years, including in multiple submissions to FSOC (JA 787-2327), before finding out that FSOC had inexplicably changed its approach.  *See Fox Television*, 556 U.S. at 515 ("[W]hen its prior policy has engendered serious reliance interests that must be taken into account," an agency "must provide a more detailed justification than what would suffice for a new policy created on a blank slate.").

estimated losses, FSOC never established a basis for a finding that MetLife's material financial

distress would 'materially impair' MetLife counterparties within the meaning of the Council's

Interpretive Guidance[.]").[19]   MetLife is correct.

Indeed, the Final Determination hardly adhered to any standard when it came to

assessing MetLife's threat to U.S. financial stability.   The Exposure channel analysis merely

summed gross potential market exposures, without regard to collateral or other mitigating

factors.   For example: "In the event that MetLife were to experience material financial distress,

the holders of its $30.6 billion in [Funding Agreement Backed Securities (FABS)], including

investment funds and large banking organizations, could sustain losses."   JA 420-21.[20]   From

that point, FSOC assumed that any such losses would affect the market in a manner that "would

be sufficiently severe to inflict significant damage on the broader economy."   12 C.F.R. § 1310

App. A.II.a.   These kinds of assumptions pervade the analysis; every possible effect of MetLife's

imminent insolvency was summarily deemed grave enough to damage the economy.   For

example, FSOC posited that "contagion can result when relatively modest direct, individual

losses cause financial institutions with widely dispersed exposures to actively manage their

balance sheets in a way that destabilizes markets."   JA 478.   But FSOC never projected *what* the

losses would be, *which* financial institutions would have to actively manage their balance sheets,

---

[19] *See also id.* ¶ 117(a) (Count VI) ("FSOC failed to make the necessary statutory determination of a threat to U.S. financial stability, or even to determine that counterparties would be "materially impaired," as required by its Interpretive Guidance.").   The Court does not accept all of the theories alleged in Count VI, but rests its decision on the basis that FSOC erred as a matter of administrative law by contradicting its own Guidance.

[20] The term "could sustain losses," with no quantification whatsoever, is a mainstay of the Exposure channel analysis.   *See* JA 421 (in two different contexts), 422, 444, 445, 446, 480.   The same goes for the term "could suffer losses."   *See* JA 418, 422, 427, 429 (in two different contexts), 451, 461 (in two different contexts), 473.

or *how* the market would destabilize as a result.  This Court cannot affirm a finding that

MetLife's distress would cause severe impairment of financial intermediation or of financial

market functioning—even on arbitrary-and-capricious review—when FSOC refused to undertake

that analysis itself.  Predictive judgment must be based on reasoned predictions; a summary of

exposures and assets is not a prediction.

It was not by accident or oversight that FSOC refused to engage.  MetLife raised

this issue in the context of FSOC's Exposure channel analysis.  *See generally* JA 474-77 (FD

§ 4.2.5, "Methodological Differences in Exposure Calculations").  MetLife challenged, among

other things, FSOC's failure to reduce exposures in the amount of $48.7 billion to account for

collateralization.  JA 475.  FSOC responded that "[w]hile collateralization of exposures serves as

a mitigant to direct losses, this analysis evaluates gross exposures, specifically gross of securities

collateral, because even fully collateralized exposures can result in negative externalities."  *Id.*

FSOC explained further that "liquidations could place downward pressure on the prices of the

assets involved, potentially spreading financial distress to other market participants that hold

assets of the same class."  *Id.*  In other words, "collateralization of an exposure reduces the

danger that financial distress will spread through the exposure transmission channel only by

increasing the danger that it will spread through the asset liquidation channel . . . ."  JA 475.

Thus, to avoid accounting for collateral and other mitigating factors in its Exposure analysis,

FSOC posited that these factors would only worsen the Asset Liquidation impact.[21]  But neither

impact is actually quantified.

---

[21] If MetLife's reliance on collateral and other mitigating measures would prevent Exposure
losses—even if at the cost of Asset-Liquidation losses—it would seem logical to conclude that
MetLife would threaten U.S. financial stability through the Asset Liquidation Channel and not
through the Exposure Channel.  Instead, while admitting that MetLife's collateral (and other
mitigating factors) shifted the danger from Exposure to Asset Liquidation, FSOC maintained

Ultimately it is clear that FSOC did not—under either the Exposure or Asset Liquidation channels—apply the standard announced in the Guidance.  Faced with MetLife's argument that it should reduce exposure estimates by an expected recovery rate, FSOC refused to do so because "total exposures to MetLife can be used to evaluate the company's interconnectedness and to compare exposures to MetLife with exposures to other financial institutions."  JA 476.  Yet FSOC stressed that "the exposure estimates are not estimates of market participants' expected losses."  *Id.*  That comment summarizes the problem: FSOC was content to evaluate interconnectedness and to refrain from calculating actual loss, *i.e.*, to stop short of projecting what could actually happen if MetLife were to suffer material financial distress.  That mode of thinking is entirely consistent with Dodd-Frank's second determination standard, under which a company's "nature, scope, size, scale, concentration, interconnectedness, or mix of [its] activities" alone "could pose a threat to the financial stability of the United States."  12 U.S.C. § 5323(a)(1).  But that was not the standard invoked by FSOC.  *See* JA 368 ("The Council has evaluated MetLife under the First Determination Standard.").  The First Determination Standard requires a causal connection between the company's material financial distress and the resultant "impairment of financial intermediation or of financial market functioning."  12 C.F.R. § 1310 App. A.II.a.  That impairment must also be "sufficiently severe" to inflict "significant damage" on the U.S. economy.  *Id.*  The Final Designation assumed such damage but never explained how it would result, in contravention of the Guidance.  That assumption reflected a change in policy, one that was neither acknowledged nor explained in the Final Determination, and which was therefore arbitrary and capricious.

without reasoned explanation that both transmission channels were implicated by the same dire predictions.

FSOC acted contrary to its Guidance, which was published for notice and comment nearly two years before MetLife was informed that it was being considered for designation.  Having announced two key interpretations, FSOC was required either to maintain them or to explain its deviation from them.  It did neither.  FSOC's reversal on either of these interpretations is enough to rescind the Final Determination as arbitrary and capricious.

### B. The Agency Ignored a Relevant Consideration: Cost

There is no doubt that FSOC refused to consider the costs of its Final Determination to MetLife, and purposefully so.  *See* JA 371 ("There is no requirement under the Dodd-Frank Act or other applicable law for the Council to conduct MetLife's proposed cost-benefit analysis with respect to determinations . . . .").  MetLife alleges in Count VII that FSOC was arbitrary and capricious in taking this position.  Compl. ¶¶ 130-34.  The costs to MetLife are "important aspect[s] of the problem" in MetLife's view, and FSOC was therefore obligated to consider them.  *Id.* ¶ 133 (quoting *State Farm*, 463 U.S. at 43).

The Complaint alleges more specifically that it was arbitrary and capricious to weaken the very company that was meant to be fortified by new regulation.  Compl. ¶ 131.  Yet that is what FSOC allegedly did, by foisting "billions of dollars" of regulatory costs on MetLife under the auspices of safeguarding it.  *Id.* ¶ 132.  To avoid suffering this loss, MetLife argues that it would have to raise prices and withdraw from certain markets, thereby reducing consumer choice and competition.  *Id.*  Neither is a rational result, according to MetLife.

FSOC rejoins that Dodd-Frank does not require a cost-benefit analysis, something that an agency need not undertake absent congressional command.  FSOC Mot. at 35-37.[22]

---

[22] FSOC compiles D.C. Circuit precedent on this point.  FSOC Mot. at 36 (citing *City of Portland v. EPA*, 507 F.3d 706, 712 (D.C. Cir. 2007); *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 377-78 (D.C. Cir. 2013); *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1039 (D.C. Cir.

FSOC points out that adjacent provisions in Dodd-Frank do require such analysis. *See, e.g.*, 12 U.S.C. § 5493(d)(7)(A)(i)(IV) (requiring "a cost-benefit analysis" of a certification program for financial counselors); *id.* § 5512(b)(2)(A)(i) (requiring CFPB to consider the "potential benefits and costs to consumers and covered [companies]" of proposed consumer protection regulations). FSOC urges the Court not to imply a requirement "to consider costs that has elsewhere, and so often, been expressly granted" by Congress. FSOC Mot. at 37 (quoting *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 467 (2001)). Should the Court disagree, FSOC argues that its interpretation of the statute merits *Chevron* deference.

Just last term, the Supreme Court decided *Michigan v. Environmental Protection Agency*, 135 S. Ct. 2699 (2015), where it entertained a challenge to certain regulations under the Clean Air Act.[23] That statute empowers EPA to regulate power plants only if "regulation is appropriate and necessary." 42 U.S.C. § 7412(n)(1)(A). Having estimated some $9.6 billion per year in regulatory costs, EPA had nonetheless refused to consider cost in its calculus. *Michigan*, 135 S. Ct. at 2705-06. The Court invalidated EPA's rule on the grounds that it misinterpreted the statue, even under the deferential rubric of *Chevron*.

The Court first observed that "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Id.* at 2706 (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). The Court then turned to the statutory text, noting that "'appropriate' is 'the classic broad and all-encompassing term that naturally and traditionally includes

---

2012)). For the reasons that follow, the proposition espoused in these cases may not survive *Michigan v. Environmental Protection Agency*, 135 S. Ct. 2699 (2015).

[23] *Michigan* was decided after the parties' cross-motions for summary judgment were filed, but both parties addressed the case in their reply briefs. *See* FSOC Reply at 45-46; MetLife Reply at 29-30.

consideration of all the relevant factors.'" *Id.* at 2707 (citing *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part)).  Although the term leaves some discretion, "an agency may not 'entirely fai[l] to consider an important aspect of the problem' when deciding whether regulation is appropriate." *Michigan*, 135 S. Ct. at 2707 (citing *State Farm*, 463 U.S. at 43).

The Court easily concluded that cost was an important aspect of the problem.  *Id.* at 2707 ("One would not say that it is even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits.").  To the contrary, cost-benefit analysis is a central part of the administrative process:

> Agencies have long treated cost as a centrally relevant factor when deciding whether to regulate. Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions. It also reflects the reality that "too much wasteful expenditure devoted to one problem may well mean considerably fewer resources available to deal effectively with other (perhaps more serious) problems." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 233 (2009) (Breyer, J., concurring in part and dissenting in part).  Against the backdrop of this established administrative practice, it is unreasonable to read an instruction to an administrative agency to determine whether "regulation is appropriate and necessary" as an invitation to ignore cost.

*Id.* at 2707-08.[24]  In the end, cost must be balanced against benefit because "[n]o regulation is 'appropriate' if it does significantly more harm than good."  *Id.* at 2707.

---

[24] The holding in *Michigan* is also consistent with longstanding practices of the current and previous Administrations.  *See* Executive Order No. 13,563 § 1(a) (Jan. 18, 2011) ("Our regulatory system . . . must take into account benefits *and costs*, both quantitative and qualitative.") (emphasis added); Executive Order No. 12,866 § 1(b)(6) (Sep. 30, 1993) ("Each agency shall assess *both the costs and the benefits* of the intended regulation and . . . propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.") (emphasis added).

"Appropriate" is also the touchstone of the catch-all factor in Dodd-Frank Section 113.  *See* 12 U.S.C. § 5323(a)(2)(K).  Notwithstanding this facial similarity between Dodd-Frank and the Clean Air Act, however, Dodd-Frank only requires FSOC to consider appropriate "risk-related" factors.  *Id.*  That distinction is addressed below.

FSOC cites *Michigan* and *Whitman* for the combined proposition that "[w]here a statute 'expressly directs [an agency] to regulate on the basis of a factor that on its face does not include cost, [it] normally should not be read as implicitly allowing the Agency to consider cost anyway.'"  FSOC Reply at 45 (quoting *Michigan*, 135 S. Ct. at 2709; *Whitman*, 531 U.S. at 467).  The quote is accurate, but FSOC omits the next two sentences from *Michigan*:

> That principle has no application here. "Appropriate and necessary" is a far more comprehensive criterion than "requisite to protect the public health"; read fairly and in context, as we have explained, the term plainly subsumes consideration of cost.

135 S. Ct. at 2709.  The same textual hook in 12 U.S.C. § 5323(a)(2)(K) ("appropriate") would thus require FSOC to consider the cost of designating a company for enhanced supervision, provided that cost is a "risk-related" factor.

FSOC points to adjacent terms in Dodd-Frank that expressly mention cost.  FSOC Mot. at 36 n.22 (citing 12 U.S.C. §§ 5493(d)(7)(A)(i)(IV), 5512(b)(2)).  But the *Michigan* Court considered and rejected the same argument.  *See* 135 S. Ct. at 2709 ("It is unreasonable to infer that, by expressly making cost relevant to other decisions, the Act implicitly makes cost irrelevant to the appropriateness of regulating power plants.").

Assuming that cost is "appropriate" to consider, the question remains whether it is "risk-related."  12 U.S.C. § 5323(a)(2)(K).  FSOC argues that the "potential cost to a designated company cannot properly be considered a 'risk-related' factor, because it is unrelated to the question posed by the statutory standard: whether the company's 'distress . . . could pose a threat

to the financial stability of the United States.'" FSOC Reply at 46 (quoting 12 U.S.C.

§ 5323(a)(1)). But that is not the only question posed by the statutory standard. According to

FSOC, several of the considerations in 12 U.S.C. § 5323(a)(2) "seek to assess the vulnerability

of a nonbank financial company to financial distress." 12 C.F.R. § 1310 App. A.II.d.1. FSOC's

*ejusdem generis* argument is thus belied by its own Guidance; the "risk" in § 5323(a)(2)(K) must

refer both to the risk of destabilizing the market and the risk of distress in the first place. FSOC

never responded to MetLife's allegation (Compl. ¶¶ 131-32) or its argument (MetLife Mot. at

61) that imposing billions of dollars in cost could actually make MetLife more vulnerable to

distress. Because FSOC refused to consider cost as part of its calculus, it is impossible to know

whether its designation "does significantly more harm than good." *Michigan*, 135 S. Ct. at 2707.

That renders the Final Determination arbitrary and capricious.

   Finally, FSOC argues that the only relevant cost is that of designation itself, not of

the ensuing prudential standards. FSOC Reply at 47. In other words, even if cost is a "risk-

related factor," it should only be considered later, when it can be discerned (under the yet-

unwritten prudential standards). *See id.* (arguing that "the designation itself [is] the only agency

action properly at issue here" and that the Court should not consider "possible future costs from

'the imposition of enhanced prudential standards'") (quoting MetLife Mot. at 61). The *Michigan*

dissent made the same argument, but it was rejected by the majority:

> This line of reasoning contradicts the foundational principle of
> administrative law that a court may uphold agency action only on
> the grounds that the agency invoked when it took the action. *SEC v.
> Chenery Corp.*, 318 U.S. 80, 87 (1943). When it deemed regulation
> of power plants appropriate, EPA said that cost was irrelevant to that
> determination—not that cost-benefit analysis would be deferred
> until later. Much less did it say (what the dissent now concludes)
> that the consideration of cost at subsequent stages will ensure that
> the costs are not disproportionate to the benefits. What it said is that
> cost is irrelevant to the decision to regulate.

135 S. Ct. at 2710.

FSOC, too, has made the decision to regulate—by designating MetLife.  That decision intentionally refused to consider the cost of regulation, a consideration that is essential to reasoned rulemaking.  *Cf. id.* at 2707 ("Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions.") (emphasis in original).  In light of *Michigan* and of Dodd-Frank's command to consider all "appropriate" risk-related factors, 12 U.S.C. § 5323(a)(2)(K), FSOC's position is at odds with the law and its designation of MetLife must be rescinded.

## IV.  CONCLUSION

MetLife advances many other arguments to challenge FSOC's designation. Having found fundamental violations of established administrative law, the Court does not reach those arguments.  For the reasons explained above, this Court finds that the Final Determination was arbitrary and capricious.

MetLife's Cross Motion for Summary Judgment [Dkt. 40] will be granted in part, as to Counts IV, VI (in part) and VII, and denied in all other respects.  FSOC's Motion to Dismiss or for Summary Judgment [Dkt. 17] will be denied, and FSOC's Final Determination will be rescinded under 12 U.S.C. § 5323(h).  The parties will be directed to meet, confer, and notify the Court whether any portions of this Opinion should remain under seal.

A memorializing Order accompanies this Opinion.


Date: March 30, 2016                              _____/s/_____
                                                  ROSEMARY M. COLLYER
                                                  United States District Judge