**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METLIFE, INC.,<br><br>       Plaintiff,<br><br>       v.<br><br>FINANCIAL STABILITY OVERSIGHT<br>COUNCIL,<br><br>       Defendant. | Civil Action No. 15-cv-45 (RMC) |

**MEMORANDUM OF POINTS AND AUTHORITIES
OF BETTER MARKETS, INC.
ADDRESSING THE QUESTIONS PRESENTED ON REMAND**

Better Markets, Inc.
Dennis M. Kelleher
D.C. Bar No. 1009682
Stephen W. Hall
D.C. Bar No. 366892
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Email: dkelleher@bettermarkets.com
Email: shall@bettermarkets.com

Dated: December 20, 2017

i

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iv

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

SUMMARY OF ARGUMENT ....................................................................................... 8

ARGUMENT ................................................................................................................. 11

I.      THE *HUBBARD* ANALYSIS IS GOVERNED BY PRINCIPLES THAT ENSURE RIGOR AND TRANSPARENCY............................................................. 11

     A.    The public's right of access serves profoundly important societal goals, and as the mechanism for enforcing that right, the *Hubbard* analysis must be rigorously applied. ............................................................................................. 11

     B.    The burden rests on those opposing transparency to produce specific and compelling reasons for confidentiality.................................................................. 12

     C.    A court must conduct an intensive analysis of the records at issue, and unseal only for compelling reasons....................................................................... 13

     D.    The Court must explain in detail its reasoning for any decision it makes to maintain the current sealing of the record or any part thereof. ............................ 15

II.     THE *HUBBARD* FACTORS SUPPORT THE UNSEALING OF THE RECORD WHEN APPLIED TO THE FACTS OF THIS CASE. ............................................... 16

     A.    The need for public access strongly favors unsealing, given the extraordinary importance of the case and the central role of the Joint Appendix........................................................................................................... 16

          1.    This case is of historic importance............................................................ 16

          2.    The Joint Appendix is central to the merits, and the parties and the Court relied heavily on it. ....................................................................... 19

     B.    The full extent of previous public access is unknown and must be addressed by MetLife and FSOC, but in any event at least some sealed information has been in the public domain........................................................................... 25

     C.    The fact of objection and the identity of those objecting favor unsealing, as no non-parties are insisting on confidentiality, FSOC is agnostic as to the

vast majority of sealed documents, and Better Markets strongly supports unsealing. ...................................................................................................... 27

    1.    There are no non-parties seeking to protect their privacy in this case. .......................................................................................................... 27

    2.    FSOC's objection is derivative. ............................................................. 28

    3.    Better Markets objects strongly to the sealing. ........................................ 30

    4.    The parties must each clearly and explicitly advance *their* interests. ....... 30

D.    The strength of any property and privacy interests favor unsealing on the current record, because the interests asserted are comparatively weak, although more information is necessary to fully assess this factor...................... 31

    1.    MetLife's confidentiality concerns are weak on their face....................... 31

    2.    Material already unredacted confirms the exaggerated nature of MetLife's claims. ................................................................................... 34

    3.    More information is needed. .................................................................... 35

E.    The possibility of prejudice to those opposing disclosure favors unsealing based on the current record, although more information is necessary to fully assess this factor................................................................................................ 38

F.    The purposes for which the documents were introduced strongly favors unsealing, as they were offered for the sole purpose of supporting the parties' arguments on the merits. ....................................................................... 40

CONCLUSION............................................................................................................ 42

CERTIFICATE OF SERVICE ..................................................................................... 43

## **TABLE OF AUTHORITIES**

**Cases**

*Avirgan v. Hull*, 118 F.R.D. 252 (D.D.C. 1987)                                    13

*Baxter Int'l, Inc. v. Abbott Labs,* 297 F. 3d 544 (7th Cir. 2002)                36

*Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013 (11th Cir. 1992)                 28

*Cipollone v. Liggett Group., Inc.*, 106 F.R.D. 573 (D.N.J. 1985)                13

*EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406 (D.C. Cir. 1996)           11, 16

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003)      13, 30

*Freidman v. Sebelius*, 672 F. Supp.2d 54 (D.D.C. 2009).                12, 13, 17, 36

*Grynberg v. BP P.L.C.*, 205 F. Supp. 3d 1 (D.D.C. 2016)                         25

*Hardaway v. District of Columbia Housing Authority*, 843 F.3d 973 (D.C. Cir. 2016)      7

*In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2 (D.D.C. 2013)           16, 21

*In re John Doe Corp.*, 675 F.2d 482 (2d Cir. 1982)                             14

*In re McCormick & Co.*, 2017 WL 2560911 (June 13, 2017)                     25, 33

*In re Nat'l Broad. Co.*, 653 F.2d 609 (D.C. Cir. 1981)                  6, 13, 15, 30

*Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370 (D.C.Cir.2013)      5, 18

*Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268 (D.C. Cir. 1991)      11, 12, 15, 16

*MetLife, Inc. v. Fin. Stability Oversight Council*, No. CV 15-0045, 2016 WL 3024015 (D.D.C.

  May 25, 2016), rev'd, 865 F.3d 661 (D.C. Cir. 2017)                        passim

*MetLife, Inc. v. Financial Stability Oversight Council,* 177 F. Supp. 3d 219 (D.D.C. 2016)1, 5, 24

*MetLife, Inc. v. Financial Stability Oversight Council,* 865 F. 3d 661 (D.C. Cir. 2017)      passim

*Nat'l Ass'n of Mfrs. v. Sec. & Exch. Comm'n*, 748 F.3d 359 (D.C. Cir. 2014)      5, 18

*Nixon v. Warner Commc'ns*, 435 U.S. 589 (1978)                                11

Order, *United States v. HSBC Bank, USA, N.A.*, No. 12-cr-763 (E.D.N.Y. Mar. 9, 2016) ECF No.

  70      34, 35, 39

*Primas v. District of Columbia*, 719 F.3d 693 (D.C. Cir. 2013)      15

*Roth v. U.S. DOJ*, 656 F. Supp. 2d 153 (D.D.C. 2009)      14

*Sec. & Exch. Comm'n  v. Am. Int'l Group,* 712 F.3d 1 (D.C. Cir. 2013)      12

*Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299 (6th Cir. 2016)      passim

*United States ex rel. Grover v. Related Cos., LP*, 4 F. Supp. 3d 21 (D.D.C.  2013)    17, 19, 25, 32

*United States v. Aetna Inc.*, 16-cv-01494, 2016 WL 8739257 (D.D.C. Dec. 4, 2016)      32

*United States v. El-Sayegh,* 131 F.3d 158 (D.C. Cir. 1997)      12

*United States v. Hubbard,* 650 F.2d 293 (D.C. Cir. 1980)      passim

*Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897 (D.C. Cir. 1996)      14

### Statutes

12 U.S.C. § 5322 (2012) ............................................................................................... 1, 22, 28, 29

12 U.S.C. § 5323 (2012) ........................................................................................................ 3, 22

5 U.S.C. § 552 (2012) ................................................................................................................. 37

### Other Authorities

Basis for the Financial Stability Oversight Council's Final Determination Regarding MetLife, Inc.

  (Dec. 18, 2014) ........................................................................................................................ 3

Hr'g Tr. 29–30, No. 16-5086 (D.C. Cir. Oct. 24, 2016) ............................................................ 23

### Rules

D.D.C. LCvR 7 ............................................................................................................... 4, 19, 20

## INTRODUCTION

In a case that will shape for years to come the ability of our government to prevent future financial crises like the one that engulfed our nation in 2008, fully two-thirds of the record has been placed under seal or redacted. These are the core documents carefully selected by the parties[1] to prove their respective claims and defenses on the merits. The public has thus been deprived of its presumptive right of access to judicial proceedings in a case that will have an enormous impact on the public interest.

Based upon that predominantly hidden record, this Court ruled in favor of MetLife, Inc. ("MetLife") in its lawsuit challenging the decision of the Financial Stability Oversight Council ("FSOC") to designate MetLife for enhanced supervision by the Federal Reserve. *See MetLife, Inc. v. Financial Stability Oversight Council,* 177 F. Supp. 3d 219 (D.D.C. 2016) ("*MetLife I*"). That decision was extraordinarily consequential for three reasons: It rescinded the designation of a massive insurance conglomerate that FSOC had judged to be a potential threat to the financial stability of the United States; it impaired FSOC's ability to exercise its designation authority when necessary in the future by imposing difficult new analytical tasks on FSOC found nowhere in the law; and it expanded the duty of all agencies to conduct burdensome and imprecise cost-benefit analyses even where no explicit Congressional directive exists. FSOC appealed to the D.C. Circuit and a decision on the merits remains pending.

Better Markets intervened for the purpose of unsealing the record, but this Court rejected that effort, primarily on the ground that Section 112 of the Dodd-Frank Act, 12 U.S.C. § 5322 (2012), protected the sealed materials from disclosure. *MetLife, Inc. v. Fin. Stability Oversight*

---

[1] References in this memorandum to the "parties" is intended to denote the original parities to the case, MetLife and FSOC, unless otherwise indicated.

*Council*, No. CV 15-0045, 2016 WL 3024015, at *5 (D.D.C. May 25, 2016), *rev'd*, 865 F.3d 661 (D.C. Cir. 2017) ("*MetLife II*"). Better Markets successfully appealed and now, pursuant to the D.C. Circuit's decision confirming that the public's presumptive right of access to judicial records applies in this case, *MetLife, Inc. v. Financial Stability Oversight Council,* 865 F.3d 661 (D.C. Cir. 2017) ("*MetLife III*"), this Court must undertake the rigorous process of determining whether MetLife and FSOC can overcome that right of access, using the six-factor test adopted by this circuit in *United States v. Hubbard,* 650 F.2d 293 (D.C. Cir. 1980).

As argued below, those six factors strongly favor the unsealing of the record, although a thorough understanding of their impact cannot be reached without significantly more detailed information about the basis for the redactions—information that the Court should require MetLife and FSOC to produce.  As further argued below, while the Court works through the *Hubbard* factors, it must adhere to the now well-established principles governing their application:  The burden rests squarely on MetLife and FSOC to try to overcome the presumption of access, if possible, with specific justifications for confidentiality as to each sealed document or redacted portion; the Court must conduct an "intensive" analysis of all of the sealed documents; and, after weighing the competing interests at stake, it must explain its decisions with specificity.  Only then will the public have full confidence in the transparency and fairness of our judicial system in this historic case.

## **BACKGROUND**

The background of this case begins with the financial crisis of 2008, which was the single most damaging economic calamity in America since the Great Depression nearly a century ago. It inflicted monumental financial losses and human suffering on the American people, as it

destroyed $20 trillion in gross domestic product,[2] threw millions of Americans into long-term unemployment, and cast over 15 million homes into foreclosure.[3]

Congress and the President responded by enacting the sweeping financial reforms set forth in the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (July 21, 2010) ("Dodd-Frank Act"). At the core of those reforms is the authority of FSOC to identify nonbank financial institutions that could pose a risk to our financial system and to designate them for prudential supervision by the Board of Governors of the Federal Reserve System ("Federal Reserve"), 12 U.S.C. § 5323 (2012), all for the purpose of protecting the public, the financial markets, and the entire U.S. economy from another crisis.

On December 18, 2014, after 17 months of extensive interaction with MetLife, an exhaustive analysis, and a finding that "financial distress at MetLife could pose a threat to U.S. financial stability," the FSOC voted 9-1 to designate MetLife for enhanced supervision by the Federal Reserve. Financial Stability Oversight Council, Basis for the Financial Stability Oversight Council's Final Determination Regarding MetLife, Inc. 2 (2014), http://www.treasury.gov/initiatives/fsoc/designations/Documents/MetLife%20Public%20Basis.pdf ("Public Basis").

On January 13, 2015, MetLife promptly challenged the designation with a lawsuit in this Court leveling a broad range of statutory and constitutional attacks against FSOC's decision. During the litigation, the parties compiled, from the much larger administrative record containing over 80,000 pages, the core collection of documents they relied upon to establish their respective

---

[2]   Better Markets, The Cost of Crisis, $20 Trillion and Counting (2015), https://www.bettermarkets.com/sites/default/files/Better%20Markets%20-%20Cost%20of%20the%20Crisis.pdf.
[3]   *Id.*

claims and defenses on the merits—the Joint Appendix required by rule 7(n) of the local rules of this Court. D.D.C. LCvR 7(n). Yet, by agreement and with FSOC essentially accommodating MetLife's position on the need for confidentiality, they managed to seal and redact[4] over two-thirds of the record— nearly 2,000 of the approximately 3,000 pages in the Joint Appendix. *MetLife III,* 865 F.3d at 664.

On November 19, 2015, Better Markets moved to intervene for the purpose of seeking to unseal the record. Accompanying Better Markets' motion was a contingent application for an order to show cause why the record should not be unsealed. *Id.* Better Markets argued that the Court should take a series of steps to maximize public access to the record while at the same time safeguarding any legitimate confidentiality concerns of the parties, including (1) ordering a re-evaluation of the redactions, by the parties; (2) requiring a privilege log from MetLife and FSOC detailing the grounds for sealing and the claimed harms that would arise from public access to the record; (3) designating a magistrate to assist the Court in closely reviewing the redactions; and (4) appointing an independent counsel to evaluate the redactions under a confidentiality agreement and argue for the public interest in unsealing the record to the maximum extent possible under *Hubbard*. Better Markets' Mem. of P. & A. in Supp. of Mot. to Intervene at 26-33, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045).

On March 30, 2016, this Court granted summary judgment to MetLife on three of the nine grounds advanced in its Complaint, and it rescinded the Final Designation of MetLife for enhanced

---

[4] References in this memorandum to the "sealed" or "redacted" materials encompass any and all of the information that has been withheld from the public record in this case, including documents that were never filed in the public record at all and documents that were filed but with portions redacted.

4

supervision by the Federal Reserve. *MetLife I,* 177 F. Supp. 3d at 221. The Court first rejected MetLife's claim that it was not eligible for designation under the Dodd-Frank Act, but then held that FSOC had acted arbitrarily and capriciously in three respects: (1) by departing from its own guidance and failing to assess MetLife's vulnerability to material financial distress; (2) by again departing from its own guidance and assuming, without establishing, that MetLife's material financial distress would lead to impairment of financial intermediation in the markets; and (3) by failing to consider the cost to MetLife of the designation, something the Court viewed as a necessary component of the "other risk-related factors" FSOC was authorized to consider if "appropriate."  These holdings have serious implications for the fate of FSOC's designation authority, encumbering the already difficult task of identifying future threats to U.S. financial stability in ways Congress did not intend, and expanding the obligation not only of FSOC but also of other agencies to perform cost-benefit analyses without a congressional requirement. *See Nat'l Ass'n of Mfrs. v. Sec. & Exch. Comm'n*, 748 F.3d 359, 369 (D.C. Cir. 2014) (stating "An agency is not required 'to measure the immeasurable,' and need not conduct a 'rigorous, quantitative economic analysis' unless the statute explicitly directs it to do so.") (quoting *Inv. Co. Inst. v. Commodity Futures Trading Comm'n*, 720 F.3d 370, 379 (D.C.Cir.2013)).

On May 25, 2017, the Court granted Better Markets' motion to intervene but declined to adopt the vetting process that Better Markets urged upon the Court, chiefly on the ground that Section 112 of the Dodd-Frank Act "supersedes the multi-factor inquiry prescribed by [the court] in *Hubbard*."  *MetLife II*, 2016 WL 3024015 at *5.

On June 22, 2017, Better Markets appealed, and on August 1, the D.C. Circuit reversed, holding that the public's strong presumptive right of access to judicial records applies with full force in this case:

> The right of public access is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of the Judicial Branch.  Although the right is not absolute, there is a strong presumption in its favor, which courts must weigh against any competing interests.  There is nothing in the language of Dodd-Frank to suggest that Congress intended to displace the long-standing balancing test that courts apply when ruling on motions to seal or unseal judicial records.

*MetLife III,* 865 F.3d at 663.  The court again drew from its declaration in *Hubbard* that "[t]his common law right . . . is fundamental to a democratic state."  *MetLife III,* 865 F.3d at 665, quoting *Hubbard,* 650 F.2d at 314-15. The D.C. Circuit accordingly ordered this Court to apply the *Hubbard* factors to determine if the parties' claimed need for confidentiality is strong enough to outweigh the presumption that all of the documents should be accessible to the public.

In its opinion, the D.C. Circuit set forth the *Hubbard* factors and described their central role in balancing the public's right of access with private interests that may be at stake:

> In *Hubbard*, we crafted a six-factor test to balance the interests presented by a given case. *See* 650 F.2d at 317-22. Specifically, when a court is presented with a motion to seal or unseal, it should weigh: "(1) the need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; (5) the possibility of prejudice to those opposing disclosure; and (6) the purposes for which the documents were introduced during the judicial proceedings." *EEOC v. Nat'l Children's Ctr., Inc.*, 98 F.3d 1406, 1409 (D.C. Cir. 1996) (citing *Hubbard*, 650 F.2d at 317-22). . . .  In subsequent cases involving motions to seal or unseal judicial records, the *Hubbard* test has consistently served as our lodestar because it ensures that we fully account for the various public and private interests at stake.

*MetLife III,* 865 F.3d at 665-66.

In addition, the court highlighted some of the core principles that must guide the process on remand: "A seal may be maintained only 'if the district court, after considering the relevant facts and circumstances of the particular case, and after weighing the interests advanced by the parties in light of the public interest and the duty of the courts, concludes that justice so requires.'" *Id.* at 665 (quoting *In re Nat'l Broad. Co.*, 653 F.2d 609, 613 (D.C. Cir. 1981). In distinguishing

this case from *Hardaway v. District of Columbia Housing Authority*, 843 F.3d 973 (D.C. Cir. 2016), the court further explained that applying *Hubbard* to the voluminous records in this case would require a more "*complex and intensive*" analysis. *MetLife III,* 865 F.3d at 676. The court added that "this case involves a diverse array of financial data, *some of which may include sensitive business information, some of which may not*." *Id.* (emphasis added). Finally, the appellate court re-affirmed that this Court "*must supply its reasoning* 'with specific reference to the particular documents or group of documents to which each reason is applicable.'" *Id.* (quoting *Hubbard*, 650 F.2d at 324).

On October 25, 2017, the parties filed a joint status report pursuant to this Court's order, setting forth recommendations for "next steps" in light of the D.C. Circuit's opinion. *See* Joint Status Report at 6-7, *Metlife I*, 177 F.Supp.3d 219 (No. 15-cv-45). Better Markets renewed its request for the vetting process it had previously sought in connection with its intervention motion. However, on November 8, 2017, the Court issued an order directing the parties "to proceed to briefing on the questions presented on remand." Order at 3, *Metlife I*, 177 F.Supp.3d 219 (No. 15-cv-45) ECF No. 120. The Court again rejected Better Markets' proposals, including an order requiring the creation of a privilege log by the parties, designation of a magistrate, and appointment of an independent counsel, finding that these steps were "not necessary for the parties to brief the Court fully on the *Hubbard* factors," particularly "in light of the burden that the privilege logs and other steps requested by Better Markets would place on the parties." *Id.* at 2-3.[5] The Court ordered

_____

[5] As shown in text *supra,* parties objecting to disclosure of judicial records have the burden of persuading a court that their interests outweigh the public's interest in full access. The costs and burdens of making this specific and concrete showing are not factors to be considered under *Hubbard*. Moreover, in this case, the parties actually expressed a willingness to prepare the privilege logs suggested by Better Markets, *but for* their pressing need to prepare for oral argument on the merits. *See* MetLife Opp. to Mot. to Intervene at 10, *Metlife I*, 177 F.Supp.3d 219 (No. 15-

Better Markets to file its Opening Brief first, followed by the parties' Responses, and Better Markets' Reply Brief. *Id.* at 3.

### SUMMARY OF ARGUMENT

The public has a powerful and presumptive right of access to judicial records. Because that right is so fundamental and so important to our democratic system of government, this Circuit has adopted a six-part test, the *Hubbard* factors, that this and all courts must apply when determining whether a litigant's desire for secrecy can overcome the public's right to view the contents of judicial records. Unless that test is applied rigorously and transparently, the appropriate balance among those competing interests cannot be struck, and the fundamental rationale for the right of access cannot be served: "maintaining the integrity and legitimacy of the Judicial Branch" and the public's confidence in our judicial system. *MetLife III,* 865 F.3d at 663.

To ensure that the application of the *Hubbard* test is a meaningful exercise and not merely a perfunctory ritual, this Court must adhere to the well-established principles governing *Hubbard*: The Court must: (1) place the burden squarely on MetLife and FSOC to show, if possible, that their interests in confidentiality outweigh the public's unquestionable right of access to judicial records; (2) require the parties to articulate, for each piece of sealed or redacted information, specific facts showing the basis for confidentiality and the prejudice or harm that is likely to follow from release of the information; (3) conduct an intensive and thorough analysis, *in camera*, and

---

cv-45) ("If Better Markets had moved to intervene at an earlier stage in the proceedings, any confidentiality review ordered at Better Markets' request could have been undertaken while the parties were compiling the joint appendix, rather than in the weeks preceding oral argument."). Oral argument is long past. Therefore, to the extent this Court encounters further resistance from the parties on grounds of burden if it seeks additional details about the redactions, it should dismiss those claims, as the Court did when ruling on Better Markets' motion to intervene. *See MetLife II,* 2016 WL 3024015, at *8 (holding that Better Markets' intervention threatened no prejudice, since "[o]ral argument has passed and the dispositive motions have been ruled upon").

weigh the parties claims against the public's interest in transparency; and (4) if it concludes that any continued sealing is appropriate, supply its reasoning with respect to the specific information at issue. *MetLife III*, 865 F.3d 661.

Based on the current record, and even without the significant amount of additional detail that the parties must supply to meet their burden, the *Hubbard* factors strongly favor the unsealing of the record in this case.

The need for public access – Here, the need for public access is at its height for two reasons. First, this case will have an enormous impact on the public interest, shaping for years to come the ability of our government to prevent future devastating financial crises, and impeding the regulatory process by expanding the duty of the FSOC and other regulatory agencies to conduct cost-benefit analyses. Second, the documents at issue—the Joint Appendix—played a central role as the basis for the Court's decision on the merits and as the carefully distilled collection of records that each party relied upon to prove their respective claims and defenses on the merits.

The extent of previous public access – At least some of the sealed or redacted documents have previously been in the public domain, and it is highly implausible that *none* of the other voluminously sealed records have ever been publicly released. In any event, under the law, this factor either supports unsealing the record or has a neutral impact on this issue.

The fact of objection and the identity of those objecting – In this case, there are no non-parties who are objecting to the unsealing of the record, which is the most important consideration when applying this factor under *Hubbard*. While MetLife certainly objects to unsealing the record, and staunchly so, FSOC is largely agnostic, seeking to preserve the seal on a relatively small number of documents it claims contain confidential information provided by other regulators.

Better Markets vigorously supports the unsealing of the record. When tallied up, these objections to sealing and unsealing favor transparency—the unsealing of the record.

<u>The strength or nature of any property and privacy interests asserted</u> – The parties' confidentiality concerns, and MetLife's in particular, are weak on their face, amounting largely to a commonplace set of broadly-labeled commercial interests that appear to fall well short of trade secrets. The information already unsealed in this case, while admittedly scant, strongly indicates that the claims for secrecy have been grossly exaggerated, as they have been in other cases.

<u>The possibility of prejudice to those opposing disclosure</u> – Just as claims about the nature of the sealed information are unconvincing, claims of the supposedly "incalculable" business harms or regulatory chilling effects that will attend public release of that information are also incredible. They certainly fall well outside the threat of a constitutional violation that most concerned the court in *Hubbard*. Even as to the potentially adverse commercial impact of unsealing the record, the glimpses we have into the once-sealed material—gained from the refiled versions of the briefs and the Joint Appendix—indicate that unsealing the record poses nowhere near the threat of harm the parties have forecasted.

<u>The purposes for which the documents were introduced</u> – This was the single most important factor in the *Hubbard* decision, and it powerfully supports unsealing of the record in this case. In *Hubbard,* the court's focus was on the peripheral role of the documents seized in Hubbard; in stark contrast here, the Joint Appendix was the evidentiary foundation of the case on the merits.

Finally, to fully and effectively apply the *Hubbard* analysis, this Court must insist on receiving more detailed information from the parties, to explain and justify their positions on virtually all of the *Hubbard* factors. As the analysis in the Argument section below makes clear

again and again, there is a paucity of detail about the sealed records that will impair the ability of this Court to comply with the letter and spirit of *Hubbard*. Moreover, as the discussion below also reveals, Better Markets is especially disadvantaged as an advocate by this informational deficit, as well as its lack of access to the records—serving as the basis for its continued request that the Court appoint independent counsel to argue for the public interest in this historic case.

## ARGUMENT

### I.   THE *HUBBARD* ANALYSIS IS GOVERNED BY PRINCIPLES THAT ENSURE RIGOR AND TRANSPARENCY.

Whenever a court is applying the *Hubbard* factors, it must adhere to a set of principles well-established in the case law that give meaning to the process and ensure that it is more than a perfunctory exercise. All of them apply with full force in this case.

#### A.   The public's right of access serves profoundly important societal goals, and as the mechanism for enforcing that right, the *Hubbard* analysis must be rigorously applied.

All members of the public have a presumptive, common law right of access to judicial records. *See Nixon v. Warner Commc'ns*, 435 U.S. 589, 597–98 (1978); *EEOC v. Nat'l Children's Ctr., Inc.* ("*Children's Ctr. I*"), 98 F.3d 1406, 1409 (D.C. Cir. 1996) (recognizing the "strong presumption in favor of public access to judicial proceedings") (citing *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991)). This right is based on the need for public oversight of our governmental institutions. The Supreme Court has framed the entitlement in terms of "the citizen's desire to keep a watchful eye on the workings of public agencies." *Warner Commc'ns*, 435 U.S. at 597–98.

The D.C. Circuit in this case succinctly articulated the interest at stake in this way: "The right of public access is a fundamental element of the rule of law, important to maintaining the integrity and legitimacy of the Judicial Branch." *MetLife III*, 865 F.3d at 663." And in *Hubbard*,

the court declared that such access "serves the important functions of ensuring the integrity of judicial proceedings in particular and of the law enforcement process more generally." *Hubbard*, 650 F.2d at 315 n. 79.  It is an indispensable element of our democratic system of government. *See Sec. & Exch. Comm'n  v. Am. Int'l Group,* 712 F.3d 1, 3 (D.C. Cir. 2013); *United States v. El-Sayegh,* 131 F.3d 158, 161 (D.C. Cir. 1997).

Properly applied, the *Hubbard* test protects and preserves these goals to the maximum possible extent while respecting genuine claims that information presumptively in the public domain should nevertheless be kept confidential.   Because the values of transparency and trust in the judiciary are so important, the right of access must be enforced through a meaningful mechanism.  Hence, the process must be rigorous, detailed, and thoroughly explained.

### B.    The burden rests on those opposing transparency to produce specific and compelling reasons for confidentiality.

The right of access is a presumptive one, and therefore, parties seeking to seal or redact such records bear the burden of showing, if possible, that their interests in confidentiality outweigh the public's right of access.   *See Freidman v. Sebelius*, 672 F. Supp.2d 54, 58 (D.D.C. 2009).  The party attempting to seal judicial records must "come forward with *specific reasons* why the record, or any part thereof, should remain under seal." *Johnson*, 951 F.2d at 1278 (emphasis added). *See also Sebelius*, 672 F. Supp.2d at 58 (holding that a party which desires a document be sealed must give specific justifications for the specific documents to be sealed).[6]

---

[6] Better Markets continues to assert that the most efficient method for the Court to use in eliciting these specific justifications would be requiring a "redaction log" from the parties, akin to a privilege log, that specifies, for each proposed redaction, which party asserts confidentiality, the justification(s) for the redaction, the harm foreseen from release of the information, and why such harms outweigh the public's right to see the entire basis on which this important case rests.

Even in the context of evaluating good cause for protective orders, which implicate far less compelling public interests, courts require the party asserting good cause to bear "the burden, for each particular document it seeks to protect, of showing that specific prejudice or harm will result if no protective order is granted." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130–31 (9th Cir. 2003); s*ee also Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987) (stating that good cause "requires a movant for a protective order to 'articulate specific facts showing "clearly defined and serious injury" resulting from the discovery sought.'") (quoting *Cipollone v. Liggett Group., Inc.*, 106 F.R.D. 573, 583 (D.N.J. 1985)). Parties must provide more than "broad references to confidential and sensitive information." *See Sebelius*, 672 F. Supp.2d at 60; *see also Avirgan*, 118 F.R.D. at 254 (finding that a proponent of a redaction "cannot rely on merely conclusory statements" but must articulate with particularity the facts underpinning the alleged injury).

In accordance with these principles, the Court here must insist upon a showing from the parties, *inter alia*, as to the basis for each redaction and the specific and concrete prejudice they fear, beyond vague and general assertions about competitive standing or a chill in relations with other regulators.

**C.**    **A court must conduct an intensive analysis of the records at issue, and unseal only for compelling reasons.**

The *Hubbard* analysis requires a court to "consider[] the relevant facts and circumstances of the particular case," and "weigh[] the interests advanced by the parties in light of the public interest and the duty of the courts." *MetLife III,* 865 F.3d at 665-66 (quoting *In re Nat'l Broad. Co.*, 653 F.2d at 613). In cases such as this, involving a large collection of documents with different characteristics and potentially different gradations of confidentiality, the court's analysis must be "*complex and intensive.*" *MetLife III,* 865 F.3d at 676. As explained by the D.C. Circuit

13

in this case, "this case involves a diverse array of financial data, *some of which may include sensitive business information, some of which may not.*" *Id.* (emphasis added). Carefully differentiating between the two is critical.

Part of this inquiry should be a thorough review of each party's proposed redactions *in camera* to determine (a) whether the justification(s) offered can meet that party's burden for demonstrating good cause and (b) whether, even for an otherwise justified redaction, the party's interest in nondisclosure—which is a function of the nature, likelihood, and magnitude of harm— outweighs the public's presumptive and compelling right of access to that information. *See Wash. Legal Found. v. U.S. Sentencing Comm'n*, 89 F.3d 897, 902 (D.C. Cir. 1996). *In camera* review of documents is a well-recognized mechanism for preserving confidentiality while enabling a court to conduct a thorough and independent judicial assessment of litigants' confidentiality claims. *See In re John Doe Corp.*, 675 F.2d 482, 490 (2d Cir. 1982) ("*In camera* submissions provide a method of judicial resolution which preserves confidentiality when justified."); *Roth v. Dept. of Just*, 656 F. Supp. 2d 153, 164 (D.D.C. 2009) (ordering modifications in the FBI's redactions in documents subject to FOIA request following *in camera* review), *aff'd,* 642 F.3d 1161, 1185 (D.C. Cir. 2011). [7] In fact, in this case, the Court issued an order for *in camera* review of the documents that were the subject of MetLife's Motion to Compel. *See* Minute Order on Nov. 6, 2015, *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45).

---

[7] Better Markets remains of the view that the Court should enlist the assistance of a magistrate judge to help with the substantial task of reviewing all of the documents under seal and applying the *Hubbard* factors. *See* Joint Status Report at 6-7, *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45), ECF No. 118.  Better Markets also continues to believe that appointment of an independent counsel, subject to a confidentiality order, is appropriate and necessary in this case, to ensure that the public's perspective is fully represented as the *Hubbard* vetting process proceeds.  *Id.*

Once a court concludes its review and analysis, a seal may be maintained only if the court, after considering the relevant facts and circumstances of the particular case, and after weighing the interests advanced by the parties in light of the public interest and the duty of the courts, "concludes that justice so requires." *MetLife III,* 865 F.3d at 666, (quoting *In re Nat'l Broad. Co.*, 653 F.2d at 613).

**D.    The Court must explain in detail its reasoning for any decision it makes to maintain the current sealing of the record or any part thereof.**

Finally, the D.C. Circuit Court has repeatedly emphasized that "it is imperative that a district court articulate its reasons for electing to seal or not seal a record." *Primas v. District of Columbia*, 719 F.3d 693 (D.C. Cir. 2013) (internal quotations omitted); *Johnson*, 951 F.2d at 1277-78 ("Should the court determine that *any* sealing remains appropriate, it should articulate the precise reasons why") (emphasis added). Indeed, the lower court's failure to articulate its reasons for unsealing the records at issue in *Hubbard* was the primary basis for the D.C. Circuit's remand in that case. *Hubbard*, 650 F.2d at 317. The D.C. Circuit reaffirmed this principle in this case, stating that this Court "*must supply its reasoning* 'with specific reference to the particular documents or group of documents to which each reason is applicable.'" *MetLife III,* 865 F.3d at 675 (quoting *Hubbard*, 650 F.2d at 317) (emphasis added). Thus, this Court must provide specific explanations for any further sealing or unsealing decisions it makes.[8]

---

[8] While the D.C. Circuit in *Hubbard* and in this case required the district court to provide its reasoning with specific reference to "particular documents or groups of documents," the reference to "groups of documents" must be interpreted narrowly to mean only subsets of documents with exactly the same characteristics as to confidential information. It would be untenable, for example, to suggest that all documents submitted to FSOC by MetLife, or the Proposed Designation of MetLife, or the Oliver Wyman report discussed text *supra* could be analyzed as groups, as that interpretation would conflict with the admonitions about specificity in the case law, offend the underlying rationale for *Hubbard*, and render the test meaningless.

## II.    THE *HUBBARD* FACTORS SUPPORT THE UNSEALING OF THE RECORD WHEN APPLIED TO THE FACTS OF THIS CASE.

Even without access to all of the information that would be necessary to fully analyze the *Hubbard* factors, it is clear that when applied to this case, they weigh heavily in favor of unsealing the Joint Appendix.

### A.    The need for public access strongly favors unsealing, given the extraordinary importance of the case and the central role of the Joint Appendix.

The first *Hubbard* factor is "the need for public access to the documents at issue." *MetLife III,* 865 F.3d at 665. *See also Hubbard,* 650 F.2d at 317. The impact of this consideration is a function of the importance of the case, and even more critically, the role the documents at issue play in relation to the merits. Here, both considerations strongly favor unsealing the Joint Appendix.

#### 1.    This case is of historic importance.

The cases applying *Hubbard* make clear that the public's right of access to court records— and the public's "need" for access—is always powerful but particularly compelling where information filed in court relates to an important public interest. *See Children's Ctr. I*, 98 F.3d at 1410 (public interest in disclosure found "compelling" where it would shed light on how public funds were being spent by a charity and on the quality of care being provided to the city's children); *Johnson*, 951 F.2d at 1277–78 (case remanded for a reconsideration of the need for any sealing of the record, in light of the "obvious public interest" in being informed about the quality of available healthcare); *In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2 (D.D.C. 2013) (documents relating to train collision are a matter of great public importance).

This Court has also recognized that the need for public access to judicial records is particularly vital where taxpayers are, in effect, the "real parties in interest." *United States ex rel.*

*Grover v. Related Cos., LP*, 4 F. Supp. 3d 21, 25, 26 (D.D.C. 2013) (taxpayers have an interest in cases brought under the False Claims Act because they involve potential monetary losses to the Government) (quoted authority omitted); *see also Sebelius*, 672 F. Supp. 2d at 58 ("[I]n cases where the government is a party[,] the appropriateness of making court files accessible is enhanced.") (internal quotations omitted). This Court has specifically acknowledged the heightened importance of unsealing records in cases tied to the financial crisis of 2008: "[T]he public has an interest in accessing allegations of fraud by officers of Fannie Mae, especially given that the allegations are so closely related to the 2008 housing crisis and subsequent taxpayer funded bailout." *Grover,* 4 F. Supp. at 29.

These principles apply with the utmost force here. This case involves a matter of undoubted consequence for the entire country: It will help determine the fate of the FSOC's designation authority—one of the most important new regulatory tools designed by Congress in the Dodd-Frank Act to help prevent or mitigate another financial crisis. The implications of this case extend far beyond the scope of any dispute between private parties, no matter the nature of their controversy or the injuries they may have suffered. The 2008 financial crisis affected all Americans, costing them over $20 trillion in lost GDP, in addition to hundreds of billions of dollars in direct taxpayer bailouts or backstops for banks, brokers, Government Sponsored Enterprises, and money market funds. If the risks potentially leading to the next crisis are not identified early and mitigated effectively through prudential regulation, the costs to the American people will be as great if not greater. And in a very literal sense, the taxpayers are the real parties in interest in

this case because the inability to prevent another financial crisis raises the prospect of more billion-dollar taxpayer bailouts of banks and nonbank institutions deemed "too big to fail." [9]

In addition, this case may ultimately impair the ability of many regulatory agencies to protect the American public from any number of threats to health and safety, by requiring those agencies to engage in the difficult, resource-intensive, imprecise, and industry-biased process of cost-benefit analysis, based on the mere appearance of general statutory language calling for a consideration of factors as "appropriate."[10]

Few cases involve such a heightened need for access to the record so that the public may understand all facets of a district court's and an appellate court's ruling, which represent potential threats to the regulatory framework that ensures the stability of our financial system, the health of our economy, and the well-being of the American people.

---

[9] The unique importance of this case is also reflected in the media coverage. The press has written about every aspect of it, including the FSOC's proposed designation of MetLife in September 2014; the actual designation on December 18, 2014; MetLife's filing of this lawsuit; and MetLife's claim that the FSOC has improperly withheld documents from the Administrative Record, and this Court appropriately recognized the "intense publicity" surrounding the Courts' opinion on the merits. *MetLife II*, 2016 WL 3024015 at *10; *see also* Leslie Scism & Victoria McGrane, *MetLife Considers Challenging 'Systemically Important' Label*, Wall St. J. (Dec. 18, 2014), *available at* http://www.wsj.com/articles/metlife-designated-as-systemically-important-by-u-s-panel-1418937044?alg=y; John Heltman, *FSOC agrees to put MetLife suit on hold for 60 days*, American Banker (May 5, 2017) *available at* https://www.americanbanker.com/news/fsoc-agrees-to-put-metlife-suit-on-hold-for-60-days; John Heltman, *MetLife Accuses FSOC of Withholding Documents*, American Banker (June 29, 2015), *available at* http://www.americanbanker.com/news/law-regulation/metlife-accuses-fsoc-of-withholding-documents-1075150-1.html; Mary Williams Walsh, *MetLife Sues Over Being Named Too Big to Fail*, N.Y. Times Dealbook Blog (Jan. 13, 2015, 7:31 AM), *available at* http://dealbook.nytimes.com/2015/01/13/metlife-to-fight-too-big-to-fail-status-in-court/.

[10] *See Nat'l Ass'n of Mfrs*, 748 F.3d at 369 (stating "An agency is not required 'to measure the immeasurable,' and need not conduct a 'rigorous, quantitative economic analysis' unless the statute explicitly directs it to do so.") (quoting *Inv. Co. Inst.*, 720 F.3d at 379).

2.     The Joint Appendix is central to the merits, and the parties and the Court relied heavily on it.

The role of the documents at issue also strongly favors unsealing the Joint Appendix under the first *Hubbard* factor.  In *Hubbard*, the court sounded a recurrent theme in support of its decision that *continued* sealing of documents was warranted, observing that the case "did not involve access to documents which have been introduced as evidence of guilt or innocence . . . . [I]t concerns only access to documents introduced by the defendants solely to show the overbreadth of a search." *Hubbard,* 650 F.2d at 317.  Central to the court's analysis in *Hubbard* was that the public already had full access to the stipulated record, "on which the defendants' criminal convictions were had." *Hubbard,* 650 F.2d at 318.

Thus, the rule of *Hubbard* on this point is clear:  When sealed documents relate only to a peripheral matter, such as a suppression hearing ancillary to a criminal prosecution, the public's need for access is comparatively weak.  However, when the documents pertain directly to the merits of a case—"guilt or innocence" in a criminal case, *Hubbard*, at 317—and further where those documents comprise the "stipulated record" on which the merits are decided, *id.,* then the public's need for access is compelling.  *See also Grover*, 4 F. Supp. 3d at 28 ("The more relevant a pleading is to the central claims of the litigation, the stronger the presumption of unsealing the pleading becomes").  Both of those elements are present here. The Joint Appendix is indeed the "stipulated record" of the parties, and its entire purpose was to support the parties' claims and defense on the merits.

Under this Court's Local Rule 7(n), the records in the Joint Appendix are, by definition, "those portions of the administrative record that are *cited or otherwise relied upon in any memorandum in support of or in opposition to any dispositive motion*." D.D.C. LCvR 7(n)(1)

(emphasis added).  Local Rule 7(n) also makes clear that "Counsel shall not burden the appendix with excess material from the administrative record that does not relate to the issues raised in the motion or opposition." D.D.C. LCvR 7(n)(1).   Thus, vastly smaller than the full administrative record, the Joint Appendix is, in the parties' own estimation, the most distilled, relevant, and important collection of documents bearing on the merits of the case—and no others.

The D.C. Circuit devoted considerable attention to the central role of the Joint Appendix as the basis for this Court's decision on the merits.  The appellate court's focus was on the question of what constitutes a "judicial record" subject to the public's right of access, but its analysis is also relevant to the public's *need* for access.  The court highlighted Local Rule 7(n), observing that "by definition, the joint appendix contains information with which the parties hope to influence the court, and upon which the court must base its decision." *MetLife III,* 865 F.3d at 667. The court went further, emphasizing not only that the Joint Appendix is the crux of the case by design and by intent, but also that this Court was *required* to review it in the course of deciding the case:

> We have no doubt that the court read the briefs, including the parts it did not cite or quote.   And it was *required* by Supreme Court precedent to examine the appendix, including the sealed portions, because the appendix contained the administrative record upon which the court's review had to be based. . . .   And the court certainly made "decisions about them" [the briefs and the appendix]: it decided that MetLife's briefs persuaded it while FSOC's did not; and it decided that FSOC's designation determination was arbitrary and capricious in light of the administrative record contained in the joint appendix.

*Id.* at 668 (emphasis added); *see also id.* at 667 ("our system of judicial review of agency action requires the court to consider the record upon which an agency made its decision"); ("the court must examine the administrative record upon which the Council based its decision").[11]

---

[11] Removing any doubt, this Court confirmed that it had "reviewed the record and all of the briefs." *MetLife II*, 2016 WL 3024015 at *11.

Finally, the D.C. Circuit made clear that while this Court's opinion on the merits was itself unsealed (although it cited to sealed material), that would not undermine the status of the sealed materials in the Joint Appendix as judicial records: "Without access to the sealed documents, it is impossible to know which parts of those materials persuaded the court and which failed to do so (and why)." *MetLife III,* 865 F.3d at 668.[12]  This point is also relevant to the *Hubbard* analysis, as it confirms that access to the sealed documents is necessary for a full understanding of this Court's decision on the merits.

The public's need for access to the record is heightened here also because so much of the Joint Appendix was redacted and yet still relied upon.  The redactions to the Joint Appendix agreed to by the parties and approved by the Court were extensive and sweeping, both quantitatively and qualitatively.  In terms of sheer amount, 1933 pages were completely withheld, representing approximately two-thirds of the entire Joint Appendix; furthermore, many documents included in the Joint Appendix were partially redacted.  *MetLife III,* 865 F.3d at 664.

The parties' briefs filed on the public docket also contained redactions.  *See* Mem. In Supp. Of Def.'s Mot. To Dismiss, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045); Reply Mem. In Supp. Of Def.'s Mot. To Dismiss, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045); Final Mem. Of P. & A. in Supp. of Pl.'s Cross Mot. for Summ. J., *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45); Reply Br. in Supp. of Pl.'s Mot. for Summ. J. at 22–23, *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45).  The parties' final-form briefs featured slightly fewer redactions than their initial filings—and none of those unredacted portions revealed genuinely confidential information.

---

[12] Even if the Joint Appendix were not so centrally relevant, it would still enjoy a presumption of public access, as it is without question a judicial record in the view of the D.C. Circuit.  *See In re Fort Totten*, 960 F. Supp. at 7 (even documents that shed incremental light warrant disclosure).

*Compare* ECF Nos. 84, 86, No. 15-cv-45, *with* ECF Nos. 22, 39, 60, 65, No. 15-cv-45; *see also* ECF No. 100, No. 15-cv-45 (D.D.C. filed Jan. 27, 2016) (filings that pare back some previous redactions); s*ee also MetLife III,* 865 F.3d at 664.

From a qualitative standpoint, in addition to the fact that the Joint Appendix as a whole is centrally relevant to the merits of this case, many of the redacted components of the Joint Appendix appear to have special significance.   For example, *all* of FSOC's proposed designation is missing from the publicly filed Joint Appendix, *see* J.A. 115-19 (TOC, referencing volumes 2 and 3 as "**REDACTED IN FULL**"), yet on its face, this document is critically important to the issues presented (and in addition, it suggests that much of what was redacted did not fall in the category of "reports, data, or information" *submitted* to FSOC, *see* 12 U.S.C. § 5322).   Perhaps even more important, the Joint Appendix redacts a report prepared by Oliver Wyman entitled "Analysis of Market Consequences of Sever Financial Distress" (Feb. 14, 2014), J.A. 117 ('**REDACTED IN FULL**").   Again, on its face, this document bears directly on the ultimate issue in this case—the impact on the financial system if MetLife were to experience "material financial distress." 12 U.S.C. § 5323(a)(1). Yet it too has been fully, not selectively, redacted.

The degree of actual reliance on the Joint Appendix in this case, including the sealed portions, further confirms the intense need for access by the public. In their briefs to the Court, the parties relied extensively on *sealed material* from the Joint Appendix. In addition to an unknown number of redacted citations, MetLife and FSOC made 90 citations to wholly redacted pages of the record, *MetLife III,* 865 F.3d at 664, and included, remarkably, quotations directly from documents that were sealed and supposedly too sensitive for the public to see even in part. MetLife's opening brief contains 74 citations to pages of the Joint Appendix that are entirely redacted, and its reply brief contains 12; FSOC's opening brief contains 1 redaction, and its reply

brief contains 3. MetLife Final Mem. Of P. & A. in Supp. of Pl.'s Cross Mot. for Summ. J., *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45), ECF No. 72-1.  About twenty percent of those citations follow the use of quotation marks, and at least some are not merely scare quotes. *See, e.g.*, MetLife Final Reply Br. in Supp. of Pl.'s Mot. for Summ. J. at 22–23, *MetLife I*, 177 F.Supp.3d 219 (No. 15-cv-45), ECF No. 86-2, ("In addition, FSOC fails to acknowledge that a central conclusion of this 24-year-old testimony was that the insurers failed simultaneously because of a common cause, *i.e.*, 'reckless practices of poorly controlled growth and risky high-yield investments'—*not*, as FSOC implies, as a result of another insurer's failure, much less contagion resulting from regulatory intervention. J.A. 1703.") (quoting from Volume 10 of the Joint Appendix, which is fully redacted, *see* J.A. 116).  The fact that unredacted portions of the parties' briefs quote fully redacted documents shows, without a doubt, that the parties' redactions to the Joint Appendix were overbroad, necessitating close scrutiny from this Court as it applies the *Hubbard* factors.

The parties also relied repeatedly on the fully redacted Oliver Wyman study, MetLife 20 times (ECF 86-1 and 2) and FSOC 29 times (Docs 84-1 and 2).  Even more astonishing, MetLife relied heavily on that study during oral argument before the merits panel of the D.C. Circuit. MetLife's counsel emphasized at length its conclusions:

> For example, Oliver Wyman's scenario 2 was AIG, which was a highly publicly observe failure that took over place over several months before the federal government intervened. That was scenario 2. Nobody thinks scenario 2 would adversely affect broader markets. Scenario 3 if you look at Joint Appendix 1187, you'll see the piece of assets sales which MetLife told FSOC was totally implausible it's far faster than had ever been seen from insurance company. So we were willing to give some margin, some benefit of the doubt to be protective. That Oliver Wyman scenario 3 analysis still showed that MetLife could meet this totally unreasonable demand on its assets and still not adversely affect the economy.

Hr'g Tr. A29–A30, No. 16-5086 (D.C. Cir. Oct. 24, 2016) (errors in original).

Even this Court cited to and discussed some of the redacted Joint Appendix in its opinion on the merits, finding those materials "interesting in several respects" on the question of whether MetLife was eligible for designation. *MetLife I*, 177 F. Supp. 3d at 231 n. 9 (citing "Memorandum from Mayer, Brown & Platt on Behalf of Metlife, Inc. to the Federal Reserve," Vol. 13, J.A. 2522 *et seq.,* "REDACTED IN FULL").   And the Court quoted multiple times from the cited memorandum—which remains under seal except for the language quoted by the Court.[13]  *See also Hubbard*, 650 F.2d at 302 ("We do not understand either the Church or the individual defendants seriously to contest the "unsealing" of documents which are part of the *stipulated record . . .* or which were *referred to by the trial judge in his opinion* on the motion to suppress") (emphasis added).

---

[13] It is clear that the "need" for access to sealed documents under *Hubbard* does not incorporate considerations about the nature of the person or organization seeking access to judicial records, or their interests or motives.  The right of access is a public one, tied to no particular intention to use the documents in any particular way.  And the procedural devices that courts have afforded for seeking such access are thoroughly agnostic as to the identity of the requester.  *See* Rule 24(b) (where a common question of law or fact exists—such as the validity of a seal—"the court may permit *anyone* to intervene")  (emphasis added); D.C. Cir. Rule 47.1(c) ("A party or *any other interested person* may move at any time to unseal any portion of the record in this court") (emphasis added).  In its opinion on Better Markets' effort to unseal the record, this Court indicated that for purposes of seeking access to documents via intervention under Rule 24(b), a would-be intervenor generally must have a "particularized interest" in the records that is "distinct from the generalized interest in judicial proceedings shared by all members of the public." *MetLife II*, 2016 WL 3024015, at *9.  While Better Markets urged the D.C. Circuit to reverse on that point, it declined to do so.  *MetLife III*, 865 F.3d at 664 n. 2.  However, even if this Court were to continue to place weight on this factor not only for purposes of intervention but also with respect to the *Hubbard* factors, Better Markets' status as a public interest organization would certainly warrant a finding that it "needs" access to the record.  As this Court held, "Better Markets meets [the particularized interest standard]." *MetLife II*, 2016 WL 3024015, at *9; Better Market's Mem. Of P. & A. In Supp. Of Mot. To Intervene at 35 n.9, 36-37, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045).

In summary, the first *Hubbard* factor favors unsealing the record in this case based on the importance of the case and the central role of the entire Joint Appendix, including its sealed portions.

**B.   The full extent of previous public access is unknown and must be addressed by MetLife and FSOC, but in any event at least some sealed information has been in the public domain.**

The second *Hubbard* factor is "the extent of previous public access to the sealed documents" or the information they contain. *MetLife III,* 865 F.3d at 665; *Hubbard,* 650 F.2d at 318. As the court explained in *Hubbard*, "[P]revious access has been considered relevant to a determination whether more liberal access should be granted to materials formerly properly accessible on a limited basis through legitimate public channels." *Hubbard,* 650 F.2d at 318. Other courts have ruled that where there has in fact been no previous public access, this factor is simply neutral rather than favoring continued secrecy. *In re McCormick & Co.*, 2017 WL 2560911 (June 13, 2017); *Grynberg v. BP P.L.C.*, 205 F. Supp. 3d 1 (D.D.C. 2016); *Grover*, 4 F. Supp. 3d at 26 (lack of prior access makes this factor neutral, "neither favoring nor disfavoring lifting the seal").

Applied in this case, this factor supports unsealing. First, it is implausible to contend that absolutely none of the information under seal has previously been made public. The parties have made sweeping redactions to large portions of the record, encompassing hundreds of pages in some instances and without parsing subsets of those documents with different characteristics, including possible prior disclosure.

Second, we know for a fact that at least some of the information that the parties placed under seal was indeed in the public domain. MetLife's final brief in support of its cross-motion for summary judgment, filed on January 27, 2016, revealed information that had been redacted in

earlier versions of the brief.  *See* Final Mem. of P. & A. in Supp. of MetLife, Inc.'s Cross-Mot. for

Summ. J., *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045) ECF 100-1.  That information was

drawn from a Wall Street Journal article (which was actually cited in the redacted material), and

it relates to one of MetLife's substantive contentions that FSOC failed adequately to consider the

impact, or cost, of designation upon MetLife:

> Indeed, General Electric Company has already announced plans to sell off most of
> the assets of General Electric Capital Corporation—one of the four nonbank
> SIFIs—in a move widely perceived as a response to the burdens of SIFI
> designation, Joann S. Lublin *et al.*, *GE Seeks Exit from Banking Business*, Wall St.
> J. (Apr. 10, 2015), http://www.wsj.com/articles/ ge-prepared-to-exit-the-bulk-of-
> ge-capital-1428662109.

*Id.* Undoubtedly, there are more examples where the parties treated already public information as

highly confidential and placed it under seal.

Because it is unclear to what extent portions of the sealed materials were ever previously

made public—beyond the example above—the Court must gather more information from MetLife

and FSOC. It is unreasonable to expect this Court to assess the extent of prior public access to the

information sealed in the Joint Appendix and the parties' briefs, as MetLife and the FSOC are in

the best position to provide that information to the Court.  Accordingly, the Court should require

MetLife to describe, for each sealed document or redacted portion thereof, whether and to what

extent the information it contains—not just the document itself—has previously been made public.

Similarly, the FSOC is in the best position to know whether the comparatively limited amount of

information it truly cares about has already been made public, and it too should be required to

provide the Court with the same evaluation.

Finally, the question of prior public access also highlights one of several unfair

disadvantages Better Markets faces in attempting to thoroughly brief the *Hubbard* factors and why

an independent advocate with full access to the entire Joint Appendix (pursuant to a non-disclosure

agreement) should be appointed.  It should be obvious that no amount of diligent research by Better

Markets could possibly equip it to fully address this factor, since Better Markets, along with the

rest of the public, cannot see what has been sealed or redacted, and therefore could never compare

that information with what is already in the public domain.

      **C.**    **The fact of objection and the identity of those objecting favor unsealing, as no non-parties are insisting on confidentiality, FSOC is agnostic as to the vast majority of sealed documents, and Better Markets strongly supports unsealing.**

The third *Hubbard* factor is "the fact that someone has objected to disclosure, and the

identity of that person." *MetLife III,* 865 F.3d at 665; *Hubbard,* 650 F.2d at 319-20.  This factor

also favors unsealing in this case, since no non-parties support the redactions—those whose

privacy interests courts most assiduously protect—while FSOC is fundamentally agnostic and

Better Markets strongly supports unsealing the record.

      1.    <u>There are no non-parties seeking to protect their privacy in this case.</u>

In applying this factor, the court in *Hubbard* focused primarily on the non-party status of

the Church that was objecting to disclosure of the seized documents: "An important element in

this case is the fact that the party from whom the documents were seized was not made a defendant

in the proceedings and now objects to public access to the fruits of the seizure." *Hubbard,* 650

F.2d at 319.  In essence, the court held that parties have a weaker claim to privacy than bystanders

to the litigation: "We think that where a third party's property and privacy rights are at issue the

need for minimizing intrusion is especially great . . . ." *Hubbard,* 650 F.2d at 319.  In this case,

by contrast with *Hubbard*, it is the parties to the original litigation that object to public disclosure,

not outsiders to the litigation.  This fact by itself strongly supports unsealing.  *See also Shane*

*Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 308 (6th Cir. 2016) (the privacy

interests of "innocent third parties" should weigh heavily in a court's balancing equation).

Far from being a passive observer caught up in a lawsuit or prosecution, MetLife was the original plaintiff in this case, as it elected to challenge FSOC's designation. Its expectations of confidentiality are therefore less compelling not only under *Hubbard,* but also under cases holding that those who turn to the courts for relief—although perfectly within their rights—must generally accept more public scrutiny of their affairs. *See Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992) ("Once a matter is brought before a court for resolution, it is no longer solely the parties' case, but also the public's case."). The Dodd-Frank Act did not upend these principles, since although it required *FOSC* to preserve the confidentiality of materials submitted to it in the designation process, it also simultaneously and expressly preserved the status quo with respect to the way *courts* handle assertions of privilege under Federal and state law, including rules of court (and the way *agencies* handle exceptions that protect confidential material under FOIA.) 12 U.S.C. § 5322(d)(5)(B) and (C); s*ee also MetLife III*, 865 F.3d 661.

2.    FSOC's objection is derivative.

With respect to the parties' stance on sealing, the court in *Hubbard* noted the important fact that the defendants *all* opposed disclosure of the documents at issue, and they did so by lodging "*strong*" objections. *Hubbard,* 650 F.2d at 319 (emphasis added). In this case, by contrast, it is only MetLife that is really battling to preserve the confidentiality of the vast majority of sealed documents in the Joint Appendix. For its part, FSOC is the proponent of a "the relatively small amount of redacted or withheld material in the Joint Appendix consisting of confidential information provided by state insurance regulators." Def.'s Resp. to M. to Intervene at 12, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045). Otherwise, FSOC has largely gone along with MetLife's insistence that it will suffer competitive injury from release of the sealed records.

As FSOC explained: "[T]he *Council has accepted the company's assertions* that portions of the parties' briefs contain 'references to the proprietary commercial or financial information of MetLife,' and that the Joint Appendix contains information the disclosure of which 'to MetLife's competitors could result in substantial competitive harm to MetLife.'" Def.'s Resp. to M. to Intervene at 13, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045) (quoting MetLife's motion to file under seal); *see also id.* at 5 (quoting MetLife's motion to file under seal); ("[T]he Council has, to a considerable extent, appropriately relied upon MetLife's assertions concerning the confidentiality of the materials withheld and agreed to maintain that confidentiality in these court proceedings . . . ."). This follows naturally. Surely, FSOC could not credibly insist that the bulk of the Joint Appendix should remain sealed because disclosure of its contents would divulge *FSOC's* valuable trade secrets or compromise *its* competitive business standing—an absurd suggestion on its face.

It is true that FSOC at one point advanced two derivative concerns about the release even of MetLife's allegedly confidential business information. First, it argued that Better Markets' request for access was inconsistent with Section 112, 12 U.S.C. § 5322, which requires FSOC to maintain the confidentiality of data, information, and reports submitted by a nonbank financial company. *MetLife II,* 2016 WL 3024015, at *5; FSOC Resp. at 2. But the D.C. Circuit dispensed with this line of argument, holding there was nothing in the Dodd-Frank Act, including Section 5322, "to suggest that Congress intended to displace the long-standing balancing test that courts apply when ruling on a motion to seal or unseal judicial records." *MetLife III,* 865 F.3d at 663.[14]

---

[14] In addition, whether advanced by FSOC or MetLife, sweeping and indiscriminate claims for secrecy predicated on Section 5322 also fail in part because that provision does not even apply to information unless it was submitted to the FSOC under the subchapter. The D.C. Circuit clearly appreciated this distinction: "Some redactions were of portions of FSOC's final determination

Second, FSOC expressed concern that applying *Hubbard* in this case "would discourage nonbank financial companies and third parties from sharing confidential information with the Council." *MetLife III,* 865 F.3d at 671-72; *MetLife II,* 2016 WL 3024015, at *6; Def.'s Resp. to M. to Intervene at 13, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045). Here too, the D.C. Circuit has laid these concerns to rest by explaining that even though *Hubbard* must be applied in this case, (1) confidential treatment of information is still possible; (2) financial companies will still have essentially the same motives to cooperate with or resist the production of information to FSOC; and (3) in any event, Dodd-Frank gives FSOC the "trump card" by empowering it to require companies to turn over information, regardless of their inclinations. *MetLife III,* 865 F.3d at 671.

3.      <u>Better Markets objects strongly to the sealing.</u>

Obviously, Better Markets, as intervenor and as a member of the public presumptively entitled to gain access to the record (as well as an advocacy organization intensely focused on the issues presented in this case), strongly opposes the continued sealing of the record.

4.      <u>The parties must each clearly and explicitly advance *their* interests.</u>

In any event, this Court should not be left to attempt to speculate about precisely which of the two original parties is objecting to disclosure of which documents and on what grounds.  The law requires parties seeking to preserve the secrecy of judicial records to come forward and advance *their* interests. *See In re Nat'l Broad. Co.*, 653 F.2d at 620; *Foltz*, 331 F.3d at 1133. The purpose is clear:  Evaluating the strength of the privacy interests at stake hinges on knowing in the first instance who is making the objection and on exactly what grounds.  Thus, both MetLife and FSOC should be required, as to each document or portion thereof under seal, to declare and

---

designating MetLife; others were of data and information that MetLife had voluntarily submitted to FSOC."  *MetLife III,* 865 F.3d at 664.

describe whether or not they object to disclosure, on what grounds, and why they believe their privacy interests override the public interest.  Only then will the Court have sufficient information to fully and adequately apply the third *Hubbard* factor, in keeping with the D.C. Circuit's mandate.

**D.**     **The strength of any property and privacy interests favor unsealing on the current record, because the interests asserted are comparatively weak, although more information is necessary to fully assess this factor.**

The fourth *Hubbard* factor is "the strength of any property and privacy interests asserted." *MetLife III,* 865 F.3d at 665; *Hubbard,* 650 F.2d at 320.  This factor also favors disclosure, as the threats to competitive business standing advanced by MetLife are both vague and relatively weak among privacy interests.  FSOC's concerns are similarly too vague to assess without a more searching analysis.  Moreover, while some of the documents that FSOC seeks to protect from disclosure are also subject to a protective order, that fact in no way obviates the need to conduct a full *Hubbard* analysis.  *See Shane Group, Inc.,* 825 F.3d at 307 (protective order restricting access to discovery materials is not reason enough to seal materials in the court record).

1.     MetLife's confidentiality concerns are weak on their face.

Dominating the application of this factor in *Hubbard* were the weighty Fourth Amendment concerns surrounding possible violations of privacy during the search and seizure of the documents at issue.  *Hubbard,* 650 F.2d at 320.  Based on those constitutional issues, the court concluded that, at least as a general proposition, the objector's interests in the sealing were "direct and substantial." *Hubbard,* 650 F.2d at 320.  In contrast here, no such constitutional concerns surround MetLife's or FSOC's asserted privacy interests.

Far from it. MetLife has advanced a commonplace set of broadly-labeled commercial interests amounting to a claim that the release of confidential business information will harm its competitive position.  Even among non-constitutional privacy concerns, fears about the release of

commercial business information generally rank below the threats from disclosure of other types of sensitive information, such as the details of "individual lives, sexual or otherwise," the "tax returns of individuals," and "attorney-client material," all of which were specifically cited in *Hubbard* as potentially "valid" privacy interests. *Hubbard,* 650 F.2d at 323-24.[15] While bona fide trade secrets *may* deserve confidential treatment, *see Hubbard,* 650 F.2d at 320; *Grover,* 4 F. Supp. 3d at 25, more generalized concerns regarding business harm do not have the same heft. *See Shane Group, Inc.*, 825 F.3d at 308 (as to financial information, only trade secrets are typically sufficient to overcome the presumption of access). *But see United States v. Aetna Inc.*, 16-cv-01494, 2016 WL 8739257 at *2 (D.D.C. Dec. 4, 2016) (recommending sealing of "competitively sensitive information" from deposition materials—a decision hinging less on the nature of the privacy interest at stake than on the fact no one objected and on the fact that it remained for the trial court to determine the ultimate use of the material at trial). The D.C. Circuit certainly recognized the gradations that exist among types of allegedly confidential business information, noting that among the "diverse array of financial data" at issue in this case, "some . . . may include sensitive business information," while "some may not." *MetLife III,* 865 F.3d at 676.

MetLife has repeatedly described its privacy interests in this case in the most general and least compelling terms, including "confidential business information," "proprietary commercial or financial information," or "proprietary commercial or financial information," the disclosure of which "could result in substantial competitive harm to MetLife." *See* Notice of Filing Mot. to File

---

[15] Although the court in *Hubbard* also alluded to business information that might harm a litigant's competitive standing, 650 F.2d at 315-16, as it canvassed the historical antecedents of the public's right of access, courts typically read *Hubbard* to mean trade secrets when it comes to business information. *See Am. Pro'l Agnecy,Inc. v. NASW Assurance Servs., Inc.*, 121 F. Supp. 3d 21, 25 (D.D.C. 2013).

Under Seal, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045), ECF No. 20; Unopposed Mot. to File, Under Seal, Unredacted Mem. in Supp. of its Cross-Mot. for Summ. J., *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045)  ECF No. 37; Mot. for Leave to File, Under Seal, Unredacted Reply Mem., *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045) ECF No. 63. Significantly, MetLife has not asserted that the information it seeks to protect is actually a trade secret. The phrase appears occasionally in MetLife's briefs but only in the context of discussing the case law or FOIA. Certainly none of the pieces of formerly redacted information that were unsealed in MetLife's final briefs or in the final Joint Appendix can reasonably be regarded as particularly sensitive, let alone trade secrets. *See* discussion *supra.*   Even when MetLife formulates these privacy interests in hyperbolic terms, if stops short of claiming they are trade secrets.  This excerpt from MetLife's briefing illustrates the point:

> The materials that MetLife submitted to FSOC during the designation process, as well as the other nonpublic materials submitted to the agency, are *highly sensitive* and cover virtually every aspect of MetLife's operations, business model, and balance sheet. If that information were disclosed publicly, MetLife's competitors would be free to exploit their knowledge of MetLife's *most closely guarded proprietary information* to *upend the competitive playing field* and enhance their strategic position. The long-term financial and reputational harm to MetLife would be *incalculable.*

Metlife Memo in Opp'n to BM Mot. to Intervene at 20-21, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045) (emphasis added).  Such general, self-serving, and unreliable claims do not satisfy *Hubbard*, and turning up the volume on an otherwise inadequate justification will not cure those defects. *See In re McCormick*, 2017 WL 2560911 at *2 (claimed harm to competitive standing based on reputational injury, as opposed to "trade secrets" or "price information," found inadequate to support redaction).

2.      Material already unredacted confirms the exaggerated nature of MetLife's claims.

There are yet other reasons to doubt the gravitas of the privacy interests asserted by the parties.  At one point, the parties refiled the Joint Appendix, exposing information previously sealed. J.A. at 557-758, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045) ECF No. 100-3. The revelations were puzzling, as the material belatedly made public was not intensely private or confidential and it certainly did not rise to the level of a trade secret.  For example, the following testimony from a November 4, 2013 hearing before FSOC was unredacted:

> So, if the capital rules are extremely harsh from our perspective and makes us uncompetitive in certain lines of business, then we will have to exit those businesses in some form. And that is what is being studied: how would you do that? How would you exit those businesses?

J.A. 2477, *MetLife I*, 177 F. Supp. 3d 219 (No. 15-CV-0045).  This and similar unredacted material offers nothing remotely sensitive, as it merely conveys the concern that MetLife might have to adapt to new capital requirements upon designation—something that was obvious and in any case already familiar to those who watched GE Capital downsize as a result of its designation.

Other cases bolster the point, illustrating that untested assertions of confidentiality may well prove unfounded when independently evaluated. *See, e.g.*, Order at 3, *United States v. HSBC Bank, USA, N.A.*, No. 12-cr-763 (E.D.N.Y. Mar. 9, 2016) ECF No. 70. In *United States v. HSBC*, a monitor was required to file reports regarding the bank's compliance with a deferred prosecution agreement relating to illegal money laundering by drug cartels and money transfers in violation of U.S. sanctions.   HSBC insisted that the reports were too sensitive for public consumption and should remain entirely sealed.   The court disagreed as to *most* of the supposedly sensitive information:

> In particular, HSBC sought to redact a large swath of the Report and Appendix under the umbrella of "commercially sensitive or proprietary HSBC information."

Although I have redacted information that is specific and detailed enough to fit into that category, *most* of HSBC's proposed redactions cannot fairly be characterized in that way. For example, HSBC proposed to redact the following as commercially sensitive or proprietary:

> Developing a strong, deeply ingrained compliance culture is no simple task, and poses particular challenges to HSBC Group in light of the depth of the cultural deficiencies that fostered the intentional criminal conduct that led to the DPA and the size and scope of the Bank's operations. Although the Bank has taken many positive steps during the past year, the fact remains that it has moved too slowly and made too little progress toward instilling the type of culture it will need in order to build an effective AML and sanctions compliance program—and to maintain that program when it is no longer subject to the Monitor's supervision." Monitor's Report at 5.

This is not sensitive or proprietary business information.  (emphasis added).

Order at 3, *HSBC*, No. 12-cr-763 (E.D.N.Y. Mar. 9, 2016) ECF No. 70. So far at least, this case presents no convincing evidence that the privacy interests advanced by the parties rise to the level of those necessary to overcome the presumption that the public should have access to all judicial records. On the current record, then, this Court could reasonably conclude that MetLife's asserted privacy interests fail the *Hubbard* test.

### 3.    More information is needed.

Without more information, it is impossible to comprehensively apply the fourth *Hubbard* factor and determine the actual strength of those vaguely defined privacy concerns.  As to each document, does the sealed information of concern to MetLife actually meet the definition of a "trade secret"?  Is it really "proprietary"?  Is it truly a vitally sensitive business strategy, or is it more akin to a run-of-the-mill fragment of commercial information that is not particularly sensitive?  And as to FSOC, what exactly is the nature of the information received from other regulators that it seeks to protect?  Is it truly sensitive information about MetLife? Is it instead about allegedly sensitive regulatory oversight practices?  Perhaps it is entirely unremarkable

35

information but FSOC simply wishes to honor its promise to those regulators—a promise that should yield once litigation is underway and the public's right of access to judicial records comes into play.

In all likelihood, much if not most of the sealed information will be self-evidently *not* sensitive or confidential, in least within the meaning of *Hubbard* and its progeny. But the process must be pursued and answers to all of these questions must be gathered as the Court undertakes the important task of balancing the public's presumptive right of access to judicial records against the privacy concerns of individuals, corporations, or agencies participating in litigation under *Hubbard*. *See Sebelius*, 672 F. Supp. at 54 (court rejected attempt to preserve a blanket seal based on broad references to "confidential and sensitive information," without identification of specific documents warranting protection); *Shane Group, Inc.,* 825 F.3d at 305-06 (quoting *Baxter Int'l, Inc. v. Abbott Labs,* 297 F. 3d 544, 548 (7th Cir. 2002)) (holding that the proponent of sealing must "analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations").

It should be stressed that Section 5322 of the Dodd-Frank Act does not negate the importance of closely evaluating the claimed privacy interest under the fourth *Hubbard* factor. As the D.C. Circuit held in this case, while that provision limits the ability of *FSOC* to divulge information it receives from a nonbank financial institution in the designation process, it in no way supersedes the common law presumptive right of public access to judicial records, including the briefs and the Joint Appendix. *MetLife III,* 865 F.3d at 675. More specifically, in the words of the court, "[t]here is nothing in the language of Dodd-Frank to suggest that Congress intended to displace the long-standing balancing test that courts apply when ruling on motions to seal or unseal judicial records." *Id.* 663. The circuit court did find that Section 5322 (d)(5)(A) evinces a

"congressional judgment" about the importance of maintaining the confidentiality of nonpublic information *submitted to* FSOC, and which should "weigh heavily" in the balancing test (*provided* of course that the information was actually submitted to FSOC and not otherwise sourced). Yet the court also made clear that on remand, this Court must nevertheless "apply the *Hubbard* analysis"—encompassing all six factors, *MetLife III,* 865 F.3d at 665—and it must "supply its reasoning 'with specific reference to the particular documents or group of documents to which each reason is applicable.'" *Id.* at 675, citing *Hubbard,* 650 F.2d at 324. The court's point about the importance of protecting "nonpublic information" submitted to FSOC in accordance with Section 5322 thus remains one general consideration among the six more concrete factors that must be analyzed and explained with specificity under *Hubbard*.[16]

Finally, the fourth *Hubbard* factor once again powerfully demonstrates the insuperable obstacle Better Markets faces in attempting to fully brief the *Hubbard* factors. Without any access to the sealed documents, it is impossible for Better Markets to thoroughly judge the real strength of the privacy interests asserted.

---

[16] The weight of Section 5322(d)(5)(A) is further tempered by the adjacent provisions in Sections 5322(d)(5)(B) and (C). The first preserves the status quo with respect to any privileges under Federal law, state law, or court rules applicable to nonpublic information submitted to FSOC; the statute neither enlarges nor diminishes those privileges. The second provision preserves the status quo with respect to the exceptions under the Freedom of Information Act, 5 U.S.C. § 552 (2012). The D.C. Circuit highlighted those points in the context of its analysis showing that Section 5322 of Dodd-Frank did not categorically exempt material submitted to FSOC from disclosure by a court. *MetLife III,* 865 F.3d at 670.

**E.**     **The possibility of prejudice to those opposing disclosure favors unsealing based on the current record, although more information isnecessary to fully assess this factor.**

The fifth *Hubbard* factor is "the possibility of prejudice to those opposing disclosure." *MetLife III,* 865 F.3d at 665; *Hubbard,* 650 F.2d at 320-21.  This factor also hinges very largely on exactly what lies beneath the redactions.  As the court in *Hubbard* explained, a true assessment of the likelihood of prejudice would depend "on a number of factors, including most importantly, the nature of the materials disclosed."  *Hubbard,* 650 F.2d at 320-21.  And as the court further explained, understanding the nature of any of the sealed materials *in this case*, and assessing the threat of prejudice from their disclosure, first requires a thorough examination of the documents at issue, to the point of "*complete familiarity*."  *Hubbard,* 650 F.2d at 321 (emphasis added).

To the extent that assessing the real threat of prejudice from unsealing the Joint Appendix is possible without gathering more details about the precise nature of the redacted material and any *concrete* harms likely to follow from its release, this *Hubbard* factor clearly leans towards disclosure, for two reasons.  First, the court in *Hubbard* was swayed by the sheer gravity of the possible prejudice arising from disclosure:  It explained that the unsealing of the seized documents might impair some of the defendants' right to a fair trial, *Hubbard,* 650 F.2d at 321, another concern of constitutional dimension that is absent here.

Second, the analysis set forth above, suggesting that the materials under seal do not appear to be genuinely confidential, also supports the inference that the prejudice from their release is unlikely to be genuinely prejudicial.

Finally, the history of litigation—commercial litigation in particular—is littered with parties' conclusory and exaggerated claims that dire economic and competitive harm will befall them if supposedly sensitive, proprietary business information is disclosed to the public.

Relatively few credible examples of those scenarios coming to fruition actually exist.  The HSBC case described above is also relevant here: The supposedly confidential information at issue there was not only unremarkable on its face, *see* Order at 3, *HSBC*, No. 12-cr-763 (E.D.N.Y. Mar. 9, 2016) ECF No. 70., but its release posed no real threat of harm.  To our knowledge, HSBC has suffered no ill-effects from the court's disclosure in that instance.

Similar hyperbole regarding supposedly "incalculable" harm is apparent in this case.  *See* discussion *supra.*  However, the parties' refiled briefs and refiled Joint Appendix, containing slightly fewer redactions, provide a glimpse into the fundamentally benign nature of at least some of the information previously sealed and the minimal harm that could be expected from its release.  The point is that such claims must be put to the test—"trust by verify" as Better Markets has previously argued.  It is incumbent on this Court to ensure that the claims of secrecy and prejudice are fully vetted and then balanced against the public's presumptive right of access—and to do that, this Court must achieve "complete familiarity" with the documents.  *Hubbard,* 650 F.2d at 321.

Furthermore, as with the fourth *Hubbard* factor (the nature of the privacy interest at stake), gauging the threat of prejudice accurately will require vastly more information from MetLife and FSOC.  Even if the Court were to become intimately familiar with the contents of the sealed documents, the threat of prejudice from their disclosure may not be self-evident, except in the most obvious cases.  If in the review process, the Court were to come across something akin to a secret formula, a true trade secret, the threat of prejudice might be readily apparent.  But even then, would this Court or any outside reviewer necessarily know it was looking at such valuable information in the context of the insurance world?  And with respect to the vast bulk of the sealed records, which are not so highly prized, it will be even more doubtful that the information is sensitive and capable of truly undermining MetLife's competitive standing. *See Shane Group, Inc.,* 825 F.3d at

307 (proponent of secrecy bears the burden of showing disclosure will cause clearly defined and serious injury).

The same basic considerations apply to any claims of possible prejudice advanced by FSOC: Is the regulatory information it seeks to protect, in light of its specific content, truly sensitive, and if so, how would its release actually harm FSOC's interests?  As discussed above, its insistence on secrecy so far rests on notions that the D.C. Circuit has largely discounted.  Thus, only by requiring MetLife and FSOC to explain the exact nature of each sealed piece of information and how and why its release would be injurious—to the point of outweighing the public's right of access—will the court be equipped to resolve the tension between MetLife's and FSOC's insistence on secrecy and Better Markets' presumptive right to access to the record.

Finally, this fifth *Hubbard* again puts Better Markets at a profound disadvantage when it comes to arguing its weight, since Better Markets has **no** access to the sealed documents, let alone "complete familiarity" with them.

**F.      The purposes for which the documents were introduced strongly favors unsealing, as they were offered for the sole purpose of supporting the parties' arguments on the merits.**

The sixth *Hubbard* factor requires the Court to consider "the purposes for which the documents were introduced during the judicial proceeding."  *MetLife III,* 865 F.3d at 665; *Hubbard,* 650 F.2d at 321. The court in *Hubbard* found this to be "the single most important element" in its analysis, and as applied in this case, it weighs decidedly in favor of unsealing the Joint Appendix: It was assembled, filed with the Court, and relied upon as the complete record basis for the respective parties' claims and defenses on the merits.  There could be no more compelling example of documentary "purposes" that satisfy the sixth *Hubbard* factor.

In support of its ruling that continued sealing of documents was appropriate, the court in *Hubbard* explained that the seized documents "were introduced by the defendants for the sole purpose of demonstrating the unlawfulness of the search and seizure," not to address the merits of the pending criminal charges.   *Hubbard,* 650 F.2d at 321.  The court elaborated by emphasizing that the documents "were not relevant to the crimes charged" nor were they "used in the subsequent 'trial.'"   *Id.*   The court's underlying concern was protecting the Fourth Amendment right to privacy in the unique context of a search and seizure: "It would be ironic indeed if one who contests the lawfulness of a search and seizure were always required to acquiesce in a substantial invasion of those interests simply to protect them."  *Id.*

This analysis from *Hubbard*, applied to the facts of this case, weighs strongly in favor of unsealing the Joint Appendix.  In stark contrast with *Hubbard*, the sealed documents at issue here, from the Joint Appendix, were filed with the Court precisely for the purpose of proving the merits of MetLife's and FSOC's respective claims and defenses, and not for some ancillary purpose such as a suppression hearing.  As discussed in detail above with respect to the first *Hubbard* factor, the Joint Appendix was by definition, in actual fact, and as required by law, the foundation for this Court's decision on the merits.

Fortifying the court's analysis in *Hubbard* were two other considerations that also favor unsealing when applied here.  First, the court in *Hubbard* noted that the risk of an unwarranted breach of privacy from the seizure was "especially grave" in part because "the protected position occupied by *personal papers* has traditionally been closely guarded."  *Hubbard,* 650 F.2d at 322 (emphasis added).  Here, in contrast, the documents at issue are essentially business and regulatory records, items that historically have enjoyed less privacy protection than other types of sensitive information.  Second, the court in *Hubbard* observed that, while not "critical" to the decision, it

was "worth emphasizing" that the lawfulness of the search and seizure was still the subject of a pending appeal, and therefore the ultimate disposition of the documents and their public status *vel non* could fundamentally change. *Hubbard,* 650 F.2d at 322. Here, the situation is just the opposite. The question of whether the Joint Appendix is a judicial record subject to the presumptive right of public access, notwithstanding Section 5322, has already been decisively settled in the affirmative by the D.C. Circuit. In short, the appellate court has determined in effect that the Joint Appendix should be unsealed to the maximum possible extent, subject only to the application of the *Hubbard* factors. *MetLife III,* 865 F.3d at 667-69.

## **CONCLUSION**

For all of the foregoing reasons, the *Hubbard* factors weigh heavily in favor of unsealing the record in this case, including the briefs and the Joint Appendix. However, only with the production of more detailed information from MetLife and FSOC, coupled with a searching review of each redacted document or portions therof, will this Court be able to fully and finally assess the *Hubbard* factors.

Dated: December 20, 2017                              Respectfully Submitted,

/s/ Dennis M. Kelleher
Dennis M. Kelleher
D.C. Bar No. 1009682
Stephen W. Hall
D.C. Bar No. 366892
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Email: dkelleher@bettermarkets.com
Email: shall@bettermarkets.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 20th, 2017, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the CM/ECF system. In accordance with Local Rule 5.4(d), electronically filing a document operates to effect service of the document on all counsel.

/s/ Stephen W. Hall
Stephen W. Hall
D.C. Bar 366892
Better Markets, Inc.
1825 K Street, N.W., Suite 1080
Washington, D.C. 20006
Tel: 202-618-6464
Email: shall@betttermarkets.com